CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
Sean A. O'Neal
Louis A. Lipner

*Proposed Counsel for the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------X
                                     :

| | | |
|---|---|---|
| *In re* | : | Chapter 11 |
| | : | |
| American Roads LLC, *et al.*,[1] | : | Case No. 13-_____ (___) |
| | : | |
| Debtors. | : | Joint Administration Requested |
| | : | |
| | : | |

-----------------------------------------------------------X

**DECLARATION OF NEAL BELITSKY IN SUPPORT OF FIRST DAY**
**MOTIONS AND APPLICATIONS IN COMPLIANCE WITH LOCAL RULE 1007-2**

I, Neal Belitsky, hereby declare under penalty of perjury:

1.      I am the Chief Executive Officer of American Roads LLC ("American Roads"), a

Delaware limited liability company, and have served in such capacity since July 2007.  I am

generally familiar with the day-to-day operations and affairs, books and records of American

Roads and its affiliates, including those affiliates that have, together with American Roads

(collectively, the "Debtors") filed voluntary petitions for relief under chapter 11 of title 11 of the

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are: Alabama Black Warrior Parkway, LLC [2479], Alabama Emerald Mountain Expressway Bridge, LLC [2480], Alabama Toll Operations, LLC [2483], American Roads Holding LLC [3194], American Roads LLC [3196], American Roads Technologies, Inc. [2016], Central Alabama River Parkway, LLC [2478], Detroit Windsor Tunnel LLC [1794], DWT, Inc. [7182] and The Baldwin County Bridge Company L.L.C. [8933]. For the purpose of these cases, the service address for the Debtors is: 100 East Jefferson Avenue, Detroit, Michigan 48226.

United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the

Southern District of New York (the "Chapter 11 Cases," and the date and time of such filing, the

"Petition Date").

2.    In addition to filing the aforementioned voluntary petitions for relief, the Debtors

also have filed a motion seeking joint administration of the Chapter 11 Cases under Rule 1015(b)

of the Federal Rules of Bankruptcy Procedure and consolidation for procedural purposes only.

The Debtors are operating their business as debtors in possession under sections 1107(a) and

1108 of the Bankruptcy Code.  No trustee, examiner or official committee of unsecured creditors

has been appointed in the Chapter 11 Cases.

3.    The Debtors have requested a variety of relief in "first day" motions and

applications (collectively, the "First Day Motions") filed concurrently herewith to minimize the

adverse effects of the commencement of these Chapter 11 Cases on the Debtors' business.  The

First Day Motions seek relief intended to allow the Debtors to perform and meet those

obligations necessary to fulfill their duties as debtors in possession.  I am familiar with the

contents of each of the First Day Motions, Professional Motions (as defined below) and

Assumption Motions (as defined below), including the exhibits thereto, and believe that the relief

sought in each First Day Motion, Professional Motion and Assumption Motion:  (a) is necessary

to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity or

value; (b) constitutes a critical element in achieving the successful reorganization of the Debtors;

and (c) best serves the Debtors' estates and creditors' interests.

4.    I submit this declaration in support of the First Day Motions (the "Declaration")

pursuant to Rule 1007-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court

for the Southern District of New York (the "Local Rules") and 28 U.S.C. § 1746.  Except as

otherwise indicated herein, all facts set forth in this Declaration are based on my personal

knowledge, information supplied to me by other members of the Debtors' management and the

Debtors' professionals, were learned from my review of relevant documents or are my opinion

based upon my experience and knowledge of the Debtors' operations and financial condition.  I

am over the age of 18 and am authorized to submit this Declaration on behalf of the Debtors.  If

called upon to testify, I could and would testify competently to the facts set forth herein.

5.      Part I of this Declaration describes the Debtors' corporate background and

business operations.  Part II describes the Debtors' prepetition capital structure and indebtedness.

Part III describes the circumstances leading to the commencement of the Chapter 11 Cases.  Part

IV sets forth the relevant facts in support of each of the First Day Motions and certain other

motions to be filed on or shortly after the Petition Date.  Part V contains statements and

schedules providing additional information about the Debtors, as required by Local Rule 1007-

2(a) and (b).

## PART I

## DEBTORS' CORPORATE BACKGROUND AND BUSINESS OPERATIONS

**A.      Corporate History and Organizational Structure**

6.      American Roads was formed in December 2005 as a limited liability company

organized under the laws of Delaware in connection with the acquisition and financing of the

Toll Facilities (as defined below).  American Roads is a wholly owned subsidiary of American

Roads Holding LLC (f/k/a Alinda Roads Holding LLC, "HoldCo"), and through its subsidiaries

owns and operates, or leases and operates, each of the Toll Facilities.  In October 2006, affiliates

of Alinda Capital Partners LLC ("ACP") acquired all of the outstanding equity interests of

Holdco.

7.      A diagram illustrating the current corporate structure of the Debtors is attached hereto as Exhibit A.

**B.      Business Overview**

8.      American Roads is a privately held company that, through its subsidiaries, owns or leases a portfolio of toll road facilities in regional markets.  American Roads indirectly owns and operates four facilities in Alabama – the Foley Beach Express, the Emerald Mountain Expressway, the Alabama River Parkway and the Black Warrior Parkway – and leases and operates an international border crossing tunnel between Detroit, Michigan and Windsor, Ontario (collectively, the "Toll Facilities").  Between the predecessor companies that have managed the DWT (as defined below) and the purchase of the Alabama Toll Facilities in 2006, American Roads has over 83 years of experience as an international transportation operator, and six years of experience as a multi-state transportation owner, operator and technology company. American Roads focuses on providing its customers with safe and efficient transport routes, developing innovative electronic toll payment programs to enhance customer convenience and time and cost savings, and maintaining security at the U.S. – Canada border.

i.      **History of the Private Toll Road Business**

9.      Over the past 40 years, governments in various countries, including Australia, the United Kingdom, and the United States, faced with fiscal pressures and growing needs for new road infrastructure have sought to have the private sector acquire existing toll roads and develop new toll roads.  Such privatization results in the transfer of several risks from government to the private sector, including development risk, the risk of construction time and cost overruns, actual traffic usage and future maintenance costs and risks arising from regulations and taxes.  In exchange, the private firm receives the right to own or a long-term concession to operate, maintain, toll and in some cases construct the toll facility.

4

ii.    **Debtors' Assets**

10.    American Roads' principal assets are its bank accounts in Manhattan holding approximately $49 million in cash and cash equivalents that have been pledged to the Collateral Agent under the Financing Documents.  All or substantially all of these accounts were established in 2006 as part of the Debtors' refinancing.  In addition, American Roads directly or indirectly holds substantially all of the interests in the Debtors (other than American Roads Technologies, Inc. and Holdco), each of which are insolvent as of the date hereof.

11.    American Roads' indirect and direct subsidiaries include Debtors – Alabama Toll Operations, LLC ("ATO"), The Baldwin County Bridge Company, L.L.C. ("BCBC"), Alabama Emerald Mountain Expressway Bridge, LLC ("EMX LLC"), Central Alabama River Parkway, LLC ("CARP LLC"), Alabama Black Warrior Parkway, LLC ("BWP LLC") and Detroit Windsor Tunnel LLC ("DWT LLC") (collectively, the "Operating Subs") – that have the right to use, operate and toll the Toll Facilities in accordance with the terms of the licenses and agreements governing them.  A description of each of the Toll Facilities is set forth below.

a.    **The Foley Beach Express Bridge.**

12.    The Foley Beach Express (the "FBX") is a 13.5 mile expressway in Baldwin County, Alabama that spans an intra-coastal waterway known as Portage Creek, linking the City of Foley on the mainland of Alabama, to the tourist and resort communities of Orange Beach and Gulf Shores, Alabama.  The Baldwin County Commission in Baldwin County, Alabama (the "Baldwin County Commission") granted a license to BCBC to construct, maintain and operate a toll bridge over Portage Creek (the "FBX Bridge") (the "Baldwin County License").  The FBX and the FBX Bridge opened to traffic in 2000 to save commuters travel time over two alternative toll-free crossings.  The FBX Bridge and its immediate approaches comprise the toll facility that American Roads owns through its subsidiary BCBC.

5

13.    The FBX Bridge employs one toll plaza, comprised of four collection booths and six toll lanes, that collects tolls for both north-bound and south-bound traffic.  Tolls are charged in each direction of the FBX Bridge and no tolls are charged at any other point on the FBX. Approximately 6,300 vehicles traveled the FBX Bridge daily in 2012.  Over the six-year period from 2007 through 2012, traffic on the FBX Bridge decreased at a compound annual growth rate of 5.1% per annum, the average toll rate at the FBX Bridge increased at a compound annual growth rate of 4.2% per annum, total revenue from the FBX Bridge decreased at a compound annual growth rate of 1.2% per annum and EBITDA from the FBX Bridge increased at a compound annual growth rate of 2.1% per annum.

14.    The FBX Bridge is operated and managed pursuant to several agreements with local authorities in addition to the Baldwin County License, including:  (i) the Baldwin County License; (ii) the Bridge Option, Easement and Annexation Agreement by and between BCBC and the City of Orange Beach, Alabama (the "City of Orange Beach") dated March 29, 2004 (the "Orange Beach Agreement"); and (iii) the Tri-Party Agreement by and between BCBC, the City of Foley, Alabama (the "City of Foley") and Baldwin County, Alabama ("Baldwin County") dated June 1, 1999, including, for the avoidance of doubt, the Access Management Plan ("AMP") (the "Tri-Party Agreement").

15.    On August 7, 1996, the Baldwin County Commission granted a license, with no expiration date, to BCBC to construct, maintain and operate the FBX Bridge.  Additionally, the Baldwin County License authorized BCBC to establish, fix and collect the toll rates to be charged at the FBX Bridge and granted BCBC in its sole discretion the right to expand the FBX Bridge without further approval or consent from the Baldwin County Commission.  Under the terms of the Baldwin County License, all rights and privileges associated with the Baldwin

County License are assignable by BCBC upon the express written consent of the Baldwin

County Commission.

16.    On March 29, 2004, BCBC and the City of Orange Beach entered into the Orange

Beach Agreement to, among other things:  (i) bind the City of Orange Beach to certain access

restrictions and conditions for use of the FBX Bridge and related roadways, including the AMP;

(ii) provide for a series of payments between the City of Orange Beach and BCBC; and

(iii) grant the City of Orange Beach certain rights and options with respect to the FBX Bridge

and nearby property.  The Orange Beach Agreement enforces BCBC's right to maintain and

operate the FBX Bridge in its sole discretion and control.  The term of the Orange Beach

Agreement expires on December 31, 2033.

17.    Under the Orange Beach Agreement, the City of Orange Beach was required to

pay BCBC an annual payment of $1,200,000 for each of the first 10 years of the agreement,

ending on January 1, 2013, in return for monthly payments by BCBC based on traffic volume.

In addition, the Orange Beach Agreement grants the City of Orange Beach certain rights such as

an option to purchase certain related real property as well as an option to purchase the FBX

Bridge at any time between January 1, 2033 and December 31, 2033.

18.    On June 1, 1999, Baldwin County, the City of Foley and BCBC entered into the

Tri-Party Agreement to define each party's rights and obligations with respect to the

construction, operation and maintenance of the FBX and the FBX Bridge.  Pursuant to the Tri-

Party Agreement, BCBC agreed to finance and construct the FBX Bridge as well as certain

segments of the FBX, the northbound portion of which was dedicated to Baldwin County.

Additionally, the terms of the Tri-Party Agreement provide that BCBC has the perpetual right to

collect tolls and determine toll fares for the FBX Bridge and is responsible for maintenance of

only 0.5 miles of the FBX roadway adjacent to the FBX Bridge.  Baldwin County and the City of

Foley are responsible for the balance of maintenance of the FBX.

19.    The term of the Tri-Party Agreement is 99 years.  Baldwin County and the City of

Foley are permitted to assign their rights and duties under the Tri-Party Agreement to the State of

Alabama, and BCBC may assign its rights and duties subject to certain limitations.  The Tri-

Party Agreement may only be amended by written consent of the party against whom

enforcement is sought.

20.    By the terms of the Tri-Party Agreement, BCBC, the City of Foley and Baldwin

County must enforce and comply with the AMP, the intent of which is to ensure free flow of

traffic along the FBX.  The principal elements of the AMP (i) set restrictions on the number and

spacing of intermediate at-grade intersections, (ii) limit the right-in/right-out access only at

certain points (including providing that there are no median crossovers on the FBX), (iii) require

adequate acceleration/deceleration lanes, and (iv) require that any new access be proven not to

cause service level deterioration on the FBX below the minimum operating speed of 40 mph

(speed limit of 55 mph).  Under the AMP, a professionally recognized traffic consultant is to

render opinions about the placement capacity and safety of access units and median openings

along the FBX, which will be enforced by the applicable permitting agency when issuing

additional permits for construction along the FBX.

**b.    The Alabama River Parkway Bridge.**

21.    The Alabama River Parkway (the "ARP"), comprising a toll bridge over the

Alabama River (the "ARP Bridge") and 12.5 miles of four-lane undivided arterial connecting

roads, was opened in 1998 providing direct access from the cities of Millbrook, Coosada and

Prattville, Alabama across the Alabama River to the northern and eastern portions of the City of

Montgomery, Alabama.  The ARP also acts as an alternative route from the northern

8

communities surrounding the City of Montgomery to the central business district of Montgomery. Alternative routes to the ARP traffic over the Alabama River from Elmore County and Autauga County to the City of Montgomery are I-65, the main competitor to the ARP, and public road SH-31.

Debtor CARP LLC (formerly known as Alabama River Parkway, L.L.C.) acquired the ARP Bridge in May 2006 pursuant to an asset purchase agreement. Approximately 3,000 vehicles traveled the ARP daily in 2012. Over the six-year period from 2007 through 2012, traffic on the ARP decreased at a compound annual growth rate of 8.6% per annum, the average toll rate at the ARP increased at a compound annual growth rate of 5.4% per annum, total revenue from the ARP decreased at a compound annual growth rate of 3.6% per annum and EBITDA from the ARP decreased at a compound annual growth rate of 3.9% per annum.

22.    CARP LLC's rights to own, operate and toll on the ARP Bridge are governed by (a) a license agreement by and between CARP LLC and Elmore County, Alabama ("Elmore"), dated August 12, 1996 (the "Elmore ARP License") and (b) a license agreement by and between CARP LLC and Montgomery County, Alabama ("Montgomery"), dated August 5, 1996 (the "Montgomery ARP License," and together with the Elmore ARP License, the "Alabama River Parkway Licenses").

23.    Under the terms of the Alabama River Parkway Licenses, CARP LLC has the right, privilege and authority to own, establish and/or operate the ARP Bridge, and the right to set, fix, and change the rates of toll for use of the ARP Bridge. CARP LLC is also responsible for all maintenance and upkeep of the ARP Bridge that may be required from time to time. The Alabama River Parkway Licenses do not have expiration dates and do not restrict the ability of CARP LLC to establish tolls at the ARP Bridge. By their terms, the Alabama River Parkway

Licenses are irrevocable by Elmore and Montgomery, and may only be amended or canceled by

CARP LLC and holders of any mortgage, lien or security interest in the ARP Bridge.

Furthermore, CARP LLC has the right to assign the Alabama River Parkway Licenses at any

time, without consent or approval of Elmore or Montgomery, respectively.  All rights under the

Alabama River Parkway Licenses are freely transferrable by CARP LLC, and transfer of such

rights would relieve CARP LLC of all obligations and liabilities under the Alabama River

Parkway Licenses.

<strong>c.      The Emerald Mountain Expressway Bridge.</strong>

24.      The Emerald Mountain Expressway (the "<u>EMX</u>") is a 4.5 mile two-lane roadway

located on the northeast outskirts of the City of Montgomery, which connects Montgomery

County, Alabama with the Emerald Mountain community and nearby parts of Elmore County,

Alabama and crosses the Tallapoosa River over the toll bridge portion of the EMX (the "<u>EMX

Bridge</u>").  The EMX Bridge and connecting roadway were opened in December 1994 to provide

(i) commuters from Elmore County working in the business districts of Montgomery a

commuting route, (ii) students a more direct route to Auburn University-Montgomery and (iii)

consumers a route to shopping in East Montgomery.  Growth in the vicinity of the Emerald

Mountain community and the adjacent parts of Wetumpka has stagnated since the economic

downturn that started in 2007.  Alternative access between Montgomery County and the

communities on the north side of the Tallapoosa River is offered via the public road SH-231.

25.      EMX LLC acquired the EMX Bridge, as well as the toll plaza and short sections

of an adjacent road, in May 2006 pursuant to an asset purchase agreement.  Approximately 3,800

vehicles traveled the BWP Bridge daily in 2012.  Over the six-year period from 2007 through

2012, traffic on the BWP Bridge decreased at a compound annual growth rate of 3.0% per

annum, the average toll rate at the BWP Bridge increased at a compound annual growth rate of

5.7% per annum, total revenue from the BWP Bridge increased at a compound annual growth rate of 2.6% per annum and EBITDA from the BWP Bridge increased at a compound annual growth rate of 4.0% per annum.

26.    EMX LLC's rights to own, operate and toll on the EMX Bridge are governed by (a) a license agreement by and between EMX LLC and Elmore, dated February 12, 1996 (the "Elmore EMX License") and (b) a license agreement by and between EMX LLC and Montgomery, dated March 6, 2006 (the "Montgomery EMX License," and together with the Elmore EMX License, the "Emerald Mountain Expressway Licenses").[2]  The rights and obligations of EMX LLC under the Emerald Mountain Expressway Licenses with respect to the EMX Bridge are identical to the rights and obligations of CARP LLC under the Alabama River Parkway Licenses with respect to the ARP Bridge.

### d.    The Black Warrior Parkway Bridge.

27.    The Black Warrior Parkway (the "BWP") is a 12.5-mile long undivided four-lane roadway opened in 1998, which provides one of three crossings of the Black Warrior River over the Black Warrior Parkway Bridge (the "BWP Bridge").  The BWP acts as a western bypass of the City of Tuscaloosa and north of the Black Warrior River and provides an alternative route from the cities of Coker and Northport, Alabama across the Black Warrior River to Tuscaloosa, Alabama, acting as a relief road to the Hugh R. Thomas Bridge on US-43/US-69 and the Woolsey Finnell Bridge on US-82.  The only toll plaza is on the southern side of the BWP Bridge.  A fourth river crossing, the Eastern Bypass, has been constructed; however, connections to the road network are still subject to land acquisition and right of way agreements.

---

[2]    The Montgomery EMX License was originally entered into on February 12, 1996, but was revised on March 6, 2006 to correct certain typographical errors.

28.    BWP LLC acquired the BWP Bridge, as well as the toll plaza and short sections of adjacent road, in May 2006 pursuant to an asset purchase agreement. Approximately 3,800 vehicles traveled the BWP Bridge daily in 2012, and the total toll revenue for the BWP Bridge in 2012 was $2,564,324. During the last seven years, traffic on the BWP has decreased at a compound average rate of approximately 5.1% per annum. Over the last seven years, the average toll rate at the BWP Bridge has increased at a compound average rate of 10.09% per annum and expenses also increased at a compound average rate of 6.9% per annum.

29.    BWP LLC's rights to own, operate and toll on the BWP Bridge are governed by a license agreement between BWP LLC and the County of Tuscaloosa (together with Elmore and Montgomery, the "Licensors"), dated June 6, 1996 (the "Tuscaloosa License," and together with the Alabama River Parkway Licenses and the Emerald Mountain Expressway Licenses, the "Central Alabama Toll Licenses"). Except for certain provisions related to the construction of the BWP Bridge that are no longer relevant, the rights and obligations of BWP LLC under the Tuscaloosa License with respect to the BWP Bridge are substantially identical to the rights and obligations of CARP LLC under the Alabama River Parkway Licenses with respect to the ARP Bridge and EMX LLC under the Emerald Mountain Expressway Licenses with respect to the EMX Bridge.

### e.    The Detroit Windsor Tunnel.

30.    The Detroit Windsor Tunnel (the "DWT") is a 5,160-foot long tunnel beneath the Detroit River that has served as a border crossing between downtown Detroit, Michigan, United States and Windsor, Ontario, Canada since 1930. The DWT is a major infrastructure facility that includes toll and inspection plazas on each side of the border. Tolls are paid on entry into the tunnel in each direction and customs and border protection are undertaken on exiting the tunnel. The toll plaza on the Detroit side of the DWT, which was recently renovated in 2011, offers 6

toll booths (4 automatic and 2 attended) and multiple customs inspection booths.  The toll plaza on the Windsor side of the DWT, which is currently undergoing major renovation scheduled for completion in 2014, offers 6 toll booths (3 automatic and 3 attended), 10 custom inspection booths and 3 dedicated truck inspection lanes.

31.    Approximately 6,650 vehicles traveled the DWT daily in 2012, of which approximately 98% were cars and about 2% were trucks, buses and miscellaneous vehicles. Over the six-year period from 2007 through 2012, traffic on the DWT decreased at a compound annual growth rate of 3.8% per annum, the average toll rate at the DWT increased at a compound annual growth rate of 2.2% per annum, total revenue from the DWT increased at a compound annual growth rate of 0.6% per annum and EBITDA from the DWT increased at a compound annual growth rate of 10.8% per annum.

32.    The DWT is subject to limited competition as there is currently no free alternative route.  The competing vehicle crossings – the  Ambassador Bridge and the Blue Water Bridge – provide more direct links between the Canadian highway system and the US Interstate system and handle significantly more truck, commercial and long distance traffic than the DWT.  A third proposed bridge, the North American International Trade Corridor (NAITC) bridge (the "NAITC Bridge"), recently received the presidential permit from the United States government and the authorizations from the Canadian federal government that are required for construction to begin. While the NAITC Bridge, which will focus on commercial traffic, is scheduled to open to traffic in 2020, the Ambassador Bridge has filed numerous legal proceedings to void the permits and prohibit construction.  In addition to these bridges, two rail tunnels currently compete for freight traffic with the DWT, the Ambassador Bridge and the Blue Water Bridge, and the construction of a third rail tunnel has been proposed.

33.     The DWT is leased, managed and operated by DWT LLC.  DWT LLC, as the

successor in interest to Detroit & Canada Tunnel Corporation ("DCTC"), is the controller of the

U.S. operations of the DWT under a long-term concession with the City of Detroit that will

expire on November 3, 2020.  The operation of the DWT in the United States is governed by the

Tube Lease dated March 20, 1978 by and between the City of Detroit and DWT LLC (the "Tube

Lease") and a Sublease dated March 20, 1978 by and between the City of Detroit as successor in

interest to Ford Motor Properties, Inc. as sub-landlord and DWT LLC as the sublessee (the

"Sublease").  Among other things, the Tube Lease and the Sublease:  (i) grant DWT LLC the

right to operate and collect tolls from the U.S. side of the DWT; (ii) require DWT LLC to

maintain the leased property and make annual rental payments to the City of Detroit; and (iii)

provide DWT LLC's use, operation and maintenance of a toll plaza for international vehicular

traffic between Canada and the United States.

34.     Additionally, DWT LLC, together with its wholly-owned subsidiary Detroit and

Windsor Subway Company Ltd. ("Windsor Subway"), is the joint operator of the Canadian

operations of the DWT under a subcontract with the City of Windsor.  On November 1, 1997,

DCTC (as predecessor to DWT LLC), Windsor Subway and the Corporation of the City of

Windsor (and together with the City of Windsor, "Windsor") entered into an agreement

providing for joint operation, management, maintenance, repair and improvement of the DWT

(the "JOA").  While the original term of the JOA ended in 2007, the JOA has continued in effect

pursuant to automatic 90-day extensions since that time.  Under the terms of the JOA, DWT LLC

and Windsor Subway are required to perform the following obligations with respect to the DWT:

(i) provide all administrative services (including providing all employees); (ii) perform all

operations, maintenance, repairs and improvements (including providing all employees,

14

including temporary employees to Windsor during work stoppages and labor disputes); (iii)

perform all day-to-day operations; (iv) conduct all collective bargaining negotiations; (v) provide

a representative to Windsor; and (vi) provide any other required assistance in connection with

their obligations under the JOA.  In exchange for managing the Canadian operations relating to

the DWT, DWT LLC receives an annual fee of $54,000 from the City of Windsor as well as

reimbursement for a share of the operational costs from Windsor.

35.     DWT LLC and Windsor Subway are entitled to all revenue from tolls collected on

vehicles entering the DWT from Detroit and all rental income in Detroit while Windsor is

entitled to all revenue from tolls collected on vehicles entering the DWT from Windsor and all

rental income in the City of Windsor.  DWT LLC and Windsor Subway, on the one hand, and

Windsor, on the other hand, share equally all revenue from tokens and electronic toll collection

card deposits (net of refunds).

36.     DWT LLC is also party to a number of subleases, allowing third parties access to

the DWT for purposes of, among other things, maintaining mobile telecommunications

equipment, displaying advertising and installing cables in exchange for rent payments.  In

addition, DWT LLC leases an offsite property to the General Services Administration (the

"GSA") for use by the U.S. Border Patrol.  This lease agreement, which expires on December

31, 2020, resulted in annual rent payments to DWT LLC of approximately $2,786,400 in 2012,

which represented approximately 24% of the total revenue received by American Roads from

DWT LLC during 2012.

iii.     **Technology**

37.     American Roads is a full service provider for the tolling, parking and point of sale

industries with the ability to provide mobile phone applications, manual, automatic and

electronic tolling/payment applications, credit and account based transaction processing, as well

15

as maintenance, operations and engineering services.  American Roads has developed and maintained certain technologies and customer programs in the ordinary course of business to encourage, among other things, electronic toll and street parking payment and enhance customer convenience, including but not limited to *NEXPRESS ® TOLL, Freedom Pass*[TM] *Mobile, Freedom Pass*[TM] *Unlimited, Freedom Pass*[TM] *Open Road, Freedom Pass*[TM] *Open Collection (lab version)* and *Freedom Pass*[TM] *Park*.

38.     American Roads' payment systems are compliant with the payment card industry and can be designed to accept dual coin and currency, as well as a variety of electronic transactions.  American Roads provides smart phone based applications for barrier, open road, high occupancy toll ("<u>HOT</u>"), marine and variable price systems and is credited with offering the first pay-by-phone tolling applications in the United States.  These mobile phone applications, which are available for a number of platforms, provide a "cashless" payment option for American Roads' customers and are designed to incorporate customer loyalty programs. Additionally, American Roads has developed and deployed Bluetooth® based traffic monitoring systems that are in use in Canada and the United States.

iv.     **<u>Employees</u>**

39.     As of July 19, 2013, the Debtors employed 43 employees in Alabama (the "<u>Alabama Employees</u>"), 43 employees in Michigan (the "<u>Michigan Employees</u>") and 46 employees in Canada (the "<u>Canadian Employees</u>," and collectively with the Alabama Employees and the Michigan Employees, the "<u>Employees</u>").  None of the Alabama Employees are represented by a union.  Of the Michigan Employees, 19 are represented by the Amalgamated Transit Union, Local 1564 AFL-CIO-CLC (the "<u>Michigan Union Employees</u>") under a collective bargaining agreement dated as of November 14, 2010 (the "<u>Michigan CBA</u>"), and the remaining 24 Michigan Employees are not represented by a union.  Of the Canadian Employees, 39 are

16

represented by the National Automobile, Aerospace, Transportation and General Workers Union

of Canada (C.A.W. – Canada) and its Local 195 (the "Canadian Union Employees," and together

with the Michigan Union Employees, the "Union Employees"), under an agreement dated as of

March 30, 2009, as amended by a Memorandum of Settlement dated as of June 11, 2012 (the

"Canadian CBA" and with the Michigan CBA, collectively, the "CBAs").  The remaining seven

(7) Canadian Employees are not represented by a union.  The Debtors do not intend to seek to

reject or modify any of their CBAs in connection with the Plan.

## PART II

## DEBTORS' PREPETITION CAPITAL STRUCTURE AND INDEBTEDNESS

40.    The Debtors are highly leveraged, with a total outstanding financial debt of

approximately $830 million, comprised of the Swaps and the Bonds, each as defined and more

fully described below.  On December 19, 2006, American Roads entered into the Swaps, issued

the Bonds and simultaneously several documents were executed, including, the Indentures (as

defined below), a guaranty agreement, the Policies (as defined below), the Common Agreement

(as defined below), the Collateral Agency Agreement (as defined below), an Insurance and

Reimbursement Agreement (as defined below) and other financing, security and related

documents in furtherance of American Roads' issuance of the Swaps and the Bonds (the

"Financing Documents").  Each of the Financing Documents was executed for the purposes of (i)

retiring certain then-existing indebtedness of American Roads and its affiliates used to acquire

the Toll Facilities; (ii) funding certain reserve, operation and maintenance and capital

expenditure accounts; (iii) paying certain fees and expenses related to the issuance of the Bonds;

and (iv) paying a portion of the insurance premium for the Policies.

41.    American Roads' obligations under the Swaps (prior to their termination and

payment in full by Syncora Guarantee Inc. (f/k/a XL Capital Assurance Inc., "Syncora"), the

17

Bonds, the Bond Policies (as defined below) and the Insurance and Reimbursement Agreement
are secured by all of the property, rights and interests of each of American Roads, Holdco, DWT
Inc. and each of the Operating Subs in which a lien has been or is required to be granted to and in
favor of the Bank of New York Mellon (the "Collateral Agent") for the benefit of the holders of
the Swaps and the Bonds in accordance with or pursuant to any Financing Document (the
"Collateral").

42.     Pursuant to the Policies (as defined below), Syncora has insured the Debtors'
obligations under the Swaps and the Bonds.  As "Instructing Senior Creditor" (as defined in the
Common Agreement), until such time as it defaults on its obligations as insurer, Syncora has the
exclusive right to direct the Collateral Agent to exercise rights or remedies of the counterparty to
the Swaps and the Bondholders under the Financing Documents, including to foreclose on the
Collateral, accelerate principal or take any other enforcement action.

**A.     The Swaps**

43.     On December 19, 2006, American Roads and Citibank, N.A. ("Citibank") entered
into the ISDA Master Agreements and Schedules, pursuant to which, among other things,
American Roads hedged certain interest rate payment obligations under the G-1 Bonds (as
defined below) (the "G-1 Swap") and the G-2 Bonds (as defined below) (the "G-2 Swap", and
together with the G-1 Swap, the "Swaps").  On September 12, 2012, American Roads, Citibank
and Barclays Bank PLC ("Barclays") consummated a novation transaction whereby Barclays
replaced Citibank as the counterparty under the Swaps.  In connection with the novation
transaction, Syncora acquired the beneficial interest in the Swaps from Barclays and became
entitled to the economic benefits of the Swaps and related Swap Policies.  As discussed more
fully below, on July 18, 2013, Syncora, in its capacity as insurer under the Swaps and the Swap
Policies, terminated the Swaps.

18

44.     Pursuant to the Swaps, American Roads made semi-annual fixed payments to the counterparty to the Swaps in exchange for quarterly floating interest rate payments in respect of a notional amount that corresponded to the then-outstanding principal under the Bonds.  In addition, the G-2 Swap was an accreting swap, which provided American Roads with financing by deferring a substantial portion of American Roads' fixed payment obligations until payment dates between June 2022 through June 2025.  In late June 2013, American Roads did not have sufficient funds to make the semi-annual payment due under the Swaps without accessing funds in a restricted account that required Syncora's consent pursuant to the Collateral Agency Agreement.  In connection with ongoing restructuring negotiations, Syncora provided American Roads with the necessary consent and the semi-annual payment was made.  As of July 18, 2013, American Roads' liability in respect of the Swaps was approximately $334 million.

45.     If an "Event of Default" under the Agreement as to Certain Undertakings, Common Representations, Warranties, Covenants and Other Terms, dated December 19, 2006, by and among American Roads, Syncora, Citibank in its capacity as counterparty to the Swaps and the Collateral Agent in its capacity as securities intermediary and collateral agent (the "Common Agreement") occurred and was continuing, Syncora, in its capacity as insurer, was permitted to terminate the Swaps and accelerate all amounts due thereunder (such termination right, the "Insurance Company Swap Termination Right").

**B.     The Bonds**

46.     On December 19, 2006, American Roads issued Series G-1 Senior Secured Bonds (the "Series G-1 Bonds") in the aggregate principal amount of $198,000,000 at an interest rate of three-month LIBOR plus 0.32% per annum pursuant to the Trust Indenture dated December 19, 2006 by and between American Roads and the Bank of New York Mellon as Trustee (the "Trustee") (the "Indenture") and the First Supplemental Indenture dated December 19, 2006 by

19

and among American Roads, the Trustee and Syncora (the "<u>First Supplemental Indenture</u>").

Additionally, on December 19, 2006, American Roads issued Series G-2 Senior Secured Bonds

(the "<u>Series G-2 Bonds</u>", and together with the Series G-1 Bonds, the "<u>Bonds</u>") in the aggregate

principal amount of $298,000,000 at an interest rate of three-month LIBOR plus 0.38% per

annum pursuant to the Trust Indenture and the Second Supplemental Indenture dated December

19, 2006 by and among American Roads, the Trustee and Syncora (the "<u>Second Supplemental</u>

<u>Indenture</u>", and together with the Indenture and the First Supplemental Indenture, the

"<u>Indentures</u>").  Interest on the Bonds is payable quarterly in arrears.  The legal maturity of the

Bonds is December 19, 2056.

47.    For so long as Syncora has not defaulted on its obligations as insurer, Syncora

controls the exercise of any rights or remedies in respect of the Bonds, including the right to

accelerate the Bonds upon the occurrence of any "Event of Default" under the Common

Agreement, including, but not limited to, a payment default by American Roads and/or the

commencement of a bankruptcy proceeding in respect of any of the Debtors.

## C.    The Policies

48.    Pursuant to certain financial guaranty insurance policies issued by Syncora on

December 19, 2006 in connection with the Bonds (the "<u>Bond Policies</u>"), Syncora unconditionally

and irrevocably guaranteed the full and complete payment of installments of principal of, and

accrued and unpaid interest on, the Bonds to the extent American Roads fails to make any such

payments when they become due and payable under the terms of the Financing Documents.

49.    Pursuant to the financial guaranty insurance policies issued by Syncora on

December 19, 2006 in connection with the Swaps (the "<u>Swap Policies</u>," and together with the

Bond Policies, the "<u>Policies</u>"), Syncora insured the payment to the counterparty to the Swaps of

(i) any fixed payments that American Roads failed to make when due and payable and (ii) if the

Swaps were terminated in accordance with the Financing Documents, any aggregate amount upon the designation of an "Early Termination Date" under the Swaps (a "Permitted Swap Termination Payment") that American Roads fails to make when due and payable.  The Debtors' reimbursement obligations under the Insurance and Reimbursement Agreement are secured by the Collateral.

50.     The beneficiary of the Bond Policies is the Collateral Agent, in its capacity as indenture trustee under the Indentures.  The Bond Policies only entitle the Bondholders to payments of interest and principal that American Roads fails to make when due and payable on the original payment dates set forth in the Indentures.  If Syncora, in its capacity as Instructing Senior Creditor, elects to accelerate the Bonds pursuant to Section 8.3 of the Common Agreement, the Bond Policies would permit, but not require, that Syncora pay the holders of the Bonds on an accelerated basis.

**D.     Insurance Premium Event of Default and Insurance Company Swap Termination**

51.     On December 19, 2006, as part of the consideration for the issuance by Syncora of the Policies, American Roads and Syncora entered into the Insurance and Reimbursement Agreement dated December 19, 2006 between Syncora and American Roads (the "Insurance and Reimbursement Agreement") and the Alinda Roads Premium Letter dated as of December 19, 2006 from Syncora to Alinda Roads LLC (the "Premium Letter"), which, taken together, provide for, among other things, American Roads' obligation to pay Syncora an insurance premium on a quarterly basis.  On June 28, 2013, American Roads failed to make the quarterly insurance premium payment then due and payable to Syncora (the "Insurance Premium Non-payment").  Pursuant to Section 8.1(b) of the Common Agreement, a failure by American Roads to make a quarterly insurance premium payment that continues for 10 business days after the non-payment date constitutes an Event of Default under the Common Agreement (an "Insurance Premium

21

Event of Default"). American Roads failed to cure the Insurance Premium Non-payment by July

15, 2013, and therefore, an Insurance Premium Event of Default occurred on July 16, 2013. As a

result of the Insurance Premium Event of Default, on July 18, 2013, Syncora, in its capacity as

insurer under the Swaps and the Swap Policies, exercised its Insurance Company Swap

Termination Right. As of the date hereof, Syncora has paid in full the Permitted Swap

Termination Payment to the counterparty of the Swaps in accordance with the terms of the Swap

Policies. Such actions created an "Enhancement Liability" to Syncora under the terms of the

Collateral Agency Agreement, and as a result, Syncora is the holder of the Swap Policies Claim,

as defined in the *Debtors' Joint Prepackaged Chapter 11 Plan* (the "Plan").

**E.      The Collateral Agency Agreement**

52.      On December 19, 2006, the Debtors, Citibank in its capacity as the counterparty

to the Swaps, the Collateral Agent in its capacity as trustee under the Indentures and in its

capacity as securities intermediary and collateral agent, and Syncora entered into the

Intercreditor, Collateral Agency and Account Agreement (the "Collateral Agency Agreement")

in connection with the Swaps and the Bonds and the other transactions contemplated by the

Financing Documents. The Collateral Agency Agreement is a Financing Document that

designates the Collateral Agent as the agent for each of the senior creditors, including Syncora,

in its capacity as insurer of the Swaps and Bonds, the counterparty to the Swaps and the

Bondholders.

53.      Additionally, the Collateral Agency Agreement describes, among other things, the

Collateral Agent's obligations to preserve and administer the Collateral and to distribute the

proceeds of any enforcement in respect of the Collateral in accordance with the terms of the

waterfall provisions set forth in Section 7.06(a) thereof.   Under the waterfall provisions set forth

in Section 7.06(a) of the Collateral Agency Agreement, distributions of proceeds of the

Collateral in respect of any principal amount of the Bonds that is then due and payable is subordinate in priority to any distributions to (i) the counterparty to the Swaps in respect of any Permitted Swap Termination Payments and (ii) Syncora in respect of any Enhancement Liabilities (as defined in the Collateral Agency Agreement) owed to Syncora that arise under the Insurance and Reimbursement Agreement as a result of a payment by Syncora of any such Permitted Swap Termination Payments pursuant to the Swap Policies ((i) and (ii) are collectively referred to as the "Swap Termination Amount Priority").  Therefore, the distribution of any proceeds resulting therefrom is subject to the waterfall provisions set forth in Section 7.06(a) of the Collateral Agency Agreement.

54.    In accordance with the terms and conditions of the RPSA (as defined below) and the Plan, Syncora directed the Collateral Agent to observe, honor and perform its obligations under the Plan, including its obligation to distribute one hundred percent of the reorganized equity of the Debtors to Syncora in accordance with the waterfall provisions set forth in section 7.06(a) of the Collateral Agency Agreement.  Pursuant to the Swap Termination Amount Priority, Syncora, as holder of the Swap Policies Claim, will be entitled to receive an amount of proceeds no less than the value of the Swap Policies Claim before the Bondholders can receive any proceeds in respect of principal of the Bonds, if any such amounts are then due and payable.

## PART III

## CIRCUMSTANCES LEADING TO COMMENCEMENT OF THE CHAPTER 11 CASES

### A.    Events Leading to the Filing of the Chapter 11 Cases

55.    The Debtors have commenced these Chapter 11 Cases to restructure a balance sheet burdened by more than $830 million on account of obligations under the Swaps and the Bonds.

56.     A restructuring of the Debtors' balance sheet is necessary because the Debtors are not able to meet their financial obligations under the Swaps and the Bonds.  Since the refinancing of their debt in 2006, the traffic volumes at the Toll Facilities have not grown to a level necessary to support the Debtors' existing capital structure.  Rather than experiencing the traffic growth projected in 2006 when the Bonds and Swaps were issued, the Toll Facilities have experienced significant traffic declines.  From 2007 through 2012, traffic has declined by between approximately 1.9% and 8.6% at each of the Toll Facilities.  This decline is driven by a number of factors, including the economic recession, the volatility of gas prices, reduced travel and discretionary spending, the negative impact of toll increases in Alabama, increased travel documentation requirements adopted by the U.S. Congress in 2009 and adverse regional events such as the Deepwater Horizon British Petroleum oil spill in 2010, the Tuscaloosa tornado in 2011 and a declining population in the Detroit area.  Although Detroit's financial situation has contributed to the difficulties facing the Debtors, these Chapter 11 Cases are not the result of the recent bankruptcy filing of Detroit.

57.     The Debtors carry approximately $830 million in debt related to the Swaps and the Bonds, including approximately $334 million in Swap Policies Claims.  During 2012, the Debtors paid approximately $35 million for debt service while generating only $14.2 million in EBITDA.  The Debtors' businesses cannot sustain the current debt level.

**B.     Prepetition Negotiations**

58.     The Debtors determined that prolonged chapter 11 cases would damage their ongoing business operations and threaten their viability as a going concern.  Therefore, in the months prior to the Petition Date, the Debtors engaged in extensive negotiations with Syncora, the insurer of the Swaps and Bonds.  The Debtors sought agreement with Syncora because, as a non-defaulting insurer, it is the Instructing Senior Creditor under the Financing Documents, and

accordingly controls the enforcement rights under the Swaps and the Bonds. In addition,

Syncora is the back-to-back counterparty to the Swaps and holds a significant portion of the

Bonds.

59.    The Debtors' discussions with Syncora occurred over several months and

culminated in the execution of the Restructuring and Plan Support Agreement, dated as of July

17, 2013 (the "RPSA"), by and among certain of the Debtors, Syncora, Alinda Capital Partners

LLC ("ACP"), Alinda Capital Partners I Ltd ("ACPI") and Alinda North American Roads, Inc.

("ANAR").

60.    The Debtors now seek to consummate the Plan and emerge as reorganized entities

under the ownership of Syncora with no outstanding financial debt. The Debtors believe that a

chapter 11 restructuring represents the best prospect for restructuring the Debtors' balance sheet

and positioning American Roads as an efficient and competitive owner and operator of the Toll

Facilities.

## C.    Summary of the Proposed Plan[3]

61.    Under the Plan, the interests in the Reorganized Debtors will be distributed to

Syncora as the holder of the Swap Policies Claim pursuant to the waterfall provisions set forth in

section 7.06(a) of the Collateral Agency Agreement. Although the waterfall provisions dictate

that holders of the Bonds will receive no distributions under the Plan, the Plan will not affect

their rights under the Bond Policies, unless after the Effective Date of the Plan the holders of

Bonds elect voluntarily to participate in the Bond Release Offer set forth in the Plan. In addition,

the Plan will not provide any recoveries to holders of general unsecured claims. However, the

---

[3]    Capitalized terms used in this Part of the Declaration and not defined herein shall have the meanings
ascribed to them in the Plan. To the extent this Declaration is inconsistent with any provision of the Plan, the Plan
shall govern.

Debtors believe that most general unsecured creditors will be paid in full because they are parties

to executory contracts and leases that will be assumed by the Debtors pursuant to the Plan.

62.     The salient terms of the Plan are as follows:

(a)     <u>Distribution of Reorganized Equity Units of Reorganized American</u>

<u>Roads</u>.  On the Effective Date, in full and final satisfaction and discharge of the Swap Policies

Claim under the Financing Documents, the Collateral Agent shall receive one hundred percent

(100%) of the Reorganized Equity Units to be issued to the Collateral Agent for immediate

distribution to Syncora or its designated affiliate or affiliates (which may include a Debtor) as the

holder of the Swap Policies Claim pursuant to the waterfall provisions set forth in Section

7.06(a) of the Collateral Agency Agreement.  Consequently, on the Effective Date,  the

Reorganized Debtors will become direct wholly-owned subsidiaries of Syncora.

(b)     <u>Other Recoveries Under the Plan</u>.  Holders of Allowed Administrative

Claims, Allowed Secured Tax Claims, Allowed Other Secured Claims, Allowed Priority Tax

Claims, Allowed Other Priority Claims, and Allowed Professional Claims will be paid in full in

Cash.  Holders of Bond Claims, General Unsecured Claims, Subordinated Claims and Interests

will not receive any distribution.  Executory contracts and unexpired leases will be assumed by

the Reorganized Debtors unless listed on the Rejection Schedule or rejected pursuant to an order

of the United States Bankruptcy Court for the Southern District of New York (the "<u>Court</u>").

(c)     <u>Option to Cash-out Bondholders</u>.  Within five Business Days after the

Effective Date, the Reorganized Debtors shall commence an offer to purchase all Bonds (the

"<u>Bond Release Offer</u>") from any Bondholder, other than Syncora, in exchange for (a) a one-time,

Cash payment equal to twenty percent (20%) of the outstanding principal balance of such Bonds,

and (b) a waiver and release of any and all claims, rights, remedies or causes of action such

holder may have against the Released Parties that arise under or relate to the Debtors, the

Chapter 11 Cases and the Financing Documents, including all rights and claims arising under the

Policies.  The Bond Release Offer shall be funded with (i) the proceeds of a capital contribution

made by Syncora to the Reorganized Debtors in an amount not to exceed $50 million and (ii) a

portion of the Cash remaining in the Reserve Accounts on the Effective Date, which portion shall

be in an amount not to exceed the lesser of (x) $15 million and (y) all Cash remaining in the

Reserve Accounts in excess of $25 million on the Effective Date.  Bondholders who elect not to

participate in the Bond Release Offer will be entitled to receive  payments of principal and

interest in respect of their Bonds, in each case, to the extent then due and payable on each

Payment Date (as defined in the Indentures) by Syncora in accordance with the terms of the

Indentures and the Bond Policies.

63.    The Debtors believe in their business judgment that the implementation of the

transactions contemplated in the RPSA and the Plan through the commencement of these

Chapter 11 Cases was a prudent and necessary step to restructuring the Debtors' balance sheet,

maximizing the value of the Debtors' business and was in the best interests of the Debtors'

constituents.

**D.    Prepetition Solicitation and Proposed Timeline**

64.    Following the execution of the RPSA, the Debtors commenced a prepackaged

solicitation of the Plan on July 23, 2013 by delivering a copy of the Plan, the related disclosure

statement and all exhibits thereto, including the RPSA (the "Disclosure Statement") and the

ballot to Syncora as the holder of the Swap Policies Claim, constituting the only impaired class

entitled to vote on the Plan.  No votes other than Syncora's votes were solicited because all other

holders of claims or interests belong to classes that are deemed to accept the Plan as a result of

not being impaired under the Plan or are deemed to reject the Plan as a result of not receiving

any distributions under the Plan.

65.    The Debtors established July 24, 2013, at 4:00 p.m. as the deadline for the receipt

of votes to accept or reject the Plan.  As of the Petition Date, Epiq Bankruptcy Solutions, LLC

("Epiq"), the Debtors' solicitation agent, has confirmed that Syncora, as holder of the Swap

Policies Claim (Class A Claim), has voted to accept the Plan.[4]  Accordingly, contemporaneously

with the filing of this Declaration, the Debtor has filed the Plan and Disclosure Statement.

66.    The following table sets forth the anticipated timetable for these Chapter 11

Cases, subject to the Court's approval:

| PROPOSED TIMELINE | |
|---|---|
| **Record Date** | July 22, 2013 |
| **Commencement of Prepetition Solicitation** | July 23, 2013 |
| **Voting Deadline** | July 24, 2013 |
| **Petition Date** | July 25, 2013 |
| **Mailing of Confirmation Hearing Notice** | July 30, 2013 |
| **Plan Supplement** | August 21, 2013 |
| **Objection Deadline** | August 21, 2013 |
| **Reply Deadline** | August 23, 2013 |
| **Confirmation Hearing** | August 28, 2013 |

67.    The Debtors believe that the Chapter 11 Cases represent the best prospect for

restructuring the Debtors' balance sheet and positioning American Roads as an efficient and

competitive owner and operator of the Toll Facilities.  In light of these circumstances, the

---

[4]    The voting results are set forth in the *Declaration of James F. Daloia on Behalf of Epiq Bankruptcy Solutions, LLC Regarding Voting and Tabulation of Ballots Cast on the Debtors' Joint Prepackaged Chapter 11 Plan*, dated July 25, 2013 (the "Tabulation Declaration"), filed contemporaneously herewith.

Debtors believe that confirmation of the Plan is in the best interests of the Debtors' estates and

stakeholders.  Accordingly, the Debtors have filed these prepackaged Chapter 11 Cases to

effectuate the proposed consensual restructuring on an expedited basis and to allow the Debtors

to emerge with a sustainable capital structure and competitive going-forward operation.

**PART IV**

**<ins>FIRST DAY AND RELATED MOTIONS</ins>**

68.    The Debtors have filed a number of First Day Motions seeking orders granting

various forms of relief intended to stabilize the Debtors' business operations, facilitate the

efficient administration of the Chapter 11 Cases and expedite a value-maximizing restructuring

of the Debtors' operations and balance sheet.  Additionally, the Debtors have filed or will file

certain other motions related to the retention of professionals (the "<ins>Professional Motions</ins>") and

the assumption of certain key contracts and agreements (the "<ins>Assumption Motions</ins>") on or

shortly after the Petition Date.  I believe that the forms of relief requested are necessary to enable

the Debtors to operate with minimal disruption during the pendency of the Chapter 11 Cases.  A

description of the relief requested and the facts supporting each of the First Day Motions,

Professional Motions and Assumption Motions is set forth below.[5]

69.    I have reviewed each of the First Day Motions, Professional Motions and

Assumption Motions, including the exhibits thereto.  I believe that the Debtors have satisfied the

applicable standards for the relief requested, and that the Court's grant of the requested relief is

in the best interests of the Debtors' estates, their creditors and all other parties in interest.

---

[5]    Capitalized terms in Part IV of the Declaration, to the extent not defined herein, have the meanings ascribed to them in the applicable First Day Motions, Professional Motions and Assumption Motions.

A.      **Procedural and Administrative First Day Motions**

      i.      **Joint Administration Motion**[6]

70.      The Debtors seek entry of an order directing the joint administration of these Chapter 11 Cases for procedural purposes only.  Specifically, the Debtors request that the Court maintain one file and one docket for all of the Chapter 11 Cases under the case of American Roads LLC.

71.      Given that the Debtors are "affiliates" pursuant to section 101(2) of the Bankruptcy Code and that the Debtors' operations are largely interrelated or shared, joint administration of the Chapter 11 Cases will provide significant administrative convenience without prejudice to any party in interest.  Certain of the Debtors are obligors, guarantors or pledgers under the Financing Documents and the RPSA imposes the same milestones on certain of the Debtors and their respective Chapter 11 Cases.  Many of the motions, hearings and orders in the Chapter 11 Cases will affect all Debtor entities.  Joint administration of the Chapter 11 Cases will reduce parties' fees and costs by avoiding duplicative filings and objections and make the most efficient use of the Court's resources.  Additionally, joint administration will allow the Office of the United States Trustee for the Southern District of New York (the "U.S. Trustee") and all parties in interest to monitor the Chapter 11 Cases with greater ease and efficiency.  Accordingly, I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

---

[6]      See *Debtors' Motion for Entry of an Order Directing Joint Administration of Their Chapter 11 Cases* (the "Joint Administration Motion") filed concurrently herewith.

ii.    **Scheduling and Solicitation Procedures Motion**[7]

72.    The Debtors seek entry of the Proposed Scheduling Order: (a) scheduling the

Confirmation Hearing to consider (i) the adequacy of the disclosure in the Disclosure Statement

and the prepetition solicitation procedures used in connection with the prepetition solicitation of

Syncora's vote to accept or reject the Plan and (ii) confirmation of the Plan; (b) establishing a

deadline for objections to the adequacy of the Disclosure Statement and confirmation of the Plan;

(c) approving the form and manner of notice of the Confirmation Hearing and the

commencement of these Chapter 11 Cases; (d) establishing procedures for any proposed

assumption and cure of executory contracts and unexpired leases; and (e) for certain related

relief. The Debtors will also request that after appropriate notice and the Confirmation Hearing,

that the Court enter the Confirmation Order, which among other things, (a) approves the

Solicitation Procedures, (b) approves the adequacy of the Disclosure Statement and (c) confirms

the Plan.

iii.    **Consolidated Creditor List Motion**[8]

73.    The Debtors request entry of an order (a) waiving the requirement that each of the

Debtors file a list of creditors and authorizing the Debtors to prepare a consolidated list of

creditors in lieu of submitting a formatted matrix and (b) authorizing the Debtors to file a single,

---

[7]    See *Debtors' Motion for Entry of (I) an Order (A) Scheduling a Combined Hearing to Consider the Adequacy of the Disclosure Statement and Confirmation of the Plan, (B) Establishing Deadlines and Procedures to File Objections to the Disclosure Statement and Plan, (C) Approving the Form and Manner of Notice of the Confirmation Hearing, (D) Establishing Procedures for Any Proposed Assumption and Cure of Executory Contracts and Unexpired Leases Pursuant to the Plan, and (E) Granting Related Relief; and (II) an Order (A) Approving the Solicitation Procedures, (B) Approving the Adequacy of the Disclosure Statement, and (C) Confirming the Plan* (the "Scheduling and Solicitation Procedures Motion") filed concurrently herewith.

[8]    See *Debtors' Motion for Entry of an Order (I) Waiving the Requirement that Each Debtor File a List of Creditors and Authorizing Preparation of a Consolidated List of Creditors in Lieu of Submitting a Formatted Mailing Matrix, and (II) Authorizing the Debtors to File a Consolidated List of the Debtors' Thirty (30) Largest Unsecured Creditors* (the "Consolidated Creditor List Motion") filed concurrently herewith.

consolidated list of the Debtors' thirty (30) largest unsecured creditors in lieu of filing separate lists of the 30 largest unsecured creditors of each Debtor.

74.     Submission of a single consolidated list of creditors is warranted under the circumstances of these Chapter 11 Cases because it will allow the Debtors, which have largely interrelated or shared operations, to more efficiently provide required notice to parties in interest and reduce the potential for duplicative mailings.  Provided that it is appointed by the Court as the Debtors' noticing and claims agent, Epiq will maintain an electronic list of the Debtors' creditors that will be sufficient to permit Epiq to promptly provide notices to all appropriate parties.  Furthermore, as a result of the prepackaged nature of these Chapter 11 Cases and the Debtors' planned short stay in bankruptcy, the Debtors do not believe that any party in interest will be prejudiced or otherwise materially impacted by the maintenance of a consolidated creditor list.

75.     Additionally, the Debtors believe that a single, consolidated list of the Debtors' thirty (30) largest unsecured creditors will allow the Debtors to prepare for these Chapter 11 Cases and continue the Debtors' operations without consuming critical time and resources.  By contrast, the filing of a list of the largest unsecured claims for each of the Debtors would impose an unnecessary burden on the U.S. Trustee, and would increase the cost to the Debtors' estates without providing any added benefit.  Accordingly, on behalf of the Debtors, I respectfully submit that the Consolidated Creditor List Motion should be approved.

iv.    **Schedules Extension/Waiver Motion**[9]

76.    By the Schedules Extension/Waiver Motion, the Debtors seek entry of an order

(a) extending the time for the Debtors to file the Bankruptcy Rule Disclosures through and

including sixty (60) days after the date hereof (the "Deadline"), without prejudice to the Debtors'

right to request additional extensions should it become necessary and (b) waiving the

requirement that the Debtors file the Bankruptcy Rule Disclosures effective on the date of

confirmation of the Plan if confirmation occurs on or before the Deadline.

77.    The Debtors have hundreds of creditors, and therefore, the ordinary operation of

the Debtors' business requires the Debtors to maintain voluminous books, records and

accounting systems.  Furthermore, given the volume of information that must be compiled and

reviewed and the substantial time required to complete the Schedules and Statements and

Financial Reports, the Debtors believe that filing the Bankruptcy Rule Disclosures at this time

would cause the Debtors to incur substantial expense and would burden the Debtors' employees

at a time when such employees should be implementing or preparing to implement the

restructuring.  Moreover, the Debtors have created a creditor matrix including certain of the

Debtors' vendors, banks, customers, directors and officers, current and former employees,

unions, insurance carriers, landlords, lenders, taxing authorities, affiliates and utility providers

and will be serving a notice of commencement of the cases on the parties identified therein.

78.    Accordingly, I believe that the relief requested in the Schedules Extension/Waiver

Motion is particularly appropriate in the Chapter 11 Cases.  The Debtors would expect to be in a

position to file the Bankruptcy Rule Disclosures at approximately the same time that the Debtors

---

[9]    See *Debtors' Motion for Entry of an Order Extending the Time, and, Upon Confirmation, Waiving the Requirement to File Schedules, Statements of Financial Affairs and Financial Reports for Non-Debtor Subsidiaries* (the "Schedules Extension/Waiver Motion") filed concurrently herewith.

expect to emerge from bankruptcy pursuant to the Plan, which is supported by Syncora.  In addition, the relief requested in the Schedules Extension/Waiver Motion will not prejudice or adversely affect the rights of the Debtors' creditors or other parties in interest.

**B.      First Day Motions Related to the Debtors' Operations in Chapter 11**

  i.      **Cash Collateral Motion**[10]

79.     By the Cash Collateral Motion, the Debtors seek entry of interim and final orders, which among other things, provide the Debtors with the following relief:  (a) authority to use the Prepetition Collateral (including Cash Collateral) in accordance with the Approved Budget (as it may be modified in accordance with the Interim Order or the Final Order); (b) the granting of the form of adequate protection to the Collateral Agent pursuant to sections 361, 362 and 363 of the Bankruptcy Code; (c) scheduling a Final Hearing on this Motion to consider entry of the Final Order; and (d) granting related relief.

80.     The Debtors use the Prepetition Collateral, including Cash Collateral, in the ordinary course for working capital, general corporate purposes, maintaining and generating the confidence of their customers and vendors and preserving the going concern value of the Debtors.  Absent approval of the cash collateral orders, I believe that the Debtors will not be able to continue operating their businesses or consummate the Plan, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest.  The Debtors need the immediate use of Cash Collateral to meet payroll, procure goods and services from vendors and suppliers, maintain operations and fund their cash management system.  Syncora and the Collateral Agent participated in the negotiation of the Interim Order, and each supports its entry.

---

[10]      See *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing Use of Cash Collateral, (B) Granting Adequate Protection to Prepetition Secured Parties and (C) Scheduling a Final Hearing* (the "Cash Collateral Motion") filed concurrently herewith.

In addition, if an interim order is not entered on the terms and conditions set forth in the RPSA within five (5) business days after the Petition Date (subject to Court availability), Syncora would have the right to terminate the RPSA. See Part II of this Declaration for more information regarding the Debtors' prepetition indebtedness.

81.    Subject only to the Carve-Out, the Applicable Debtors propose to provide the Collateral Agent and Syncora with two primary forms of adequate protection to protect against the postpetition diminution in value of the Prepetition Collateral (including the Cash Collateral) resulting from the use, sale or lease of the Prepetition Collateral (including the Cash Collateral) and the imposition of the automatic stay (collectively, the "Adequate Protection"):

(a) **Adequate Protection Liens**. As security for the Adequate Protection Obligations, effective as of the Petition Date and perfected without further action by the Applicable Debtors, the Applicable Debtors propose to grant first priority liens on Unencumbered Property, and junior priority replacement and priming liens on certain prepetition and postpetition assets of the Applicable Debtors; and

(b) **Superpriority Claims**. The Adequate Protection Obligations include superpriority administrative expense claims with priority in payment, subject to entry of a Final Order, over any and all administrative expenses.

82.    I believe that use of the Cash Collateral is essential for the Debtors to continue to operate and maintain the value of their estates during the pendency of the Chapter 11 Cases.

ii.    **Cash Management Motion**[11]

83.    By the Cash Management Motion, the Debtors seek entry of orders (i) authorizing them, in their sole discretion, to (a) continue to operate the Cash Management System (as defined below); (b) honor certain prepetition obligations related thereto; (c) continue to invest

---

[11]    See *Debtors' Motion for Entry of Orders (I) Authorizing the Debtors to (A) Continue to Operate the Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, (C) Continue Current Investment Practices on an Interim and Final Basis and (D) Maintain Existing Business Forms, (II) Permitting Continued Intercompany Transactions and Historical Practices, and (III) Granting Certain Administrative Claims* (the "Cash Management Motion") filed concurrently herewith.

funds in accordance with the Debtors' current investment practices on an interim and final basis;

and (d) maintain existing business forms; (ii) permitting continued intercompany transactions

and historical practices; and (iii) granting certain administrative claims.

84.    In the ordinary course of their business, the Debtors utilize an integrated,

centralized cash management system (the "Cash Management System"), which includes all

activities necessary and pertinent to the collection, disbursing and investing of the Debtors' cash

assets.  The Cash Management System allows the Debtors to efficiently identify the Debtors'

cash requirements and transfer cash as needed to respond to these requirements.  The Debtors'

management maintains oversight over the Cash Management System and implements cash

management controls on behalf of the enterprise.  The Cash Management System was

specifically tailored to meet the Debtors' operating needs, enabling them to centrally control and

monitor corporate funds and toll collection revenues, ensure cash availability and liquidity,

invest excess cash, comply with the requirements and investment guidelines of the Financing

Documents, and reduce administrative expenses by facilitating the movement of funds.  The

Cash Management System is essential to efficient execution and achievement of the Debtors'

strategic business objectives, and, ultimately, to maximizing the value of the Debtors' estates.

85.    The Debtors' Cash Management System allows them to administer the cash of

their numerous operating units in a cost-effective, efficient manner.  Generally, funds received

(including by electronic funds transfer, check, wire, money order, credit card and cash) are

collected and concentrated in the relevant collection accounts, transferred to the relevant

operating accounts[12] and used to satisfy outstanding accounts payable.[13]

---

[12]      Proceeds from the Canadian Deposit Account (as defined below) are transferred to a Canadian master
proceeds account maintained at BNY, rather than to an operating account.

86.    In accordance with the limitations set forth in the Collateral Agency Agreement, the Debtors invest excess cash and the various reserve funds required under the Collateral Agency Agreement through the Collateral Agent in a Dreyfus money market fund (the "Money Market Fund"). The Money Market Fund complies with Rule 2a-7 of the Securities and Exchange Commission under the Investment Company Act of 1940 and is rated Aaa by Moodys.

87.    As of the Petition Date, the Debtors maintained and utilized approximately 28 bank accounts (the "Bank Accounts") at various financial institutions (the "Banks"). All Bank Accounts are pledged to the Collateral Agent. The Debtors' finance and corporate accounting departments manage the Bank Accounts, including the opening, closing and day-to-day maintenance of accounts, and perform monthly reconciliations of Bank Account information to the Debtors' general ledger.

88.    Generally, the Bank Accounts consist of (i) commercial checking accounts controlled by the Debtors for day-to-day operations (the "Operating Accounts") and (ii) certain other accounts, including disbursement and reserve accounts, controlled by the Collateral Agent for, among other things, funding the Debtors' monthly operating and maintenance expenditures, capital expenditures, debt service obligations and certain reserve requirements under the Financing Documents (the "BNY Accounts").

89.    The Operating Accounts are funded both from the Debtors' toll and other operating revenues and transfers from the BNY Accounts. The BNY Accounts were initially funded from proceeds of the transactions consummated by the Debtors under the Financing

---

[13]    In the ordinary course of its business, DWT LLC collects cash toll revenues on the Canadian side of the DWT. Pursuant to the Joint Operating Agreement, such funds are the property of Windsor, and accordingly are either passed through directly to Windsor (if received in Canadian Dollars) or deposited into the operating account of DWT LLC (if received in U.S. Dollars) and used to set off amounts owed by Windsor to DWT LLC pursuant to the Joint Operating Agreement.

Documents. Prior to the Petition Date, the BNY Accounts were managed in accordance with the

terms and conditions of the Financing Documents:

> (a)    Cash received by or on behalf of the Debtors was generally transferred weekly from certain Operating Accounts (as described in the table below) into a master proceeds account (the "Master Proceeds Account") maintained at the Collateral Agent pursuant to standing transfer instructions. On a monthly basis, American Roads provided a transfer certificate (the "Account Transfer Certificate") to the Collateral Agent, which, among other things, directed the Collateral Agent to (i) sweep any surplus funds from the BNY Accounts into the Master Proceeds Account and (ii) replenish shortfalls in the BNY Accounts with amounts available in the Master Proceeds Account in accordance with waterfall provisions set forth in the Collateral Agency Agreement.

> (b)    Together with the Account Transfer Certificate, American Roads provided the Collateral Agent with expenditure certificates (the "Expenditure Certificates") that detailed the Debtors' anticipated operating and maintenance expenditures and capital expenditures for the coming month and the extent to which such expenditures may exceed the amounts provided for such expenditures in the Debtors' annual budget ("Budget").[14]

> (c)    After reviewing and approving the Account Transfer Certificate and the accompanying Expenditure Certificates, the Collateral Agent disbursed the funds in accordance with the Accounts Transfer Certificate.[15]

90.    The following table details certain key Bank Accounts and their uses as part of the

Cash Management System:

| Category | Description |
| --- | --- |
| BNY Accounts | American Roads maintains a series of accounts at BNY as required by the Collateral Agency Agreement. These accounts are used to concentrate cash, hold reserves for debt service, capital expenditures, and operational contingencies; make short-term investments and disburse cash to operating subsidiaries based on monthly instructions |

---

[14]    The Budget is approved on an annual basis by a third-party technical reviewer.

[15]    In certain circumstances, the consent of Syncora, as Instructing Senior Creditor under the Financing Documents, is required in order for the Collateral Agent to authorize requested transfers. For example, such consent was required if the anticipated expenditures set forth in the Expenditure Certificates significantly exceed the amounts for such expenditures set forth in the Budget.

in accordance with the Budget.

| | |
|---|---|
| Alabama Deposit Accounts | Certain of the Debtors maintain deposit accounts at Regions Bank to receive cash and credit card toll revenues and other receipts.  Funds from these accounts are automatically swept every Thursday to the Master Proceeds Account maintained by American Roads at BNY. |
| Alabama Operating Accounts | Certain of the Debtors maintain operating accounts at Regions Bank for the purpose of funding operational expenses other than payroll, including taxes and trade payables.  Each of these accounts is funded by the Debtors' corporate accounting department on a monthly basis from the Master Proceeds Account maintained at BNY. |
| Alabama Toll Operations, LLC Account | ATO maintains an operating account at Regions Bank.  In addition to making accounts payable disbursements, the Debtors also fund payroll and payroll taxes for all Alabama employees via this account.  At the beginning of each month, the Debtors' corporate accounting department transfers cash from each of the Alabama operating companies to fund such companies' payroll for the month.  ATO transfers funds to the Debtors' third party payroll processor, Automatic Data Processing, Inc. ("ADP"), from the ATO operating account one (1) day before the scheduled pay date in an amount sufficient to cover all net payroll and related withholding obligations. |
| Detroit Operating Account | DWT LLC maintains an operating account at Chase Bank to make disbursements for operational expenses, including payroll, accounts payable, taxes and insurance.  Funds from this account that are not necessary for ongoing operations, based on projections of upcoming required disbursements, are wired on a periodic basis to the Master Proceeds Account maintained by American Roads at BNY.  This account is funded via weekly wire transfers from the Detroit Deposits Account. |
| Detroit Deposits Account | DWT LLC maintains a deposit account at Chase Bank to receive cash and credit card toll revenues.  The balance of funds in this account is wire transferred on a weekly basis to the Detroit Operating Account. |
| Canadian Operating Account | DWT LLC maintains an operating account at Scotia Bank for the purpose of funding operational expenses in Canadian Dollars, including payroll for Canadian Employees of non-debtor The Detroit Windsor Subway Company NSULC.  This account is funded on an as-needed basis from the Detroit Operating Account.  Additionally, DWT LLC receives reimbursements from the Windsor Detroit Tunnel Corporation into this account. |

| | |
|---|---|
| Canadian Deposit Account | DWT LLC maintains a deposit account at Scotia Bank to receive cash and credit card toll revenues and other receipts in Canadian Dollars.  Funds from this account are wire transferred every Thursday to the Master Proceeds Account maintained by American Roads at BNY. |
| Canadian Investment Account | DWT LLC maintains a certificate of deposit at Scotia Bank to guarantee its workers' compensation obligations in Canada. |

91.     As noted in the table above, in addition to administering payroll for its employees, DWT LLC administers payroll for its non-debtor subsidiary, the Detroit Windsor Subway Company NSULC ("DWSC"), which is the named employer for those employees who fulfill the Debtors' obligations under the applicable agreements in Canada.  On a regular periodic basis, DWT LLC processes and issues payroll checks for the DWSC's employees (the "Affiliate Payroll Processing System").  Amounts paid through the Affiliate Payroll Processing System total approximately $106,000 per pay period.  As part of the relief requested in the Cash Management Motion, the Debtors request authority to continue making such transfers to employees of DWSC in accordance with their Cash Management System and in compliance with any order of this Court permitting use of cash collateral.

92.     As noted in the table above, in addition to administering payroll for its employees, DWT LLC administers payroll for its non-debtor subsidiary, the Detroit Windsor Subway Company NSULC ("DWSC"), which is the named employer for those employees who fulfill the Debtors' obligations under the applicable agreements in Canada.  On a regular periodic basis, DWT LLC processes and issues payroll checks for the DWSC's employees (the "Affiliate Payroll Processing System").  Amounts paid through the Affiliate Payroll Processing System total approximately $106,000 per bi-weekly pay period.  As part of the relief requested in the Cash Management Motion, the Debtors request authority to continue making such transfers to

employees of DWSC in accordance with their Cash Management System and in compliance with any order of this Court permitting use of cash collateral.

93.    I believe it is essential that the Debtors are granted relief to continue to use the Cash Management System.  If the Debtors were not granted such relief, it may severely disrupt, and would likely cripple, the Debtors' ordinary financial operations.   Indeed, the Cash Management System is a mainstay of the Debtors' ordinary, usual and essential business practices.

iii.    **Customer Programs Motion**[16]

94.    By the Customer Programs Motion, the Debtors seek entry of an order authorizing them to honor their prepetition obligations to customers arising under essential, ordinary course customer dealings, promotion programs and other practices that are aimed at maintaining and improving existing customer satisfaction and attracting new customers (collectively, the "Customer Programs") and to continue such Customer Programs on a postpetition basis.

95.    In the ordinary course of conducting their businesses, the Debtors provide certain accommodations to customers in order to maintain positive customer relationships.  Maintaining the loyalty and goodwill of customers is fundamental to the Debtors' reorganization efforts.  The Debtors' ability to continue to collect electronically paid tolls is dependent on customer confidence that travelling through the Debtors' various Toll Facilities will provide time and cost savings.  To maintain the loyalty and goodwill of their customers, in the ordinary course of business the Debtors maintain the Customer Programs, to encourage electronic toll payment, enhance customer convenience and satisfaction and ensure that drivers continue to utilize the

---

[16]    See *Debtors' Motion for Entry of an Order Authorizing the Debtors to Honor Prepetition Obligations Associated with, and to Continue Customer Programs, in the Ordinary Course of Business* (the "Customer Obligations Motion") filed concurrently herewith.

Toll Facilities.  Accordingly, the Customer Programs are an important aspect of the Debtors'

business.  Maintaining and honoring the Customer Programs will be even more important as the

Debtors embark on their chapter 11 restructuring initiatives.  Indeed, I believe that the ability to

honor the Customer Program Commitments is necessary to retain their customer base and ensure

a smooth transition into chapter 11.

### a.   Prepaid Tolls.

96.     The Debtors collect prepaid tolls via customers' Nexpress® and Freedom Pass

electronic toll collection accounts.  Nexpress® and Freedom Pass are electronic toll systems that

read data from a transponder, a Radio Frequency Identification ("RFID") card, or a Quick

Response Code ("QRC") displayed on a card, a sticker or a smart phone.  Transponders, RFID

cards and QRC cards and stickers can be linked to either Nexpress® or Freedom Pass accounts,

and QRC codes displayed on smart phones are also available for Freedom Pass accounts.[17]  Each

time a customer uses his or her Nexpress® or Freedom Pass transponder, RFID card or QRC at a

Toll Facility, the customer account associated with that device is debited by the toll amount.  The

Debtors have approximately 17,000 active Nexpress® and Freedom Pass accounts as of the

Petition Date.

97.     When a customer opens a Nexpress® account, the Debtors collect $100 in prepaid

tolls.  When a customer opens a Freedom Pass account, the Debtors collect a variable amount

selected by the customer, with a general minimum of $30 per account.  The Debtors collect the

initial funding and subsequent replenishments by check, cash or charging the customer's credit

or debit card.  Generally, if a customer has so elected, when the prepaid balance of a customer's

account falls below a minimum threshold of $10 for Nexpress® accounts, or $12 for Freedom

---

[17]     As of August 2013, QRC codes displayed on smart phones will be available for Nexpress® accounts.

Pass accounts, the Debtors replenish the account balance to the minimum balances described above by collecting a check, cash or charging the customer's credit or debit card. Additionally, the Debtors collect deposits or fees ranging from $6 to $10 from customers who do not provide credit cards as security. No prepaid tolls are due back to the customer upon closure of the Nexpress® or Freedom Pass account and return of the card.

98.    Additionally, BCBC sells unlimited crossing passes (the "Unlimited Passes") for periods varying from three (3) days to one (1) year, which range in price from $25 to $755. BCBC amortizes the liability associated with Unlimited Passes on a straight line basis consistent with the life of each pass.

99.    As of the Petition Date, prepaid tolls on account of customers' Nexpress® and Freedom Pass accounts totaled approximately $910,000 (the "Prepaid Tolls"). The balance of BCBC's unamortized Unlimited Passes as of the Petition Date totaled approximately $191,000. The Debtors request authority to continue to apply the Prepaid Tolls and the Unlimited Passes to the respective customers' toll usage in the ordinary course of business

**b.    Relief Requested.**

100.    The Debtors believe that continuation of the Customer Programs is ordinary course activity that does not require Court approval. However, in an abundance of caution, given the importance of the Customer Programs to the Debtors' operations and reorganization efforts, the Debtors have filed the Customer Programs Motion. I believe that if the Debtors are not authorized to continue the Customer Programs during the pendency of these Chapter 11 Cases, their valuable business relationships with their customers will be severely jeopardized. Even a short delay by the Debtors in continuing their Customer Programs could cause serious and irreparable harm to the value of the Debtors' estates. Customer promotions and other incentives

43

are essential elements of the business and must be offered for the Debtors to maximize traffic

and revenue through the Toll Facilities.

101.     Moreover, I submit that the total amount to be paid or credited to customers if the

Court grants the requested relief is *de minimis* compared with the losses that the Debtors could

suffer if the patronage of their customers erodes at the outset of these cases.  In sum,

maintenance of the Customer Programs is essential to the continued vitality of the Debtors'

businesses and, ultimately, to their prospects for a successful reorganization.  Accordingly, the

Debtors submit that permitting them to continue to honor the Customer Programs, without

interruption, is in the best interests of their estates, their creditors and all other parties in interest.

iv.     **Employee Obligations Motion**[18]

102.     By the Wages Motion the Debtors seek entry of interim and final orders

authorizing them to pay prepetition claims, honor obligations, and/or continue certain employee-

related programs, in the ordinary course of business (collectively, the "Employee Obligations"),

including with respect to:

(a)     Unpaid Wages, Temporary Employee Obligations, Reimbursable Expenses, Vacation Time, and Paid Leave (each, as defined below);

(b)     Payroll Taxes, Benefit Deductions and Other Employee Deductions (each, as defined below);

(c)     Employee Benefits (as defined below);

(d)     Retirement Benefits (as defined below);

(e)     Workers' Compensation Programs and Other Programs (each, as defined below); and

---

[18]     See *Debtors' Motion for Entry an Order (I) Authorizing the Debtors to (A) Pay Certain Prepetition Wages, Salaries, Other Compensation and Related Costs and (B) Maintain and Continue Employee Benefits and Programs in the Ordinary Course, and (II) Authorizing and Directing Applicable Banks to Honor All Checks and Transfers Related to Such Obligations* (the "Employee Obligations Motion") filed concurrently herewith.

(f)       Provider Fees (as defined below).

      a.       **Wages**

103.     Employees are paid either by direct deposit or by manually issued check according to different pay cycles depending on their location of employment.  In order to facilitate payroll, the Debtors utilize a third-party payroll processor, ADP.[19]

104.     The chart below provides an overview of the Debtors' upcoming payroll dates for each of their Employee groups:

| Employee Group | Pay Date | Period Covered | ADP Funding Date |
|---|---|---|---|
| Alabama Employees | August 2 | July 14– July 27 | August 1 |
| Canadian Employees | August 1 | July 14 – July 27 | July 31 |
| Michigan Employees | August 8 | July 21 – August 3 | August 7 |

105.     On average, the Debtors pay approximately $229,000 per pay cycle to the Employees.  As of the Petition Date, the Debtors believe approximately $131,000 is unpaid on account of wages, salaries and other compensation earned prior to the Petition Date since the last applicable pay cycle ("Unpaid Wages").  The Debtors paid the Michigan Employees, the Alabama Employees, and the Canadian Employees on July 25, 2013,[20] July 19, 2013, and July 18, 2013, respectively, all then known payroll wage obligations.  Nonetheless, a few Employees may be entitled to compensation for services provided before these dates because (a) discrepancies may exist as to amounts paid or (b) certain payroll checks issued prior to the

---

[19]       Consistent with standard industry practices, once the Debtors fund their payroll obligations to ADP, the funds are under the control of ADP and not available to the Debtors.

[20]       In accordance with their customary payroll procedures, the Debtors funded their obligations to the Michigan Employees on July 24, and ADP processed payments to the Michigan Employees at the beginning of the calendar day on July 25.

Petition Date may not have been presented for payment or may not have cleared the banking

system as of the Petition Date.

106.    Certain of the Debtors utilize temporary staffing to provide additional support for

the Debtors' traffic control, toll collection and general accounting activities on an as-needed

basis (the "Temporary Employees").  The Debtors have engaged certain staffing agencies (the

"Staffing Agencies") to provide such Temporary Employees.  Accordingly, the Temporary

Employees are paid by the Debtors indirectly through payments to the Staffing Agencies.  The

Debtors pay the Staffing Agencies approximately $150,000 per year.  As of the Petition Date, the

Debtors estimate that they owe no more than approximately $15,000 to the Staffing Agencies

(the "Temporary Employee Obligations").  The Debtors believe that if the Temporary

Employees are unpaid as a result of the filing of these Chapter 11 Cases, the Staffing Agencies

will not permit the Temporary Employees to continue to provide services to the Debtors.

Further, the Staffing Agencies may refuse to provide Temporary Employees to the Debtors in the

future.  The loss of services from currently staffed Temporary Employees and from the Staffing

Agencies on a prospective basis would be disruptive to the Debtors' operations.

107.    I do not believe that any Unpaid Wages or Temporary Employee Obligations as to

any individual Employee or Temporary Employee exceeds the priority cap of $12,475 under

section 507(a)(4) of the Bankruptcy Code (the "Priority Cap").

**b.    Reimbursable Expenses**

108.    Prior to the Petition Date and in the ordinary course of their businesses, the

Debtors reimbursed Employees or paid credit card invoices on behalf of Employees for

approved, legitimate expenses incurred on behalf of the Debtors in the scope of the Employees'

employment (the "Reimbursable Expenses").

109.    The Debtors reimburse Reimbursable Expenses (other than those paid by the Debtors directly on account of credit card invoices) to Employees after processing and approving expense reports containing receipts for all items to be reimbursed.  Reimbursement is thus contingent on the Debtors' determination that the charges are for legitimate, reimbursable business expenses.  In aggregate, the Debtors pay approximately $20,000 per month on account of Reimbursable Expenses.  Although the Debtors request that Employees submit reimbursement requests promptly, not all Employees are able to do so.  Therefore, it is difficult for the Debtors to precisely calculate the amount of Reimbursable Expenses outstanding as of the Petition Date.  Based on historical practices, the Debtors estimate that, as of the Petition Date, not more than $5,000 in total Reimbursable Expenses remains unpaid.

110.    Employees incurred Reimbursable Expenses as business expenses on the Debtors' behalf and with the understanding that they would be reimbursed.  To avoid harming Employees who incurred the Reimbursable Expenses, the Debtors request authority to (a) continue reimbursing the Reimbursable Expenses in accordance with prepetition practices, (b) honor any prepetition obligations related thereto and (c) modify their prepetition policies relating thereto as they deem appropriate.

**c.    Vacation and Sick Days**

111.    As part of their overall compensation, Employees are entitled to vacation as a paid time-off benefit on the basis described herein (the "Vacation Time").  After six (6) months of continuous full time employment with the Debtors, Non-Union Employees begin to accrue Vacation Time, which is earned at different rates depending on the length of an Employee's service.  Part-time Employees accrue vacation on a pro-rated basis.  Non-Union Employees accrue vacation as follows:

47

- Employees with between six (6) months and four (4) years of service earn 2.5 days every quarter (total of 10 days per year).

- Employees with between four (4) and 11 years of service earn 3.75 days every quarter (total of 15 days per year).

- Employees with more than 11 years of service earn five (5) days every quarter (total of 20 days per year).

At termination or retirement, Non-Union Employees with more than six (6) months of continuous service for the Debtors are paid in full for accrued and unused Vacation Time.

112.    Canadian Union Employees who have worked 1,040 or more hours in the year preceding their service anniversary date are entitled to Vacation Time as follows:

- Employees with between one (1) and four (4) years of service earn 14 days of vacation with 80 hours of pay.

- Employees with between (4) and 12 years of service earn 21 days of vacation with 120 hours of pay.

- Employees with between 12 and 21 years of service earn 28 days of vacation with 160 hours of pay.

- Employees with more than 21 years of service earn 35 days of vacation with 200 hours of pay.

113.    Canadian Union Employees who have worked less than 1,040 hours in the year preceding their service anniversary date are entitled to compensation on account of Vacation Time as follows:

- Instead of 80 hours of pay, four percent (4%) of gross earnings;

- Instead of 120 hours of pay, six percent (6%) of gross earnings;

- Instead of 160 hours of pay, eight percent (8%) of gross earnings; and

- Instead of 200 hours of pay, 10% of gross earnings.

At termination or retirement, Canadian Union Employees with more than one year of service are paid in full for accrued and unused Vacation Time.  If a Canadian Union Employee has accrued

at least six (6) months of Vacation Time as of the date of retirement, he shall receive his full

Vacation Time entitlement for the year.  If a Canadian Union Employee has, at the time of his

retirement, accrued less than six (6) months of Vacation Time, his Vacation Time entitlement

shall be his accrued entitlement at the time of his retirement.

114.    Michigan Union Employees who have worked 1,040 or more hours in the year

preceding their service anniversary date are entitled to Vacation Time as follows:

- Employees with between one (1) and four (4) years of continuous service earn 14 days of vacation with 80 hours of pay.

- Employees with between four (4) and 11 years of continuous service earn 21 days of vacation with 120 hours of pay.

- Employees with 11 years or more of continuous service earn 28 days of vacation with 160 hours of pay.

- Employees hired before November 30, 1990, who have completed 20 years or more of continuous service earn 35 days of vacation with 200 hours of pay.

115.    Vacation Time for Michigan Union Employees who have worked less than 1,040

hours in the year preceding their service anniversary date is calculated in the same manner as

with respect to Canadian Union Employees.  At termination, Michigan Union Employees with

more than one year of continuous service are paid in full for accrued and unused Vacation Time.

116.    Additionally, most Employees are provided paid sick days, one or more paid

personal days and holidays (together, the "Paid Leave," and collectively with Unpaid Wages,

Reimbursable Expenses and Vacation Time, the "Employee Compensation") each calendar year,

all of which must be used within that year, or lost.  Generally, if unused, Paid Leave may not be

cashed out upon termination or retirement and may not be carried over to the following year.

117.    My employment is subject to an employment contract with DWT LLC, which the

Debtors intend to assume in connection with the Plan.  When considered together with my

Unpaid Wages, it is possible that my amount of Vacation Time may exceed the Priority Cap.

49

Accordingly, the Debtors seek authority to permit my ability to take paid Vacation Time in the ordinary course; however, absent Court approval, the Debtors will not make any cash payments during the pendency of these Chapter 11 Cases on account of the Vacation Time I have earned prior to the Petition Date.  It is my understanding that none of the other Employees' amounts of Vacation Time will exceed the Priority Cap.  Therefore, the Debtors request authorization to continue to provide Vacation Time and Paid Leave as they did in the ordinary course prepetition.

> **d.** **Payroll Taxes, Benefit Deductions and Other Employee Deductions.**

118.     The Debtors are required by law to withhold from Employees' paychecks amounts related to federal, state and local income taxes, U.S. social security and Medicare taxes, and Canadian  pension and health tax (collectively, the "Withholding Taxes") and to remit the same to the appropriate taxing authorities (collectively, the "Taxing Authorities").  In addition, the Debtors are required to make matching payments from their own funds on account of social security and Medicare taxes and to pay, based on a percentage of gross payroll and subject to state or provincial-imposed limits, additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance, Canadian workers compensation insurance, and Canadian health tax (collectively, the "Employer Payroll Taxes" and, together with the Withholding Taxes, the "Payroll Taxes").  The Debtors, through ADP, remit to the Taxing Authorities approximately $45,000 on account of Payroll Taxes per pay cycle.  As of the Petition Date, the Debtors estimate that they owe approximately $25,000 to the Taxing Authorities on account of Payroll Taxes relating to the prepetition period, and representing both the Debtors' and Employees' portions of such federal, state, and local taxes.

119.     During each pay cycle, the Debtors, through ADP, deduct certain amounts from Employee paychecks, including, without limitation, (a) garnishments, child support and similar deductions and (b) other pre-tax and after-tax deductions payable pursuant to certain Employee

Benefits discussed herein, such as an Employee's share of health care benefits, and insurance premiums (collectively, the "Benefit Deductions"), and forward those amounts to the administrators of the applicable programs and other various third-party recipients.

120.    In addition, the Debtors deduct from the Employees' paychecks amounts for certain miscellaneous Employee Benefits paid by the Debtors on behalf of Employees (collectively the "Other Employee Deductions").  Such amounts include contributions to 401(k) plans, repayment of employee 401(k) loans, union dues, and employee contributions to United Way campaigns.  Per provisions of the CBAs, the Debtors are required to withhold monthly union dues from Union Employees' paychecks and remit the dues to the respective unions within specified timeframes.  The Debtors estimate that as of the Petition Date, union dues currently due and owing are approximately $3,225.

121.    Accordingly, the Debtors seek authority, in their sole discretion, to direct ADP to continue to forward any prepetition Payroll Taxes and Benefit Deductions to the applicable third party on a post-petition basis, in the ordinary course of business.  Similarly, the Debtors seek authority, in their sole discretion, to continue to forward any prepetition Other Employee Deductions to the applicable third parties postpetition in the ordinary course of business.

**e.    Payment of Prepetition Employee Benefit Claims**

122.    Prior to the Petition Date, the Debtors offered full-time Employees various standard employee benefits (collectively, the "Employee Benefits") including, but not limited to: (i) 401(k) plans; (ii) medical, dental and vision plans; (iii) basic life and accidental death and dismemberment, short-term disability and long-term disability insurance; (iv) Opt-Out Incentives (as defined below); and (v) the Severance Plans (as defined below).

i.     401(k) Plans.

123.    DWT LLC maintains two 401(k) plans (the "401(k) Plans"), administered by the

Principal Life Insurance Company,[21] through which participating Employees may defer a portion

of their salary and/or may make post-tax contributions.  The 401(k) Plans include the Detroit

Windsor Tunnel Union 401(k) Plan for Michigan Union Employees and the Detroit Windsor

Tunnel 401(k) Plan for Michigan and Alabama Non-Union Employees.  The 401(k) Plans are

open to all Employees on the Debtors' United States payrolls, including Canadian citizens.

124.    Employees with more than 1,000 service hours in the relevant plan year are

eligible for employer "matching" contributions in the following manner:

- Under the Detroit Windsor Tunnel 401(k) Plan, (a) Non-Union Michigan and Alabama Employees who contribute less than 5% of their annual pay receive a matching contribution equal to the lesser of (x) 1% of such Employee's annual pay and (y) 25% of such Employee's contribution, and (b) Non-Union Michigan and Alabama Employees who contribute 5% or more of their annual pay receive a matching contribution of 2% of such Employee's annual pay.

- Under the Detroit Windsor Tunnel Union 401(k) Plan, Michigan Union Employees receive matching contributions equal to 25% of the Employee's contributions until such contributions reach 8% of such Employee's annual pay.  Contributions that exceed 8% of annual pay are not matched.

125.    Employees are eligible for matching payments upon hiring provided they are

contributing.  The Debtors' matching contributions fully vest immediately for all eligible

Employees.  Accordingly, an Employee's contributed funds, any matching funds, and investment

earnings belong to the Employee.  Matching contributions are generally made on or about

December 31 of each year.  The total amount paid in respect of matching contributions in 2012

---

[21]    Certain fees paid to Principal Life Insurance Company are funded from each of the covered 401(k) Plans. Accordingly, by this Motion, the Debtors are not seeking authorization to pay directly any such amounts that are paid through 401(k) plan funds.

was approximately $30,000.  The match paid to Union Employees is subject to the provisions of the CBAs.

126.    Approximately 29 Michigan Employees and 5 Alabama Employees currently participate in the 401(k) Plans.  Employee contributions to be remitted to the 401(k) Plans on account of the next pay cycle are estimated to be approximately $7,600.

127.    The Debtors seek authorization to collect and pay any and all prepetition and postpetition amounts attributable to the 401(k) Plans and to make all employer matches if these cases are ongoing at the December 31 match date.

ii.    Medical, Dental and Vision Plans.

128.    All Employees scheduled to work 40 or more hours per week are eligible for coverage beginning on their 90th day of employment unless a different eligibility date is described in an applicable CBA.  The Debtors offer Employees medical insurance, dental insurance and vision insurance.  Generally, the plans are fully insured, meaning that the Debtors pay the insurance carrier a monthly premium using agreed upon premium rates, and the insurance carrier pays Employees' claims based on the terms of the applicable plan.[22] Employees may enroll in any of the health plans for which they are eligible, or, alternatively, they may waive enrollment if they have provided proof of alternative equitable coverage.

129.    Generally, medical, dental and vision benefits sponsored by the Debtors continue until an Employee's final date of service.  Coverage may continue post-employment in certain circumstances, such as retirement.  Employees and their eligible dependents have the right to continue (as defined by law) medical, dental and/or vision coverage under COBRA for the benefits to which they subscribed during employment.

---

[22]    The Debtors maintain one self-insured program that covers limited and specific testing and diagnostic procedures.  The average amount of claims paid by the Debtors through this program each year is less than $1,000.

130.    The Debtors pay on average $60,900 per month for Employee health care coverage.  The Debtors request authorization to pay these amounts to providers of the Employee Benefits and to continue to fund all post-petition claims relating to the Employee Benefits in the ordinary course of business as they become due and payable.

iii.    Disability Plan, Life Insurance Plan and Supplemental Plan.

131.    The Debtors provide and/or offer a number of other insurance benefits to their Employees, including basic life and accidental death and dismemberment, short-term disability and long-term disability.  The Debtors' contribution for such plans is approximately $43,000 per year.  The Debtors request authorization to continue to provide basic life and accidental death and dismemberment, short-term disability and long-term disability insurance to Employees in the ordinary course of business.

iv.    Opt-Out Incentive.

132.    The Debtors offer an opt-out incentive (an "Opt-Out Incentive") to Employees who decline and waive, in writing, coverage under certain benefit plans for which they are eligible in a given plan year.  The Opt-Out Incentive is paid to an Employee in the form of taxable compensation if he or she waives benefit coverage for such plan year.  The Opt-Out Incentive amount equals 50% of the cost of coverage waived by the Employee for the plan year and is paid in accordance with the regular payroll cycle at the end of each calendar quarter.  If an Employee participating in the Opt-Out Incentive terminates employment during a calendar quarter, he or she receives a ratable portion of the Opt-Out Incentive for such quarter.  Currently five Employees receive the Opt-Out Incentive.  The Debtors request authority to maintain the Opt-Out Incentive and to continue to make such payments in the ordinary course of business regardless of whether such payment obligations were incurred before or after the Petition Date.

54

v.    Severance Obligations.

133.    The Debtors are required, pursuant to the Canada Labour Code, to pay any statutorily-determined severance owed to Canadian Employees.  The Debtors, therefore seek authority to pay any severance obligations arising under Canadian law in accordance with the relevant regulations, and which in the Debtors sole judgment and consistent with the Debtors' calculations are due and owing postpetiton even if for prepetition service.

**f.    Pension Plan and Retirement Plan and Programs.**

134.    The Debtors maintain four defined benefit pension plans (the "Pension Plans"): (a) Detroit Windsor Tunnel, LLC U.S. Salaried Employees' Pension Plan, for Michigan Non-Union and Alabama Employees; (b) Detroit Windsor Tunnel, LLC Hourly-Rate U.S. Employees' Pension Plan, for Michigan Union Employees; (c) Detroit Windsor Tunnel, LLC Pension Plan for Hourly-Rate Canadian Employees, for Canadian Union Employees; and (d) Detroit Windsor Tunnel, LLC Canadian Salaried Employees Pension Plan, for Canadian Non-Union Employees. These plans are cash balance defined benefit plans that cover certain eligible Employees of the Debtors.

135.    Approximately 90 Employees currently participate in the Pension Plans.  The Debtors contribute an amount at least equal to the minimum legal funding requirement for the Pension Plans.  During 2012, the Debtors contributed approximately $1.1 million to the Pension Plans.

136.    The Debtors also offer medical, dental and vision coverage to certain retired Employees (the "Retiree Coverage," and together with the Pension Plans, the "Retirement Benefits").  Retiree Coverage is provided under insured arrangements.  The Debtors' monthly expense for Retiree Coverage is approximately $21,300.

137.    The Debtors request authority to maintain the Retirement Benefits and continue to make all required contributions regardless of whether qualified expenses were incurred before or after the Petition Date.

### g.    Workers' Compensation Programs and Other Programs.

138.    Under the laws of Michigan, Alabama and Canada, the Debtors must maintain workers' compensation insurance ("Workers' Compensation Programs").  U.S. Fire Insurance Company is the Debtors' U.S. workers' compensation carrier.  The annual  premium in respect of U.S. workers' compensation insurance is approximately $81,300, and is scheduled for renewal on November 20, 2013.  For Canadian Employees, the Debtors pay into an accident fund maintained by the Workplace Safety and Insurance Board of Ontario and maintain a stop-loss policy with Zurich Insurance.  The annual  premium in respect of Canadian workers' compensation insurance is approximately $32,000.

139.    The Debtors provide other employee benefit programs, including business travel insurance which provides coverage for accidental death and dismemberment and permanent total disability for employees injured on business travel ("Business Travel Insurance") and the Directors & Officers, Employment Practices Liability and Fiduciary Insurance (the "D&O Insurance").  The annual cost for the Business Travel Insurance and D&O Insurance is approximately $43,361.  The Debtors utilize the services of Ceridian Corporation to administer employee assistance program hotlines (the "Hotline Program").  Employees can utilize the Hotline Program to help them resolve personal problems that may interfere with work.  The Debtors pay Ceridian in the U.S. and Canada approximately $750 and $190 per quarter, respectively.  The Debtors also utilize the services of Credential Check, which conducts pre-employment criminal background checks, and Concentra (together with Credential Check, the "Pre-Employment Services," and collectively with the Business Travel Insurance, the D&O

Insurance and the Hotline Program, the "Other Programs"), which conducts physicals for prospective Employees.  The services provided by Credential Check and Concentra are critical to the Debtors' ability to employ qualified staff.  The total annual cost of the Pre-Employment Services is approximately $6,000.

140.    The Debtors request authority to maintain the Workers' Compensation Programs and the Other Programs, and to continue to make such payments in the ordinary course of business regardless of whether such payment obligations were incurred before or after the Petition Date.

### h.    Payroll Administrator and Other Benefit Providers.

141.    As described above, the Debtors utilize the services of ADP to facilitate the administration of wages and benefits for Employees.  ADP's responsibilities include processing payroll and transferring funds collected from Payroll Taxes, Benefit Deductions and Other Employee Deductions to the applicable third-party recipients.  In connection with these services, the Debtors pay ADP a total of approximately $700 each pay cycle (the "Payroll Fees").  Services provided by ADP are crucial to the functioning of the Debtors' payroll system, and the Debtors request permission to pay any unpaid prepetition Payroll Fees.

142.    The Debtors also utilize the services of various other benefit providers to administer benefits for their Employees.  In connection with these services, the Debtors pay such benefit providers certain fees ("Benefit Fees," and together with the Payroll Fees, the "Provider Fees").  For example, the Debtors employ outside consultants to prepare compliance filings including annual financial statement audits of the 401(k) Plans and preparation of IRS Form 5500s for the 401(k) Plans.  Additionally, from time to time, the Debtors pay Principal Life Insurance Company certain fees for ad hoc reporting and related tasks in connection with the

57

401(k) plans.  A portion of the costs for preparation of the filings and related fees  for calendar year 2013 will cover the prepetition period.

143.    The annual cost for such Benefit Fees is approximately $228,600.  As the services provided by such benefit providers are crucial to the functioning of the Debtors' benefit programs, the Debtors request permission to pay any prepetition fees or expenses owed to such benefit providers on account of their services.

144.    The Debtors request authority to make payments on account of the Provider Fees in the ordinary course of business regardless of whether such payment obligations were incurred before or after the Petition Date.

### i.    Relief Requested.

145.    I believe the relief requested in the Employee Obligations Motion is necessary to avoid immediate and irreparable harm to the Debtors and all parties in interest.  The Employees are vital to the Debtors' operations and the success of the Plan.  Failure to satisfy the Employee Obligations in the ordinary course of business within the first 21 days of these Chapter 11 Cases will cause Employees to terminate employment or will reduce productivity on account of lowered employee morale.  The Debtors' operations would be severely disrupted at a critical juncture in their restructuring.  Additionally, the Employees rely on their compensation, benefits and reimbursement of expenses to pay their living expenses and the effect could be financially ruinous if the Debtors cannot pay them in the ordinary course of business.

146.    Because most of the Employee Obligations are priority claims, the Debtors are required to pay these claims in full to confirm the Plan.  Moreover, the Debtors intend to assume all Employee Obligations in accordance with the terms of the Plan.  Accordingly, granting the relief sought herein only affects the timing of such payments to Employees, and the Debtors seek to emerge from chapter 11 within two months from the Petition Date, subject to the Court's

schedule.  Therefore, I believe that the relief requested in the Employee Obligations Motion is appropriate in the Chapter 11 Cases.

      vi.    **Insurance Motion**[23]

    147.    By the Insurance Motion, the Debtors seek entry of an order (i) authorizing, but not directing, the Debtors to continue performing their obligations under the Insurance Policies (as defined below), including the authority to pay any amounts potentially owed respecting Insurance Policy premiums and/or deductibles whether such obligations relate to the prepetition or postpetition period, (ii) authorizing all applicable financial institutions to receive, process, honor and pay any and all checks or wire transfer requests in respect of the Insurance Policies, and (iii) authorizing the Debtors to enter into new policies on an as needed basis during the postpetition period without further Court approval.

    148.    In connection with their business operations, the Debtors maintain multiple insurance policies for their own benefit and the benefit of their non-debtor affiliate, Windsor Subway (each an "Insurance Policy" and, collectively, the "Insurance Policies").  The Insurance Policies vary in amounts and types of coverage in accordance with prudent business practices, state and local laws governing the jurisdictions in which the Debtors operate and various contractual obligations.  The Insurance Policies provide coverage for, among other things, general liability, property, directors and officers, automobile liability, terrorism liability, cyber-security, crime, fiduciary liability and umbrella/excess liability.  The total annual premiums under the Insurance Policies are approximately $1.3 million.  There are no payments due within 45 days of the Petition Date.  Annual insurance premiums (the "Insurance Premiums") are paid

---

[23]    See *Debtors' Motion for Entry of an Order Authorizing the Debtors to (A) Continue Prepetition Insurance Policies in the Ordinary Course of Business and (B) Pay All Prepetition Obligations in Respect Thereof* (the "Insurance Motion") filed concurrently herewith.

by the Debtors in a lump sum payment before or around the date that coverage begins. Deductibles are subtracted by the Insurance Carriers from settlements payable to the Debtors and are payable by the Debtors to the Insurance Carriers for settlements payable to third parties (the "Deductibles").  As of the Petition Date, the Debtors estimate that they owe Insurance Carriers $1,750 and, pending the outcome of an ongoing litigation, may owe up to an additional $5,000 for these deductibles.  The Debtors do not have premium financing arrangements in place with respect to any of the Insurance Policies.

149.   The coverage provided under the Insurance Policies is essential for preserving the value of the Debtors' assets and, in many instances, such coverage is required by various regulations, laws and contracts that govern the Debtors' business operations.  If the Debtors fail to perform their obligations under the Insurance Policies, their coverage thereunder could be voided.  I have been informed that such a disruption of the Debtors' insurance coverage could expose the Debtors to serious risks, including but not limited to:  (a) direct liability for the payment of claims that otherwise would have been payable by the Insurance Carriers; (b) material costs and other losses that otherwise would have been reimbursed by the Insurance Carriers under the Insurance Policies; (c) the loss of good standing certification in jurisdictions that require the Debtors to maintain certain levels of insurance coverage; (d) the inability to obtain similar types of insurance coverage; and (e) higher costs for re-establishing lapsed policies or obtaining new insurance coverage.  Any or all of these consequences could cause serious harm to the Debtors' businesses and to their ability to consummate the restructuring contemplated by the Plan.  Accordingly, I believe the relief requested in the Insurance Motion is in the best interests of the Debtors, their estates and creditors, and all parties in interest.

vii.    **Taps and Fees Motion**[24]

150.    By the Taxes and Fees Motion, the Debtors seek entry of interim and final orders

authorizing them, in their sole discretion to pay to the applicable taxing authorities in the

ordinary course of business any taxes, fees or charges, as well as related penalties, interest or

similar charges, that accrued and were due and owing prior to the date hereof or become due and

owing during the pendency of these Chapter 11 Cases (collectively, the "Taxes and Fees").   The

Taxes and Fees may include amounts relating to tax audits that have been completed, are in

progress or arise from prepetition periods.

151.    The Debtors incur real and personal property, business and occupation, and

various other taxes, fees and charges on behalf of numerous governmental authorities

(collectively, the "Authorities,") in the ordinary course of business.  The Debtors remit Taxes

and Fees to the respective Authorities in the ordinary course of business and in accordance with

all applicable laws and regulations.  As of the Petition Date, the Debtors believe that they have

timely filed substantially all applicable returns for the Taxes and Fees.

152.    The Debtors are pass-through entities or report as part of consolidated returns for

federal income tax purposes.  Accordingly, each individual Debtor's income or loss is reported

for federal income tax purposes either by the member of Holdco, ANAR, or within the

consolidated return of ANAR.   The Debtors, therefore, do not directly incur federal or state

income tax liabilities.

153.    The following table contains descriptions of the Taxes and Fees and the Debtors'

estimate of the amounts of the Taxes and Fees accrued as of the Petition Date, as well as the

---

[24]    See *Debtors' Motion for Entry of Interim and Final Orders Authorizing the Payment of Certain Prepetition Taxes and Fees* (the "Taxes and Fees Motion") filed concurrently herewith.

amounts of such Taxes and Fees that are estimated to be paid within 45 days of the Petition Date

if the relief requested in the Taxes and Fees Motion is granted:

| Category | Description | Amount Accrued as of Petition Date | Amount Requested To Be Paid Within 45 Days |
|---|---|---|---|
| Real & Personal Property Taxes[25] | The Debtors incur real and personal property taxes in a number of states and localities on account of real property, equipment and other personal property maintained in those jurisdictions. | $674,000 | $400,000 |
| Franchise/Privilege Taxes | The Debtors incur and remit franchise taxes in a number of jurisdictions based on their income tax base, assets and/or a number of other factors. Payment of such taxes is required for the Debtors' continued operations in the relevant jurisdictions. The Debtors typically pay these taxes on an annual basis. | $ 0.00[26] | $0.00 |
| Miscellaneous Fees and Permits | The Debtors incur miscellaneous inspection and permit fees assessed in various jurisdictions related to fire, electrical, HVAC, elevators, radio, signs, etc. Payment of such fees and permits is required for the Debtors' continued operations. | $0.00[27] | $2,000[28] |

154.    Specifically, with respect to 2013 property taxes, the Debtors expect to make their

first annual real and personal property tax installment payment of approximately $400,000 to the

---

[25]    Assessments for certain of the Debtors' 2013 real and personal property tax obligations have not yet been published. In such cases, the above table reflects 2012 real and personal property assessment amounts. The Debtors' real and personal property tax obligations to the City of Detroit for 2013 are payable in part in August 2013, with the remainder payable in January 2014. The Debtors' real and personal property tax obligations in Alabama are due and payable in late 2013.

[26]    The Debtors paid all franchise tax and business privilege fees for 2013 prior to the Petition Date such that no amounts are outstanding as of the Petition Date or expected to be due within 45 days of filing.

[27]    Miscellaneous Fees and Permits arise in irregular time increments. The Debtors are not aware of any amounts accrued on account of Miscellaneous Fees and Permits as of the Petition Date.

[28]    Miscellaneous Fees and Permits paid in the first 45 days after the Petition Date are not expected to exceed $2,000.

City of Detroit and Wayne County on or about August 15, 2013. The balance of the annual tax will be paid in January 2014.

155.    As described above, the Debtors, with the support of their only secured creditor entitled to receive value on account of its claims under the Plan, have proposed a Plan that does not impair the Authorities' claims. I understand that under the Plan, Taxes and Fees, as secured or priority claims, will be paid in full on the later of the effective date of the Plan or in the ordinary course of business. Thus, the relief sought in the Taxes and Fees Motion seeks to alter only the timing, not the amount, of payments to the Authorities. Furthermore, payment of the Taxes and Fees is critical to the Debtors' continued, uninterrupted operations and no creditor will be prejudiced by the relief requested herein. I believe payment of the Taxes and Fees is prudent and in the best interests of the Debtors' estates and stakeholders.

viii.    **Utility Motion**[29]

156.    By the Utility Motion, the Debtors seek entry of interim and final orders:  (a) prohibiting the Utility Providers (as defined below) from altering, refusing, or discontinuing services on account of prepetition amounts outstanding and on account of any perceived inadequacy of the Debtors' proposed adequate assurance; (b) determining that the Utility Providers (as defined herein) have been provided with adequate assurance of payment within the meaning of section 366 of the Bankruptcy Code; (c) determining that the Debtors are not required to provide any additional adequate assurance beyond what is proposed by this Motion; and (d) approving the Debtors' proposed offer of adequate assurance and procedures governing the Utility Providers' requests for additional or different adequate assurance.

---

[29]    See *Debtors' Motion for Entry of Interim and Final Orders Pursuant to Section 366(b) of the Bankruptcy Code (I) Prohibiting Utility Providers From Altering, Refusing, or Discontinuing Utility Services, (II) Deeming Utility Providers Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment* (the "Utility Motion") filed concurrently herewith.

157.    The Debtors incur utility expenses in the ordinary course of business for, among other things, water, electricity, natural gas, local and long-distance telephone service, mobile communications, internet and other similar services (the "Utility Services").  The Debtors have spent an average of approximately $71,500 each month on Utility Services over the past twelve months.  These Utility Services are provided by various utility providers located in the United States and Canada (collectively, the "Utility Providers"), with several Utility Providers having multiple accounts with the Debtors.  Three of the Utility Providers hold security deposits that exceed the Debtors' average monthly payment to such providers.  Prior to their chapter 11 filings, the Debtors made timely monthly payments to the Utility Providers.  To the best of my knowledge, there are no defaults or arrearages of any significance with respect to the Debtors' undisputed invoices from the Utility Providers, other than payment interruptions that may be caused by the commencement of the Chapter 11 Cases.  The Debtors intend to pay all postpetition obligations owed to the Utility Providers in a timely manner, and I believe that their cash flows from operations and cash on hand will be sufficient to do so.

158.    After consideration of the average payments to Utility Providers over the last year, I believe that the Adequate Assurance Deposit of $33,400, which is approximately 50 percent of the Debtors' average monthly cost of Utility Services, in combination with the Debtors' ability to pay for Utility Services in the ordinary course of business postpetition, constitutes adequate assurance of future payment, especially in light of the anticipated short length of the Chapter 11 Cases.  The Debtors request that the Court order that, absent compliance with the procedures to request Additional Adequate Assurance set forth in the Utilities Motion, the Utility Providers are forbidden from altering, refusing or discontinuing service to the Debtors

on account of: (i) unpaid charges for prepetition services, (ii) a pending Additional Assurance
Request, or (iii) any objections filed in response to the Proposed Adequate Assurance.

159.    If the Utility Providers are permitted to terminate services under section 366 of
the Bankruptcy Code, the Debtors will be forced to cease the affected operations, resulting in a
severe disruption, loss of revenue and profits, and potentially the destruction of their businesses.
Such disruption and loss would at a minimum cause substantial harm to the Debtors' efforts to
expeditiously restructure their business affairs and would be detrimental to the estates and the
Debtors' creditors. Accordingly, I believe it is essential that the Utility Providers continue to
provide their services without interruption.

## C.    Professional Motions

160.    In addition to the First Day Motions, the Debtors have filed or intend to file
certain motions related to the retention of various professionals. Such Professional Motions will
be heard at a subsequent hearing date to be established by the Court.

### i.    **Cleary Gottlieb Retention Application**[30]

161.    The Debtors have determined that it is necessary to engage counsel with
knowledge and experience in the areas of bankruptcy, reorganization, tax, corporate governance
and other matters. Such counsel will enable the Debtors to carry out their duties in the Chapter
11 Cases and to assist in the reorganization of their estates. The Debtors, therefore, seek to retain
and employ Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb") as their restructuring
attorneys in all phases of the Chapter 11 Cases.

---

[30]    See *Debtors' Application for an Order Authorizing Employment and Retention of Cleary Gottlieb Steen &
Hamilton LLP as Counsel for the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition Date* (the
"Cleary Gottlieb Retention Application").

162.    I understand that Cleary Gottlieb is a law firm, which employs more than 1,200 attorneys and maintains offices for the practice of law at One Liberty Plaza, New York, New York, as well as offices in Washington, D.C.; Paris, France; Brussels, Belgium; London, England; Moscow, Russia; Frankfurt, Germany; Cologne, Germany; Rome, Italy; Milan, Italy; Hong Kong; Beijing, China; Buenos Aires, Argentina; São Paulo, Brazil; Abu Dhabi, United Arab Emirates; and Seoul, South Korea.  I also have been informed that Sean A. O'Neal of Cleary Gottlieb, the lead partner who will be engaged in the Chapter 11 Cases, is a member in good standing of, among others, the Bar of the State of New York and the United States District Court for the Southern District of New York.

163.    Over the course of its representations of the Debtors, Cleary Gottlieb has become familiar with the Debtors' business  and affairs, including the transactions contemplated by the RPSA and the Plan, as well as the legal issues that may arise in these proceedings.  Cleary Gottlieb's present representation of the Debtors regarding the restructuring contemplated in these Chapter 11 Cases began on May 17, 2013.  Additionally, from March 2010 until May 14, 2013, Cleary Gottlieb represented the Debtors together with their existing owner, ACP, in various matters including litigation, corporate law, restructuring and bankruptcy, and between October 2012 and May 2013, Cleary Gottlieb represented the Debtors, together with ACP and John S. Laxmi, a director of American Roads, in connection with a lawsuit filed by Syncora in the Supreme Court of the State of New York, which has since been dismissed without prejudice against such parties.  I have been informed that Cleary Gottlieb does not hold or represent any interest adverse to the Debtors or their estates, and that Cleary Gottlieb is a "disinterested person" as that phrase is defined in section 101(14) of the Bankruptcy Code, as modified by section 1107(b) of the Bankruptcy Code.

164.    The Debtors believe, and I agree, that Cleary Gottlieb is both well qualified and uniquely able to represent the Debtors in the Chapter 11 Cases in an efficient and timely manner. Accordingly, I respectfully submit that the Cleary Gottlieb Retention Application should be approved.

ii.    **Curtis Retention Application as Conflicts Counsel**[31]

165.    The Debtors intend to seek retention of Curtis, Mallet-Prevost, Colt & Mosle LLP ("Curtis") as their conflicts counsel in these Chapter 11 Cases. Curtis has extensive experience and knowledge in, and is widely recognized for the level of its services in the role of conflicts counsel in cases under chapter 11 of the Bankruptcy Code. Curtis will be available to handle matters that the Debtors may encounter which are not appropriately handled by Cleary Gottlieb and other professionals because of a potential conflict of interest.

166.    I understand that Curtis is a law firm, which employs more than 300 attorneys worldwide and maintains offices for the practice of law at 101 Park Avenue, New York, New York, as well as offices in Houston, Texas; Washington D.C.; Almaty, Kazakhstan; Ashgabat, Turkmenistan; Astana, Kazakhstan; Buenos Aires, Argentina; Dubai, United Arab Emirates; Frankfurt, Germany; Istanbul, Turkey; London, England; Mexico City, Mexico; Milan, Italy; Muscat, Sultanate of Oman; and Paris, France. I have also been informed that Curtis does not hold or represent any interest adverse to the Debtors or their estates, and that Curtis is a "disinterested person" as that phrase is defined in section 101(14) of the Bankruptcy Code, as modified by 1107(b) of the Bankruptcy Code.

---

[31]    *See Debtors' Application for an Order Authorizing Employment and Retention of Curtis, Mallet-Prevost, Colt & Mosle LLP as Conflicts Counsel for the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition Date* (the "Curtis Retention Application").

167.    The Debtors believe, and I agree, that rather than resulting in any extra expense to the Debtors' estates, the retention of Curtis as conflicts counsel will promote the effective and economic representation of the Debtors in these Chapter 11 Cases.  Curtis and Cleary Gottlieb will coordinate their efforts and function cohesively to ensure that the legal services provided to the Debtors by each firm are not duplicative.  Therefore, I respectfully submit that the Curtis Retention Application should be approved.

### iii.    **Protiviti Retention Application**[32]

168.    The Debtors seek to retain Protiviti Inc. ("Protiviti") as their financial advisor *nunc pro tunc* to the Petition Date.  Protiviti has been assisting the Debtors in preparing for these Chapter 11 Cases since June 7, 2013.  Protiviti is responsible for collecting information necessary for First Day Motions, the Disclosure Statement, the Plan and various reports required in these Chapter 11 Cases.  As such, it has become familiar with the Debtors' corporate structures, capital structure and businesses.  I understand that Protiviti has substantial experience in providing similar services in other chapter 11 restructurings.  Accordingly, the Debtors believe, and I agree, that Protiviti is both well qualified and uniquely able to service them in the Chapter 11 Cases in a cost-effective, efficient and timely manner.  I respectfully submit that the Protiviti Retention Application should be approved.

### iv.    **Greenhill Retention Application**[33]

169.    The Debtors seek to retain Greenhill & Co., LLC ("Greenhill") as their financial advisor *nunc pro tunc* to the Petition Date.  Greenhill has the experience and expertise in

---

[32]    See *Debtors' Application for an Order Authorizing Employment and Retention of Protiviti Inc. Nunc Pro Tunc to the Petition Date as Their Financial Advisor* (the "Protiviti Retention Application").

[33]    See *Debtors' Application for an Order Authorizing Employment and Retention of Greenhill & Co., LLC as Financial Advisor to the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition Date* (the "Greenhill Retention Application").

providing similar services in chapter 11 cases and debt restructurings.  In June 2013, the Debtors

engaged Greenhill to assist and advise them with respect to preparing for a possible

recapitalization, reorganization or restructuring.  I understand that Greenhill has substantial

experience with a particular focus on completing a valuation of the Debtors and assisting with

the materials required for the Disclosure Statement and the Plan, including the valuation

analysis, the liquidation analysis and the financial projections.  In providing such services to the

Debtors, Greenhill has worked closely with the Debtors' management and become well

acquainted with the Debtors' capital structure, financial affairs and related matters.  I believe that

the employment and retention of Greenhill is necessary and in the best interests of the Debtors

and their estates.

v.   **Epiq Claims and Noticing Agent Retention Application**[34]

170.   Pursuant to the Epiq Claims and Noticing Agent Retention Application, the

Debtors are seeking authority to retain and appoint Epiq as their Claims and Noticing Agent

under section 156(c) of the Judicial Code.  As described below, the Debtors will also file an

application to retain Epiq as their Solicitation Agent pursuant to section 327 of the Bankruptcy

Code.  The Epiq Claims and Noticing Agent Retention Application pertains only to work to be

performed by Epiq under the Clerk's Office's delegation of duties permitted by section 156(c) of

the Judicial Code, Local Rule 5075-1, General Order M-409 of the Court and the Claims Agent

Protocol.  In compliance with the Claims Agent Protocol, the Debtors' management reviewed the

proposals of at least two other Court-approved claims and noticing agents to ensure selection

through a competitive process.  The Debtors believe, and I agree, that Epiq's rates are

---

[34]   See *Debtors' Application for an Order Authorizing and Approving the Retention and Appointment of Epiq Bankruptcy Solutions, LLC as Claims and Noticing Agent for the Debtors Pursuant to 28 U.S.C. § 156(c), Bankruptcy Code Section 105(a), Local Rule 5075-1(a) and General Order M-409* (the "Epiq Claims and Noticing Agent Retention Application") filed concurrently herewith.

competitive and reasonable as compared to those offered in the other proposals and given the

quality of Epiq's services and prior bankruptcy expertise.  Additionally,  the Debtors believe, and

I agree, that indemnification provisions under the terms of the Services Agreement are customary

and reasonable for claims and noticing agents in chapter 11 cases.

171.    Based on Epiq's considerable experience in providing similar services in matters

comparable in size and complexity to these Chapter 11 Cases, the Debtors believe, and I agree,

that Epiq is well qualified to serve as Claims and Noticing Agent.  A detailed description of the

services that Epiq has agreed to render and the compensation and other terms of the engagement

are provided in the Epiq Claims and Noticing Agent Retention Application.  I have reviewed the

terms of the engagement and believe that the Debtors' estates, creditors, parties in interest, and

this Court will benefit as a result of Epiq's experience and cost-effective methods.  Accordingly,

on behalf of the Debtors, I respectfully submit that the Epiq Claims and Noticing Agent

Retention Application should be approved.

vi.    **Epiq Solicitation Agent Retention Application**[35]

172.    The Debtors seek entry of an order approving the Debtors' retention of Epiq as

Solicitation Agent for the Debtors in these Chapter 11 Cases pursuant to the Services Agreement,

effective *nunc pro tunc* to the Petition Date.  The Debtors anticipate that the administration of the

Chapter 11 Cases will require Epiq to perform duties outside the scope of the duties of the

Claims and Noticing Agent contemplated by section 156(c) of the Judicial Code, including

balloting services, tabulation services, management of distributions pursuant to a confirmed plan

of reorganization and other services set forth in the Services Agreement.  The Debtors selected

---

[35]    See *Debtors' Application for an Order Authorizing and Approving the Employment and Retention of Epiq Bankruptcy Solutions, LLC as Solicitation Agent for the Debtors and Debtors in Possession Nunc Pro Tunc to the Petition Date* (the "Epiq Solicitation Agent Retention Application").

Epiq because it is one of the country's leading providers of chapter 11 administration, soliciting, balloting and facilitating other administrative aspects of chapter 11 cases. Accordingly, I believe that the retention of Epiq under the terms described herein is in the best interests of the Debtors' and their estates.

**D.     The Assumption Motions**

173.    In addition to the First Day Motions and the Professional Motions, the Debtors have filed or intend to file certain motions related to the assumption of key agreements with local governmental authorities governing the Debtors rights and obligations with respect to the Toll Facilities. Such Assumption Motions will be heard at a subsequent hearing date to be established by the Court.

i.     **The FBX Bridge Agreements Assumption Motion**[36]

174.    The Debtors seek entry of an order authorizing the assumption of the Baldwin County License, the Orange Beach Agreement and the Tri-Party Agreement, each of which govern the Debtors' rights and responsibilities related to the operation and maintenance of the FBX Bridge. The Debtors have reviewed their overall operations and determined, in their business judgment, that assumption of the FBX Bridge Agreements at this stage in their restructuring process is in the estates' best interests. The FBX Bridge is a valuable asset to the Debtors, currently generating significant revenue and representing potential for future growth as a result of further development in the tourist and resort Gulf Shore Communities and possible expansion of the FBX in the near future. The Debtors' operations at the FBX Bridge were responsible for approximately 33.7% of the Debtors' EBITDA in 2012.

---

[36]     See *Debtors' First Omnibus Motion for Entry of an Order Authorizing Debtors to Assume (A) the License with the Baldwin County Commission, (B) the Bridge Option, Easement and Annexation Agreement with the City of Orange Beach, Alabama and (C) the Tri-Party Agreement with the City of Foley, Alabama and Baldwin County, Alabama* (the "FBX Bridge Agreements Assumption Motion").

175.    Furthermore, the Debtors believe that the Baldwin County License, the Orange

Beach Agreement and the Tri-Party Agreement (including the AMP) are complimentary, and

accordingly, the assumption of these agreements is critical to the continued operation of the FBX

Bridge and go hand-in-hand.  Indeed, continued cooperation with local governmental authorities

in enforcing the terms of the AMP to ensure the free flow of traffic on the FBX is important to

maintaining the FBX as an attractive route to travelers, and further, is important to the future

success of the Debtors' operations in the State of Alabama generally.  Moreover, the Debtors are

not aware of any cure amounts carried under the FBX Bridge Agreements and it is my

understanding that Syncora, as the Instructing Senior Creditor and only creditor entitled to vote

on the Plan, supports the relief sought in the FBX Bridge Agreements Assumption Motion.  For

these reasons, the Debtors believe that it is in the best interests of their estates to assume the FBX

Bridge Agreements.

ii.    **Central Alabama Toll Licenses Assumption Motion**[37]

176.    By the Central Alabama Toll Licenses Assumption Motion, the Debtors seek

entry of an order authorizing them to assume the Alabama River Parkway Licenses, Emerald

Mountain Expressway Licenses and Black Warrior Parkway License.  After a review of the

Debtors' overall operations, the Debtors believe, and I agree, that it is in the Debtors' business

judgment to assume the Central Alabama Toll Licenses given that such licenses are a key source

of value to the Debtors' estates – with the CARP Bridge, EMX Bridge and BWP Bridge

accounting for approximately 33.4% of the Debtors' EBITDA in 2012.  Additionally, as an

owner and operator of multiple toll facilities in the State of Alabama, the Debtors' relationships

---

[37]    See *Debtors' Second Omnibus Motion for Entry of an Order Authorizing Debtors to Assume License Agreements with (I) Elmore County, Alabama, (II) Montgomery County, Alabama and (III) Tuscaloosa County, Alabama* (the "Central Alabama Toll Licenses Assumption Motion").

with local governmental authorities, including Elmore, Montgomery and Tuscaloosa, are critical

to the Debtors' business plan and long-term viability in the private toll industry.  Moreover, it is

my understanding that the Central Alabama Toll Licenses do not carry a cure amount and

further, that Syncora, as the Instructing Senior Creditor and only creditor entitled to vote on the

Plan, supports the relief sought in this Central Alabama Toll Licenses Assumption Motion.

Accordingly, I believe that it is in the Debtors' business judgment to assume the Central

Alabama Toll Licenses.

iii.    **The DWT Leases Assumption Motion**[38]

177.    By the DWT Leases Assumption Motion, the Debtors seek entry of an order

authorizing the assumption of the Tube Lease and the Sublease.

178.    On March 20, 1978, Detroit, as lessor, leased to DCTC (as predecessor to DWT

LLC), as tenant, the portion of the DWT subterranean tube located on the U.S. side of the

international boundary as it existed in 1978, including all fixtures and equipment (the "Leased

Property").  While the initial term of the Tube Lease ended on November 3, 1990, the Tube

Lease provided for three (3) additional extension periods of ten (10) years, each of which was

exercised.  Accordingly, by its terms, unless extended again, the Tube Lease will expire on

November 3, 2020.  The Tube Lease and Sublease must be extended or terminated together

pursuant to their terms.  Rent under the Tube Lease is $1.00 per year, in addition to other costs

and charges that must be paid by DWT LLC according to the terms of the Tube Lease.  Such

additional costs and charges include: (i) DWT LLC pays all real estate taxes and assessments,

personal property taxes, and special assessments; (ii) DWT LLC repairs and maintains the DWT

---

[38]    See *Debtors' Motion for Entry of an Order Authorizing the Debtors to Assume the Detroit-Windsor Tunnel Leases with the City of Detroit* (the "DWT Leases Assumption Motion").

(including the ventilation system) at its sole expense; and (iii) DWT LLC insures the DWT based on a formula tied to replacement cost.[39]

179.    On March 20, 1978, Detroit, as successor in interest to Ford Motor Properties Inc. as sub-landlord, leased to DCTC (as predecessor to DWT LLC), three pieces of property under the Sublease: the "Tunnel Property," the "Offsite Inspection Area" and various vacated city streets comprising the "New Tunnel Property" (collectively, the "Leased Properties").  The Tunnel Property consists of certain real estate, buildings and improvements designated and described in certain exhibits to the Sublease.  The Offsite Inspection Area consists of certain real estate shown and described in an exhibit to the Sublease.  The New Tunnel Property consists of certain real estate described in an exhibit to the Sublease.  Currently, certain areas of the Leased Properties are being used by the U.S. federal government pursuant to an agreement with DWT LLC.  Specifically, the U.S. Customs and Border Protection leases office and parking space located on the Leased Properties for its officers and agents to enforce all applicable U.S. Laws.  Through its activities at these facilities the agency prevents narcotics, agricultural pests and smuggled goods from entering the U.S.  and also identifies and arrests those with outstanding criminal arrest warrants.

180.    Since the Sublease was entered into, improvements have been made to the Leased Properties.  For example, the toll plaza on the U.S. side of the DWT (the "Detroit Plaza") was renovated in 1980 and again in 2011 and offers six (6) toll booths (four (4) automatic and two (2) attended) and multiple customs inspection booths.  The Debtors' continued possession of the Leased Properties is essential to the continued safe and efficient operation of the DWT.

---

[39]    If the DWT suffers a casualty loss and insurance proceeds are sufficient, Detroit is required to restore the DWT.

181.    As is the case for the Tube Lease, the initial term of the Sublease ended on

November 3, 1990, though the Sublease provided for three (3) additional extension periods of ten

(10) years, each of which was exercised.  Accordingly, unless extended again, the Sublease will

expire on November 3, 2020 (as noted above, the Tube Lease and Sublease must be extended or

terminated together pursuant to their terms).  Current rent payments under the Sublease are based

on a percentage (20%) of the average annual net operating income before income taxes derived

from DWT LLC's operations for the immediately preceding five (5) fiscal years, payable in

monthly installments.  In 2012, rent under the Sublease totaled $745,849.  Additionally, DWT

LLC must maintain and repair the Leased Properties at its own expense and must maintain

casualty insurance in amounts tied to replacement costs.[40]

182.    The DWT Leases are critical to the Debtors' continued operation of the DWT as

the Debtors' operations at the DWT were responsible for approximately 32.9% of the Debtors'

EBITDA in 2012.  Moreover, it is my understanding that Syncora, as the Instructing Senior

Creditor and only creditor entitled to vote on the Plan, supports the relief sought in the DWT

Leases Assumption Motion.  Accordingly, the Debtors believe in their business judgment that it

is in the best interests of their estates to assume the DWT Leases.

iv.    **The JOA Assumption Motion**[41]

183.    The Debtors seek an order authorizing the assumption of the JOA, which

provides for the joint operation, management, maintenance, repair and improvement of the

DWT.  In addition to the terms of the JOA set forth above, the JOA divides responsibility for

---

[40]    If the DWT suffers a casualty loss and insurance proceeds are sufficient, Detroit is required to restore the DWT.

[41]    See *Debtors' Motion for Entry of an Order Authorizing the Debtors to Assume the Joint Operating Agreement with the Corporation of the City of Windsor and Windsor Tunnel Commission* (the "JOA Assumption Motion").

operating costs of the DWT between DWT LLC and Windsor.  Specifically, the JOA provides

that, with certain limited exceptions related to major repairs to the Windsor toll plaza, all costs

related to the operation of the DWT are to be paid by DWT LLC.  Thereafter, depending on the

category of the cost (as described more fully in the JOA Assumption Motion), DWT LLC either:

(i) remains responsible for the full cost, (ii) is reimbursed a certain percentage of the cost by

Windsor, or (iii) is fully reimbursed by Windsor.

184.     Accordingly, pursuant to framework set forth in the JOA, DWT LLC is

obligated and required to make payments to certain third-party vendors (the "JOA Vendors") in

order to pay the:  Administrative Costs, Shared Costs, Costs of Windsor Tunnel, Costs of Detroit

Tunnel, Costs of Major Repairs to the Windsor and Detroit Plazas, Collective Bargaining Costs

and In-House Engineering Costs (collectively, the "JOA Vendor Costs").  If DWT LLC does not

pay the JOA Vendor Costs it is in breach of the JOA.  While DWT LLC would initially have to

pay approximately $99,065 to the JOA Vendors in order to cure all outstanding defaults under

the JOA as a result of accrued and unpaid JOA Vendor Costs as of the Petition Date, DWT LLC

is entitled to recover approximately $37,334 of these costs from Windsor.

185.     Upon review of the Debtors' operations, the Debtors believe in their business

judgment that assumption of the JOA is essential to the Debtors' continued operation of the

DWT.  I have been informed that the Debtors' operation of the DWT accounted for nearly half of

all the Debtors' revenue in 2012 and approximately 32.9% of the Debtors EBITDA.

Accordingly, it is the Debtors' belief that the assumption of the JOA is crucial to the Debtors

continued operation of the DWT.  Any failure or delay by the Debtors in complying with the

JOA, including making payments to the JOA Vendors, could strain their relationship with

Windsor, which could seek to terminate the JOA at any time with 90 days' notice.  Moreover,

assumption of the JOA is critical because the JOA provides for reimbursement arrangements for costs DWT LLC would otherwise be solely responsible, such as costs related to employees. Therefore, the Debtors submit that their decision to assume the JOA is in the best interests of the estates, their creditors, and all parties in interest and is, therefore, a sound exercise of the Debtors' business judgment that should be approved by the Court.

## PART V

## LOCAL RULE 1007-2 DISCLOSURES

186.    Pursuant to Local Rule 1007-2(a)(1), a statement regarding the nature of the Debtors' businesses and the circumstances leading to the filing of these Chapter 11 Cases is set forth in Parts I through III above.

187.    These cases were not originally commenced under chapter 7 or chapter 13 of the Bankruptcy Code.  Accordingly, Local Rule 1007-2(a)(2) is inapplicable.

188.    Pursuant to Local Rule 1007-2(a)(3), to the best of the Debtors' knowledge and belief, no committee has been organized prior to the Petition Date.

189.    In accordance with Local Rule 1007-2(a)(4), Schedule 1 lists the thirty (30) largest unsecured claims, excluding the claims of insiders, held against each of the Debtors on a consolidated basis.  Schedule 1 includes a list of the names and addresses of these creditors and the names, addresses and telephone numbers of persons familiar with the Debtors' account. When available, the amount of the claim is also included.  In each case, the claim amounts listed on Schedule 1 are estimated, on a preliminary basis, and subject to verification.  The Debtors reserve any and all rights (i) as to whether any claim is contingent, unliquidated, disputed or subject to setoff, (ii) to challenge the priority, nature, amount and status of any claim or debt and (iii) to assert any remedies, defenses, counterclaims and offsets with respect to each of the foregoing.

190.     Pursuant to Local Rule 1007-2(a)(5), <u>Schedule 2</u> lists the names and addresses of the two largest secured claims against the Debtors as of the Petition Date, on a consolidated basis, excluding claims of insiders.  Any amounts or collateral values listed on <u>Schedule 2</u> are estimated, on a preliminary basis, and subject to verification.  The Debtors reserve any and all rights as to the validity, enforceability and priority of each claim and lien and reserve any and all rights to assert remedies, defenses, counterclaims and offsets with respect to each such claim and lien.

191.     Pursuant to Local Rule 1007-2(a)(6), <u>Schedule 3</u> provides a summary of the Debtors' total assets and liabilities on a consolidated basis as of May 31, 2013.

192.     In accordance with Local Rule 1007-(a)(7), <u>Schedule 4</u> lists the number and classes of publicly traded debt securities issued by the Debtors.  The Debtors represent that no officer of the Debtors owns any of the securities listed on <u>Schedule 4</u>.

193.     In response to Local Rule 1007-2(a)(8), <u>Schedule 5</u> contains a list of all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity, giving the name, address and telephone number of such entity.  The Debtors represent that there are no proceedings related to any of the above pending in any court.

194.     Pursuant to Local Rule 1007-2(a)(9), <u>Schedule 6</u> lists the property or premises owned, leased or held under other arrangement from which the Debtors operate their businesses.

195.     In accordance with Local Rule 1007-2(a)(10), <u>Schedule 7</u> lists the locations of the Debtors' substantial assets, the location of their books and records, and the nature, location and value of any assets held by the Debtors outside the territorial limits of the United States.

196.    In response to Local Rule 1007-2(a)(11), <u>Schedule 8</u> lists pending actions and proceedings against the Debtors.

197.    As required by Local Rule 1007-2(a)(12), a list of the Debtors' existing senior management, including their tenure with the Debtors and a brief summary of their relevant responsibilities and experience is attached hereto as <u>Schedule 9</u>.

198.    In accordance with Local Rule 1007-2(b)(1), the Debtors estimate that the payroll for employees, exclusive of officers, directors, stockholders and partners, during the 30-day period following the Petition Date will be $415,500.00.

199.    In accordance with Local Rule 1007-2(b)(2)(A), the Debtors estimate that the amount to be paid to the Debtors' officers and directors for the 30-day period following the Petition Date will be $36,500.00.[42]

200.    In accordance with Local Rule 1007-2(b)(2)(C), the Debtors estimate that the amount to be paid to financial and business consultants retained by the Debtors for the 30 days following the Petition Date will be $0, as all professionals will file fee applications and will not be paid any amounts within 30 days of the commencement of the Chapter 11 Cases.

201.    Pursuant to Local Rule 1007-2(b)(3), <u>Schedule 10</u> provides the estimated consolidated cash receipts, disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid for the 30 days following the Petition Date, other than professional fees.

---

[42]    This amount does not include any directors' fees.  Inside directors of the Debtors are not entitled to any compensation as directors.  However, independent directors may seek compensation under their service contracts.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true

and correct.

Dated:  July 25, 2013                                    Respectfully submitted,


                                                         */s/ Neal Belitsky*
                                                         _____
                                                         Neal Belitsky
                                                         Chief Executive Officer

**Exhibit A**

**Debtors' Organizational Chart**

# American Roads LLC, et al.
# Corporate Organizational Structure



Debtor Entities Shaded in Grey

## <u>SCHEDULES 1-10</u>

**Local Rule 1007-2 Disclosures**

## **Schedule 1**

**Consolidated List of the Holders of the Debtors' 30 Largest Unsecured Claims**

## <u>Schedule 1</u>

**Consolidated List of the Holders of the Debtors' 30 Largest Unsecured Claims**

Pursuant to Local Rule 1007-2(a)(4), the following is a consolidated list of the Debtors' creditors holding the thirty (30) largest unsecured claims (the "Consolidated Creditor List") based on the Debtors' unaudited books and records as of the Petition Date. The Consolidated Creditor List has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include (i) persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code or (ii) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 30 largest unsecured claims.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. Any amounts listed herein are estimated, on a preliminary basis, and subject to verification. The Debtors reserve any and all rights to assert that any debt or claim included reserve any and all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| # | NAME OF CREDITOR | COMPLETE MAILING ADDRESS, AND EMPLOYEE, AGENT, OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM *(bond debt, trade debt, bank loan, government contracts, etc.)* | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED, OR SUBJECT TO SETOFF | AMOUNT OF CLAIM *(if secured also state value of security)* |
|---|---|---|---|---|---|
| 1. | THE BANK OF NEW YORK MELLON (SERIES G-2 BONDS) | ATTN: FRANK HEARN, ESQ. 101 BARCLAY STREET, FLOOR 8W NEW YORK, NEW YORK 10286 FRANK.HEARN@BNYMELLON.COM | BOND DEBT | | $    298,000,000.00 |
| 2. | THE BANK OF NEW YORK MELLON (SERIES G-1 BONDS) | ATTN: FRANK HEARN, ESQ. 101 BARCLAY STREET, FLOOR 8W NEW YORK, NEW YORK 10286 FRANK.HEARN@BNYMELLON.COM | BOND DEBT | | 198,000,000.00 |
| 3. | ENWIN UTILITIES | VICTOR ZUBER, CFO 787 OULETTE AVE P.O. BOX 1625 STN A WINDSOR, ON N9A 577 T: 519-255-2888 x 769 FINANCE@ENWIN.COM | TRADE DEBT | UNLIQUIDATED | 48,495.81 [a] |
| 4. | DTE ENERGY | BRUCE PETERSON, SVP & GC 1 ENERGY PLAZA DETROIT, MI 48226 T: 313-235-4000 PETERSONB@DTEENERGY.COM | TRADE DEBT | UNLIQUIDATED | 25,776.84 |
| 5. | PERSONNEL STAFFING INC. | TINA GREGERSON, PRESIDENT PO BOX 172 GADSDEN, AL 35902 T: 256-547-7657 F: 256-547-1625 | TRADE DEBT | UNLIQUIDATED | 7,155.18 |
| 6. | MIKE LEE | MIKE LEE 9665 ASGARD WINDSOR, ON N8R 1E1 T: 519-817-6860 | TRADE DEBT | UNLIQUIDATED | 6,187.50 [a] |

[a] Amount represents $Canadian. Exchange rate as of 7/24/13 was USD / CDN at 1.03.

| # | NAME OF CREDITOR | COMPLETE MAILING ADDRESS, AND EMPLOYEE, AGENT, OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM *(bond debt, trade debt, bank loan, government contracts, etc.)* | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED, OR SUBJECT TO SETOFF | AMOUNT OF CLAIM *(if secured also state value of security)* |
|---|---|---|---|---|---|
| 7. | ALABAMA POWER COMPANY | GORDON MARTIN<br>600 NORTH 18TH ST<br>BIRMINGHAM, AL 35291<br>T: 205-257-1000<br>F: 205-257-2176 | TRADE DEBT | UNLIQUIDATED | 3,388.16 |
| 8. | HOLLAND CHEMICAL & JANITORIAL | MICHAEL SHALHOUB, PRESIDENT<br>4590 RHODES DRIVE<br>WINDSOR, ON N82 5C2<br>T: 519-948-4373<br>F: 519-945-2256 | TRADE DEBT | UNLIQUIDATED | 3,276.40 [a] |
| 9. | WADDICK FUELS | JAYMIE WADDICK<br>280 RICHMOND ST.<br>CHATHAM, ON N7M 1B6<br>T: 519-354-0110<br>F: 519-354-0340<br>JAYMIE@WADDICKFUELS.COM | TRADE DEBT | | 2,061.74 [a] |
| 10. | ALLIED ELECTRONICS | MAUREEN MCGRATH<br>20270 MIDDLEBELT RD. SUITE 8<br>LIVONIA, MI 48152<br>T: 248-473-5437<br>F: 248-473-5853<br>MAUREEN.MCGRATH@ALLIEDELEC.COM | TRADE DEBT | UNLIQUIDATED | 2,050.66 |
| 11. | LONG'S HUMAN RESOURCE SERVICES | CARMAN LONG, CONTROLLER<br>PO BOX 160947<br>MOBILE, AL 36616<br>T: 251-476-4080<br>F: 251-476-4091<br>CLONG@LONGSHRS.COM | TRADE DEBT | | 1,867.40 |
| 12. | ACCOUNTEMPS | JELINA AOUN<br>6 PARKLANE BLVD<br>SUITE 100<br>DEARBORN, MI 48126<br>T: 313-240-8209<br>F: 313-240-8207<br>JELINA.AOUN@RHI.COM | TRADE DEBT | | 1,611.10 |
| 13. | ACTUARIAL SOLUTIONS, INC. | DEAN NEWELL<br>1695 MANNING RD<br>SUITE 202<br>TECUMSEH, ON N8N 2L9<br>T: 519-979-4600<br>F: 519-979-4699 | TRADE DEBT | UNLIQUIDATED | 1,500.00 [a] |
| 14. | TREVOR PEARCE | TREVOR PEARCE<br>556 SACRED HEART DRIVE<br>LASALLE, ON N9J 3L9<br>T: 313-567-4422 x 304<br>F: 519-256-3505<br>TPEARCE@DWTUNNEL.COM | EMPLOYEE | UNLIQUIDATED | 1,275.35 [a] |

[a] Amount represents $Canadian.  Exchange rate as of 7/24/13 was USD / CDN at 1.03.

| # | NAME OF CREDITOR | COMPLETE MAILING ADDRESS, AND EMPLOYEE, AGENT, OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM (bond debt, trade debt, bank loan, government contracts, etc.) | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED, OR SUBJECT TO SETOFF | AMOUNT OF CLAIM (if secured also state value of security) |
|---|---|---|---|---|---|
| 15. | TARGET BUILDING MATERIALS | MOE DROVILLARD, CEO 3245 COUNTY ROAD 42 WINDSOR, ON N9A 6J3 T: 519-966-6000 F: 519-966-3053 MDROVILLARD@TARGETSUPPLY.COM | TRADE DEBT | UNLIQUIDATED | 1,050.90 [a] |
| 16. | VERIZON WIRELESS | VERIZON WIRELESS BANKRUPTCY ADMIN 500 TECHNOLOGY DRIVE SUITE 550 WELDON SPRING, MD 63304 T: 636-793-1100 | TRADE DEBT | UNLIQUIDATED | 880.00 |
| 17. | PERSONNEL BY PRO STAFF | COLLEEN HURST, PRESIDENT 2557 DOUGALL AVE, SUITE 6 WINDSOR, ON N8X 1T5 T: 519-250-9403 F: 519-250-9407 COLLEEN@PROSTAFFWORKS.CA | TRADE DEBT | | 810.44 [a] |
| 18. | WFS LTD. | VICTOR MILOSEVSKI BRANCH MANAGER P.O. BOX 2100 WINDSOR, ON N8Y 4R7 T: 519-966-2202 F: 519-966-2740 | TRADE DEBT | UNLIQUIDATED | 689.07 [a] |
| 19. | SOFTWARE CREATIONS | 51194 ROMEO PLANK RD STE. 337 MACOMB, MI 48042 T: 586-948-5920 F: 586-948-5980 | TRADE DEBT | UNLIQUIDATED | 648.00 |
| 20. | PATCO ELECTRICAL CONTRACTORS | MICHAEL GENDREAU 7400 CHARLIE SHIRLEY RD NORTH PORT, AL 35476 T: 205-330-2553 F: 205-330-2526 | TRADE DEBT | UNLIQUIDATED | 588.00 |
| 21. | DILLON CONSULTING LIMITED | ROB KELL P.O. BOX 426 LONDON, ON N6A 4W7 T: 519-438-6192 F: 519-672-8209 RKELL@DILLON.CA | TRADE DEBT | UNLIQUIDATED | 563.84 [a] |
| 22. | PITNEY BOWES GLOBAL FINANCIAL | DANIEL J. GOLDSTEIN EVP & CHIEF LEGAL AND COMPLIANCE OFFICER 1 ELMCROFT RD STAMFORD, CT 06926 T: 203-356-5000 DANIEL.GOLDSTEIN@PB.COM | TRADE DEBT | | 449.59 |

[a] Amount represents $Canadian.  Exchange rate as of 7/24/13 was USD / CDN at 1.03.

| # | NAME OF CREDITOR | COMPLETE MAILING ADDRESS, AND EMPLOYEE, AGENT, OR DEPARTMENT OF CREDITOR FAMILIAR WITH CLAIM | NATURE OF CLAIM *(bond debt, trade debt, bank loan, government contracts, etc.)* | INDICATE IF CLAIM IS CONTINGENT, UNLIQUIDATED, DISPUTED, OR SUBJECT TO SETOFF | AMOUNT OF CLAIM *(if secured also state value of security)* |
|---|---|---|---|---|---|
| 23. | CONCENTRA MEDICAL CENTERS | SU ZAN NELSON, CHIEF OF FINANCE 5080 SPECTRUM DRIVE SUITE 1200 W ADDISON, TX 75001 T: 866-944-9046 | TRADE DEBT | | 431.00 |
| 24. | NORTHSTREAM NETWORKS | STANLEY STEVENS, PRESIDENT 24700 NORTHWESTERN HWY, #700 SOUTHFIELD, MI 48075 T: 248-418-0400 | TRADE DEBT | UNLIQUIDATED | 428.29 |
| 25. | ADVANCE PLUMBING AND HEATING | RONALD MOSS, PRESIDENT 1977 E WEST MAPLE WALLED LAKE, MI 48390 T: 248-669-7474 F: 248-669-7471 | TRADE DEBT | | 413.21 |
| 26. | MC BUSINESS SOLUTIONS LTD. | KEITH KOKE 1821 PROVINCIAL RD. WINDSOR, ON N8W 5V7 T: 519-969-9400 F: 519-969-9406 | TRADE DEBT | | 228.98 [a] |
| 27. | WASTE MANAGEMENT OF AL-MOBILE | 4770 HAMILTON BLVD THEODORE, AL 36582 T: 800-284-2451 F: 866-384-1627 | TRADE DEBT | UNLIQUIDATED | 155.53 |
| 28. | COPY PRODUCTS COMPANY | DAVID ARD, CONTROLLER 910 EAST CERVANTES ST PENSACOLA, FL 32501 T: 850-432-1580 F: 850-432-8666 DARD@COPYPRODUCTS.COM | TRADE DEBT | UNLIQUIDATED | 126.60 |
| 29. | YP LLC | YP LLC ATTN: LEGAL DEPARTMENT 611 N. BRAND BLVD, FLOOR 5 GLENDALE, CA 91203 F: 818-241-1002 | TRADE DEBT | | 101.00 |
| 30. | FEDERAL EXPRESS | 3965 AIRWAYS MODULE G REVENUE SERVICES MEMPHIS, TN 38116 T: 800-622-1147 F: 800-548-3020 | TRADE DEBT | UNLIQUIDATED | 50.24 |

[a] Amount represents $Canadian.  Exchange rate as of 7/24/13 was USD / CDN at 1.03.

## **Schedule 2**

**Consolidated List of the Holders of the Debtors' Two Largest Secured Claims**

## Schedule 2

**Consolidated List of the Holders of the Debtors' Two Largest Secured Claims**

Pursuant to Local Rule 1007-2(a)(5), the following is a list of creditors holding the two largest secured claims against the Debtors, on a consolidated basis, excluding claims of insiders as defined in 11 U.S.C. § 101(31) and claims held by undersecured creditors.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. Any amounts listed herein are estimated, on a preliminary basis, and subject to verification. The Debtors reserve any and all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| Creditor Name and Mailing Address | Amount of Claim (Whether Disputed) | Collateral Description | Value of Collateral |
|---|---|---|---|
| 1.  Syncora Guarantee Inc. 135 West 50th Street, 20th Floor New York, New York 10020 | $334,000,000 | All property, rights and interests of the Debtors (with the exception of American Roads Technologies, Inc.) | $205,000,000 |
| 2.  The Bank of New York Mellon 101 Barclay Street, Floor 8W New York, New York 10286 | TBD – Fees and expenses under the Financing Documents | All property, rights and interests of the Debtors (with the exception of American Roads Technologies, Inc.) | $205,000,000 |

## <u>Schedule 3</u>

**Summary of the Debtors' Assets and Liabilities**

## Schedule 3

### Summary of the Debtors' Assets and Liabilities

Pursuant to Local Rule 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities on a consolidated basis. The following financial data is the latest available information and reflects the Debtors' financial condition, as consolidated with its affiliated Debtors and non-Debtors as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

| Assets and Liabilities | Amount |
|---|---|
| Total Assets (Book Value as of May 31, 2013) | $ 241.9 million |
| Total Liabilities (Book Value as of May 31, 2013) | $ 885.7  million |

## Schedule 4

**Summary of the Publicly Held Securities of the Debtors**

## Schedule 4

### Summary of the Publicly Held Securities of the Debtors

Pursuant to Local Rule 1007-2(a)(7), the following lists the classes of debt securities of American Roads that may be publicly held.  There are no equity securities of the Debtors that are publicly held.  None of the Debtors' directors, managers and officers hold any publicly-held securities of the Debtors.

The debt securities of American Roads that may be publicly held are:

| Trustee | Issuance | Issue Amount | Outstanding Principal Amount as of Petition Date | Maturity | Approximate Number of Holders |
|---|---|---|---|---|---|
| The Bank of New York Mellon | Series G-1 Bonds | $198,000,000 | $198,000,000 | December 19, 2056 | Undetermined |
| The Bank of New York Mellon | Series G-2 Bonds | $298,000,000 | $298,000,000 | December 19, 2056 | Undetermined |

## Schedule 5

**Summary of Debtors' Property Held by Third Parties**

## Schedule 5

### Summary of Debtors' Property Held by Third Parties

Pursuant to Local Rule 1007-2(a)(8), the following schedule lists the Debtors' property that is in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, or secured creditor, or agent for any such entity. The Debtors have also paid advance payment retainers to various professionals. Professionals seeking retention in these Chapter 11 Cases will disclose their retainers in their respective retention applications.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to challenge the priority, nature, amount or status of any claim or debt and to assert any remedies defenses, counterclaims, and offsets with respect to each of the foregoing.

| Name | Mailing Address and Telephone Number | Purpose | Amount |
|---|---|---|---|
| The Bank of New York Mellon | 101 Barclay Street, Floor 8W New York, New York 10286 (212) 495-1784 | Cash Collateral under Financing Documents | $49,179,305.52[1] |
| Windsor Detroit Tunnel Corporation | 555 Goyeau Street, Windsor, Ontario N9A 1H1, Canada (519) 256-2451 | Storage of personal property used in operation, management, maintenance and repair of the Detroit Windsor Tunnel | $13,000.00[2] |
| Alabama Power Company | P.O. Box 242 Birmingham, AL 35292 (888) 430-5787 | Utility security deposit | $3,870.00 |
| Central Alabama Electric | P.O. Box 2153 Department 1340 Birmingham, AL 35287-1340 (334) 365-6762 | Utility security deposit | $3,040.00 |
| Sea Star, Inc. | EMX - Expressway Office | Lease security | $1,400.00 |

[1]    The balance of the bank account at Bank of New York Mellon is as of June 30, 2013.

[2]    This amount constitutes the Debtors' estimate of certain assets stored at the Windsor Plaza in connection with the Debtors' management of the DWT. In the ordinary course of business, the Debtors maintain access to such assets.

| Name | Mailing Address and Telephone Number | Purpose | Amount |
|---|---|---|---|
| | 55 Emerald Mountain Parkway Wetumpka, AL 36093 (334) 567-2001 | deposit | |
| Vosloh Properties LLC | ATO - Alabama Toll Operations Information Technology Office 22401-A Miflin Road Foley, AL 36535 (251) 995-2111 | Lease security deposit | $950.00 |
| Central Elmore Water and Sewage Authority | 716 U.S. 231 Wetumpka, AL 36093 | Utility security deposit | $300.00 |

## **<u>Schedule 6</u>**

**Schedule of Owned and Leased Property**

## Schedule 6

### Schedule of Owned and Leased Property

Pursuant to Local Rule 1007-2(a)(9), the following schedule lists the location of the property or premises owned, leased or held under other arrangement from which the Debtors operate their businesses as of the Petition Date.

### LEASED:

| Description | Property Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| Detroit-Windsor Tunnel Plaza and Offices | 100-101 East Jefferson Avenue | Detroit | Michigan | 48226 | USA |
| Detroit Office and Parking Subleased to Third Party | 1331 East Atwater | Detroit | Michigan | 48207 | USA |
| Alabama Toll Operations Information Technology Office | 22401-A Miflin Road | Foley | Alabama | 36535 | USA |
| Expressway Office | 55 Emerald Mountain Parkway | Wetumpka | Alabama | 36093 | USA |

### OWNED:

| Description | Property Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| Parkway Office | 2950 Alabama River Parkway | Millbrook | Alabama | 36054 | USA |
| Bridge Office | 22867 Brown Lane | Orange Beach | Alabama | 36561 | USA |
| Parkway Office | 2220 Black Warrior Parkway | Tuscaloosa | Alabama | 35401 | USA |

## JOINT OPERATING AGREEMENT:

| Description | Property Address | City | State | Zip Code | Country |
|---|---|---|---|---|---|
| Windsor Plaza | 555 Goyeau Street | Windsor | Ontario | N9A 1H1 | Canada |
| Vent Building | 70 University Avenue East | Windsor | Ontario | N9A 5N6 | Canada |

## **Schedule 7**

**Location of the Debtors' Substantial Assets, Books and Records,
and Nature and Location of Assets Outside the United States**

## Schedule 7

### Location of the Debtors' Substantial Assets, Books and Records,
### and Nature and Location of Assets Outside the United States

Pursuant to Local Rule 1007-2(a)(10), the following provides the location of the Debtors' substantial assets, books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States as of the Petition Date.

| Debtor Assets | Location |
|---|---|
| Debtors' Substantial Assets | New York, New York[1] <br> Detroit, Michigan <br> Baldwin County, Alabama <br> Montgomery, Alabama <br> Orange Beach, Alabama <br> Foley, Alabama <br> Millbrook, Alabama <br> Tuscaloosa, Alabama <br> Wetumpka, Alabama |
| Debtors' Books and Records | Detroit, Michigan |
| Debtors' Assets Outside the United States | Windsor, Ontario[2] |

---

[1]       American Roads LLC's principal assets are bank accounts in Manhattan holding approximately $49,179,305.52 in cash and cash equivalents as of June 30, 2013 that are pledged to Bank of New York Mellon, as Collateral Agent.

[2]       In accordance with the Joint Operating Agreement, certain of the Debtors store personal property used to operate, manage, maintain and repair the Detroit-Windsor Tunnel at Windsor Plaza of the Windsor Detroit Tunnel Corporation.  As set forth in Schedule 5, the aforementioned personal property is held at 555 Goyeau Street, Windsor, ON N9A 1H1.

## Schedule 8

### Schedule of Litigation

## Schedule 8

### Schedule of Litigation

Pursuant to Local Rule 1007-2(a)(11), the following schedule lists the nature and present status of each action or proceeding, pending or threatened, against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent as of the Petition Date.

| Name of Case | Type of Proceeding | Court and Location | Brief Description and Status |
|---|---|---|---|
| *National Automobile Aerospace and Transportation and General Workers C.A.W. – Canada and its Local 195 ("CAW Local 195") Cost of Living Adjustment ("COLA") Grievance Arbitration* | Arbitration | N/A | • On July 4, 2012, CAW Local 195 filed a grievance against DWT LLC regarding an alleged violation of the Memorandum of Settlement between DWT LLC and CAW Local 195 for failure to pay COLA amounts to certain employees.  DWT LLC denied the grievance on July 5, 2012, and subsequently, CAW Local 195 decided to arbitrate the matter.<br>• The arbitration is currently pending. |

**<u>Schedule 9</u>**

**Debtors' Senior Management**

**Schedule 9**

**Debtors' Senior Management**

Pursuant to Local Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name | Title | Relevant Experience / Responsibility | Tenure |
|---|---|---|---|
| Neal Belitsky | Chief Executive Officer of American Roads Holding LLC, American Roads LLC and The Baldwin County Bridge Company, L.L.C.<br><br>President of DWT Inc., Alabama Toll Operations, LLC, American Emerald Mountain Expressway Bridge, LLC, Alabama Black Warrior Parkway, LLC, Detroit Windsor Tunnel LLC ("DWT LLC") and American Roads Technologies, Inc. | Served as President of Operations at DCTC (the predecessor entity to DWT LLC) from January 1998 to July 2007 when he assumed his current position. From 1977 to 1997 he was the Manager of Facilities for a major public university. Mr. Belitsky has almost 30 years of facility management experience. He holds a Bachelor of Science and a Masters of Arts degree and is a Certified Facility Manager and a licensed builder.<br><br>Mr. Belitsky's responsibilities include overall management and oversight of the Debtors' operations. | 1998 - Present |
| Carolyn Brown | Executive Vice President of American Roads LLC | Served as Director of Administration at DCTC (the predecessor entity to DWT LLC) from March 1998 to May 2006 when she assumed her current position as Executive Vice President.  Prior to DCTC, she served as the Special Operations Officer of the City of Windsor from 1989 to 1998 working on special projects, which included the Detroit Windsor | 1998 - Present |

| Name | Title | Relevant Experience / Responsibility | Tenure |
|---|---|---|---|
| | | Tunnel. Ms. Brown is the Chair of the Board of Directors of the Windsor and Essex Regional Chamber of Commerce and Past Chair of the Chamber's Transportation Committee.  She holds a Master of Arts degree in Political Science and a Bachelor of Public Administration degree.<br><br>Ms. Brown is responsible for all administration and human resource functions of the Debtors, including but not limited to employee wages and benefits, risk and pension management and all aspects of labor relations. | |
| Robert Moore | Vice President of Finance of American Roads LLC | Served as Chief Financial Officer of The Gilbert Residence, a non-profit retirement and assisted living facility from 2008 to 2012. From 2002 to 2007 he founded, financed and developed Moore House, a non-profit organization. Mr. Moore served as Chief Executive Officer of Rentek Inc., a small computer software development firm specializing in software for trucking companies, mortgage servicing industry, and tier II automotive companies from 1999 to 2002 and served as Chief Financial Officer and Chief Information Officer of Pilot Transport Inc., a national trucking company from 1992 to 1999. From 1976 to 1992, Mr. Moore held various positions, including the Director of Finance and Facilities, for a major public university. He holds a Bachelor of Business Administration in Accounting. | January 2013 – Present |

| Name | Title | Relevant Experience / Responsibility | Tenure |
|------|-------|--------------------------------------|--------|
| | | Mr. Moore oversees all accounting, finance and treasury functions of the Debtors. | |
| Gary Mack Roberts | Vice President of Development & Engineering | Prior to joining American Roads, Mr. Roberts served in several private and public sector development, engineering, and construction roles.  Mr. Roberts has over 50 years of experience relating to highway development and engineering. He is the President of the Southeastern Association of Highway and Transportation Officials and the Chairman of the Affiliates Committee of the National Asphalt Institute the Transportation Committee. He holds degrees from Jacksonville State University and University of Alabama at Birmingham.<br><br>Mr. Roberts is responsible for the development of American Roads, governmental and community relations in Alabama, and American Roads' interaction with the Alabama Legislature. | April 2007 to Present |

**<u>Schedule 10</u>**

**Schedule of 30-Day Estimated Cash Receipts and Disbursements, Net Cash
Gain or Loss, and Accrued Obligations and Receivables (Excluding Professional Fees)**

## Schedule 10

**Schedule of 30-Day Estimated Cash Receipts and Disbursements, Net Cash
Gain or Loss, and Accrued Obligations and Receivables (Excluding Professional Fees)**

Pursuant to Local Rule 1007-2(b)(3), the following schedule provides, for the 30-day period following the Petition Date, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue but remain unpaid, other than professional fees, for the Debtors on a consolidated basis.

| Type | Estimated Amount |
|---|---|
| Cash Receipts | $2.6 million |
| Cash Disbursements | $1.5 million |
| Net Cash Gain | $1.1 million |
| Unpaid Obligations (excluding professional fees) | $0.1 million |
| Unpaid Receivables (excluding professional fees) | $0.0 million |