CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
Sean A. O'Neal
Louis A. Lipner

*Proposed Counsel for the Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------------------X
                                                      :
In re                                                 :     Chapter 11
                                                      :
American Roads LLC, et al.,[1]                        :     Case No. 13-_____ (____)
                                                      :
                                  Debtors.            :     Joint Administration to Be Requested
                                                      :
                                                      :
                                                      :
----------------------------------------------------------------------X
```

**DISCLOSURE STATEMENT FOR THE DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN**

THIS IS A SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN IN ACCORDANCE WITH SECTION 1125 AND WITHIN THE MEANING OF SECTION 1126 OF THE BANKRUPTCY CODE, 11 U.S.C. §§ 1125, 1126. THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT WILL BE SUBMITTED TO THE BANKRUPTCY COURT FOR APPROVAL FOLLOWING SOLICITATION AND THE DEBTORS' FILING FOR RELIEF UNDER CHAPTER 11 OF THE BANKRUPTCY CODE. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

**Dated: July 23, 2013**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number are: Alabama Black Warrior Parkway, LLC [2479], Alabama Emerald Mountain Expressway Bridge, LLC [2480], Alabama Toll Operations, LLC [2483], American Roads Holding LLC [3194], American Roads LLC [3196], American Roads Technologies, Inc. [2016], Central Alabama River Parkway, LLC [2478], Detroit Windsor Tunnel LLC [1794], DWT, Inc. [7182] and The Baldwin County Bridge Company L.L.C. [8933]. For the purpose of these cases, the service address for the Debtors is: 100 East Jefferson Avenue, Detroit, Michigan 48226.

## DISCLAIMER

This Disclosure Statement [2] contains summaries of certain provisions of the Plan and certain other documents and financial information. The information included in this Disclosure Statement is provided for the purpose of soliciting acceptances of the Plan and should not be relied upon for any purpose other than to determine whether and how to vote on the Plan; *provided that,* in the case of Bondholders only, the information included in this Disclosure Statement may also be relied upon for the purpose of determining whether to accept the Bond Release Offer. All holders of Claims entitled to vote and all Bondholders entitled to participate in the Bond Release Offer are advised and encouraged to read this Disclosure Statement and the Plan in their entirety. The Debtors believe that these summaries are fair and accurate. The summaries of the financial information and the documents that are attached to, or incorporated by reference in, the Disclosure Statement are qualified in their entirety by reference to such information and documents. In the event of any inconsistency or discrepancy between a description in the Disclosure Statement and the terms and provisions of the Plan or the other documents and financial information incorporated in the Disclosure Statement by reference, the Plan or the other documents and financial information, as the case may be, shall govern for all purposes.

Except as otherwise provided in the Plan or in accordance with applicable law, the Debtors are under no duty to update or supplement this Disclosure Statement. The Bankruptcy Court's approval of this Disclosure Statement does not constitute a guarantee of the accuracy or completeness of the information contained herein or an endorsement of the merits of the Plan by the Bankruptcy Court. The statements and financial information contained in this Disclosure Statement have been made as of the date of the Disclosure Statement unless otherwise specified. Holders of Claims and Bondholders, if applicable, reviewing the Disclosure Statement should not assume at the time of such review that there have been no changes in the facts set forth in the Disclosure Statement since the date of the Disclosure Statement. No holder of a Claim should rely on any information, representations, or inducements made to obtain an acceptance of the Plan that are other than as set forth, or are inconsistent with, the information contained in this Disclosure Statement, the documents attached to this Disclosure Statement, and the Plan. The Disclosure Statement does not constitute legal, business, financial, or tax advice. Any entities desiring any such advice should consult with their own advisors.

The securities described in this Disclosure Statement to be issued under the Plan will be issued in compliance with the registration requirements of the Securities Act or exempt from the registration requirements of section 5 therein pursuant to section 1145 of the Bankruptcy Code, section 4(2) of the Securities Act, or any other available exemption from registration under the Securities Act, as applicable.

This Disclosure Statement has not been approved or disapproved by the United States Securities and Exchange Commission (the "SEC"), nor has the commission commented upon the accuracy or adequacy of the statements contained in this Disclosure Statement. Likewise, this Disclosure Statement has not been approved or disapproved by the Bankruptcy Court. The Debtors are soliciting acceptances to the Plan prior to commencing any cases under chapter 11 of the Bankruptcy Code.

The financial information contained in or incorporated by reference into this Disclosure Statement has not been audited, except as specifically indicated otherwise. The financial projections, attached hereto as Exhibit B and described in this Disclosure Statement, have been prepared by the Debtors' management in consultation with their advisors. The financial projections, while presented with numerical specificity, necessarily were based on a variety of estimates and assumptions that are inherently uncertain and may be beyond the control of the Debtors' management. Important factors that may affect actual results and cause the management forecasts to not be achieved include, but are not limited to, risks and uncertainties relating to the Debtors' businesses (including their ability to achieve strategic goals, objectives and targets over applicable periods), industry performance, the regulatory environment, general business and economic conditions and other factors. The Debtors caution that no representations can be made as to the accuracy of these projections or to the ultimate performance of Reorganized Debtors compared to the information contained in the forecasts or that the forecasted results will be achieved. Therefore, the financial projections may not be relied upon as a guarantee or other assurance that the actual results will occur.

---

[2]   Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Debtors' Joint Prepackaged Chapter 11 Plan (the "Plan"), attached hereto as Exhibit A.

Regarding contested matters, adversary proceedings, and other pending, threatened, or potential litigation or other actions, this Disclosure Statement does not constitute, and may not be construed as, an admission of fact, liability, stipulation, or waiver by the Debtors or any other party, but rather as a statement made in the context of settlement negotiations in accordance with Rule 408 of the Federal Rules of Evidence.  As such, this Disclosure Statement shall not be admissible in any non-bankruptcy proceeding involving the Debtors or any other party in interest, nor shall it be construed to be conclusive advice on the tax, securities, financial or other effects of the Plan to holders of Claims against, or Interests in, the Debtors or any other party in interest.  Please refer to Article VIII of this Disclosure Statement, entitled "Certain Factors to be Considered" for a discussion of certain risk factors that a creditor voting on the Plan should consider.

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................................1

**ARTICLE I PLAN OVERVIEW** ....................................................................................................1
    1.1      Plan Structure Overview ...........................................................................................1
    1.2      Circumstances Leading to the Plan ..........................................................................1
    1.3      Historical Financial Information ..............................................................................2
    1.4      Restructuring and Plan Support Agreement .............................................................2
    1.5      Prepetition Solicitation ............................................................................................3
    1.6      The Restructuring Transactions ...............................................................................4
    1.7      Payments to Bondholders under the Bond Policies ..................................................4
    1.8      Administrative and Priority Claims ..........................................................................4
    1.9      Classified Claims and Interests ................................................................................5
    1.10    Liquidation Analysis ................................................................................................8
    1.11    Valuation Analysis ...................................................................................................9

**ARTICLE II THE CHAPTER 11 CASES** ......................................................................................9
    2.1      Chapter 11 Cases ......................................................................................................9
    2.2      Significant "First Day" Motions ..............................................................................9

**ARTICLE III VOTING PROCEDURES AND REQUIREMENTS**.............................................10
    3.1      Classes Entitled to Vote on the Plan ......................................................................10
    3.2      Votes Required for Acceptance by a Class .............................................................10
    3.3      Certain Factors to be Considered Prior to Voting ..................................................10
    3.4      Classes Not Entitled to Vote on the Plan ...............................................................11
    3.5      Solicitation Procedures ...........................................................................................11
    3.6      Voting Procedures ..................................................................................................12

**ARTICLE IV CONFIRMATION** ..................................................................................................12

**ARTICLE V FINANCIAL INFORMATION AND PROJECTIONS** ...........................................13

**ARTICLE VI BUSINESS DESCRIPTIONS**..................................................................................13
    6.1      Corporate Background and Organizational Structure .............................................13
    6.2      Employees...............................................................................................................24
    6.3      Directors and Officers ............................................................................................24
    6.4      Financial Advisors .................................................................................................26
    6.5      Prepetition Capital Structure ..................................................................................26

**ARTICLE VII OTHER KEY ASPECTS OF THE PLAN** .............................................................29
    7.1      Distributions............................................................................................................29
    7.2      Treatment of Executory Contracts and Unexpired Leases .....................................31
    7.3      Release, Injunction, and Related Provisions ..........................................................32
    7.4      Protection Against Discriminatory Treatment ........................................................35
    7.5      Indemnification ......................................................................................................35
    7.6      Recoupment ...........................................................................................................35
    7.7      Release of Liens .....................................................................................................35
    7.8      Reimbursement or Contribution .............................................................................35
    7.9      Cancellation of Interests, Dissolution of Holdco and Issuance of Reorganized Equity
               Units.......................................................................................................................36
    7.10    Incentive Plans and Employee and Retiree Benefits ..............................................36
    7.11    Subordination .........................................................................................................36
    7.12    Vesting of Assets in the Reorganized Debtors........................................................36
    7.13    Modification of Plan ..............................................................................................36
    7.14    Revocation or Withdrawal of Plan .........................................................................37
    7.15    Reservation of Rights..............................................................................................37

i

7.16    Plan Supplement Exhibits ........................................................................................37
7.17    Conditions Precedent to the Effective Date ..........................................................37
7.18    Waiver of Conditions Precedent ............................................................................37

**ARTICLE VIII CERTAIN FACTORS TO BE CONSIDERED.......................................................38**
8.1     General.....................................................................................................................38
8.2     Risks Related to the Plan and Other Bankruptcy Law Considerations ..................38
8.3     Business-Specific Risk Factors ..............................................................................42
8.4     Risk Factors Relating to Bondholders that Elect Not to Tender Their Bonds to the
        Reorganized Debtors After Confirmation ...............................................................49
8.5     Disclosure Statement Disclaimer ...........................................................................50

**ARTICLE IX IMPORTANT SECURITIES LAW DISCLOSURE ................................................51**

**ARTICLE X CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES.................................52**
10.1    Introduction.............................................................................................................52
10.2    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors .........53
10.3    Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Bondholder
        Claims .....................................................................................................................53
10.4    Withholding and Reporting ....................................................................................54

**ARTICLE XI CONFIRMATION PROCEDURES........................................................................54**
11.1    The Confirmation Hearing ......................................................................................54
11.2    Confirmation Standards ..........................................................................................54
11.3    Best Interests Test/Liquidation Analysis................................................................55
11.4    Feasibility................................................................................................................55
11.5    Confirmation Without Acceptance by All Impaired Classes ..................................56

**ARTICLE XII ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN...........56**

**ARTICLE XIII CONCLUSION AND RECOMMENDATION....................................................1**

**APPENDIX: RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW,
        AND OTHER REFERENCES .......................................................................1**

## EXHIBITS

| | |
|---|---|
| Exhibit A | Debtors' Joint Prepackaged Chapter 11 Plan |
| Exhibit B | Financial Projections |
| Exhibit C | American Roads Restructuring and Plan Support Agreement |
| Exhibit D | Historical Financial Statements |
| Exhibit E | Unaudited Liquidation Analysis of the Debtors |
| Exhibit F | Unaudited Valuation Analysis of the Reorganized Debtors |
| Exhibit G | Corporate Structure Diagram |
| Exhibit H | Maps of Toll Facilities |

# INTRODUCTION

American Roads LLC ("American Roads") is a privately-held company that owns and operates toll road facilities in regional markets. American Roads currently owns and operates four facilities in Alabama – the Foley Beach Express, the Emerald Mountain Expressway, the Alabama River Parkway and the Black Warrior Parkway – and an international border crossing tunnel between Detroit, Michigan and Windsor, Ontario (collectively, the "Toll Facilities"). American Roads focuses on providing its customers with safe and efficient transport routes, developing innovative electronic toll payment programs to enhance customer convenience and time and cost savings.

American Roads is a limited liability company organized under the laws of Delaware that was formed in December 2005 in connection with the acquisition and financing of the Toll Facilities. American Roads is a wholly owned subsidiary of American Roads Holding LLC (f/k/a Alinda Roads Holding LLC) ("Holdco"), and through its subsidiaries owns and operates the Toll Facilities. In October 2006, affiliates of Alinda Capital Partners LLC ("ACP") acquired all of the outstanding equity interests of Holdco. A diagram illustrating the current corporate structure of the Debtors is attached hereto as Exhibit G.

This Disclosure Statement provides information regarding the Plan, a copy of which is attached hereto as Exhibit A. The only impaired Classes of Claims entitled to vote on the Plan are Classes 1A-10A, the Classes of Claims held by Syncora under the Financing Documents. As discussed in further detail below, after analyzing their strategic options and engaging in negotiations with Syncora, ACP, Alinda Capital Partners I Ltd ("ACPI") and Alinda North American Roads, Inc. ("ANAR"), the Debtors entered into the Restructuring and Plan Support Agreement, dated July 17, 2013 (the "RPSA"), in order to recapitalize their outstanding debt. The RPSA is attached hereto as Exhibit C. The Debtors believe that a Chapter 11 restructuring represents the best prospect for restructuring the Debtors' balance sheet and positioning American Roads as an efficient and competitive owner and operator of the Toll Facilities. The Debtors believe that the Plan is in the best interests of the estates. Accordingly, the Debtors urge all such holders entitled to vote on the Plan to vote in favor of the Plan.

# ARTICLE I
# PLAN OVERVIEW

## 1.1    Plan Structure Overview

The Plan effects a restructuring of the Debtors, including (a) the discharge of certain Claims and Interests, (b) the issuance of membership interests in Reorganized American Roads, (c) the distribution of such membership interests to the Collateral Agent for distribution, pursuant to the waterfall provisions set forth in section 7.06(a) of the Collateral Agency Agreement, and (d) the cancellation of existing membership interests in American Roads. In addition, in connection with the Plan, holders of Bonds, other than Syncora, will have the opportunity to tender their Bonds to the Reorganized Debtors pursuant to the Bond Release Offer.

Specifically, as more fully described below, under the Plan on the Effective Date, in full and final satisfaction and discharge of the Swap Policies Claim under the Financing Documents, one hundred percent (100%) of the Reorganized Equity Units shall be issued to the Collateral Agent for immediate distribution to Syncora or its designated affiliate or affiliates (which may include a Reorganized Debtor) pursuant to Syncora's right to reimbursement of Enhancement Liabilities and subrogation as the holder of the Swap Policies Claim pursuant to the waterfall provisions set forth in Section 7.06(a) of the Collateral Agency Agreement.

Holders of Allowed Administrative Claims, Allowed Secured Tax Claims, Allowed Other Secured Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Professional Claims will be paid in full in Cash. Holders of Bond Claims, General Unsecured Claims, Subordinated Claims and Interests will not receive any distributions. Executory contracts and unexpired leases will be assumed by the Reorganized Debtors unless rejected pursuant to an order of the Bankruptcy Court.

## 1.2    Circumstances Leading to the Plan

The Debtors have commenced these chapter 11 cases (the "Chapter 11 Cases") to restructure a balance sheet burdened by more than $830 million on account of obligations under the Swaps and the Bonds.

A restructuring of the Debtors' balance sheet is necessary because the Debtors are not able to meet their financial obligations under the Swaps and the Bonds.  Since the refinancing of their debt in 2006, the traffic volumes at the Toll Facilities have not grown to a level necessary to support the Debtors' existing capital structure.  Rather than experiencing the traffic growth projected in 2006 when the Bonds and Swaps were issued, the Toll Facilities have experienced significant traffic declines.  From 2007 through 2012, traffic has declined by between approximately 1.9% and 8.6% at each of the Toll Facilities.  This decline is driven by a number of factors, including the economic recession, the volatility of gas prices, reduced travel and discretionary spending, the negative impact of toll increases in Alabama, increased travel documentation requirements adopted by the U.S. Congress in 2009 and adverse regional events such as the Deepwater Horizon British Petroleum oil spill in 2010, the Tuscaloosa tornado in 2011 and the Detroit financial crisis. Although Detroit's financial situation has contributed to the difficulties facing the Debtors, these Chapter 11 Cases are not the result of the recent bankruptcy filing of Detroit.

As a result of declining traffic, revenue is substantially lower than projected at the time of the refinancing.  For example, the Debtors' revenue totaled $22.2 million in 2012 and $20.3 million in 2011, compared to over $50 million for 2012 as projected by outside traffic consultants at the time of the refinancing.  Moreover, the Debtors' EBITDA has ranged between $14.2 million and $15.8 million in 2009 through 2012, which is far below the amount necessary to support $830 million in outstanding debt, which has an average annual debt service of approximately $35 million.

The Debtors determined that prolonged chapter 11 cases would damage their ongoing business operations and threaten their viability as a going concern.  Therefore, in the months prior to the Petition Date, the Debtors engaged in extensive negotiations with Syncora, the insurer of the Swaps and Bonds.  The Debtors sought agreement with Syncora because, as a non-defaulting insurer, it is the Instructing Senior Creditor under the Financing Documents, and accordingly controls the enforcement rights under the Swaps and the Bonds.  In addition, Syncora is the back-to-back counterparty to the Swaps and holds a significant portion of the Bonds.

The Debtors now seek to consummate the Plan and emerge as reorganized entities under the ownership of Syncora with no outstanding financial debt.  The Debtors believe that a chapter 11 restructuring represents the best prospect for restructuring the Debtors' balance sheet and positioning American Roads as an efficient and competitive owner and operator of the Toll Facilities.

## 1.3    Historical Financial Information

The Debtors have made available certain historical financial information attached as <u>Exhibit D</u> to this Disclosure Statement.

## 1.4     Restructuring and Plan Support Agreement

The Plan is the culmination of extensive arms' length negotiations between the Debtors, ACP and Syncora, which is the insurer under Policies benefitting the holders of the Swaps and the Bonds.  Negotiations between the Debtors, ACP and Syncora commenced in May 2013, resulting in the execution of the RPSA on July 17, 2013.  A copy of the RPSA is attached hereto as <u>Exhibit C</u>.  The RPSA contemplates a series of transactions occurring before and after the commencement of the Chapter 11 Cases.  The following summary of the terms of the RPSA is not a complete summary and is qualified in its entirety by reference to the RPSA.

Under the RPSA, the Debtors agree to take reasonable and appropriate actions consistent with their obligations under Section 1 of the RPSA, including to:

- prosecute the Plan in accordance with the terms of the RPSA;

- observe and perform all terms of the Cash Collateral Order; and

- otherwise work cooperatively with Syncora to prepare, file and prosecute the Chapter 11 Cases.

Under the RPSA, Syncora agrees to take reasonable and appropriate actions consistent with its obligations under Section 2 of the RPSA, including to:

- Timely casts votes held by Syncora to accept the Plan;

- support and take any and all commercially reasonable, necessary or appropriate actions in support of the Debtors' restructuring efforts;

- not exercise any rights or remedies against the Debtors or the Collateral under the Financing Documents or applicable non-bankruptcy law, except as permitted in the Cash Collateral Order and the RPSA;

- refrain from taking any action not required by law that is inconsistent with, or that would materially delay or impede approval, confirmation or consummation of the Plan or that is otherwise inconsistent with the express terms of the RPSA or the Plan;

- consent to the use of cash Collateral during the pendency of the Chapter 11 Cases on the terms and conditions set forth in the Cash Collateral Order; and

- reimburse ANAR and Alinda for certain fees and expenses in exchange for certain agreements by ANAT and Alinda as more fully described in the RPSA.

Under the RPSA, ACP, ACPI and ANAR agree to take reasonable and appropriate action consistent with its obligations under Section 3 of the RPSA, including to:

- support and take any and all reasonably necessary or appropriate actions in furtherance of the Debtors' restructuring efforts;

- refrain from, and cause their respective affiliates to refrain from, taking any action not required by law that is inconsistent with, or that would materially delay or impede approval, confirmation or consummation of the Plan or that is otherwise inconsistent with the express terms of the RPSA or the Plan; and

- execute any document and give any notice, order, instruction or direction that is necessary or desirable to support the Debtors' restructuring efforts.

The RPSA may be terminated upon the occurrence of certain events. For example, the Debtors or Syncora may terminate the RPSA if the Effective Date does not occur by December 31, 2013. Syncora may terminate the RPSA if certain events occur, including if the Cash Collateral Order is terminated or the Debtors materially breach the RPSA and fail or refuse to cure such breach within five (5) business days after written notice of such breach has been provided by Syncora.

The Debtors may terminate the RPSA if Syncora materially breaches the RPSA and fails or refuses to cure such breach within five (5) business days after written notice of such breach has been provided by the Debtors.

Nothing in the RPSA shall require the Debtors, or any of their respective directors or officers (in such person's capacity as a director or officer) to take any action, or to refrain from taking any action, to the extent that taking such action or refraining from taking such action would be inconsistent with such person's fiduciary obligations under applicable law, subject to certain qualifications described in further detail in section 11 of the RPSA.

## 1.5    Prepetition Solicitation

Following the negotiation and execution of the RPSA, the Debtors commenced a prepackaged solicitation of the Plan on the date hereof by distributing this Disclosure Statement and a ballot to Syncora as the holder of the Swap Policies Claim. No votes other than Syncora's votes are being solicited because all other holders of Claims or Interests belong to Classes that are deemed to accept the Plan as a result of not being impaired under the Plan or are deemed to reject the Plan as a result of not receiving any distributions under the Plan.

**1.6**     **The Restructuring Transactions**

    **(a)**     **Distribution of Reorganized Equity Units of Reorganized American Roads**

On the Effective Date, in full and final satisfaction and discharge of the Swap Policies Claim under the Financing Documents, the Collateral Agent shall receive one hundred percent (100%) of the Reorganized Equity Units of Reorganized American Roads, which shall be issued to the Collateral Agent for immediate distribution pursuant to the waterfall provisions set forth in Section 7.06(a) of the Collateral Agency Agreement. In accordance with this waterfall, the Collateral Agent will distribute all such Reorganized Equity Units to Syncora, in respect of Settlement Amounts (as defined in the Swaps), Party B Termination Amounts (as defined in the Swaps) and any Enhancement Liabilities (as defined in the Collateral Agency Agreement) incurred by Syncora under the Financing Documents. Consequently, on the Effective Date, the Reorganized Debtors will become direct wholly-owned subsidiaries of Syncora or its designated affiliate or affiliates (which may include a Reorganized Debtor).

    **(b)**     **Option to Cash-out Bondholders**

Within five Business Days after the Effective Date, the Reorganized Debtors shall commence an offer to purchase all Bonds (the "Bond Release Offer") from any Bondholder, other than Syncora, in exchange for (a) a one-time, Cash payment equal to twenty percent (20%) of the outstanding principal balance of such Bonds as of the Petition Date, and (b) a waiver and release of any and all claims, rights, remedies or causes of action such Bondholder may have against the Released Parties that arise under or relate to the Debtors, the Chapter 11 Cases and the Financing Documents, including all rights and claims arising under the Policies. The mechanics of the Bond Release Offer shall be specified in the Plan Supplement. The Bond Release Offer shall be funded with (i) the proceeds of a capital contribution made by Syncora to the Reorganized Debtors in an amount not to exceed $50 million and (ii) a portion of the Cash remaining in the Reserve Accounts on the Effective Date, which portion shall be in an amount not to exceed the lesser of (x) $15 million and (y) all Cash remaining in the Reserve Accounts in excess of $25 million on the Effective Date.

**1.7**     **Payments to Bondholders under the Bond Policies**

Bondholders who elect not to participate in the Bond Release Offer will be entitled to receive payments of principal and interest in respect of their Bonds, in each case, solely to the extent then due and payable on each Payment Date (as defined in the Indentures) in accordance with the terms of the Indentures and the Bond Policies. Nothing in the Plan shall prejudice the rights of Bondholders under the Bond Policies, which shall be unaffected by the Plan and shall not be altered or modified as a result of the Effective Date. Please see section 8.4 ("Risk Factors Relating to Bondholders that Elect Not to Tender Their Bonds to the Reorganized Debtors After Confirmation") for a further discussion of risk factors related to Syncora.

**1.8**     **Administrative and Priority Claims**

    **(a)**     **Unclassified Claims Summary**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, Professional Claims, and Priority Tax Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article III of the Plan. The Claim recoveries for such unclassified Claims are set forth below:

| Claim | Plan Treatment | Projected Plan Recovery |
| --- | --- | --- |
| Administrative Claims and Professional Claims | Paid in full in Cash | 100% |
| Priority Tax Claims | Paid in full in Cash | 100% |

    (b)    **Unclassified Claims Detail**

    (1)    **Administrative Claims**

Unless otherwise agreed to by the holder of an Allowed Administrative Claim and the Debtors or Reorganized Debtors, as applicable, each holder of an Allowed Administrative Claim (other than holders of Professional Claims and Claims for fees and expenses pursuant to section 1930 of chapter 123 of title 28 of the United States Code) will receive in full and final satisfaction of its Allowed Administrative Claim an amount of Cash equal to the amount of such Allowed Administrative Claim either: (a) on the Effective Date, or as soon as reasonably practicable thereafter; (b) if the Administrative Claim is not Allowed as of the Effective Date, no later than 30 days after the date on which an order Allowing such Administrative Claim becomes a Final Order, or as soon as reasonably practicable thereafter; or (c) if the Allowed Administrative Claim is based on liabilities incurred by the Debtors in the ordinary course of their business after the Petition Date in accordance with the terms and conditions of the particular transaction giving rise to such Allowed Administrative Claims without any further action by the holders of such Allowed Administrative Claims.

    (2)    **Professional Claims**

All requests for payment of Professional Claims for services rendered and reimbursement of expenses incurred prior to the Confirmation Date must be filed no later than 45 days after the Effective Date. The Bankruptcy Court shall determine the Allowed amounts of such Professional Claims after notice and a hearing in accordance with the procedures established by the Bankruptcy Code. The Reorganized Debtors shall pay Allowed Professional Claims in Cash in the amount approved by the Bankruptcy Court. From and after the Confirmation Date, any requirement that Professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

    (3)    **Priority Tax Claims**

Each holder of an Allowed Priority Tax Claim due and payable on or before the Effective Date shall receive in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Priority Tax Claim: (a) the treatment provided by section 1129(a)(9)(C) of the Bankruptcy Code; (b) a Cash payment on, or as soon as reasonably practicable after, the later of the Effective Date or the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim, equal to the amount of such Allowed Priority Tax Claim; or (c) such other less favorable treatment as may be agreed upon between the holder of such Allowed Priority Tax Claim and the applicable Debtor. If payment is made in accordance with section 1129(a)(9)(C), installment payments shall be made quarterly and interest shall accrue in accordance with 26 U.S.C. § 6621. On the Effective Date, Liens securing any Allowed Secured Tax Claim shall be deemed released, terminated and extinguished, in each case without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order or rule or the vote, consent, authorization or approval of any Person. To the extent any Allowed Priority Tax Claim is not due and owing on the Effective Date, such Claim may be paid in full in Cash in accordance with the terms of any agreement between the Debtors and the holder of such Claim, or as may be due and payable under applicable non-bankruptcy law, or in the ordinary course of business.

**1.9**    **Classified Claims and Interests**

    (a)    **The Debtors**

There are a total of ten (10) Debtors. Each Debtor has been assigned a number below for the purposes of classifying and treating Claims against and Interests in each Debtor. The Claims against and Interests in each Debtor, in turn, have been assigned to separate lettered Classes with respect to each Debtor based on the type of Claim or Interest involved. Accordingly, the classification of any particular Claim or Interest in any of the Debtors depends on the particular Debtor against which such Claim is asserted or in which such Interest is held and the type of Claim or Interest in question. The numbers applicable to the various Debtors are as follows:

| Number | Debtor Name |
|--------|-------------|
| 1 | American Roads |
| 2 | Holdco |
| 3 | Alabama Toll Operations, LLC |
| 4 | The Baldwin County Bridge Company, L.L.C. |
| 5 | Alabama Emerald Mountain Expressway Bridge, LLC |
| 6 | Central Alabama River Parkway, LLC |
| 7 | Alabama Black Warrior Parkway, LLC |
| 8 | Detroit Windsor Tunnel LLC |
| 9 | DWT |
| 10 | American Roads Technologies, Inc. |

     **(b)**     **Classified Claims and Interests Summary**

The Plan establishes a comprehensive classification of Claims and Interests. The table below summarizes the classification, treatment, voting rights and estimated recoveries, estimated as of the date hereof, of the Claims and Interests, by Class, under the Plan.  Projected recoveries under the Plan and the liquidation recoveries are based on certain assumptions and estimates described herein.  Accordingly, recoveries received by holders of Claims and Interests may differ materially from the projected recoveries listed below.   Please refer to the Unaudited Valuation Analysis of Reorganized Debtors and Unaudited Liquidation Analysis of the Debtors described in Exhibit F and Exhibit E, respectively, for more information.

| Class | Claim or Interest | Voting Rights | Treatment | Plan Recovery | Liquidation Recovery |
|-------|-------------------|---------------|-----------|---------------|----------------------|
| 1A-10A | Swap Policies Claim | Impaired | Reorganized Equity Units in Reorganized American Roads | 58.4 - 64.4  % | 49.3 – 53.9% |
| 1B – 10B | Other Secured Claims | Unimpaired | Paid in full in cash[3] | 100% | 100% |
| 1C – 10C | Other Priority Claims | Unimpaired | Paid in full in cash[4] | 100% | 100% |
| 1D – 10D | Bondholder Claims | Impaired | Receives no distribution | 0% | 0% |
| 1E – 10E | General Unsecured Claims | Impaired | Receives no distribution | 0% | 0% |
| 1F – 10F | Subordinated Claims | Impaired | Receives no distribution | 0% | 0% |
| 1G – 10G | Interests | Impaired | Receives no distribution | 0% | 0% |

---

[3]    The Debtors are not aware of any Claims in Class B.

[4]    The Debtors are not aware of any Claims in Class C.

(c)    **Classified Claims and Interests Details**

Except to the extent that a holder of an Allowed Claim against or Interest in the Debtors, as applicable, agrees to a less favorable treatment, such holder shall receive under the Plan the treatment described below in full and final satisfaction, settlement, release, and discharge of and in exchange for such holder's Allowed Claim or Interest.  Unless otherwise indicated, the holder of an Allowed Claim or Interest, as applicable, shall receive such treatment on the Effective Date, or as soon as reasonably practicable thereafter.

(1)    **Classes 1A Through 10A (Swap Policies Claim)**

*Classification*:  Classes 1A through 10A consist of the Swap Policies Claim against the applicable Debtor.

*Allowance:*  Syncora is deemed to have made the election under section 1111(b)(2) of the Bankruptcy Code to have the Swap Policies Claim treated as a fully Secured Claim.  On the Effective Date, the Swap Policies Claim shall be an Allowed Secured Claim, and shall not be subject to avoidance, objection, challenge, deduction, subordination, recharacterization or offset, in the aggregate principal amount of $334 million, plus (A) any accrued but unpaid interest as of the Petition Date payable in accordance with the Financing Documents, (B) any unpaid fees, expenses or other amounts due to Syncora under the Financing Documents as of the Petition Date, and (C) any unpaid adequate protection payments required to be paid pursuant to the terms of the Cash Collateral Order.

*Treatment*:  On the Effective Date, in full and final satisfaction and discharge of the Swap Policies Claim under the Financing Documents, one hundred percent (100%) of the Reorganized Equity Units of Reorganized American Roads shall be issued to the Collateral Agent for immediate distribution to Syncora or its designated affiliate or affiliates (which may include a Reorganized Debtor) as the holder of the Swap Policies Claim pursuant to the waterfall provisions set forth in Section 7.06(a) of the Collateral Agency Agreement.

*Voting*:  Classes 1A through 10A are Impaired.  Syncora, as holder of the Swap Policies Claim, is entitled to vote to accept or reject the Plan.

(2)    **Classes 1B Through 10B (Other Secured Claims)**

*Classification*:  Classes 1B through 10B consist of all Allowed Other Secured Claims against the applicable Debtor.

*Treatment*: Each holder of an Allowed Other Secured Claim shall, at the sole discretion of Syncora and the Debtors (i) have the legal, equitable and contractual rights of such holder reinstated in full, or (ii) receive in full satisfaction, settlement, and release of, and in exchange for, such holder's Allowed Other Secured Claim, at the sole option of Syncora and the Debtors, (A) Cash in an amount equal to such Allowed Other Secured Claim, (B) the property of the Debtors that constitutes collateral securing such Allowed Other Secured Claim, or (C) such other less favorable treatment as to which Syncora, the Debtors and the holder of such Allowed Other Secured Claim have agreed upon.

*Voting*:  Classes 1B through 10B are Unimpaired.  Holders of Allowed Other Secured Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Secured Claims are not entitled to vote to accept or reject the Plan.

(3)    **Classes 1C Through 10C (Other Priority Claims)**

*Classification*:  Classes 1C through 10C consist of all Allowed Other Priority Claims against the applicable Debtor.

*Treatment*:  On the Effective Date, each holder of an Allowed Other Priority Claim shall receive Cash in an amount equal to such Allowed Other Priority Claim.

*Voting*: Classes 1C through 10C are Unimpaired.  Holders of Allowed Other Priority Claims are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code.  Holders of Allowed Other Priority Claims are not entitled to vote to accept or reject the Plan.

### (4)    Classes 1D Through 10D (Bondholder Claims)

Classification: Classes 1D through 10D consist of all Allowed Bondholder Claims against the applicable Debtor.

Treatment: Holders of Allowed Bondholder Claims shall receive no property or distributions under the Plan on account of such Claims.

Voting: Classes 1D through 10D are Impaired.  Holders of Allowed Bondholder Claims are conclusively presumed to have rejected the Plan under section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

### (5)    Classes 1E Through 10E (General Unsecured Claims)

*Classification*:  Classes 1E through 10E consist of all Allowed General Unsecured Claims against the applicable Debtor.

*Treatment*:  Holders of Allowed General Unsecured Claims shall receive no property or distributions under the Plan on account of such Claims.

*Voting*:  Classes 1E through 10E are Impaired.  Holders of Allowed General Unsecured Claims are conclusively presumed to have rejected the Plan under section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

### (6)    Classes 1F Through 10F (Subordinated Claims)

*Classification*:  Classes 1F through 10F consist of all Allowed Subordinated Claims against the applicable Debtor.

*Treatment*:  Holders of Allowed Subordinated Claims shall receive no property or distributions under the Plan on account of such Claims in accordance with the effect of section 510 of the Bankruptcy Code.

*Voting*:  Classes 1F through 10F are Impaired.  Holders of Allowed Subordinated Claims are conclusively presumed to have rejected the Plan under section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

### (7)    Classes 1G Through 10G (Interests)

*Classification*: Classes 1G through 10G consist of all Allowed Interests in the applicable Debtor.

*Treatment*: On the Effective Date, the Allowed Interests in the Debtors shall be cancelled and the holders of such Interests shall receive no property or distribution under the Plan on account of such Interests.

*Voting*: Classes 1G through 10G are Impaired.  Holders of Allowed Interests in the Debtors are conclusively presumed to have rejected the Plan under section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

## 1.10    Liquidation Analysis

The Debtors believe that the Plan provides the same or a greater recovery for holders of Allowed Claims and Interests as would be achieved in a liquidation under chapter 7 of the Bankruptcy Code.

The Debtors, in consultation with their financial advisors, have prepared an unaudited liquidation analysis, attached hereto as Exhibit E, to assist holders of Claims in evaluating the Plan.  The liquidation analysis compares the projected creditor recoveries that would result from the liquidation of the Debtors in a hypothetical case under chapter 7 of the Bankruptcy Code with the estimated distributions to holders of Allowed Claims and Interests under the Plan. The liquidation analysis is based on the value of the Debtors' assets and liabilities as of a certain date and incorporates various estimates and assumptions, including a hypothetical conversion to a chapter 7 liquidation as of a certain date.  Further, the analysis is subject to potentially material changes, including with respect to economic and business conditions and legal rulings.  Therefore, the actual liquidation value of the Debtors could vary materially from the estimate provided in the liquidation analysis.

### 1.11    Valuation Analysis

The Debtors' financial advisor, Greenhill & Co., Inc. ("Greenhill") has performed an analysis of the estimated value of the Reorganized Debtors on a going-concern basis as of the date hereof (the "Valuation Analysis"). The Valuation Analysis is attached hereto as Exhibit F.

According to the Valuation Analysis, the estimated value of the Debtors is within a range from approximately $195 to $215, with a point estimate of $205. The Valuation Analysis, including the procedures followed, assumptions made, qualifications and limitations on review undertaken described therein, should be read in conjunction with Article VIII of this Disclosure Statement, entitled "Certain Factors to be Considered."

## ARTICLE II
## THE CHAPTER 11 CASES

### 2.1    Chapter 11 Cases

On the Petition Date the Debtors  intend to file the Plan and a motion requesting procedural consolidation of the Chapter 11 Cases for ease of administration.

### 2.2    Significant "First Day" Motions

On the Petition Date, the Debtors intend to file several motions requesting the Bankruptcy Court to enter orders authorizing the Debtors to continue operating in the ordinary course. These motions are designed to ease the strain on the Debtors' businesses as a consequence of the filings.  The following summary highlights certain of the motions that are expected to be filed.

#### (a)    Cash Management Motion

In order to, among other things, avoid administrative inefficiencies, on the Petition Date, the Debtors intend to move the Bankruptcy Court (the "Cash Management Motion") for an order (i) approving the continued use of the existing cash management system, and (ii) granting certain other relief.

#### (b)    Cash Collateral Motion

The Debtors have sufficient cash to fund the Chapter 11 reorganization and ongoing operations. Substantially all of the Debtors' cash is subject to liens of the Collateral Agent.  Without authorization to use this cash collateral, the Debtors may not be able to reorganize.  Accordingly, on the Petition Date, the Debtors intend to move the Bankruptcy Court (the "Cash Collateral Motion") for an order (i) authorizing the Debtors to use certain cash collateral that is subject to liens subject to an agreed-upon budget, (ii) providing the Collateral Agent with such liens adequate protection with respect to that cash collateral, and (iii) granting certain other relief. Syncora and the Collateral Agent have consented to the Debtors' use of cash collateral pursuant to an agreed form of order.

#### (c)    Customer Programs Motion

The Debtors intend to seek entry of an order authorizing them to honor their prepetition obligations to customers arising under essential, ordinary course customer dealings, promotion programs and other practices that are aimed at maintaining and improving existing customer satisfaction and attracting new customers (collectively, the "Customer Programs") and to continue such Customer Programs on a postpetition basis.  The Debtors believe that the Customer Programs represent ordinary course activity but intend to seek approval to continue honoring such programs in an abundance of caution and to provide greater assurance to customers.

#### (d)    Scheduling Motion

The Debtors will be seeking confirmation of the Plan and to emerge from Chapter 11 as soon as possible. To that end, they intend to file a motion on the Petition Date requesting that the Bankruptcy Court set a date and time for a hearing approximately 30 days after the Petition Date to consider approval of this Disclosure Statement and confirmation of the Plan at the Confirmation Hearing.

**(e)**        **Retention Applications**

On the Petition Date, the Debtors intend to file several motions for the retention of professionals. Specifically, the Debtors requested that the Bankruptcy Court authorize the Debtors to retain (i) Cleary Gottlieb Steen & Hamilton LLP, as restructuring counsel, (ii) Greenhill, as financial advisor, (iii) Protiviti Inc. ("Protiviti") as financial advisor,  and (iv) Epiq Bankruptcy Solutions, LLC ("Epiq") to act, among other things, as the Claims and Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

**ARTICLE III**
**VOTING PROCEDURES AND REQUIREMENTS**

**3.1**    **Classes Entitled to Vote on the Plan**

The following Classes are the only Classes entitled to vote to accept or reject the Plan:

| Classes | Claim or Interest | Status |
|---------|-------------------|--------|
| 1A-10A | Swap Policies Claim | Impaired |

If your Claim is not included in Classes 1A through 10A, you are not entitled to vote and you will not receive a solicitation package, including a ballot setting forth detailed voting instructions.  If you are entitled to vote under the Plan, you should read your ballot and carefully follow the instructions included in the ballot.  Please use only the ballot that accompanies this Disclosure Statement or the ballot that the Debtors, including the Claims and Solicitation Agent, otherwise provide to you.

**3.2**    **Votes Required for Acceptance by a Class**

Under the Bankruptcy Code, acceptance of a plan of reorganization by a Class of Claims or Interests is determined by calculating the amount and, if a Class of Claims, the number of Claims voting to accept, as a percentage of the Allowed Claims or Interests, as applicable, that have voted.  Acceptance by a Class of Claims requires an affirmative vote of more than one-half in number of total Allowed Claims that have voted and an affirmative vote of at least two-thirds in dollar amount of the total Allowed Claims that have voted.  Acceptance by a Class of Interests requires an affirmative vote of at least two-thirds in amount of the total Allowed Interests that have voted.

**3.3**    **Certain Factors to be Considered Prior to Voting**

There are a variety of factors that all holders of Claims entitled to vote on the Plan should consider prior to voting to accept or reject the Plan.  These factors may impact recoveries under the Plan and include:

- unless otherwise specifically indicated, the financial information contained in the Disclosure Statement has not been audited and is based on an analysis of data available at the time of the preparation of the Plan and the Disclosure Statement;

- although the Debtors believe that the Plan complies with all applicable provisions of the Bankruptcy Code, the Debtors can neither assure such compliance nor that the Bankruptcy Court will confirm the Plan;

- the Debtors may request Confirmation without the acceptance of all Impaired Classes entitled to vote in accordance with section 1129(b) of the Bankruptcy Code; and

- any delays of either Confirmation or Consummation could result in, among other things, increased Administrative Claims and Professional Claims.

While these factors could affect distributions available to holders of Allowed Claims and Interests under the Plan, the occurrence or impact of such factors will not necessarily affect the validity of the vote of the holder

entitled to vote to accept or reject the Plan or necessarily require a re-solicitation of the votes of holders of Claims entitled to vote on the Plan.

For a further discussion of risk factors, please refer to Article VIII of this Disclosure Statement ("Certain Factors to be Considered").

### 3.4 Classes Not Entitled to Vote on the Plan

Under the Bankruptcy Code, holders of Claims and Interests are not entitled to vote if their contractual rights are Unimpaired by the Plan or if they will receive no property under the Plan. Accordingly, the following Classes are not entitled to vote to accept or reject the Plan:

| Class | Claim or Interest | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| 1B – 10B | Other Secured Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| 1C – 10C | Other Priority Claims | Unimpaired | Deemed To Accept; Not Entitled To Vote |
| 1D – 10D | Bondholder Claims | Impaired | Deemed To Reject; Not Entitled To Vote |
| 1E – 10E | General Unsecured Claims | Impaired | Deemed To Reject; Not Entitled To Vote |
| 1F – 10F | Subordinated Claims | Impaired | Deemed To Reject; Not Entitled To Vote |
| 1G – 10G | Interests | Impaired | Deemed To Reject; Not Entitled To Vote |

### 3.5 Solicitation Procedures

#### (a) Claims and Solicitation Agent

The Debtors retained Epiq to act, among other things, as the Claims and Solicitation Agent in connection with the solicitation of votes to accept or reject the Plan.

#### (b) Claim Holder Solicitation Package

The following materials will constitute the solicitation package (the "Solicitation Package") distributed to holders of Claims entitled to vote to accept or reject the Plan:

- the appropriate ballot(s) and applicable voting instructions; and

- the Disclosure Statement, including the Plan with all exhibits.

#### (c) Distribution of the Solicitation Package and Plan Supplement

The Debtors, by way of the Claims and Solicitation Agent, intend to distribute the Solicitation Package to Syncora, as the holder of Claims in Classes 1A-10A, on July 23, 2013. The voting deadline is 4:00 p.m. on July 24, 2013 (the "Voting Deadline").

The Solicitation Package (except the ballot(s)) may also be obtained from the Claims and Solicitation Agent by: (1) calling (646) 282-2400; or (2) writing to American Roads Ballot Processing Center, c/o Epiq Bankruptcy Solutions LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017. Copies of any pleadings filed with the Bankruptcy Court may be obtained for free by visiting the Debtors' restructuring website, http://dm.epiq11.com/AmericanRoads, or for a fee via PACER at http://www.deb.uscourts.gov.

Prior to the Confirmation Hearing, the Debtors intend to file the Plan Supplement. As the Plan Supplement is updated or otherwise modified, such modified or updated documents will be made available on the Debtors'

restructuring website.  The Debtors will not serve paper or CD-ROM copies of the Plan Supplement; however, parties may obtain a copy of the Plan Supplement from the Claims and Solicitation Agent by: (1) calling (646) 282-2400; or (2) visiting the Debtors' restructuring website, http://dm.epiq11.com/AmericanRoads; and/or (3) writing to American Roads Ballot Processing Center, c/o Epiq Bankruptcy Solutions LLC, 757 Third Avenue, 3rd Floor, New York, NY 10017.

**3.6      Voting Procedures**

The date hereof is the voting record date, which is the date for determining which holder(s) of Claims are entitled to vote to accept or reject the Plan and receive the Solicitation Package in accordance with the solicitation procedures.

In order for the holder of a Claim in a voting class to have its ballot counted as a vote to accept or reject the Plan, such holder's ballot must be properly completed, executed, and delivered by: (a) email to tabulation@epiqsystems.com; or (b) via courier or personal delivery to American Roads Inc. Ballot Processing Center, c/o Epiq Systems, 757 Third Floor, New York, New York 10017, so that such holder's ballot or the master ballot incorporating the vote cast by such ballot, as applicable, is **actually received** by the Claims and Solicitation Agent **on or before the Voting Deadline**.

IF A BALLOT IS RECEIVED AFTER THE VOTING DEADLINE, IT WILL NOT BE COUNTED UNLESS THE DEBTORS DETERMINE OTHERWISE IN THEIR SOLE AND ABSOLUTE DISCRETION.

ANY BALLOT THAT IS PROPERLY EXECUTED BY THE HOLDER OF A CLAIM BUT THAT DOES NOT CLEARLY INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN OR ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

EACH HOLDER OF A CLAIM MUST VOTE ALL OF ITS CLAIMS WITHIN A PARTICULAR CLASS EITHER TO ACCEPT OR REJECT THE PLAN AND MAY NOT SPLIT SUCH VOTES.  BY SIGNING AND RETURNING A BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER BALLOTS WITH RESPECT TO SUCH CLAIM HAVE BEEN CAST OR, IF ANY OTHER BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLASS OF CLAIMS, SUCH OTHER BALLOTS INDICATED THE SAME VOTE TO ACCEPT OR REJECT THE PLAN. IF A HOLDER CASTS MULTIPLE BALLOTS WITH RESPECT TO THE SAME CLASS OF CLAIMS AND THOSE BALLOTS ARE IN CONFLICT WITH EACH OTHER, SUCH BALLOTS WILL NOT BE COUNTED FOR PURPOSES OF ACCEPTING OR REJECTING THE PLAN.

IT IS IMPORTANT THAT ANY HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN FOLLOW THE SPECIFIC INSTRUCTIONS PROVIDED ON SUCH HOLDER'S BALLOT AND THE ACCOMPANYING INSTRUCTIONS.

**ARTICLE IV
CONFIRMATION**

Under section 1128(a) of the Bankruptcy Code, the Bankruptcy Court, after notice, may hold a hearing to confirm a plan of reorganization.  If the Debtors file the Chapter 11 Cases, they will file a motion on the Petition Date requesting that the Bankruptcy Court set a date and time approximately 30 days after the Petition Date for the Confirmation Hearing in the Bankruptcy Court.  The Debtors also will request that the Bankruptcy Court approve this Disclosure Statement at the Confirmation Hearing.  The Confirmation Hearing, once set, may be continued from time to time without further notice other than an adjournment announced in open court or a notice of adjournment filed with the Bankruptcy Court and served on those parties who have requested notice under Bankruptcy Rule 2002 and the Entities who have filed an objection to the Plan, if any, without further notice to parties in interest.  The Bankruptcy Court, in its discretion and prior to the Confirmation Hearing, may put in place additional procedures governing the Confirmation Hearing.  Subject to section 1127 of the Bankruptcy Code and the RPSA, the Plan may be modified, if necessary, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

Additionally, section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.  The Debtors, in the same motion requesting a date for the Confirmation Hearing, will request that the Bankruptcy Court set a date and time for parties in interest to file Plan objections.  All objections to the Plan must be

filed with the Bankruptcy Court and served on the Debtors and certain other parties in interest in accordance with the applicable order of the Bankruptcy Court so that they are received on or before the deadline to file such objections.

## ARTICLE V
## FINANCIAL INFORMATION AND PROJECTIONS

In connection with the planning and development of the Plan, the Debtors in consultation with their financial advisors prepared projections for the calendar years 2013 through 2023 to present the anticipated impact of the Plan. The projections assume that the Plan will be implemented in accordance with its stated terms.

The projections are based on forecasts of key economic variables and may be significantly impacted by, among other factors, changes in the competitive environment, regulatory changes and/or a variety of other factors, including those factors listed in this Disclosure Statement. Accordingly, the estimates and assumptions underlying the projections are inherently uncertain and are subject to significant business, economic, and competitive uncertainties. Therefore, such projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.

The projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement and the Exhibits attached hereto.

The Debtors' financial projections for the calendar years 2013 through 2023, including management's assumptions and initiatives related thereto, are attached hereto as Exhibit B. For purposes of the financial projections, the Debtors have assumed an Effective Date of September 30, 2013.

## ARTICLE VI
## BUSINESS DESCRIPTIONS

### 6.1   Corporate Background and Organizational Structure

#### (a)      Overview

American Roads was formed in December 2005 as a Delaware limited liability company in connection with the acquisition and financing of the Toll Facilities (as defined below). American Roads' principal assets are its bank accounts in Manhattan holding approximately $49 million in cash and cash equivalents that have been pledged to the Collateral Agent under the Financing Documents. All or substantially all of these accounts were established in 2006 as part of the Debtors' refinancing. In addition, American Roads directly or indirectly holds substantially all of the interests in the Debtors (other than American Roads Technologies, Inc. and Holdco), each of which are insolvent as of the date hereof.

American Roads' indirect and direct subsidiaries include Debtors – Alabama Toll Operations, LLC ("ATO"), The Baldwin County Bridge Company, L.L.C. ("BCBC"), Alabama Emerald Mountain Expressway Bridge, LLC ("EMX LLC"), Central Alabama River Parkway, LLC ("CARP LLC"), Alabama Black Warrior Parkway, LLC ("BWP LLC") and Detroit Windsor Tunnel LLC ("DWT LLC") (collectively, the "Operating Subs") – that have the right to use, operate and toll the Toll Facilities in accordance with the terms of the licenses and agreements governing them.

The Operating Subs' toll facilities (the "Toll Facilities") comprise the following:

- FBX Bridge: the toll bridge portion (the "FBX Bridge") of the Foley Beach Express (the "FBX"), in Baldwin County, Alabama, which connects mainland Alabama to the resort communities of Orange Beach and Gulf Shores, Alabama. The FBX Bridge and connecting roadway were opened in June 2000 to save commuters travel time over the congested SR-59.

- EMX Bridge: the toll bridge portion (the "EMX Bridge") of the road (the "Emerald Mountain Expressway" and referred to herein as the "EMX") that connects Montgomery County, Alabama with Elmore County, Alabama and crosses the Tallapoosa River over the EMX Bridge. The EMX connects the Emerald Mountain community of Elmore County to Montgomery, Alabama. The EMX Bridge and

connecting roadway were opened in December 1994 to provide (i) commuters from Elmore County working in the business districts of Montgomery a commuting route, (ii) students a more direct route to Auburn University-Montgomery and (iii) consumers a route to shopping in East Montgomery.

- ARP Bridge: the toll bridge portion (the "ARP Bridge") of the road (the "Alabama River Parkway" and referred to herein as the "ARP") that connects towns in Elmore and Autauga Counties in Alabama with Montgomery, Alabama and crosses the Alabama River over the ARP Bridge. The ARP connects the areas of Prattville, Coosada and Millbrook in Elmore County to Montgomery, Alabama. The ARP was opened in April 1998.

- BWP Bridge: the toll bridge portion (the "BWP Bridge") of the road (the "Black Warrior Parkway" and referred to herein as the "BWP") that provides a bypass around Tuscaloosa and Northport, Alabama from the north and west and crosses the Black Warrior River over the BWP Bridge. The BWP was opened in 1998.

- DWT: lease, management and operations rights with respect to the Detroit Windsor Tunnel (the "DWT"), the subaqueous border crossing that connects downtown Detroit, Michigan, United States with Windsor, Ontario, Canada and the right (expiring in 2020) to collect all tolls from the DWT traffic travelling from Detroit to Windsor.

    See Exhibit H for maps of each of the Toll Facilities.

(b)     **Background of the Private Toll Road Business**

Toll roads exist in many developed countries around the world. Using "user pays" tolls to finance the development of essential road infrastructure represents an alternative to imposing general tax increases. Over the past 40 years, governments in various countries, including Australia, the United Kingdom, and the United States, faced with fiscal pressures and growing needs for new road infrastructure have sought to have the private sector acquire existing toll roads and develop new toll roads. Privatization results in the transfer of several risks from government to the private sector, including development risk, the risk of construction time and cost overruns, actual traffic usage and future maintenance costs and risks arising from regulations and taxes. In exchange, the private firm receives the right to own or a long-term concession to operate, maintain, toll and in some cases construct the toll facility.

(c)     **The Toll Facilities**

(i)     **The Foley Beach Express Bridge**

*Description of Property and Surrounds*

The FBX is a 13.5-mile expressway that was opened to traffic in 2000. It is a divided carriage way with two traffic lanes in each direction (other than along the FBX Bridge) and a limited number of at-grade (all movement) intersections at approximately 1-mile to 2-mile intervals. The FBX spans the intra-coastal waterway (known as Portage Creek), linking the City of Foley on the mainland of Alabama, to the tourist and resort communities of Orange Beach and Gulf Shores on Alabama's gulf coast (the "Gulf Shore communities").

The northern access point to the FBX Bridge is from SR-59, which connects to I-10. In 2014, a publicly financed extension of the FBX is scheduled to open, which will connect the FBX directly to I-10. Drivers traveling to mainland Alabama from the Gulf Shore communities access the FBX Bridge from SR-180.

A toll is collected from traffic crossing Portage Creek via the FBX Bridge. The FBX Bridge and its immediate approaches comprise the toll facility that American Roads owns through its subsidiary BCBC.

The FBX Bridge has one lane in each direction. It employs a closed barrier system of toll collection, which means that there is one toll plaza on the northwest end of the bridge that collects tolls for both north bound and south bound traffic. The toll plaza has four collection booths, and six toll lanes, two in each direction, and two reversible. Tolls are charged in each direction of the FBX Bridge. No tolls are charged at any other point on the FBX.

*Background*

On August 7, 1996, the Baldwin County Commission in Baldwin County, Alabama granted to BCBC a license, with no expiration date, to maintain and operate the FBX Bridge. The original owner built the FBX Bridge pursuant to a toll road license agreement with Baldwin County and various agreements with local authorities (described further under "License and Project Documents" below). It opened to traffic in 2000.

Approximately 6,300 vehicles traveled the FBX Bridge daily in 2012. Over the six-year period from 2007 through 2012, traffic on the FBX Bridge decreased at a compound annual growth rate of 5.1% per annum, the average toll rate at the FBX Bridge increased at a compound annual growth rate of 4.2% per annum, total revenue from the FBX Bridge decreased at a compound annual growth rate of 1.2% per annum and EBITDA from the FBX Bridge increased at a compound annual growth rate of 2.1% per annum.

*Function*

The FBX provides an eastern bypass for the City of Foley and the Gulf Shore communities from SR-59 north of the City of Foley to the Gulf Shore communities.

Compared to the main route between I-10 and the Gulf Shore communities on SR-59, the FBX provides a significant travel benefit in terms of travel time savings and improved journey reliability, especially during peak travel times (including holidays, special events and seasonal travel).

*Competition*

There are two alternative crossings to access the Gulf Shore communities, both of which are toll-free.

SR-59 is the main alternative north-south route between I-10 and the Gulf Shore communities. It passes through the urban areas of Foley, Summerdale, Robertsdale and Loxley. SR-59 is a divided road that generally has two lanes in each direction. The six-lane bridge on SR-59 runs directly parallel and several miles to the west of the FBX Bridge. SR-59 has numerous intersections, driveway access, and local traffic that cause the SR-59 route to take 24 minutes longer from Three Mile Curve to Orange Beach than the FBX, based on average speeds of approximately 40 mph on the FBX and 24 mph on SR-59.

The other alternative, a bridge on SR-182, allows traffic to enter and leave the Gulf Shore communities from east of the FBX Bridge and provides a significantly less direct route for north-south traffic.

*License and Project Documents*

Four agreements comprise the regulatory and contractual position of the FBX Bridge. These agreements are the Baldwin County License, the Foley Beach Express Agreement, the Access Management Plan, and the Orange Beach Agreement. The Debtors intend to file a motion seeking the assumption of these agreements.

- *Baldwin County License.* On August 7, 1996, the Baldwin County Commission awarded a license, with no expiration date, to BCBC to construct, maintain, and operate a toll bridge over Portage Creek. BCBC was awarded the license by the County under the authority of the Code of Alabama, Section 23-1-81, which states that the County Commission of each County in Alabama is vested with authority to license any corporation to establish or to operate toll bridges and authorize the licensee to establish the rates of tolls. American Roads' purchase of BCBC did not affect the validity or duration of the license.

- *Foley Beach Express Agreement (Tri-Party Agreement).* On June 1, 1999, Baldwin County, the City of Foley and BCBC signed the Foley Beach Express Agreement, also known as the Tri-Party Agreement. The Tri-Party Agreement defines the relative rights and obligations surrounding the FBX and the FBX Bridge with respect to the construction, operation and management responsibilities of the three parties. One important aspect of the Tri-Party Agreement is that it renders BCBC responsible for maintenance of only 0.5 miles of the FBX roadway around the FBX Bridge. Baldwin County is responsible for the balance of the FBX roadway (subject to funding availability). The term of the Tri-Party Agreement is 99 years and neither Baldwin County nor the City of Foley may amend it without the explicit consent of BCBC. By the terms of the Tri-Party Agreement, the City of Foley and Baldwin County must comply with the AMP described below.

- *Access Management Plan (AMP).* The AMP is an attachment to the Tri-Party Agreement. The intent of the AMP is to ensure free flow of traffic along the FBX. The AMP sets forth how roadway interconnections to the FBX must be made and requires that interconnections must be constructed in a way to minimize the impact on the free flow of traffic on the FBX. The principal elements of the AMP (i) set restrictions on the number and spacing of intermediate at-grade intersections, (ii) limit the right-in/right-out access only at certain points (including providing that there are no median crossovers on the FBX), (iii) require adequate acceleration/deceleration lanes, and (iv) require that any new access be proven not to cause service level deterioration on the FBX below the minimum operating speed of 40 mph (speed limit of 55 mph). A professionally recognized traffic consultant will render opinions about the placement capacity and safety of access units and median openings along the FBX, which will be enforced by the applicable permitting agency when issuing additional permits for construction along the FBX. The majority of the property owners with land adjacent to the feeder routes to the FBX Bridge hold their land by deeds which contain restrictions substantially similar to those in the AMP.

- *Bridge Option, Easement and Annexation Agreement (The Orange Beach Agreement).* Under the Orange Beach Agreement dated March 29, 2004 (the "Orange Beach Agreement"), the City of Orange Beach was required to pay BCBC an annual payment of $1,200,000 for each of the first 10 years of the agreement, ending on January 1, 2013, in return for monthly payments by BCBC based on traffic volume, under the following schedule:

| Annual Traffic | Payment (per vehicle) |
| --- | --- |
| First 2 million vehicles .............................................. | $0.10 |
| Next million (2-3 million) vehicles............................. | $0.21 |
| Next million (3-4 million) vehicles............................. | $0.36 |
| Above 4 million vehicles ........................................... | $0.46 |

The payments by BCBC to the City of Orange Beach continue, according to the rates stated above, until the sooner of (i) January 1, 2014 or (ii) total payments by BCBC to the City of Orange Beach have reached a cumulative total of $12 million; thereafter the payment rate per vehicle will be fixed at $0.30.

In addition, the Orange Beach Agreement grants the City of Orange Beach an option to purchase the FBX Bridge at any time between January 1, 2033 and December 31, 2033 for a price equal to ten multiplied by the highest annual revenue produced by toll charges for usage of the FBX Bridge for the three years prior to 2033 (with a modification to such amount if a force majeure event affects revenues in any year by more than 10%). The Orange Beach Agreement also provides that BCBC will be obligated to expand the FBX Bridge to permit four lanes of traffic if, in any given year during the term of the agreement, traffic levels for the months of June, July and August combined exceeds 2,000,000 vehicles and total traffic for that year exceeds 6,000,000 vehicles. BCBC's duty to commence construction for the expansion is subject to: (i) BCBC's ability to obtain all necessary permits for the increase in the size of the FBX Bridge, including, but not limited to, all environmental, regulatory and constructions permits; (ii) BCBC's ability to obtain the necessary bonding and insurance coverage for such construction at commercially reasonable rates; and (iii) approval by BCBC's then-current lenders.

Furthermore, under the terms of the agreement, the City of Orange Beach agrees to be bound by and to enforce the terms of the AMP, and the City of Orange Beach's obligations under the AMP shall extend beyond the term of the agreement.

### (ii)    Emerald Mountain Expressway Bridge

*Description of Property and Surrounds*

The EMX is a 4.5-mile two-lane roadway.  Located on the northeast outskirts of the City of Montgomery, it links the eastern part of the City of Montgomery, with the low density residential community of Emerald Mountain and nearby parts of Elmore County.  Growth in the vicinity of the Emerald Mountain community and the adjacent parts of Wetumpka have stagnated since the economic downturn that started in 2007.

Through American Roads' wholly-owned subsidiary EMX LLC, American Roads indirectly owns the bridge, toll plaza and short sections of the adjacent road.  The toll plaza is located on the Elmore County (north) side of the EMX Bridge.

*Background*

The EMX was built pursuant to a public-private partnership between its original owner, who constructed the bridge, toll plaza and short sections of adjacent road, and local authorities.  The EMX Bridge was built to replace an existing crossing at the same location.  The previous bridge had existed since the early 1900s but had become unusable several years before the EMX Bridge was built.

Most of the EMX is provided for and maintained by local authorities.  The EMX Bridge was acquired by American Roads' subsidiary EMX LLC in May 2006 pursuant to an asset purchase agreement.

Traffic on the EMX and the EMX Bridge is heaviest during the morning and evening peaks consistent with the mainly commuting function of the roadway.  Private cars on the EMX Bridge pay an average toll of $1.55 per trip and account for approximately 96% of EMX Bridge traffic.

Approximately 3,800 vehicles traveled the EMX Bridge daily in 2012.  Over the six-year period from 2007 through 2012, traffic on the EMX Bridge decreased at a compound annual growth rate of 1.9% per annum, the average toll rate at the EMX Bridge increased at a compound annual growth rate of 4.4% per annum, total revenue from the EMX Bridge increased at a compound annual growth rate of 2.4% per annum and EBITDA from the EMX Bridge increased at a compound annual growth rate of 2.6% per annum.

*Function*

The main function of the EMX is to provide an additional crossing of the Tallapoosa River on the eastern side of the City of Montgomery, connecting the City of Montgomery to the community of Emerald Mountain and Elmore County.  It provides an alternative to SH-231 as a route into and out of the City of Montgomery.  The EMX mainly serves local and commuter traffic but also provides an alternative route for recreational traffic from the eastern portion of the City of Montgomery to the lakes district of Elmore County approximately 30 miles north of Emerald Mountain.  The EMX also carries a small population of commercial traffic, mainly construction and services related traffic serving the Emerald Mountain area.  The main connector roads to the EMX Bridge are County Road 4, which is north of the Tallapoosa River and provides access to the community of Emerald Mountain and Elmore County and County Highway 64, which is south of Tallapoosa River and provides access to Montgomery County (including access to shopping areas).

*Competition*

Alternative access between Montgomery County and the communities on the north side of the Tallapoosa River is offered via the public road SH-231, the main highway connection between Wetumpka, the administrative center of Elmore County, and the City of Montgomery.  SH-231 is located approximately 5 miles west of the EMX and carries approximately 34,000 vehicles per day at the Tallapoosa River.  It is a six-lane divided arterial road (three lanes in each direction) south of the Tallapoosa River and a four-lane undivided road north of the river. SH-231 crosses the Tallapoosa River at the Tallapoosa River Bridge, which is currently operating as a four-lane divided crossing and is in the process of widening to three lanes in each direction, for a total of six lanes.

There is a significant time and distance benefit via the EMX compared with SH-231 for trips between the community of Emerald Mountain and the City of Montgomery.  The time benefit is particularly significant during

the morning and evening commuter periods, during which express commuter service is available for account holders.

### License and Project Documents

EMX LLC holds a right to toll through License Agreements with the County of Montgomery and the County of Elmore. These License Agreements, which do not have expiration dates, do not place restrictions on the ability of EMX LLC to establish tolls at the EMX Bridge. The License Agreements are entered into pursuant to authority granted to Montgomery County and Elmore County under the Code of Alabama, Section 23-1-81, which permits the County Commission of any Alabama County to provide a license to any corporation to establish or to operate toll bridges and to authorize the licensee to establish the rates of tolls. The Debtors intend to file a motion seeking the assumption of these agreements.

**(iii)     Alabama River Parkway Bridge**

### Description of Property and Surrounds

The ARP, comprising a toll bridge over the Alabama River and 12.5 miles of four-lane undivided arterial connecting roads, was opened in 1998. Most of the road is maintained by local authorities. American Roads, through its wholly-owned subsidiary ARP LLC, owns the bridge, toll plaza and short sections of the adjacent road.

### Background

The ARP Bridge, toll bridge and short sections of adjacent road were built by the original owner of the ARP Bridge pursuant to a public-private partnership with local authorities. The ARP Bridge was acquired by American Roads' subsidiary ARP LLC in May 2006 pursuant to an asset purchase agreement.

In recent years, traffic on the ARP Bridge has been negatively affected by the economic downturn and the tightening of immigration controls in Alabama, each of which has had a negative impact on certain surrounding communities of the ARP Bridge, including Coosada and Millbrook.

Approximately 3,000 vehicles traveled the ARP daily in 2012. Over the six-year period from 2007 through 2012, traffic on the ARP decreased at a compound annual growth rate of 8.6% per annum, the average toll rate at the ARP increased at a compound annual growth rate of 5.4% per annum, total revenue from the ARP decreased at a compound annual growth rate of 3.6% per annum and EBITDA from the ARP decreased at a compound annual growth rate of 3.9% per annum.

### Function

The ARP runs from SH-143 in the west to the Northern Bypass in the east and provides direct access from the cities of Millbrook, Coosada and Prattville across the Alabama River to the northern and eastern portions of the City of Montgomery. The ARP also acts as an alternative route from the northern communities surrounding the City of Montgomery to the central business district of Montgomery. It provides a northern connection across the Alabama River between the City of Montgomery and Elmore County and Autauga County.

### Competition

The alternative routes to the ARP for traffic over the Alabama River from Elmore County and Autauga County to the City of Montgomery are I-65 and SH-31. I-65 acts as the main competing road carrying over 64,000 vehicles per day (the largest proportion of traffic in the corridor). In 2001-2002, it was widened to three lanes in each direction between Prattville and the interchange north of the ARP Bridge. Since then, sections south of the interchange have been widened to four lanes in each direction.

Construction impacts of I-65 have historically inflated ARP traffic and decreases in ARP traffic have been consistent with the completion of I-65 lane widening projects that provided additional capacity on the ARP's main competing route.

In the future, as I-65 becomes congested from time to time, the ARP will receive the benefit of a small amount of additional traffic. American Roads believes it is likely that the Alabama Department of Transportation will continue to increase the capacity of I-65 as necessary to accommodate growth.

SH-31 is not considered as significant a competitor to the ARP as I-65 due to its location and road characteristics. It is located further west of I-65 and serves traffic from different origins and destinations. However, it still captures a nominal amount of trips away from the ARP.

Travel time for all trips from Millbrook, Coosada, Prattville and I-65 North to east of the City of Montgomery are shortest when utilizing the ARP

### License and Project Documents

ARP LLC holds a right to toll through License Agreements with the County of Montgomery and the County of Elmore. These License Agreements, which do not have expiration dates, do not place restrictions on the ability of ARP LLC to establish tolls on the ARP. The License Agreements are entered into pursuant to authority granted to Montgomery County and Elmore County under the Code of Alabama, Section 23-1-81, which permits the County Commission of any Alabama County to provide a license to any corporation to establish or to operate toll bridges and to authorize the licensee to establish the rates of tolls. The Debtors intend to file a motion seeking the assumption of these agreements.

**(iv)    Black Warrior Parkway Bridge**

### Description of Property and Surrounds

The BWP, a 12.5-mile long undivided four-lane roadway, provides one of only three crossings of the Black Warrior River, which cuts through Tuscaloosa County. Most of the BWP is maintained by local authorities. Through American Roads' wholly-owned subsidiary, BWP LLC, American Roads owns the bridge, toll plaza and short sections of adjacent road. The only toll plaza is on the southern side of the BWP Bridge.

The BWP lies between US-82 in the north and I-20/59 in the south. The road lies to the western side of the Tuscaloosa Municipal Airport and connects the urban centers of Coker and Northport with locations south of the Black Warrior River. To the west, the BWP forms a bypass of the City of Tuscaloosa and north of the river it extends nine miles as Rose Boulevard. It provides a convenient route between Coker and locations south of the City of Tuscaloosa.

The peak passenger car traffic times on the BWP are morning and evening consistent with the main function of the BWP, which is commuting to and from work. The BWP relies heavily on commercial traffic with lanes and electronic toll systems designed to accommodate this traffic.

In December 2005, the northern extension to the BWP, Rose Boulevard, opened to traffic. The new road extends nine miles north from the Black Warrior River and crosses through to US-82, SH-171 and the intersection of US-43 North and County Highway 56. It forms a north-south bypass of the City of Tuscaloosa and a west-east bypass of the City of Northport.

### Background

The BWP Bridge, toll plaza and sections of the adjacent road were built by its original owner pursuant to a public-private partnership with the local council. It was opened in 1998. The bridge, toll plaza and sections of the adjacent road were acquired by American Roads' subsidiary BWP LLC in May 2006 pursuant to an asset purchase agreement.

Approximately 3,800 vehicles traveled the BWP Bridge daily in 2012. Over the six-year period from 2007 through 2012, traffic on the BWP Bridge decreased at a compound annual growth rate of 3.0% per annum, the average toll rate at the BWP Bridge increased at a compound annual growth rate of 5.7% per annum, total revenue from the BWP Bridge increased at a compound annual growth rate of 2.6% per annum and EBITDA from the BWP Bridge increased at a compound annual growth rate of 4.0% per annum.

### Function

The BWP provides direct access from the cities of Coker and Northport across the Black Warrior River to western Tuscaloosa. In addition, it acts as a western bypass of the City of Tuscaloosa and provides an alternative route for communities west and north of the City of Tuscaloosa to cross the Black Warrior River to Tuscaloosa,

acting as a relief road to the two other river crossings in Tuscaloosa, the Hugh R. Thomas Bridge on US-43/US-69 and the Woolsey Finnell Bridge on US-82.

There are four roads that are the primary feeder roads to the BWP. They are US-82, US-11 South, US-43 North and I-20/59.

### Competition

At the time the BWP Bridge was developed, Tuscaloosa already had two public bridges over the Black Warrior River, the Hugh R. Thomas Bridge on US-43/US-69 North and the Woolsey Finnell Bridge on US-82. A fourth public bridge, the Eastern Bypass, is proposed.

US-43/US-69 North (the main highway connection with the City of Tuscaloosa and the northern and western parts of Tuscaloosa County, including the towns of Northport and Coker) is a feeder road to the BWP, but it is also the main competing route due to its road function and characteristics as a principal arterial road. It is approximately 3 miles east of the BWP and where it crosses the Black Warrior River it carries 60,000 vehicles per day.

US-82, while not considered a significant competing route when compared to US-43/US-69 North due to its locality further east of the BWP and road characteristics, does still capture a small number of trips from the BWP. It is approximately 7 miles east of the BWP and carries 56,000 vehicles per day.

A fourth river crossing is planned, the Eastern Bypass, further east of the three current river crossings. The timing of completion of the Eastern Bypass, according to the West Alabama Regional Commission (WARC), is uncertain. The bridge across the river has been completed, but the connections to the road network are still subject to land acquisition and right of way agreements. The Eastern Bypass, if and when completed, will form a link between I-20/59 to US-82 West through the eastern and northern outskirts of the City of Tuscaloosa. While the Eastern Bypass will not be a direct competing route to the BWP, American Roads believes it may have a negative effect on the BWP as it will lessen traffic on US-82 and US-43/US-69.

### License and Project Documents

BWP LLC holds a right to toll through the License Agreement with the County of Tuscaloosa dated June 6, 1996. This License Agreement, which does not have an expiration date, provides for the construction of a bridge across the Black Warrior River and grants BWP LLC the right to establish the rates of toll. The License Agreement is entered into pursuant to authority granted to Tuscaloosa County under the Code of Alabama, Section 23-1-81, which permits the County Commission of any Alabama County to provide a license to any corporation to establish or to operate toll bridges and to authorize the licensee to establish the rates of tolls. The Debtors intend to file a motion seeking the assumption of these agreements.

### (v) The Detroit Windsor Tunnel

### Description of Property and Surrounds

The DWT is a tunnel beneath the Detroit River that serves as a border crossing between the United States and Canada. It is one of the busiest tolled border crossings between the two countries for passenger cars. Located between Detroit, Michigan and Windsor, Ontario, it provides convenient access between downtown Windsor, Ontario, Canada and the downtown area of the City of Detroit.

The DWT is a major infrastructure facility that includes toll and inspection plazas on each side of the border. Tolls are paid on entry into the tunnel in each direction and customs and border protection are undertaken on exiting the tunnel. The tunnel is 5,160 feet long with a height clearance of 13 feet 2 inches. The roadway is 22 feet wide and allows for two lanes of traffic in opposite directions. The maximum depth of the roadway beneath the river surface is 75 feet.

### Background

The DWT is leased, managed and operated by DWT LLC. DWT LLC has a concession from the City of Detroit, expiring in 2020, that entitles it to collect tolls from traffic travelling from Detroit to Windsor. See "License

and Project Documents—Ordinance" below. Tolls from traffic travelling from Windsor to Detroit belong to the Windsor Detroit Tunnel Corporation (WDTC), which is wholly-owned by the City of Windsor, but are collected by a subsidiary of DWT LLC on behalf of WDTC under the Joint Operating Agreement (defined below under "—License and Project Documents—Joint Operating Agreement").

The toll plaza on the U.S. side of the DWT (the "Detroit Plaza") was renovated in 1980 and again in 2011 and offers 6 toll booths (4 automatic and 2 attended) and multiple Customs Inspection Booths. The toll plaza on the Canadian side of the DWT (the "Windsor Plaza") was reconstructed in 1995 and offers 6 toll booths (3 automatic and 3 attended), 10 Customs Inspection Booths and 3 dedicated truck inspection lanes. The Windsor Plaza is currently undergoing a major renovation (C$30 million) scheduled for completion in 2014.

Approximately 6,650 vehicles traveled the DWT daily in 2012, of which approximately 98% were cars and about 2% were trucks, buses and miscellaneous vehicles. Over the six-year period from 2007 through 2012, traffic on the DWT decreased at a compound annual growth rate of 3.8% per annum, the average toll rate at the DWT increased at a compound annual growth rate of 2.2% per annum, total revenue from the DWT increased at a compound annual growth rate of 0.6% per annum and EBITDA from the DWT increased at a compound annual growth rate of 10.8% per annum.

### Function

Tunnel traffic is generated principally by:

- commuters from Windsor working in Detroit;

- residents of Windsor traveling to Detroit for recreation and sporting events;

- residents of southeast Michigan traveling to  Caesar's Windsor;

- residents of Detroit traveling to Windsor for recreation and dining; and

- a mix of business related trips (non home-based trips).

The Detroit-Windsor region is a vital transportation artery between Canada and the United States and the busiest trade corridor in North America. Over 16 million cars and trucks cross through the Detroit-Windsor corridor every year. Cross border shipments through the corridor are valued at $400 million daily. Moreover, of Michigan's three major international ports of entry, namely Port Huron, Sault Ste. Marie and Detroit, the value of trade crossing at the City of Detroit is roughly twice that of Port Huron and fifty times that of Sault Ste. Marie. In addition, different laws and purchasing power between the two countries may provide reasons for people on each side to visit the other side of the river.

### Competition

The DWT is subject to limited competition, since there is currently no free alternative route.

The competing vehicle crossings are the Ambassador Bridge and the Blue Water Bridge. While the DWT provides access to downtown Windsor and downtown and eastern Detroit, the Ambassador Bridge provides the most direct link from the Canadian highway system (Highway 401) to the US Interstate system (I-75, I-94 and I-96). Due to size, the DWT is restricted from carrying larger highway tractor trailers. As a result, the Ambassador Bridge handles significantly more truck, commercial and long distance traffic than the DWT, while the DWT mainly carries cars making short distance trips between Detroit and Windsor. The Ambassador Bridge's car tolls are $4.75 in either direction. Commuter discounts reduce the Ambassador Bridge rates to a range of $3.75-$4.35. These commuter tolls are comparable to the DWT tolls for commuters (using electronic tolling), which are $3.85 in both directions.

Passenger car volumes and travel patterns on the Ambassador Bridge are very similar to the DWT. The commuter pool using the DWT is about the same as that using the Ambassador Bridge.

The second competitor to the DWT, the Blue Water Bridge, is located 60 miles north of the DWT and has a strong focus on truck traffic, similar to the Ambassador Bridge, given its direct links to the major US interstates and the Canadian highway system (Highways 401 & 402).

The North American International Trade Corridor (NAITC) bridge (the "NAITC Bridge") recently received the presidential permit from the United States government and the authorizations from the Canadian federal government that are required for construction to begin. The NAITC Bridge is scheduled to open to traffic in 2020. There are currently numerous legal proceedings filed by the Ambassador Bridge to void the permits and prohibit construction of the NAITC Bridge. The NAITC Bridge's main focus will be commercial traffic, serving as direct competition to the Ambassador Bridge. Loss of commercial traffic may cause the Ambassador Bridge to compete more heavily with DWT for passenger car traffic.

There are also two rail tunnels that compete for freight traffic with the DWT, the Ambassador Bridge and the Blue Water Bridge, and the construction of a third such rail tunnel has been proposed. Given rail's direct competition with road haulage and the DWT's focus on commuter traffic, the DWT is not significantly affected by the operations of either of the two existing rail tunnels, nor is it expected to be significantly affected if the third rail tunnel is completed.

Except as discussed above, we are not aware of current plans to build an additional river/border crossing between the cities of Windsor and Detroit.

### License and Project Documents

DWT LLC is the successor in interest to DCTC, the controller of the U.S. operations of the DWT under a long-term concession with the City of Detroit and through a wholly-owned subsidiary of DWT LLC, the Detroit and Windsor Subway Company Ltd. ("Windsor Subway"), the operator of the Canadian operations of the DWT under a subcontract with the City of Windsor.

The operation of the DWT in the United States is governed by the Tube Lease and a Sublease agreement of even date, by and between the City of Detroit as successor in interest to Ford Motor Properties Inc. as sub-landlord and DWT LLC as the sublessee (the "Sublease"). Among other things, the Tube Lease and the Sublease give DWT LLC the right to operate the U.S. side of the DWT and require DWT LLC to maintain the leased property and make annual rental payments to the City of Detroit. The Tube Lease and Sublease also provide for the use and operation and maintenance of a toll plaza for international vehicular traffic between Canada and the United States by DWT LLC. The joint operation of the DWT between the Detroit side of the DWT and the Windsor side of the DWT is subject to the Joint Operating Agreement. The Joint Operating Agreement provides for the joint operation, management, repair, replacement and improvement of the DWT as a unitary and integrated tunnel upon the terms and conditions in the Joint Operating Agreement.

DWT LLC owns an economic interest in the U.S. side of the DWT, including the toll plaza and customs and immigration building, through the long-term operating concession. The concession gives DWT LLC the right to collect tolls in exchange for annual rent payments and, among other things, the obligation to operate and maintain the DWT.

The three key documents, (i) Tube Lease, (ii) Sublease and (iii) Joint Operating Agreement, and a City of Detroit ordinance that govern the U.S. and Canadian operations are described in more detail below. The Debtors intend to file motions seeking the assumption of the Tube Lease, the Sublease and the Joint Operating Agreement.

- *Tube Lease*. On March 20, 1978, the City of Detroit, as lessor, leased to DCTC (as predecessor to DWT LLC), as tenant, the portion of the DWT located on the U.S. side of the international boundary as it existed in 1978, including all fixtures and equipment. The initial term of the lease ended on November 3, 1990 and three (3) additional extension periods of ten (10) years each of which were exercised. Accordingly, the Tube Lease will expire November 3, 2020 (the Tube Lease and Sublease must be extended or terminated together pursuant to their terms). Rent under the Tube Lease is $1.00 per year, in addition to the other costs and charges as follows: (i) DWT LLC pays all real estate taxes and assessments, personal property taxes, and special assessments, (ii) DWT LLC repairs and maintains the DWT (including the ventilation system) at its sole expense and (iii) DWT LLC insures

the DWT based on a formula tied to replacement cost.  If the DWT suffers a casualty loss and insurance proceeds are sufficient, the City of Detroit is required to restore the DWT.  If insurance is not adequate and neither the City of Detroit nor DWT LLC wishes to contribute the short fall, the Tube Lease automatically terminates.  The circumstances following the condemnation of the DWT are comparable to the casualty loss provisions.  Upon expiration or earlier termination, the City of Detroit may require DWT LLC to seal the Detroit terminus of the DWT by placing in the exit and entrance of the DWT a concrete bulkhead and filling the portal to street level with compacted soil.

- *Sublease*.  The premises under the Sublease include the "Tunnel Property," "Offsite Inspection Area" and various vacated city streets comprising the "New Tunnel Property."  The Sublease has been renewed in parallel with the Tube Lease and will expire November 3, 2020.  Annual rental payments during the renewal periods are based on a percentage (20%) of the average annual net operating income before income taxes derived from DWT LLC's operations for the immediately preceding five fiscal years, payable in monthly installments.  DWT LLC must maintain and repair the property at its own expense and, as in the Tube Lease, must maintain casualty insurance in amounts tied to replacement costs.  After a casualty loss the same provisions dealing with reconstruction apply as in the Tube Lease.  Rent does not abate during restoration.  To the extent the alterations are movable they may be removed by DWT LLC at the end of the term.  The Sublease is cross-defaulted and cross-terminated with the Tube Lease.

- *Joint Operating Agreement*.  On November 1, 1997, DCTC (as predecessor to DWT LLC), Windsor Subway, and the Corporation of the City of Windsor (the "City of Windsor") and Windsor Tunnel Commission (collectively with the City of Windsor, "Windsor") entered into an agreement providing for joint operation, management, maintenance, repair and improvement of the DWT (the "Joint Operating Agreement").  The original term of the Joint Operating Agreement ended in 2007, but the Joint Operating Agreement has continued in effect pursuant to automatic 90-day extensions.  DWT LLC and Windsor Subway are required to (i) provide all administrative services (including providing all employees), (ii) perform all operations, maintenance, repairs and improvements of the DWT (including providing all employees, including temporary employees to Windsor during work stoppages and labor disputes), (iii) perform all day-to-day operations of the tunnel, (iv) conduct all collective bargaining negotiations, (v) provide a representative to Windsor and (vi) provide any other required assistance.  DWT LLC and Windsor Subway are entitled to all revenue from tolls collected on vehicles entering the DWT from Detroit and all rental income in Detroit.  Windsor is entitled to all revenue from tolls collected on vehicles entering the DWT from Windsor and all rental income in the City of Windsor.  DWT LLC and Windsor Subway, on the one hand, and Windsor, on the other hand, share equally all revenue from tokens and electronic toll collection card deposits (net of refunds).  Windsor is obligated to reimburse DWT LLC and Windsor Subway for a share of the costs of the operations.  The Joint Operating Agreement may be terminated by any of the parties with ninety (90) days' written notice and may be terminated early, among other things, if the Tube Lease and Sublease are terminated.

- *Ordinance*.  The document governing DWT LLC's ability to establish tolls is Ordinance No. 7-C issued by the City of Detroit (the "Ordinance").  Pursuant to Section 6 of the Ordinance, the City of Detroit has granted to DWT LLC, as successor to the original grantee, Detroit-Ontario Subways, Inc., the right to collect and establish the rate of tolls collected on the DWT.

DWT LLC receives an annual fee of $54,000 from the City of Windsor for managing the Canadian operations relating to the DWT.  In the event the Joint Operating Agreement ceases to be extended, DWT LLC would cease to receive this fee.  DWT LLC is also party to a number of subleases allowing third parties access to the DWT for purposes of, among other things, maintaining mobile telecommunications equipment, displaying advertising, and installing other cables.  DWT LLC receives rent payments from these third parties.

### DWT Lease Agreement with the General Services Administration

DWT LLC leases an offsite property to the General Services Administration (the "GSA") for use by the U.S. Border Patrol.  This lease agreement resulted in annual rent payments to DWT LLC of approximately

$2,786,400 in 2012, which represented approximately 24% of the total revenue received by American Roads from DWT LLC during 2012. For additional information relating to the lease agreement with the GSA, see section 8.3(y) ("Business Specific Risk Factors - The General Services Administration may terminate its lease with DWT").

**(d)** **Technology**

American Roads is a full service provider for the tolling, parking and point of sale industries with the ability to provide mobile phone applications, manual, automatic and electronic tolling/payment applications, credit and account based transaction processing, as well as maintenance, operations and engineering services. American Roads has developed and maintained certain technologies and customer programs in the ordinary course of business to encourage, among other things, electronic toll and street parking payment and enhance customer convenience, including but not limited to *NEXPRESS ® TOLL, Freedom Pass*$^{TM}$ *Mobile, Freedom Pass*$^{TM}$ *Unlimited, Freedom Pass*$^{TM}$ *Open Road, Freedom Pass*$^{TM}$ *Open Collection (lab version)* and *Freedom Pass*$^{TM}$ *Park*.

American Roads' payment systems are compliant with the payment card industry and can be designed to accept dual coin and currency, as well as a variety of electronic transactions. American Roads provides smart phone based applications for barrier, open road, high occupancy toll ("HOT"), marine and variable price systems and is credited with offering the first pay-by-phone tolling applications in the United States. These mobile phone applications, which are available for a number of platforms, provide a "cashless" payment option for American Roads' customers and are designed to incorporate customer loyalty programs. Additionally, American Roads has developed and deployed Bluetooth® based traffic monitoring systems that are in use in Canada and the United States.

**6.2** **Employees**

As of July 19, 2013, the Debtors employed 43 employees in Alabama (the "Alabama Employees"), 43 employees in Michigan (the "Michigan Employees") and 46 employees in Canada (the "Canadian Employees," and collectively with the Alabama Employees and the Michigan Employees, the "Employees"). None of the Alabama Employees are represented by a union. Of the Michigan Employees, 19 are represented by the Amalgamated Transit Union, Local 1564 AFL-CIO-CLC (the "Michigan Union Employees") under a collective bargaining agreement dated as of November 14, 2010 (the "Michigan CBA"), and the remaining 24 Michigan Employees are not represented by a union (the "Michigan Non-Union Employees"). Of the Canadian Employees, 39 are represented by the National Automobile, Aerospace, Transportation and General Workers Union of Canada (C.A.W. – Canada) and its Local 195 (the "Canadian Union Employees," and together with the Michigan Union Employees, the "Union Employees") under an agreement dated as of March 30, 2009, as amended by a Memorandum of Settlement dated as of June 11, 2012 (the "Canadian CBA" and with the Michigan CBA, collectively the "CBAs"). The remaining seven (7) Canadian Employees are not represented by a union (the "Canadian Non-Union Employees," and collectively with the Alabama Employees and the Michigan Non-Union Employees, the "Non-Union Employees").

The Debtors do not intend to seek to reject or modify any of their collective bargaining agreements in connection with the Plan.

**6.3** **Directors and Officers**

**(a)**    The Debtors' current directors and officers are as follows:

**(1)**    **American Roads LLC**

A.    Directors: John Laxmi, Alex Black, William Diamond

B.    Officers: Neal Belitsky – Chief Executive Officer; Robert Moore – VP Finance; Carolyn Brown – Executive VP; Gary Mack Roberts – VP Engineering & Development

**(2)**    **American Roads Holding LLC**

A.    Directors: Sanjay Khettry, Philip Dyk, Victor Duva

B.    Officers: Neal Belitsky – Chief Executive Officer

24

    (3)        **Alabama Toll Operations, LLC**

        A.      Directors:  None

        B.      Officers:  Neal Belitsky – President; Christopher Beale – VP; John Laxmi – Secretary

    (4)        **The Baldwin County Bridge Company L.L.C.**

        A.      Directors:  None

        B.      Officers:  Neal Belitsky – Chief Executive Officer

    (5)        **Detroit Windsor Tunnel LLC**

        A.      Directors:  None

        B.      Officers:  Neal Belitsky – President; John Laxmi; Sanjay Khettry

    (6)        **Alabama Emerald Mountain Expressway Bridge, LLC**

        A.      Directors:  None

        B.      Officers:  Neal Belitsky – President; Christopher Beale – VP; John Laxmi – Secretary

    (7)        **Central Alabama River Parkway, LLC**

        A.      Directors:  None

        B.      Officers:  Neal Belitsky – President; Christopher Beale – VP; John Laxmi – Secretary

    (8)        **Alabama Black Warrior Parkway, LLC**

        A.      Directors:  None

        B.      Officers:  Neal Belitsky – President; Christopher Beale – VP; John Laxmi – Secretary

    (9)        **DWT, Inc.**

        A.      Directors: Sanjay Khettry, Christopher Beale, Philip Dyk

        B.      Officers: Neal Belitsky – President; John Laxmi – Secretary and Treasurer

    (10)        **American Roads Technologies, Inc.**

        A.      Directors: Christopher Beale, John Laxmi, Sanjay Khettry

        B.      Officers: Neal Belitsky – President; Sanjay Khettry – VP; John Laxmi – Secretary; Guy Lotem - Treasurer

In accordance with section 1129(a)(5) of the Bankruptcy Code, the identities and affiliations of the members of the Reorganized Debtors' Boards and the officers of the Reorganized Debtors shall be disclosed at or before the Confirmation Hearing in the Plan Supplement.  From and after the Effective Date, each director or officer of the Reorganized Debtors shall serve pursuant to the terms of their respective charters and bylaws or other constituent documents, and applicable state corporation law.

### 6.4    Financial Advisors

As part of the evaluation of financial and strategic options, American Roads' board of directors engaged Greenhill and Protiviti as financial advisors in June 2013.

#### (a)    Greenhill

American Roads retained Greenhill to provide financial advisory services in connection with the a potential restructuring.  Pursuant to the terms of the engagement letter between American Roads and Greenhill, Greenhill agreed to perform a valuation of American Roads, provide financial restructuring advice, assist American Roads in connection with the preparation of a restructuring plan and disclosure statement, participate in court hearings before the Bankruptcy Court and assist American Roads in connection with negotiations relating to the restructuring plan

Greenhill's compensation for services rendered to American Roads under the engagement letter consists of (i) a monthly advisory fee of $150,000 (the "Monthly Fee") and (ii) a restructuring transaction fee of $2,250,000 (the "Restructuring Fee") payable if a restructuring contemplated by the engagement letter is consummated during or within 12 months following the termination of the engagement letter between American Roads and Greenhill.  An amount equal to 50% of each Monthly Fee paid after $600,000 in Monthly Fees have been paid to Greenhill under the terms of the engagement letter will be credited against the payment of the full Restructuring Fee.

#### (b)    Protiviti

Pursuant to the terms of the engagement letter between American Roads and Protiviti, Protiviti agreed, among other things, to perform on behalf of American Roads various accounting, administrative, and compliance tasks associated with the Chapter 11 process, assist counsel to American Roads and provide support and testimony, if needed, for any motions, recovery actions or litigation during the pendency of the Chapter 11 Cases.

Protiviti's compensation for services rendered to American Roads under the engagement letter is comprised of a $50,000 retainer and monthly fees determined on the basis of hourly rates. Under the terms of the engagement letter, Protiviti may not exceed $200,000 in total fees without the prior written consent of American Roads.

### 6.5    Prepetition Capital Structure

#### (a)    Overview

American Roads was formed in December 2005 as a Delaware limited liability company in connection with the acquisition and financing of the Toll Facilities.  In October 2006, affiliates of Alinda Capital Partners LLC acquired all of the outstanding equity interests of American Roads Holding (f/k/a Alinda Roads Holding LLC). American Roads is a wholly-owned subsidiary of American Roads Holding LLC.

On December 19, 2006, American Roads entered into the Swaps, issued the Bonds and executed each of the other Financing Documents for the purposes of (i) retiring certain then-existing indebtedness of American Roads and its affiliates used to acquire the Toll Facilities; (ii) funding certain reserve, operation and maintenance and capital expenditure accounts; (iii) paying certain fees and expenses related to the issuance of the Bonds; and (iv) paying a portion of the insurance premium for the Policies.

On July 18, 2013, Syncora, in its capacity as insurer under the Swaps and the Swap Policies, terminated the Swaps.  See "Insurance Premium Event of Default and Insurance Company Swap Termination" below for further discussion relating to the termination of the Swaps.

The Swaps were (prior to their termination and payment in full by Syncora, in its capacity as insurer under the Swaps and the Swap Policies) and the Bonds are secured by all of the Property, rights and interests of each of the Company, Holdco, DWT Inc. and each of the Operating Subs in which a lien has been or is required to be granted to and in favor of the Collateral Agent for the benefit of the Senior Creditors in accordance with or pursuant to any Financing Document.

Pursuant to the Policies, Syncora has insured the Debtors' obligations under the Swaps and the Bonds.  For so long as there is no "Insurer Default"[5], Syncora is the "Instructing Senior Creditor" (as defined in the Common Agreement) under the Financing Documents.  As of the date hereof, because there has been no Insurer Default, Syncora is the Instructing Creditor.  As Instructing Senior Creditor, Syncora has the exclusive right to direct the Collateral Agent to exercise rights or remedies of the counterparty to the Swaps and the Bondholders under the Financing Documents, including to foreclose on the Collateral, accelerate principal or take any other enforcement action.

In the event Syncora directs the Collateral Agent to take any such enforcement action, the distribution of any proceeds resulting therefrom is subject to the waterfall provisions set forth in Section 7.06(a) of the Collateral Agency Agreement.  Under the waterfall, distributions of proceeds of the Collateral in respect of any principal amount of the Bonds that are then due and payable is subordinate in priority to any distributions to (i) the counterparty to the Swaps in respect of any Permitted Swap Termination Amounts (as defined in the Collateral Agency Agreement) and (ii) Syncora in respect of any Enhancement Liabilities (as defined in the Collateral Agency Agreement) owed to Syncora that arise under the Insurance and Reimbursement Agreement as a result of a payment by Syncora of any such Permitted Swap Termination Amounts pursuant to the Swap Policies (hereinafter, (i) and (ii) are collectively referred to as the "Swap Termination Amount Priority").

(b)     **The Swaps**

On December 19, 2006, American Roads and Citibank N.A. ("Citibank") entered into the Swaps.  On September 12, 2012, American Roads, Citibank and Barclays Bank PLC ("Barclays") consummated a novation transaction whereby Barclays replaced Citibank as the counterparty under the Swaps.  In connection with the novation transaction, Syncora acquired the beneficial interest in the Swaps from Barclays and became entitled to the economic benefits of the Swaps and related Swap Policies.  On July 18, 2013, Syncora, in its capacity as insurer under the Swaps and the Swap Policies terminated the Swaps.  See "Insurance Premium Event of Default and Insurance Company Swap Termination" below for further discussion relating to the termination of the Swaps.

Pursuant to the Swaps, American Roads made semi-annual fixed payments to the counterparty to the Swaps in exchange for quarterly floating interest rate payments in respect of a notional amount that corresponded to the then-outstanding principal under the Bonds.  In addition, the G-2 Swap was an accreting swap, which provided American Roads with financing by deferring a substantial portion of American Roads' fixed payment obligations until payment dates between June 2022 through June 2025.  As of July 18, 2013, American Roads' liability in respect of the Swaps was $334 million.

For so long as no Insurer Default in respect of the Swap Policies occurred, the counterparty to the Swaps was not permitted to terminate the Swaps nor accelerate the payment of any amounts due thereunder without the prior written consent of Syncora.  In addition, many of the events of default and termination events in the form normally applicable to swap counterparties pursuant to an ISDA Master Agreement, such as bankruptcy, misrepresentation, cross-defaults, breaches of provisions of the swap agreement and certain tax events, were not applicable to American Roads.  However, if an "Event of Default" under the Common Agreement occurred and was continuing, Syncora, in its capacity as insurer, was permitted to terminate the Swaps and accelerate all amounts due thereunder (such termination right, the "Insurance Company Swap Termination Right").

---

5     An "Insurer Default" includes (i) failure by Syncora to make a payment pursuant to a payment notice under any of the Policies, (ii) the commencement of bankruptcy proceedings with respect to Syncora, (iii) a court or regulatory authority of competent jurisdiction has entered a final and nonappealable order, judgment or decree (x) appointing a custodian, trustee, agent or receiver for Syncora or (y) authorizing the taking of possession by a custodian, trustee, agent or receiver of all or a material portion of the property of Syncora or (iv) with respect to the G-2 Swap only, failure by Syncora, other than by reason of a *force majeure*, to make a payment under any insurance policy or financial guarantee in respect of any claim that is either undisputed by Syncora or that has been judicially determined to be valid, due for payment and non-appealable, and that is of an amount that satisfies certain tests set forth in the G-2 Swap and that remains unpaid after notice thereof from the counterparty to the G-2 Swap.

(c)     **The Bonds**

On December 19, 2006, American Roads issued $198,000,000 aggregate principal amount of the G-1 Bonds at an interest rate of three-month LIBOR plus 0.32% per annum and $298,000,000 aggregate principal amount of the G-2 Bonds at an interest rate of three-month LIBOR plus 0.38% per annum. Interest on the Bonds is payable quarterly in arrears. The legal maturity of the Bonds is December 19, 2056.

Pursuant to the Indentures, portions of the aggregate principal amounts of the Bonds will be subject to pre-payment by American Roads between June 30, 2016 and June 30, 2018, in the case of the G-1 Bonds, and between June 30, 2025 and June 30, 2028, in the case of the G-2 Bonds. Any portion of the Bonds that are not purchased in accordance with the pre-payment schedule provided in the Indentures will be subject to an increased floating rate of interest and an alternate amortization schedule.

For so long as no Insurer Default has occurred and is continuing under the Bond Policies, Syncora controls the exercise of any rights or remedies in respect of the Bonds, including the right to accelerate the Bonds upon the occurrence of any Event of Default under the Common Agreement (including, but not limited to a payment default by American Roads and/or the commencement of a bankruptcy proceeding in respect of any of the Debtors). Pursuant to the terms of the Indentures, so long as no Insurer Default has occurred and is continuing, Syncora is appointed the "sole holder" in respect of the Bonds,[6] and Syncora has the rights to: (i) direct the Collateral Agent, in its capacity as indenture trustee, in writing to accelerate all principal on the Bonds then outstanding,[7] (ii) direct the Collateral Agent, in its capacity as indenture trustee, to exercise the rights and powers conferred by the Financing Documents,[8] (iii) direct the method and place of conducting any proceeding for the enforcement of the terms and conditions of the Financing Documents[9] and (iv) control and direct all remedies upon the occurrence of an Event of Default.[10]

(d)     **Insurance Policies**

On December 19, 2006, Syncora (f/k/a XL Capital Assurance, Inc.) issued the Bond Policies. Pursuant to the Policies, Syncora unconditionally and irrevocably guaranteed the full and complete payment of installments of principal of, and accrued and unpaid interest on, the Bonds to the extent American Roads fails to make any such payments when they become due and payable under the terms of the Financing Documents. Pursuant to the Swap Policies, Syncora insured the payment to the counterparty to the Swaps of (i) any fixed payments that American Roads failed to make when due and payable and (ii) if the Swaps were terminated in accordance with the terms of the Financing Documents, any Permitted Swap Termination Payments (as defined in the Collateral Agency Agreement) that American Roads failed to make when due and payable. The Debtors' reimbursement obligations under the Policies are secured by the Debtors' collateral.

The beneficiary of the Bond Policies is the Collateral Agent, in its capacity as indenture trustee under the Indentures, and the beneficiary of the Swap Policies was the counterparty to the Swaps.

The Bond Policies entitle the Bondholders only to the payments of interest and principal that American Roads fails to make when due and payable on the original payment dates set forth in the Indentures. If Syncora, in its capacity as Instructing Senior Creditor, elects to accelerate the Bonds pursuant to Section 8.3 of the Common Agreement, the Bond Policies would permit, but would not require, that Syncora pay the Bondholders on an accelerated basis.

---

[6] Supplemental Indentures § 6.4.

[7] Indenture §§ 802 and 1204(a)(iii).

[8] Indenture § 803.

[9] Indenture § 804.

[10] Indenture §1204(a)(ii).

     (e)     **Insurance Premium Event of Default and Insurance Company Swap Termination**

On December 19, 2006, as part of the consideration for the issuance by Syncora of the Policies, American Roads and Syncora entered into the Insurance and Reimbursement Agreement and the Premium Letter, which, taken together, provide for, among other things, American Roads' obligation to pay Syncora an insurance premium on a quarterly basis. On June 28, 2013, American Roads failed to make the quarterly insurance premium payment then due and payable to Syncora (the "Insurance Premium Non-payment"). Pursuant to Section 8.1(b) of the Common Agreement, a failure by American Roads to make a quarterly insurance premium payment that continues for 10 Business Days after the non-payment date shall constitute an Event of Default under the Common Agreement (an "Insurance Premium Event of Default"). Because American Roads failed to cure the Insurance Premium Non-payment by July 15, 2013, an Insurance Premium Event of Default occurred on July 16, 2013.

As a result of the occurrence of the Insurance Premium Event of Default, on July 18, 2013, Syncora, in its capacity as insurer under the Swaps and the Swap Policies, exercised its Insurance Company Swap Termination Right and, as of the date of this Disclosure Statement, Syncora has paid in full the Permitted Swap Termination Payment to the counterparty to the Swaps in accordance with the terms of the Swap Policies. Such actions created an "Enhancement Liability" to Syncora under the terms of the Collateral Agency Agreement, and as a result, Syncora is the holder of the Swap Policies Claim described in the Plan. Syncora intends, in accordance with the terms and conditions of the RPSA and the Plan, to direct the Collateral Agent to foreclose on the Collateral and take any other enforcement action permitted under the Financing Documents, such that any proceeds therefrom will be distributed by the Collateral Agent in accordance with the waterfall provisions set forth in the Collateral Agency Agreement. Pursuant to the Swap Termination Amount Priority, Syncora, as holder of the Swap Policies Claim, will be entitled to receive an amount of proceeds no less than the value of the Swap Policies Claim before the Bondholders can receive any proceeds in respect of principal of the Bonds, if any such amounts are then due and payable.

     (f)     **Collateral Agency Agreement**

On December 19, 2006, in connection with the Swaps and the Bonds and the other transactions contemplated by the Financing Documents, American Roads, the Operating Subs, the counterparty to the Swaps, the Collateral Agent, Syncora, and certain other parties entered into the Collateral Agency Agreement. The Collateral Agency Agreement is a Financing Document that designates the Collateral Agent as the agent for each of the senior creditors, including Syncora, in its capacity as insurer of the Swaps and Bonds, the counterparty to the Swaps and the Bondholders, and describes, among other things, the Collateral Agent's obligations to preserve and administer the Collateral and to distribute the proceeds of any enforcement in respect of the Collateral in accordance with the terms of the waterfall provisions set forth in Section 7.06(a) thereof.

Pursuant to Section 7.03 of the Collateral Agency Agreement, both the counterparty to the Swaps and the Bondholders have delegated the right to exercise any rights or remedies under the Financing Documents, including any enforcement action in respect of the Collateral, to the Collateral Agent. Pursuant to Section 8.3 of the Common Agreement and Section 7.03 of the Collateral Agency Agreement, for so long as there is no Insurer Default, the Collateral Agent may only exercise rights or remedies on behalf of the counterparty to the Swaps and the Bondholders, including  in respect of the Swap Policies Claim, at the direction of Syncora, in its capacity as Instructing Senior Creditor. Furthermore, to the extent the Collateral Agent takes any enforcement action in respect of the Collateral, the distribution of any proceeds resulting therefrom is subject to the waterfall provisions set forth in Section 7.06(a) of the Collateral Agency Agreement, including the Swap Termination Amount Priority.

**ARTICLE VII**
**OTHER KEY ASPECTS OF THE PLAN**

**7.1**     **Distributions**

One of the key concepts under the Bankruptcy Code is that only Claims and Interests that are "allowed" may receive distributions under a chapter 11 plan. This term is used throughout the Plan and the descriptions below. In general, an Allowed Claim or Interest means that the Debtors agree, or if there is a dispute, the Bankruptcy Court determines that the Claim or Interest, and the amount thereof, is in fact a valid obligation of or interest in the Debtors. Except as otherwise provided in the Plan, a Final Order, or as otherwise agreed to by the relevant parties,

on the Distribution Date, the Debtors or their duly appointed disbursing agent shall make initial distributions under the Plan on account of Allowed Claims and Interests, including those that become Allowed after the Distribution Date, subject to the Reorganized Debtors' right to object to Claims and Interests.

**(a)     Disputed Claims**

Except as otherwise provided in the Plan, if a party files a Proof of Claim and the Debtors or Reorganized Debtors, as applicable, do not determine in their sole discretion, and without the need for notice to or action, order or approval of the Bankruptcy Court, that the Claim subject to such Proof of Claim is Allowed, such Claim shall be Disputed unless Allowed or disallowed by a Final Order or as otherwise set forth in Article VII of the Plan. Except as otherwise provided in the Plan, all Proofs of Claim filed after the Effective Date shall be expunged without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court. For the avoidance of doubt, on and after the Effective Date, the Reorganized Debtors may settle any Claims including Claims for which a Proof of Claim has been filed or for which a Proof of Claim has not been filed without further notice to or approval of the Bankruptcy Court, the Claims and Solicitation Agent or any other party.

**(b)     Resolution of Disputed Claims**

Except insofar as a Claim is Allowed under the Plan, the Debtors or the Reorganized Debtors shall be entitled to object to the Claim. Any objections to Claims shall be served and filed on or before the 120th day after the Effective Date or by such later date as ordered by the Bankruptcy Court. Notwithstanding any authority to the contrary, an objection to a Claim shall be deemed properly served on the holder thereof if service is effected in any of the following manners: (a) in accordance with Rule 4 of the Federal Rules of Civil Procedure, as modified and made applicable by Bankruptcy Rule 7004; (b) by first class mail, postage prepaid, on any counsel that has appeared on the holder's behalf in the Chapter 11 Cases. The Debtors and the Reorganized Debtors shall be authorized to, and shall, resolve all Disputed Claims or Interests by withdrawing or settling such objections thereto or by litigating to Final Order in the Bankruptcy Court the validity, nature and/or amount thereof. All Claims  not objected to by the end of such 120-day period shall be deemed Allowed unless such period is extended upon approval of the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately prior to the Effective Date with respect to any Disputed Claim, including the Causes of Action retained pursuant to Section 4.19 of the Plan.

**(c)     No Interest**

Unless otherwise provided for in the Plan or by order of the Bankruptcy Court, postpetition interest shall not accrue or be paid on Claims, and no holder of a Claim shall be entitled to interest accruing on or after the Petition Date on any Claim or right. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

**(d)     No Distributions Pending Allowance**

Notwithstanding any other provision of the Plan to the contrary, no payments or distributions of any kind or nature shall be made with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Final Order and the Disputed Claim has become an Allowed Claim. Distributions on account of Disputed Claims that become Allowed Claims shall be made pursuant to Section 6.2 of the Plan.

**(e)     Disallowance of Claims and Interests**

All Claims of any Entity from which property is sought by the Debtors under section 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any

property or monies under any of the aforementioned sections of the Bankruptcy Code and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**7.2**    **Treatment of Executory Contracts and Unexpired Leases**

(a)    **Assumption of Executory Contracts and Unexpired Leases**

Except as otherwise provided in the Plan or pursuant to the Confirmation Order, each Executory Contract and Unexpired Lease, including, the contracts and leases identified on Exhibit A to the Plan (which Exhibit A may be modified by the Debtors no later than ten (10) days prior to the Confirmation Hearing or, with consent of the applicable counterparty, at any time prior to the Confirmation Hearing), shall be deemed assumed, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date under section 365 of the Bankruptcy Code, unless any such Executory Contract or Unexpired Lease: (a) is listed on the Rejection Schedule; (b) has been previously assumed or rejected by the Debtors by Final Order or has been assumed or rejected by the Debtors by order of the Bankruptcy Court as of the Effective Date, which order becomes a Final Order after the Effective Date; or (c) is the subject of a motion to assume or reject pending as of the Effective Date. The Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described assumptions, assignments, and rejections.

Except as otherwise provided in the Plan or agreed to by the Debtors with the applicable counterparty, each assumed Executory Contract or Unexpired Lease shall include all modifications, amendments, supplements, restatements, or other agreements related thereto, and all rights related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated hereunder. Modifications, amendments, supplements, and restatements to prepetition Executory Contracts and Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease or the validity, priority, or amount of any Claims that may arise in connection therewith.

(b)    **Cure of Defaults and Objections to Cure and Assumption**

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the Cure on the Effective Date or as soon as reasonably practicable thereafter, subject to the limitation described below, or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree. Any Cure shall be deemed fully satisfied, released, and discharged upon payment by the Debtors or the Reorganized Debtors of the Cure; provided, however, that nothing herein shall prevent the Reorganized Debtors from paying any Cure despite the failure of the relevant counterparty to file such request for payment of such Cure.

In the event of a dispute regarding (i) the amount of any Cure, (ii) the ability of the Reorganized Debtors or any assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease to be assumed, or (iii) any other matter pertaining to assumption, the payments required by section 365(b)(1) of the Bankruptcy Code in respect of Cures shall be made following the entry of a Final Order or orders resolving the dispute and approving the assumption (and, if applicable, assignment). Any objection by a counterparty to an Executory Contract or Unexpired Lease to a proposed assumption or related Cure must be filed with the Bankruptcy Court and served on the Debtors within fifteen (15) days of service of notice of the Debtors' intent to assume or reject such Executory Contract or Unexpired Lease. Any such objection will be scheduled to be heard by the Bankruptcy Court upon at least fifteen (15) days' notice. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption or Cure of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption or Cure. The Debtors or Reorganized Debtors, as applicable, also may settle any Cure without any further notice to or action, order, or approval of the Bankruptcy Court. The Debtors or Reorganized Debtors, as applicable, reserve the right either to reject or nullify the assumption of any Executory Contract or Unexpired Lease within 45 days after a Final Order resolving an objection to assumption or determining the Cure or any request for adequate assurance of future performance required to assume such Executory Contract or Unexpired Lease, is entered.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall result in the full release and satisfaction of any Cures, Claims, or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract or Unexpired Lease at any time prior to the effective date of assumption. Any and all Proofs of Claim based upon Executory Contracts or Unexpired Leases that have been assumed in the Chapter 11 Cases, including pursuant to the Confirmation Order, shall be deemed disallowed and expunged as of the Effective Date without the need for any objection thereto or any further notice to or action, order, or approval of the Bankruptcy Court.

(c)    **Pre-existing Payment and Other Obligations**

Rejection of any Executory Contract or Unexpired Lease pursuant to the Plan or otherwise shall not constitute a termination of pre-existing obligations owed to the Debtors or Reorganized Debtors, as applicable, under such contract or lease. In particular, notwithstanding any non-bankruptcy law to the contrary, the Reorganized Debtors expressly reserve and do not waive any right to receive, or any continuing obligation of a counterparty to provide: (a) payment to the contracting Debtors or Reorganized Debtors, as applicable, of outstanding and future amounts owing thereto under or in connection with rejected Executory Contracts or Unexpired Leases or (b) warranties or continued maintenance obligations on goods previously purchased by the contracting Debtors or Reorganized Debtors, as applicable, from counterparties to rejected Executory Contracts.

(d)    **Rejection Damages Claims and Objections to Rejections**

Pursuant to section 502(g) of the Bankruptcy Code, counterparties to Executory Contracts or Unexpired Leases that are rejected shall have the right to assert Claims, if any, on account of the rejection of such contracts and leases. Unless otherwise provided by a Bankruptcy Court order, any Proofs of Claim asserting Claims arising from the rejection of Executory Contracts and Unexpired Leases pursuant to the Plan must be filed with the Claims and Solicitation Agent no later than 30 days after the later of the Confirmation Date or the effective date of rejection. Any such Proofs of Claim that are not timely filed shall be disallowed without the need for any further notice to or action, order, or approval of the Bankruptcy Court. Such Proofs of Claim shall be forever barred, estopped, and enjoined from assertion. Moreover, such Proofs of Claim shall not be enforceable against any Reorganized Debtor, without the need for any objection by the Reorganized Debtors or any further notice to or action, order, or approval of the Bankruptcy Court, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged notwithstanding anything in a Proof of Claim to the contrary. All Allowed Claims arising from the rejection of Executory Contracts and Unexpired Leases shall be classified as Class D—General Unsecured Claims against the applicable Debtor counterparty thereto.

(e)    **Contracts and Leases Entered into After the Petition Date**

Contracts and leases entered into after the Petition Date by any Debtor and any Executory Contracts and Unexpired Leases assumed by any Debtor may be performed by the applicable Reorganized Debtor in the ordinary course of business.

(f)    **Reservation of Rights**

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, including Exhibit A to the Plan, shall constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or Unexpired Lease or that any Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or Reorganized Debtors, as applicable, shall have 45 days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

**7.3    Release, Injunction, and Related Provisions**

(a)    **Discharge of Claims and Termination of Interests**

Except as otherwise provided for in the Plan and effective as of the Effective Date: (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all Claims and Interests of any nature whatsoever, including any interest accrued on such

Claims from and after the Petition Date, against the Debtors or any of their assets, property, or Estates; (b) the Plan shall bind all holders of Claims and Interests, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged, and released in full, and the Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all Entities shall be precluded from asserting against the Debtors, the Debtors' Estates, the Reorganized Debtors, their successors and assigns, and their assets and properties any other Claims or Interests based upon any documents, instruments, or any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Effective Date.

### (b)    Releases by the Debtors

Pursuant to section 1123(b) of the Bankruptcy Code, and except as otherwise expressly provided for in the Plan, for good and valuable consideration, on and after the Effective Date, the Released Parties are conclusively, absolutely, unconditionally, irrevocably, and forever deemed released and discharged by the Debtors, the Reorganized Debtors, and the Estates from any and all Claims, Interests, obligations, rights, and liabilities whatsoever, whether for tort, fraud, contract, violations of federal or state securities laws, Avoidance Actions, including any derivative Claims, asserted or that could possibly have been asserted directly or indirectly on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, and any and all Causes of Action asserted or that could possibly have been asserted on behalf of the Debtors, that the Debtors, the Reorganized Debtors, or the Estates, would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, or actions taken in drafting and negotiating the RPSA, the Disclosure Statement, the Plan or related agreements, instruments or other documents, based in whole or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that the foregoing releases will have no effect on the liability of any of the Released Parties for gross negligence, willful misconduct, fraud, or criminal conduct as determined by a Final Order entered by a court of competent jurisdiction.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in Section 8.2 of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Released Parties; (b) a good faith settlement and compromise of the Claims released by Section 8.2 of the Plan; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any of the Debtors asserting any Claim or Cause of Action released by Section 8.2 of the Plan.

### (c)    Releases by Syncora and Collateral Agent

As of the Effective Date, Syncora and the Collateral Agent shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged the Debtors, the Reorganized Debtors, the Estates, the ACP Litigation Defendants, Alinda and each such Entity's successors and assigns, current and former affiliates, subsidiaries, officers, directors, principals, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, and other Professionals, solely in their respective capacities as such, and only if such Persons occupied any such positions at any time on or after the Petition Date, from any and all Claims, Interests, obligations, rights, liabilities, actions, causes of action, choses in action, suits, debts, demands, damages, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, judgments, remedies, rights of set-off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims, and crossclaims (including all claims and actions against any Entities under the Bankruptcy Code) whatsoever, whether for tort, fraud, contract, violations of federal or state securities laws, Avoidance Actions, including any derivative Claims, asserted on behalf of the Debtors, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, that such Entity asserted or that could possibly have been asserted, or would have been legally entitled to assert (whether individually or collectively), based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, the Chapter 11 Cases, the Bonds, the Swaps, the Policies, any claims that were or could have been asserted in the ACP Litigation, or actions taken in drafting and negotiating the RPSA, the Disclosure Statement, the Plan or related agreements, instruments or other documents, based in whole

or in part upon any act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date; provided, however, that nothing in Section 8.3 of the Plan shall in any way or to any extent release, prejudice or otherwise affect, or constitute a covenant not to sue with respect to, any claims or causes of action held by Syncora or the Collateral Agent against Macquarie Securities (USA) Inc.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the release set forth in Section 8.3 of the Plan, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that such release is: (a) in exchange for the good and valuable consideration provided by the Debtors, the Reorganized Debtors, the Estates, the ACP Litigation Defendants, and Alinda; (b) a good faith settlement and compromise of the Claims released by Section 8.3 of the Plan; (c) in the best interests of the Debtors and all holders of Claims and Interests; (d) fair, equitable, and reasonable; (e) given and made after due notice and opportunity for hearing; and (f) a bar to any Entity granting a release under Section 8.3 of the Plan from asserting any Claim or Cause of Action released by Section 8.3 of the Plan.

**(d)**    **Exculpation**

No Exculpated Party shall have or incur, and each Exculpated Party is hereby released and exculpated from any Exculpated Claim or any obligation, Cause of Action, or liability for any Exculpated Claim; provided, however, that the foregoing "exculpation" shall have no effect on the liability of any Entity that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct; provided, further, that in all respects such Entities shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities pursuant to, or in connection with, the Plan. The Exculpated Parties have, and upon Confirmation shall be deemed to have, participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code with regard to the solicitation of acceptances and rejections of the Plan and the making of distributions pursuant to the Plan and, therefore, are not and shall not be liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

**(e)**    **Preservation of Rights of Action**

Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Final Order, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Plan Supplement, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date. No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them. The Debtors and the Reorganized Debtors expressly reserve all rights to prosecute any and all Causes of Action against any Entity, except as otherwise expressly provided in the Plan. Unless any Causes of Action against an Entity are expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Bankruptcy Court order, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel, judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the Confirmation or Consummation.

The Reorganized Debtors reserve and shall retain Causes of Action notwithstanding the rejection of any Executory Contract or Unexpired Lease during the Chapter 11 Cases or pursuant to the Plan. In accordance with section 1123(b)(3) of the Bankruptcy Code, any Causes of Action that a Debtor may hold against any Entity shall vest in the Reorganized Debtors. The applicable Reorganized Debtor, through its authorized agents or representatives, shall retain and may exclusively enforce any and all such Causes of Action. The Reorganized Debtors shall have the exclusive right, authority, and discretion to determine and to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action, or to decline to do any of the foregoing, without the consent or approval of any third party or any further notice to or action, order, or approval of the Bankruptcy Court.

(f)      **Injunction**

Except as otherwise provided in the Plan or for obligations issued pursuant to the Plan, all Entities that have held, hold, or may hold Claims or Interests that have been released pursuant to Section 8.2 or Section 8.3 of the Plan, discharged pursuant to Section 8.1 of the Plan, or are subject to exculpation pursuant to Section 8.4 of the Plan are permanently enjoined, from and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Reorganized Debtors, the Released Parties, the ACP Litigation Defendants, or the Exculpated Parties: (a) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against such Entities on account of or in connection with or with respect to any such Claims or Interests; (c) creating, perfecting, or enforcing any encumbrance of any kind against such Entities or the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests; (d) asserting any right of setoff, subrogation, or recoupment of any kind against any obligation due from such Entities or against the property or Estates of such Entities on account of or in connection with or with respect to any such Claims or Interests unless such holder has filed a motion requesting the right to perform such setoff on or before the Confirmation Date; and (e) commencing or continuing in any manner any action or other proceeding of any kind on account of or in connection with or with respect to any such Claims or Interests released, exculpated, or settled pursuant to the Plan.

**7.4      Protection Against Discriminatory Treatment**

In accordance with section 525 of the Bankruptcy Code, and consistent with paragraph 2 of Article VI of the United States Constitution, no Governmental Unit shall discriminate against any Reorganized Debtor, or any Entity with which a Reorganized Debtor has been or is associated, solely because such Reorganized Debtor was a Debtor under chapter 11, may have been insolvent before the commencement of the Chapter 11 Cases (or during the Chapter 11 Cases but before such Debtor was granted or denied a discharge), or has not paid a debt that is dischargeable in the Chapter 11 Cases.

**7.5      Indemnification**

On and from the Effective Date, and except as prohibited by applicable law, the Reorganized Debtors shall assume or reinstate, as applicable, all indemnification obligations in place as of the Effective Date (whether in by-laws, certificates of incorporation, board resolutions, contracts, or otherwise) for the current and former directors, officers, managers, employees, attorneys, other professionals and agents of the Debtors.

**7.6      Recoupment**

In no event shall any holder of Claims or Interests be entitled to recoup any Claim or Interest against any Claim, right, or Cause of Action of the Debtors or the Reorganized Debtors, as applicable, unless such holder actually has performed such recoupment and provided notice thereof in writing to the Debtors on or before the Confirmation Date, notwithstanding any indication in any Proof of Claim or Interest or otherwise that such holder asserts, has, or intends to preserve any right of recoupment.

**7.7      Release of Liens**

Except (a) with respect to the Liens securing Other Secured Claims (depending on the treatment of such Claims), or (b) as otherwise provided in the Plan or in any contract, instrument, release, or other agreement or document created pursuant to the Plan, on the Effective Date, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the applicable Reorganized Debtor and its successors and assigns.

**7.8      Reimbursement or Contribution**

If the Bankruptcy Court disallows a Claim for reimbursement or contribution of an Entity pursuant to section 502(e)(1)(B) of the Bankruptcy Code, then to the extent that such Claim is contingent as of the Effective Date, such Claim shall be forever disallowed notwithstanding section 502(j) of the Bankruptcy Code, unless prior to the Effective Date (a) such Claim has been adjudicated as noncontingent or (b) the relevant holder of a Claim has

filed a noncontingent Proof of Claim on account of such Claim and a Final Order has been entered determining such Claim as no longer contingent.

**7.9    Cancellation of Interests, Dissolution of Holdco and Issuance of Reorganized Equity Units**

Immediately before the Effective Date, the existing Interests in ART shall be cancelled and distributed to American Roads.  Effective as of the Effective Date, the existing Interests in each of American Roads, Holdco, DWT and the Operating Subs shall be cancelled and certain of the Debtors shall issue the Reorganized Equity Units to the extent provided herein.  The Reorganized Equity Units in American Roads, Holdco, DWT and the Operating Subs shall be issued and distributed to the Collateral Agent for distribution to Syncora or its designated affiliate or affiliates (which may include a Reorganized Debtor) in accordance with Section 3.3(a)(3) of the Plan.  On or after the Effective Date, the Reorganized Debtors shall be authorized to dissolve Holdco for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Reorganized Debtors or payments to be made in connection therewith.  Upon such dissolution, the Reorganized Debtors shall file a notice with the Bankruptcy Court.

**7.10    Incentive Plans and Employee and Retiree Benefits**

Except as otherwise provided in the Plan, on and after the Effective Date, subject to any Final Order, the Reorganized Debtors shall: (a) amend, adopt, assume and/or honor in the ordinary course of business, any contracts, agreements, policies, programs, and plans, in accordance with their respective terms, for, among other things, compensation, including any incentive plan, health care benefits, disability benefits, deferred compensation benefits, savings, severance benefits, retirement benefits, welfare benefits, workers' compensation insurance, and accidental death and dismemberment insurance for the directors, officers, and employees of any of the Debtors who served in such capacity from and after the Petition Date and (b) honor, in the ordinary course of business, Claims of employees employed as of the Effective Date for accrued vacation time, 401(k) contributions and other employee benefits arising prior to the Petition Date and not otherwise paid pursuant to a Bankruptcy Court order. Notwithstanding the foregoing, pursuant to section 1129(a)(13) of the Bankruptcy Code, from and after the Effective Date, all retiree benefits (as that term is defined in section 1114 of the Bankruptcy Code), if any, shall continue to be paid.

**7.11    Subordination**

The allowance, classification, and treatment of all Claims and Interests under the Plan shall conform to and with the respective contractual, legal, and equitable subordination rights of such Claims and Interests, and the Plan shall recognize and implement any such rights.  Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided in the Plan, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

**7.12    Vesting of Assets in the Reorganized Debtors**

Except as otherwise provided in the Plan, or in any agreement, instrument, or other document incorporated in the Plan, on the Effective Date, all property in each Estate and all Causes of Action, shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

**7.13    Modification of Plan**

Effective as of the date hereof: (a) the Debtors, subject to the conditions and limitations set forth in the RPSA, including Syncora's express prior written consent, which consent may not be unreasonably withheld, conditioned or delayed, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan before the entry of the Confirmation Order, subject to the limitations set forth in the Plan and the RPSA; and (b) after the entry of the Confirmation Order, the Debtors or the Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in the Plan in such manner as may be

necessary to carry out the purpose and intent of the Plan, subject to the limitations set forth in the Plan and the RPSA.

**7.14    Revocation or Withdrawal of Plan**

Subject to the conditions and limitations set forth in the RPSA, the Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date and to file subsequent chapter 11 plans. If the Debtors revoke or withdraw the Plan, or if Confirmation or the Effective Date does not occur, then: (a) the Plan will be null and void in all respects; (b) any settlement or compromise embodied in the Plan, assumption or rejection of Executory Contracts or Unexpired Leases effected by the Plan, and any document or agreement executed pursuant to the Plan will be null and void in all respects; and (c) nothing contained in the Plan shall (1) constitute a waiver or release of any Claims, Interests, or Causes of Action, (2) prejudice in any manner the rights of any Debtor or any other Entity, or (3) constitute an admission, acknowledgement, offer, or undertaking of any sort by any Debtor or any other Entity.

**7.15    Reservation of Rights**

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests prior to the Effective Date.

**7.16    Plan Supplement Exhibits**

All exhibits and documents included in the Plan Supplement are incorporated into and are a part of the Plan as if set forth in full in the Plan. After the exhibits and documents are filed, copies of such exhibits and documents shall be made available upon written request to the Debtors' counsel at the address above or by downloading such exhibits and documents from the Bankruptcy Court's website at www.nysb.uscourts.gov. Unless otherwise ordered by the Bankruptcy Court, to the extent any exhibit or document in the Plan Supplement is inconsistent with the terms of any part of the Plan that does not constitute the Plan Supplement, such part of the Plan that does not constitute the Plan Supplement shall control.

**7.17    Conditions Precedent to the Effective Date**

It shall be a condition to the Effective Date that the following conditions shall have been satisfied or waived pursuant to Section 9.2 of the Plan: (a) the Confirmation Order shall have been entered, and such order shall not have been stayed, modified, or vacated on appeal; (b) all respective conditions precedent to the transactions contemplated under the RPSA shall have been waived or satisfied in accordance with the terms thereof; and (c) all documents and agreements necessary to implement the Plan shall have: (1) all conditions precedent to such documents and agreements satisfied or waived pursuant to the terms of such documents or agreements; (2) been tendered for delivery to the required parties and, to the extent required, filed with and approved by any applicable Governmental Units in accordance with applicable laws; and (3) been effected or executed.

**7.18    Waiver of Conditions Precedent**

The Debtors, with the express prior written consent of the Collateral Agent, Syncora and ANAR, which may not be unreasonably withheld, may amend, modify, supplement or waive any of the conditions to the Effective Date set forth in Section 9.1 of the plan at any time without any notice to any other parties in interest and without any further notice to or action, order, or approval of the Bankruptcy Court, and without any formal action other than proceeding to confirm or consummate the Plan.

**ARTICLE VIII
CERTAIN FACTORS TO BE CONSIDERED**

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, PLEASE READ AND CAREFULLY CONSIDER THE FACTORS SET FORTH HEREIN, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT.

ALTHOUGH THESE RISK FACTORS ARE MANY, THESE FACTORS SHOULD NOT BE REGARDED AS CONSTITUTING THE ONLY RISKS PRESENT IN CONNECTION WITH THE DEBTORS' BUSINESSES OR THE PLAN AND ITS IMPLEMENTATION.

**8.1    General**

The following provides a summary of various important considerations and risk factors associated with the Plan; however, it is not exhaustive.

**8.2    Risks Related to the Plan and Other Bankruptcy Law Considerations**

**(a)    A Claim or Interest Holder May Object to, and the Bankruptcy Court May Disagree with, the Debtors' Classification of Claims and Interests**

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Debtors created Classes of Claims and Interests, each encompassing Claims or Interests, as applicable, that are substantially similar to the other Claims and Interests in each such Class.  However, a Claim or Interest holder could challenge the Debtors' classification.  In such an event, the cost of the Chapter 11 Cases and the time needed to confirm the Plan may increase, and there can be no assurance that the Bankruptcy Court will agree with the Debtors' classification.  If the Bankruptcy Court concludes that either or both of the classifications of Claims and Interests under the Plan do not comply with the requirements of the Bankruptcy Code, the Debtors may need to modify the Plan.  Such modification could require re-solicitation of votes on the Plan.  The Plan may not be confirmed if the Bankruptcy Court determines that the Debtors' classification of Claims and Interests is not appropriate.

**(b)    The Debtors May Not Be Able to Satisfy the Voting Requirements for Confirmation of the Plan**

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Debtors may seek, as promptly as practicable thereafter, Confirmation.  If the Plan does not receive such votes, the Debtors may elect to amend the Plan, seek Confirmation regardless of the rejection, seek to sell their assets pursuant to section 363 of the Bankruptcy Code, or proceed with liquidation.

**(c)    The Bankruptcy Court May Not Confirm the Plan or May Require the Debtors to Re-Solicit Votes with Respect to the Plan**

The Debtors cannot assure you that the Plan will be confirmed by the Bankruptcy Court.  Section 1129 of the Bankruptcy Code, which sets forth the requirements for confirmation of a plan of reorganization, requires, among other things, a finding by the Bankruptcy Court that the plan of reorganization is "feasible," that all claims and interests have been classified in compliance with the provisions of section 1122 of the Bankruptcy Code, and that, under the plan of reorganization, each holder of a claim or interest within each impaired class either accepts the plan of reorganization or receives or retains cash or property of a value, as of the date the plan of reorganization becomes effective, that is not less than the value such holder would receive or retain if the debtor were liquidated under chapter 7 of the Bankruptcy Code.  There can be no assurance that the Bankruptcy Court will conclude that the feasibility test and other requirements of section 1129 of the Bankruptcy Code have been met with respect to the Plan.

If the Plan is filed, there can be no assurance that modifications to the Plan would not be required for Confirmation, or that such modifications would not require a re-solicitation of votes on the Plan.

Moreover, the Bankruptcy Court could fail to approve this Disclosure Statement and determine that the votes to accept the Plan should be disregarded. The Debtors then would be required to recommence the solicitation process, which would include re-filing a plan of reorganization and disclosure statement(s). Typically, this process involves a 20- to 60-day period and includes a court hearing for the required approval of disclosure statement(s), followed (after bankruptcy court approval) by another solicitation of claim and interest holder votes for the plan of reorganization, followed by a confirmation hearing at which the bankruptcy court will determine whether the requirements for confirmation have been satisfied, including the requisite claim and interest holder acceptances.

If the Plan is not confirmed, the Chapter 11 Cases may be converted into cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of claims and interests and the Debtors' liquidation analysis are set forth under the unaudited liquidation analysis, attached hereto as Exhibit E. The Debtors believe that liquidation under chapter 7 of the Bankruptcy Code would result in, among other things, smaller distributions being made to creditors than those provided for in the Plan because of:

- the likelihood that the Debtors' assets would need to sold or otherwise disposed of in a less orderly fashion over a short period of time;

- additional administrative expenses involved in the appointment of a trustee; and

- additional expenses and claims, some of which would be entitled to priority, which would be generated during the liquidation and from the rejection of leases and other Executory Contracts in connection with a cessation of the Debtors' operations.

**(d)     The Debtors May Object to the Amount or Classification of a Claim or Interest**

Except as otherwise provided in the Plan, the Debtors reserve the right to object to the amount or classification of any Claim or Interest under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any holder of a Claim or Interest where such Claim or Interest is subject to an objection. Any holder of a Claim or Interest that is subject to an objection thus may not receive its expected share of the estimated distributions described in this Disclosure Statement.

**(e)     Even if the Debtors Receive All Necessary Acceptances for the Plan to Become Effective, the Debtors May Fail to Meet All Conditions Precedent to Effectiveness of the Plan**

Although the Debtors believe that the Effective Date would occur very shortly after the Confirmation Date, there can be no assurance as to such timing.

The Confirmation and effectiveness of the Plan are subject to certain conditions that may or may not be satisfied. The Debtors cannot assure you that all requirements for Confirmation and effectiveness required under the Plan will be satisfied.

**(f)     Contingencies May Affect Distributions to Holders of Allowed Claims and Interests**

The distributions available to holders of Allowed Claims and Interests under the Plan can be affected by a variety of contingencies, including, whether the Bankruptcy Court orders certain Allowed Claims to be subordinated to other Allowed Claims. The occurrence of any and all such contingencies could affect distributions under the Plan.

**(g)     The Bankruptcy Court May Find the Solicitation of Acceptances Inadequate**

Usually, votes to accept or reject a plan of reorganization are solicited after the filing of a petition commencing a chapter 11 case. Nevertheless, a debtor may solicit votes prior to the commencement of a chapter 11 case in accordance with sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b). Sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) require that:

- solicitation comply with applicable nonbankruptcy law;

- the plan of reorganization be transmitted to substantially all creditors and other interest holders entitled to vote; and

- the time prescribed for voting is not unreasonably short.

With regard to solicitation of votes prior to the commencement of a bankruptcy case, if the Bankruptcy Court concludes that the requirements of Bankruptcy Rule 3018(b) have not been met, then the Bankruptcy Court could deem such votes invalid, whereupon the Plan could not be confirmed without a resolicitation of votes to accept or reject the Plan. While the Debtors believe that the requirements of sections 1125(g) and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018(b) will be met, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

**(h)**     **The Debtors May Seek to Amend, Waive, Modify or Withdraw the Plan at Any Time Prior to Confirmation**

The Debtors reserve the right, prior to the Confirmation of the Plan or substantial Consummation thereof, subject to the provisions of section 1127 of the Bankruptcy Code and applicable law and the RPSA, to amend the terms of the Plan or waive any conditions thereto if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the holders of Claims and Interests cannot presently be foreseen but may include a change in the economic impact of the Plan on some or all of the proposed Classes or a change in the relative rights of such Classes. All holders of Claims and Interests will receive notice of such amendments or waivers required by applicable law and the Bankruptcy Court. If, after receiving sufficient acceptances, but prior to Confirmation of the Plan, the Debtors seek to modify the Plan, the previously solicited acceptances will be valid only if (1) all classes of adversely affected creditors and interest holders accept the modification in writing, or (2) the Bankruptcy Court determines, after notice to designated parties, that such modification was de minimis or purely technical or otherwise did not adversely change the treatment of holders of accepting Claims and Interests or is otherwise permitted by the Bankruptcy Code.

**(i)**     **The Plan May Have a Material Adverse Effects on the Debtors' Operations**

The solicitation of acceptances of the Plan and commencement of the Chapter 11 Cases could adversely affect the relationships between the Debtors and their respective customers, employees, partners, and others. There is a risk, due to uncertainty about the Debtors' future, that, among other things:

- the Debtors' customers' confidence in the abilities of the Debtors to manage their operations including the Toll Facilities, resulting in a significant decline in the Debtors' revenues, profitability, and cash flow;

- it may become more difficult to retain, attract, or replace key employees;

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- the Debtors' suppliers, vendors, and service providers could terminate their relationships with the Debtors or require financial assurances or enhanced performance, subject to the Debtors' assertions in the Bankruptcy Court of certain protections under the Bankruptcy Code.

**(j)**     **The Debtors Cannot Predict the Amount of Time Spent in Bankruptcy for the Purpose of Implementing the Plan, and a Lengthy Bankruptcy Proceeding Could Disrupt the Debtors' Businesses, as well as Impair the Prospect for Reorganization on the Terms Contained in the Plan**

The Debtors estimate that the process of obtaining Confirmation of the Plan by the Bankruptcy Court will last approximately 30 to 60 days from the Petition Date, but it could last considerably longer if, for example, Confirmation is contested or the conditions to Confirmation or Consummation are not satisfied or waived.

While the Debtors expect that the Chapter 11 Cases filed solely for the purpose of implementing the Plan would be of short duration and would not be unduly disruptive to the Debtors' businesses, the Debtors cannot be certain that this necessarily would be the case. Although the Plan is designed to minimize the length of the

bankruptcy proceedings, it is impossible to predict with certainty the amount of time that the Debtors may spend in bankruptcy, and the Debtors cannot be certain that the Plan would be confirmed. Even if confirmed on a timely basis, a bankruptcy proceeding to confirm the Plan could itself have an adverse effect on the Debtors' businesses. There is a risk, due to uncertainty about the Debtors' futures, that, among other things:

- the Debtors' customers' confidence in the abilities of the Debtors to manage their operations including the Toll Facilities, resulting in a significant decline in the Debtors' revenues, profitability, and cash flow;

- employees could be distracted from performance of their duties or more easily attracted to other career opportunities; and

- suppliers, vendors, and service providers could terminate their relationship with the Debtors or demand financial assurances or enhanced performance, any of which could impair the Debtors' prospects.

A lengthy bankruptcy proceeding also would involve additional expenses and divert the attention of management from the operation of the Debtors' businesses.

The disruption that the bankruptcy process would have on the Debtors' businesses could increase with the length of time it takes to complete the Chapter 11 Cases. If the Debtors are unable to obtain Confirmation of the Plan on a timely basis, because of a challenge to the Plan or otherwise, the Debtors may be forced to operate in bankruptcy for an extended period of time while they try to develop a different reorganization plan that can be confirmed. A protracted bankruptcy case could increase both the probability and the magnitude of the adverse effects described above.

**(k)     Other Parties in Interest Might Be Permitted to Propose Alternative Plans of Reorganization that May Be Less Favorable to Certain of the Debtors' Constituencies Than the Plan**

Other parties in interest could seek authority from the Bankruptcy Court to propose an alternative plan of reorganization to the Plan. Under the Bankruptcy Code, a debtor-in-possession initially has the exclusive right to propose and solicit acceptances of a plan of reorganization for a period of 120 days from filing. However, such exclusivity period can be reduced or terminated upon order of the Bankruptcy Court. If such an order were to be entered, other parties in interest would then have the opportunity to propose alternative plans of reorganization.

If other parties in interest were to propose an alternative plan of reorganization following expiration or termination of the Debtors' exclusivity period, such a plan may be less favorable to creditors than the Plan. Alternative plans of reorganization also may treat less favorably the Claims of a number of other constituencies, including the Debtors' employees, and the Debtors' trading partners and customers. The Debtors consider maintaining relationships with Syncora, employees, and trading partners and customers as critical to maintaining the value of the Reorganized Debtors following the Effective Date, and have sought to treat those constituencies accordingly. However, proponents of alternative plans of reorganization may not share the Debtors' assessments and may seek to impair the Claims of such constituencies to a greater degree. If there were competing plans of reorganization, the Chapter 11 Cases likely would become longer, more complicated, and much more expensive. If this were to occur, or if the Debtors' employees or other constituencies important to the Debtors' business reacted adversely to an alternative plan of reorganization, the adverse consequences discussed in the foregoing Section 8.2(j) also could occur.

**(l)     The Debtors' Businesses May Be Negatively Affected if the Debtors Are Unable to Assume Their Executory Contracts**

An executory contract is a contract on which performance remains due to some extent by both parties to the contract. The Plan provides for the assumption of all Executory Contracts and Unexpired Leases, unless designated on a schedule of rejected contracts. The Debtors intend to preserve as much of the benefit of their existing contracts and leases as possible. However, with respect to some limited classes of Executory Contracts, including licenses with respect to patents or trademarks, the Debtors may need to obtain the consent of the counterparty to maintain the benefit of the contract. There is no guarantee that such consent either would be forthcoming or that conditions would not be attached to any such consent that makes assuming the contracts unattractive. The Debtors then would

41

be required to either forego the benefits offered by such contracts or to find alternative arrangements to replace them.

**(m)      Material Transactions Could Be Set Aside as Fraudulent Conveyances or Preferential Transfers**

Certain payments received by stakeholders prior to the bankruptcy filing could be challenged under applicable debtor/creditor or bankruptcy laws as either a "fraudulent conveyance" or a "preferential transfer." A fraudulent conveyance occurs when a transfer of a debtor's assets is made with the intent to defraud creditors or in exchange for consideration that does not represent reasonably equivalent value to the property transferred. A preferential transfer occurs upon a transfer of property of the debtor while the debtor is insolvent for the benefit of a creditor on account of an antecedent debt owed by the debtor that was made on or within 90 days before the date of filing of the bankruptcy petition or one year before the date of filing of the petition, if the creditor, at the time of such transfer was an insider. If any transfer was challenged in the Bankruptcy Court and found to have occurred with regard to any of the Debtors' material transactions, a bankruptcy court could order the recovery of all amounts received by the recipient of the transfer.

**(n)      The Debtors May Be Unsuccessful in Obtaining First Day Orders to Permit Them to Pay Their Employees, or to Continue to Perform Customer Programs in the Ordinary Course of Business**

The Debtors have tried to address potential concerns of their key customers, employees and other key parties in interest that might arise from the filing of the Plan through a variety of provisions incorporated into or contemplated by the Plan, including the Debtors' intention to seek appropriate court orders to permit the Debtors to pay prepetition employee wages. However, there can be no guarantee that the Debtors will be successful in obtaining the necessary approvals of the Bankruptcy Court for such arrangements or for every party in interest the Debtors may seek to treat in this manner, and, as a result, the Debtors' businesses might suffer.

**(o)      The Bankruptcy Court May Not Approve the Debtors' Use of Cash Collateral**

Upon commencing the Chapter 11 Cases, the Debtors will ask the Bankruptcy Court to authorize the Debtors to use cash collateral to fund the Chapter 11 Cases and to provide customary adequate protection to their creditors under the Financing Documents, which requests will be in accordance with the terms of the RPSA. Such access to cash collateral will provide liquidity during the pendency of the Chapter 11 Cases. There can be no assurance that the Bankruptcy Court will approve such use of cash collateral on the terms requested. Moreover, if the Chapter 11 Cases take longer than expected to conclude, the Debtors may exhaust their available cash collateral. There is no assurance that the Debtors will be able to obtain an extension of the right to use cash collateral, in which case, the liquidity necessary for the orderly functioning of the Debtors' businesses may be impaired materially.

**(p)      The Plan May Be Confirmed Under the Cram-Down Provisions of the Bankruptcy Code**

Under the "cram down" provisions of the Bankruptcy Code, the Plan may be confirmed even if a Class votes to reject the Plan if the Bankruptcy Court finds that the Plan does not discriminate unfairly, and is fair and equitable, regarding each Class of Claims or Interests that is Impaired under, and has not accepted, the Plan. Because certain Classes of Claims are deemed to reject the Plan, the Debtors intend to seek to have the Plan confirmed under the cram down provisions of the Bankruptcy Code.

**8.3      Business-Specific Risk Factors**

**(a)      The Debtors may not be able to achieve their projected financial results or meet post-reorganization debt obligations**

The financial projections set forth on Exhibit B to this Disclosure Statement (the "Financial Projections") represent management's good faith estimate of the Debtors' future financial performance based on currently known facts and assumptions about the Debtors' future operations, as well as the U.S. and world economy in general and the regional economy in which the Debtors operate in particular, and there is no guarantee that the Projections will be realized. The Debtors' actual financial results may differ significantly from the Financial Projections. To the extent the Reorganized Debtors do not meet the projected financial results or achieve projected revenues and cash flows, the Reorganized Debtors may lack sufficient liquidity to continue operating as planned after the Effective

Date, may be unable to service their debt obligations as they come due, may not be able to meet their operational needs, and the value of the Reorganized Equity Units of the Reorganized American Roads may thereby be negatively affected. Further, a failure of the Reorganized Debtors to meet the projected financial results or achieve projected revenues and cash flows could lead to cash flow and working capital constraints, which constraints may require the Reorganized Debtors to seek additional working capital. The Reorganized Debtors may not be able to obtain such working capital when it is required.

**(b)** **A liquid trading market for the Reorganized Equity Units of Reorganized American Roads is unlikely to develop**

A liquid trading market for the Reorganized Equity Units in Reorganized American Roads is unlikely to develop. As of the Effective Date, the Reorganized Equity Units in Reorganized American Roads will not be listed for trading on any stock exchange or trading system. Consequently, the trading liquidity of the Reorganized Equity Units in Reorganized American Roads will be limited. The future liquidity of the trading market for the Reorganized Equity Units in Reorganized American Roads will depend upon, among other things, the number of holders of the Reorganized Equity Units in Reorganized American Roads and the terms of the Limited Liability Company Agreement of Reorganized American Roads.

**(c)** **Estimated Valuation of the Reorganized Debtors, the Reorganized Equity Units in Reorganized American Roads, and the estimated recoveries to Holders of Allowed Claims are not intended to represent the potential market values (if any) of the Reorganized Equity Units in Reorganized American Roads**

The Debtors' estimated recoveries to Holders of Allowed Claims are not intended to represent the market value of the Reorganized Debtor's securities, if any. The estimated recoveries are based on numerous assumptions (the realization of many of which will be beyond the control of the Reorganized Debtor), including: (a) the successful reorganization of the Debtors; (b) an assumed date for the occurrence of the Effective Date; (c) the Reorganized Debtor's ability to achieve the operating and financial results included in the Projections; (d) the Reorganized Debtor's ability to maintain adequate liquidity to fund operations; and (e) the assumption that capital and equity markets remain consistent with current conditions.

**(d)** **Certain tax implications of the Debtors' bankruptcy and reorganization may increase the tax liability of the Reorganized Debtors**

Please carefully review the Section herein entitled, "Certain U.S. Federal Income Tax Consequences of the Plan," to determine how the tax implications of the Plan and the Chapter 11 Cases may adversely affect the Reorganized Debtors.

**(e)** **Concentration of Credit Risk**

Financial instruments that potentially subject the Debtors to significant concentrations of credit risk consist principally of cash deposited with financial institutions in excess of amounts insured by the FDIC. The Debtors place cash and cash equivalents with large financial institutions and monitor the credit rating of such institutions, which the Debtors believe limits such credit risk. In addition, any funds in excess of $250,000 are invested in money market or equivalent funds that are secured by United States government obligations.

**(f)** **Diversification Risk**

The concentration of the Debtors' assets in the Toll Facilities may impact the Debtors' operating results adversely as compared to other entities maintaining a wider diversification of revenue earning assets.

**(g)** **The Debtors will file voluntary petitions for relief under Chapter 11 in the Bankruptcy Court and are subject to the risks and uncertainties associated with the Chapter 11 Cases**

For the duration of the Chapter 11 Cases, the Debtors' operations and the Debtors' ability to execute their business strategy will be subject to the risks and uncertainties associated with bankruptcy. These risks include:

- the Debtors' ability to obtain approval of the Bankruptcy Court with respect to motions filed in the Chapter 11 Cases from time to time;

- the Debtors' ability to obtain creditor and Bankruptcy Court approval for, and then to consummate a Plan to emerge from bankruptcy;

- the occurrence of any event, change or other circumstance that could give rise to the termination of the RPSA;

- the Debtors' ability to obtain and maintain normal trade terms with service providers and maintain contracts that are critical to their operations;

- the Debtors' ability to attract, motivate and retain key employees;

- the Debtors' ability to fund and execute their business plan;

- adverse economic conditions that impact employment rates and income rates in the regions surrounding the Toll Facilities; and

- development of residential and commercial property in the region surrounding the Toll Facilities.

The Debtors will also be subject to risks and uncertainties with respect to the actions and decisions of the creditors and other third parties who have interests in the Chapter 11 Cases that may be inconsistent with the Debtors' plans.

These risks and uncertainties could affect the Debtors' businesses and operations in various ways. For example, negative events or publicity associated with the Chapter 11 Cases could adversely affect the Debtors' relationships with their customers, as well as their suppliers and employees, which in turn could adversely affect the Debtors' operations and financial condition. Also, pursuant to the Bankruptcy Code, the Debtors need approval of the Bankruptcy Court for transactions outside the ordinary course of business, which may limit their ability to respond timely to certain events or take advantage of certain opportunities. Because of the risks and uncertainties associated with the Chapter 11 Cases, the Debtors cannot predict or quantify the ultimate impact that events occurring during the reorganization process will have on their businesses, financial condition, liquidity and results of operations.

As a result of the Chapter 11 Cases, the realization of assets and the satisfaction of liabilities are subject to uncertainty. While operating as debtors in possession, and subject to approval of the Bankruptcy Court, or otherwise as permitted in the normal course of business or Bankruptcy Court order, the Debtors may sell or otherwise dispose of assets and liquidate or settle liabilities. Further, a Plan could materially change the amounts and classifications of assets and liabilities reported in the historical consolidated financial statements. The historical consolidated financial statements do not include any adjustments to the reported amounts of assets or liabilities that might be necessary as a result of confirmation of a Plan.

(h)    **Potential for the Loss of Key Members of the Executive Management Team**

The Debtors are highly dependent on the efforts and performance of their executive management team. If the Debtors were to lose key members of this team, the Debtors' businesses, financial condition, liquidity, and results of operations could be adversely affected.

(i)    **Economic conditions that are beyond the Debtors' control**

The Debtors depend on their customers' willingness to pay to travel on the roadways connecting to the Toll Facilities.  A customers' willingness to travel on the roadways connecting to the Toll Facilities depends largely upon prevailing economic and traffic conditions that are influenced by numerous factors over which the Debtors' management has no control, such as: (a) the employment rate in the area surrounding the Toll Facilities; (b) real estate development in the areas surrounding the Toll Facilities; and (c) natural disasters in the areas surrounding the Toll Facilities.

(j)    **Concentration of Geographic Risk**

The Debtors' Toll Facilities are located in Alabama and Michigan. Successful operation of the Toll Facilities is dependent upon many factors, including population and employment growth, weather conditions and

tourism in these areas. Future growth is dependent upon the strength of the residential and commercial real estate markets and the availability of financing for both builders and buyers. Recent turmoil in the credit and housing markets has resulted in a tightening of credit standards for residential mortgages and significantly reduced liquidity and has adversely affected the ability of home builders and home buyers to obtain financing, which in turn has adversely impacted traffic on the roadways connecting to the Toll Facilities. The downturn in the real estate markets may continue to adversely impact the performance of the Toll Facilities in the near future.

On April 20, 2010, an explosion on the "Deepwater Horizon" oil rig of BP plc ("BP") resulted in a 4.9 billion barrel oil spill in the Gulf of Mexico, (the "BP Oil Spill"), which materially and adversely impacted the tourism industry in the region. In particular, the BP Oil Spill contributed to a decrease of annual traffic flow over the FBX during 2010 of approximately 8.7 % as compared to 2009. Although BP recently announced the conclusion of its clean-up efforts in each of Alabama, Mississippi and Florida, environmental and weather conditions along the Gulf of Mexico may continue to negatively impact the beaches and water recreation areas by washing up chemicals, tar balls and oily residue, which may have a negative impact on traffic flows on roadways connecting to the coast of the Gulf of Mexico, including, in particular, the FBX.

On June 14, 2013, the City of Detroit defaulted on certain of its indebtedness. In connection with the default, the State-appointed Emergency Manager (the "EM") of the City of Detroit proposed a debt restructuring plan that involves the retirement of certain of the city's outstanding indebtedness at a substantial discount. On July 18, 2013 the City of Detroit filed for chapter 9 bankruptcy protection, which is the largest municipal bankruptcy in U.S. history. These actions and other potential actions of the EM relating to the restructuring of the City of Detroit's debt may result in any of the following:

- a decline in economic conditions, population and/or employment in and around the City of Detroit;

- decreased U.S.-Canadian cross-border travel to and from Detroit, including traffic through the DWT;

- increased lease payments in respect of the DWT;

- early termination of Tube Lease and Sublease relating to the DWT; and/or

- the sale of the DWT by the City of Detroit to a third party;

any of which, individually or in the aggregate, may have an adverse impact on American Roads' businesses, financial condition and results of operation.

**(k)**      **Delays in real estate development in the areas surrounding the FBX Bridge may reduce the anticipated rate of traffic growth of the FBX Bridge**

Traffic growth for the FBX Bridge is expected to increase as a result of, among other things, real estate development and sales in the area surrounding the FBX Bridge. While American Roads does not have any present indication of such conditions, delays or cancellation of such development may impair the anticipated rate of traffic growth of the FBX Bridge which may have an adverse effect on American Roads' businesses.

**(l)**      **Traffic volume and revenues are elastic**

Toll rates at each of the Toll Facilities in Alabama increased in 2010 and toll rates at the DWT increased in 2012. There are no further toll increases anticipated at any of the Toll Facilities prior to 2014. An increase in toll rates at any Toll Facility may result in a decrease in traffic at that Toll Facility. As a result, there can be no assurance that any increase in toll rates will result in an increase in revenue and such an increase may even result in a decrease in revenue.

An increase in toll rates at any tolled bridge, tunnel or road (including any of the Toll Facilities) may also result in an attempt by federal, state or local government to regulate (through legislative means or otherwise) how American Roads establishes the tolls.

**(m)    Natural disasters or other catastrophes could damage the Toll Facilities or lower the revenues from the Toll Facilities**

Four of the five Toll Facilities are located in Alabama, including one, the FBX Bridge, near the Gulf of Mexico. Alabama is susceptible to severe storms, including hurricanes and tornados, and risks associated with oil spills in the Gulf of Mexico, such as the BP Oil Spill that occurred in April 2010.  See "—Concentration of Geographic Risk" above..  A natural disaster or other catastrophe could damage one or more of the Toll Facilities and could have a significant impact on travel, traffic patterns and American Roads' ability to operate one or more of the Toll Facilities.  In particular, in the case of the FBX, traffic revenues declined in 2010 as a direct result of the BP Oil Spill.  In addition, all five Toll Facilities are near bodies of water, and the access roads to any Toll Facility could be susceptible to flooding. Natural disasters and other catastrophes may have an adverse effect American Roads' businesses.

**(n)    American Roads ability to set toll rates at the Toll Facilities may, in the future, be regulated (in the case of those in Alabama) or, more heavily regulated (in the case of DWT)**

American Roads generally is not subject to any local, state or federal restriction governing its ability to establish tolls at the Toll Facilities, other than a general restriction in legislation applicable to the DWT requiring that such tolls shall be reasonable and just and provide a fair and reasonable return. The introduction of regulation by federal, state or local government (or, in the case of the DWT, an increase in such regulation) could have an adverse effect on American Roads' ability to establish or increase toll rates at the Toll Facilities in its discretion. Limitations on American Roads' ability to set toll rates could limit or reduce revenues from the Toll Facilities.

For example, in  2007, 2009 and 2010 legislation was proposed in Alabama to require the approval of the Alabama Department of Transportation for toll rates charged by a private entity operating a private toll bridge. The legislation proposed that the average rates of return for utilities should serve as a guide for fair rates of return for the toll bridges. While this proposal died in committee and was never introduced to the full legislature, there are no assurances going forward that comparable legislation will not be proposed or adopted in the future.

**(o)    There are little or no contractual or regulatory restrictions on competition from other toll roads and non-toll roads**

The Toll Facilities may in the future face competition from other toll roads. The licenses for the EMX Bridge, the ARP Bridge, the BWP Bridge and the FBX Bridge are not exclusive. Accordingly, the counties in which the EMX Bridge, the ARP Bridge, the BWP Bridge and the FBX Bridge are located or the Alabama Department of Transportation may grant to another party licenses similar to the licenses pursuant to which American Roads' subsidiaries have been granted rights to the EMX Bridge, the ARP Bridge, the BWP Bridge and the FBX Bridge. However, the language in Section 23-1-81 of the Code of Alabama forbids toll bridges traversing the same watercourse to be located within two miles of one another. None of the Joint Operating Agreement, the Tube Lease or the Sublease for the DWT contain any limitations on competition with the DWT.  If competing toll facilities are built, they may have an adverse effect on American Roads' revenues.

In addition, non-tolled roads may be built within two miles of the Toll Facilities in Alabama, providing drivers with a comparable toll-free alternative route. Construction of a non-tolled roads could negatively impact future traffic on the roadways connecting to the Toll Facilities in Alabama and could have an adverse effect on American Roads' revenues.

**(p)    Improvements may be made to alternate routes surrounding the Toll Facilities, which may divert traffic away from the Toll Facilities and adversely affect toll revenues and results of operations**

The Toll Facilities compete with both public and private alternative routes. If improvements are made to alternate routes surrounding the Toll Facilities reducing congestion, this may increase their capacity or may otherwise make them a more attractive alternative to the Toll Facilities resulting in decreased traffic on the Toll Facilities, which may adversely impact American Roads revenues.

(q)    **Failure to maintain the traffic corridors connecting to the Toll Facilities may have an adverse effect on traffic volumes and revenues**

Maintenance of the roadways connecting to the Toll Facilities is and will continue to be performed by local or state agencies and is outside of American Roads' control. If such agencies do not properly maintain the connecting roadways, or if such maintenance requires lane closures, the Toll Facilities may experience a decrease in traffic volume, which could adversely affect toll revenues.

(r)    **American Roads' businesses may be harmed by required compliance with anti-terrorism measures and regulations at the DWT**

Following the 2001 terrorist attacks on the United States, a number of federal, state and local authorities have implemented various security measures, including checkpoints and travel restrictions, particularly on international travel. Although many companies may be adversely affected by additional international travel restrictions, the negative impact could affect the DWT disproportionately, since the DWT crosses an international border. For example, increased security measures at the DWT could cause additional expense and disrupt or impede travel through the Detroit-Windsor corridor due to additional delays or inconvenience. Any additional expense could reduce cash available for debt service and any delay or inconvenience could reduce traffic volumes which could have an adverse effect on the revenues at the DWT.

(s)    **Currency risk between the Canadian dollar and the U.S. dollar could have an adverse effect on the revenues collected by the DWT**

A portion of the tolls from the DWT are collected in Canadian dollars, which exposes American Roads to currency risk. If the Canadian dollar depreciates against the U.S. dollar, that portion of the revenue from tolls collected in Canadian dollars would be effectively reduced.

(t)    **Market factors affecting traffic volumes that are beyond American Roads' control may have an adverse effect on revenues**

Tolls collected from the operation of the Toll Facilities constitute substantially all of American Roads' operating revenues. Toll revenues depend on the number of vehicles that travel on the Toll Facilities and the toll rates being charged. Traffic volume depends on, and may be affected by, a wide variety of factors, many of which are not within American Roads' control, such as demographic changes, economic growth, increasing fuel prices, government macroeconomic policies, social instability, competition from untolled or public transportation, and other factors prevalent in the areas in which the Toll Facilities operate. In addition, the DWT crosses the international border between the United States and Canada, and any restrictions on travel or commerce between the United States and Canada would also negatively affect the DWT and, as a result, American Roads' businesses. Specifically, U.S. and/or Canadian governments could elect to impose additional border control policies, which may result in an increase of entry and exit controls.  If any of these negative factors were to occur, the number of vehicles traveling on the Toll Facilities may not increase as forecast or may decrease. Failure to meet forecast traffic volumes on the Toll Facilities may impact revenues.

(u)    **Presently unidentified environmental matters could give rise to potential liability in the future**

The operations at each of the Toll Facilities are subject to various environmental laws and regulations, including those relating to the discharge of pollutants, the treatment, transport, storage and disposal of solid and hazardous wastes, and the remediation of soil and groundwater contamination. While American Roads believes the Toll Facilities are in material compliance with applicable environmental requirements, American Roads cannot be certain that it has identified all environmental matters giving rise to potential liability. The past use of hazardous materials by the prior owners of the Toll Facilities, new releases of hazardous substances, or more stringent future environmental requirements (or different methods of enforcing existing requirements) could result in expenditures or liabilities which could have an adverse effect on American Roads' businesses or financial condition. In addition, while American Roads believes that liabilities arising from such conditions in existence prior to its acquisition of the Toll Facilities are the responsibility of the entities who sold the Toll Facilities to it under the relevant purchase agreements and environmental laws, if for any reason American Roads is unable to enforce these provisions, there could be a material adverse effect on American Roads' businesses or financial condition.

**(v)      Disruption of the Toll Facilities' automated toll accounting and administrative systems would harm the Debtors' businesses**

The Toll Facilities are managed in part by hardware and software which account for and administer the collection of toll revenue. In the event that these systems malfunctioned and could not be restored quickly, American Roads would need to identify and implement new systems to replace those that are currently in use.  The time and expense associated with identifying and deploying new systems could be significant and could harm American Roads' businesses.

**(w)      The Debtors may be adversely affected by changes in applicable law or governmental regulation**

The Debtors' businesses are not currently subject to an extensive governmental regulatory regime, other than laws and regulations of general application, such as laws and regulations relating to environmental protections, employee benefits, construction and similar general matters. If a regulatory regime applicable to the business of any of the Debtors is implemented, or if the laws and regulations of general application change, one or more of the Debtors may not be able to comply with such a regulatory regime or changes in such laws or regulations. This noncompliance could have an adverse effect on American Roads ability to operate the Toll Facilities in a cost-effective manner.

**(x)      The Tube Lease and Sublease of the DWT each expire in 2020 and the Joint Operating Agreement with Windsor may be terminated with 90 days' notice**

DWT LLC operates the DWT pursuant to the Tube Lease, Sublease between DWT LLC and the City of Detroit LLC and the Joint Operating Agreement between DWT LLC and Windsor.  The DWT accounts for nearly 50% of the Debtors' total revenue. Both the Tube Lease and the Sublease expire on November 3, 2020 and the Joint Operating Agreement may be terminated at any time by any of the parties thereto upon 90 days' notice.  The failure to renew the Tube Lease and Sublease on terms and conditions favorable to DWT LLC and/or the termination of the Joint Operating Agreement would have a material and adverse impact on the Debtors' businesses, financial condition and results of operations.

**(y)      The General Services Administration may terminate its lease with DWT**

DWT LLC leases an offsite property to the General Services Administration (the "GSA") for use by the U.S. Border Patrol. GSA has indicated that it may terminate its lease with DWT LLC and move the U.S. Border Patrol to a newly constructed government-owned facility.  If GSA elects to terminate its lease with DWT LLC, there is a risk that DWT LLC may not be able to identify a new tenant without substantial delay, if at all, which, in either case, would adversely impact DWT LLC's business, financial condition and results of operations.

**(z)      Detroit has filed for bankruptcy**

On June 14, 2013, the City of Detroit defaulted on certain of its indebtedness.  In connection with the default, the State-appointed Emergency Manager (the "EM") of the City of Detroit proposed a debt restructuring plan that involves the retirement of certain of the city's outstanding indebtedness at a substantial discount.  On July 18, 2013 the City of Detroit filed for chapter 9 bankruptcy protection, which is the largest municipal bankruptcy in U.S. history.  These actions and other potential actions of the EM relating to the restructuring of the City of Detroit's debt may result in any of the following:

- a decline in economic conditions, population and/or employment in and around the City of Detroit;

- decreased U.S.-Canadian cross-border travel to and from Detroit, including traffic through the DWT;

- increased lease payments in respect of the DWT;

- early termination of Tube Lease and Sublease relating to the DWT; and/or

- the sale of the DWT by the City of Detroit to a third party;

any of which, individually or in the aggregate, may have an adverse impact on American Roads' businesses, financial condition and results of operation.

**8.4    Risk Factors Relating to Bondholders that Elect Not to Tender Their Bonds to the Reorganized Debtors After Confirmation**

The following provides a summary of various important considerations and risk factors that may apply to Bondholders who elect not to tender their Bonds to Reorganized American Roads in accordance with the Bond Release Offer described in Section 4.3 of the Plan.

**(a)    The Bonds will no longer be secured by the assets of the Debtors and payments on the Bonds will only be made with proceeds of draws on the Bond Policies**

Except as otherwise provided for in the Plan and effective as of the Effective Date, all Claims and Interests will be discharged and released as more fully set forth in Section 8.1 of the Plan.  Holders of Allowed Bondholder Claims will receive no property or distributions under the Plan on account of such Claims and the Debtors shall be discharged from such Claims.  Accordingly, Bondholders who elect not to participate in the Bond Release Offer will only receive payments of principal and interest in respect of their Bonds out of proceeds received by the Collateral Agent from claims on the related Bond Policy in accordance with the original payment schedule set forth in the Indenture.

In addition, as a result of the release and discharge of the Debtors' obligations with respect to the Bonds, the Bonds will not be remarketed as contemplated by the Indentures.  Therefore, principal amounts of the Bonds will, in each case, be paid in accordance with the Alternative Payment Schedule (as defined in the Indentures) in accordance with the terms of the Indentures and the Bond Policies.

**(b)    A decline in Syncora's financial condition or the liquidation, rehabilitation or receivership of Syncora may  reduce the value of the Bonds and may impair the ability of Syncora to make payments under the Bond Policies**

Any decline in the financial condition or rating of Syncora or the liquidation, rehabilitation or receivership of Syncora may result in the reduction of the value of the Bonds and may impair the ability of Syncora to make payments to the Collateral Agent pursuant to the Bond Policies.  In addition, since the Bond Policies do not provide for acceleration of any amounts due thereunder, including in the event of the liquidation or rehabilitation of Syncora, under insurance insolvency proceedings, it is possible that the Collateral Agent, in its capacity as indenture trustee under the Indentures, would be unable to recover the full amount due under the Bond Policies on its unsecured claim against Syncora.  If Syncora defaults on its payment obligations under the Bond Policies or becomes subject to a receivership or similar proceeding, the Bondholders may not receive amounts due on the Bonds.

**(c)    Syncora does not publish GAAP financial statements**

Syncora is not registered under the Securities Exchange Act of 1934, as amended, and does not publish financial statements prepared in accordance with accounting principles generally acceptable in the United States. Syncora, as a New York domiciled financial guarantee insurance company, prepares its statutory basis financial statements in accordance with accounting practices prescribed or permitted by the New York State Department of Financial Services (the "NYDFS" and such financial statements referred to herein as "Statutory-Basis Financial Statements"). The NYDFS recognizes only statutory accounting practices prescribed or permitted by the State of New York for determining and reporting the financial condition and results of operations of an insurance company and for determining its solvency under insurance law. The National Association of Insurance Commissioners ("NAIC") Accounting Practices and Procedures manual ("NAIC SAP") has been adopted as a component of prescribed or permitted practices by the State of New York. The state has adopted certain prescribed accounting practices that differ with those found in NAIC SAP. The NYDFS has the right to permit other specific practices that deviate from prescribed practices.   Syncora's Statutory-Basis Financial Statements can be found at www.syncora.com.

49

    (d)    **Impact of Interest Rates**

Changes and volatility in interest rates may affect the market value of the Bonds. The Bonds carry floating interest rates which are tied to the London Interbank Offer Rate ("LIBOR"). LIBOR is the rate at which many banks borrow and lend money with other banks. LIBOR may be increased in response to certain market conditions, resulting in higher interest costs for Syncora in connection with Syncora's payments to any Bondholder under the Bond Policies.  LIBOR is currently at historically low levels, increasing the potential risk of an increase in rate.

**8.5**    **Disclosure Statement Disclaimer**

    (a)    **Information Contained Herein is for Soliciting Votes**

The information contained in this Disclosure Statement is for the purpose of soliciting acceptances of the Plan and may not be relied upon for any other purpose, *provided that*, in the case of Bondholders only, the information included in this Disclosure Statement may also be relied upon for the purpose of determining whether to accept the Bond Release Offer.

    (b)    **Disclosure Statement May Contain Forward Looking Statements**

This Disclosure Statement may contain "forward-looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate," or "continue," or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward-looking statements are necessarily speculative, and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The Liquidation Analysis, distribution projections and other information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

    (c)    **No Legal or Tax Advice Is Provided to You by This Disclosure Statement**

THIS DISCLOSURE STATEMENT IS NOT LEGAL ADVICE TO YOU.  The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each holder of a Claim should consult his or her own legal counsel and accountant with regard to any legal, tax, and other matters concerning his or her Claim.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to Confirmation.

    (d)    **No Admissions Made**

The information and statements contained in this Disclosure Statement will neither (1) constitute an admission of any fact or liability by any entity (including the Debtors) nor (2) be deemed evidence of the tax or other legal effects of the Plan on the Debtors, holders of Allowed Claims or Interests, or any other parties-in-interest.

    (e)    **Failure to Identify Litigation Claims or Projected Objections**

No reliance should be placed on the fact that a particular litigation Claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement.  The Debtors reserve the right to continue to investigate Claims and Interests and file and prosecute objections to Claims and Interests.

    (f)    **No Waiver of Right to Object or Right to Recover Transfers and Assets**

The vote by a holder of an Allowed Claim or Interest for or against the Plan does not constitute a waiver or release of any Claims or rights of the Debtors to object to that holder's Allowed Claim or Interest, or to bring Causes of Action or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified herein.

(g)    **Information Was Provided by the Debtors and Was Relied Upon by the Debtors' Advisors**

Counsel to and other advisors retained by the Debtors have relied upon information provided by the Debtors in connection with the preparation of this Disclosure Statement. Although counsel to and other advisors retained by the Debtors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained herein.

(h)    **Potential Exists for Inaccuracies and the Debtors Have No Duty to Update**

The Debtors make the statements contained in this Disclosure Statement as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since such date. Although the Debtors have used their reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Debtors nonetheless cannot, and do not, confirm the current accuracy of all statements appearing in this Disclosure Statement. Further, although the Debtors may subsequently update the information in this Disclosure Statement, the Debtors have no affirmative duty to do so unless ordered by the Bankruptcy Court.

(i)    **No Representations Outside of the Disclosure Statement Are Authorized**

No representations concerning or relating to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.

## ARTICLE IX
## IMPORTANT SECURITIES LAW DISCLOSURE

Under the Plan, the Reorganized Debtors will issue, on the Effective Date, Reorganized Equity Units of Reorganized American Roads for the benefit of the Collateral Agent. All such shares will be duly authorized, validly issued, fully paid, and non-assessable.

The offering, issuance, and distribution of any Securities, will be in compliance with the registration requirements of the Securities Act or exempt from the registration requirements of section 5 therein pursuant to section 1145 of the Bankruptcy Code, section 4(a)(2) of the Securities Act, or any other available exemption from registration under the Securities Act, as applicable. Section 1145 of the Bankruptcy Code exempts from registration the sale of a debtor's Securities under a chapter 11 plan if such Securities are offered or sold in exchange for a claim against, or equity interests in, or a claim for an administrative expense in a case concerning, such debtor. Under this exemption, Reorganized Equity Units of Reorganized American Roads generally will be exempt from the registration requirements of the Securities Act. Accordingly, recipients will be able to resell the Reorganized Equity Units of Reorganized American Roads without registration under the Securities Act or other federal securities laws, unless the recipient is an "underwriter" with respect to such Securities, within the meaning of section 1145(b)(1) of the Bankruptcy Code or similar federal, state, local, or foreign laws. In addition, under section 1145 of the Bankruptcy Code, if applicable, any Securities issued under the Plan will be freely transferable under the Securities Act by the recipients thereof, subject to: (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an "underwriter" in section 2(a)(11) of the Securities Act, and in compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the SEC, if any, applicable at the time of any future transfer of such Securities or instruments; (2) the restrictions, if any, on the transferability of such Securities and instruments; and (3) any other applicable regulatory approval.

Section 1145(b)(1) of the Bankruptcy Code defines an "underwriter" as any person who: (1) purchases a claim against, an interest in, or a claim for an administrative expense in the case concerning, the debtor, if that purchase is with a view to distributing any Security received in exchange for such a claim or interest; (2) offers to sell Securities offered under a plan of reorganization for the holders of those Securities; (3) offers to buy those Securities from the holders of the Securities, if the offer to buy is (a) with a view to distributing those Securities and (b) under an agreement made in connection with the plan of reorganization, or with the offer or sale of Securities under the plan of reorganization; or (4) is an "issuer" with respect to the Securities, as the term "issuer" is defined in section 2(a)(11) of the Securities Act.

To the extent that entities who receive Reorganized Equity Units of Reorganized American Roads are deemed to be "underwriters," resales by such Entities may not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Those Entities may, however, be permitted to

sell Reorganized Equity Units of Reorganized American Roads without registration, subject to the provisions of Rule 144 under the Securities Act, which permit the public sale of securities received pursuant to a plan of reorganization by "underwriters," subject to the availability to the public of current information regarding the issuer, volume limitations and certain other conditions.  Whether or not any Entity would be deemed to be an "underwriter" with respect to any Security to be issued pursuant to the Plan would depend upon various facts and circumstances applicable to that Entity.   Accordingly, the Debtors express no view as to whether any Entity would be an "underwriter" with respect to any Security to be issued pursuant to the Plan.  YOU SHOULD CONFER WITH YOUR OWN LEGAL ADVISORS TO HELP DETERMINE WHETHER OR NOT YOU ARE AN "UNDERWRITER".

### ARTICLE X
### CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

**10.1**     **Introduction**

The following is a general discussion of the material U.S. federal income tax consequences of the Plan to the Debtors and to holders (which for purposes of this discussion, include beneficial owners) of certain Claims.  The discussion is based on the IRC, the U.S. Treasury Regulations promulgated thereunder, judicial authorities, published administrative positions of the U.S. Internal Revenue Service (the "IRS") and other applicable authorities, all as in effect on the date of this Disclosure Statement, and all of which are subject to change or differing interpretations, possibly with retroactive effect.  Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below.  No opinion of counsel has been obtained and the Debtors do not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below.  The discussion below is not binding upon the IRS or the courts.  No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.  This summary does not apply to holders of Claims that are not "U.S. persons" (as such phrase is defined in the IRC).  This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtors or to certain holders in light of their individual circumstances.  This discussion does not address tax issues with respect to holders subject to special treatment under the U.S. federal income tax laws (including, for example, banks, governmental authorities, or agencies, pass-through entities, subchapter S corporations, dealers and traders in securities or currencies, insurance companies, financial institutions, tax-exempt organizations, small business investment companies, foreign taxpayers, persons who are related to the Debtors within the meaning of the IRC, persons using a mark-to-market method of accounting, holders of Claims who are themselves in bankruptcy, persons who received their Claims pursuant to the exercise of an employee stock option or otherwise as compensation, and regulated investment companies, entities treated as partnerships for U.S. federal income tax purposes (and partners therein) and those holding Claims as part of a hedge, straddle, conversion or other integrated transaction).  No aspect of state, local, estate, gift, or non-U.S. net income taxation is addressed in this discussion.  Furthermore, this summary assumes that a holder of a Claim holds only Claims in a single Class and holds the Claim as a "capital asset" (within the meaning of section 1221 of the IRC).  This summary also assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.  Further, this discussion assumes that the transaction will be completed as further described in this document.

This discussion does not address the U.S. federal income tax consequences to holders of Claims except as expressly provided herein.  Specifically, it does not address the U.S. federal income tax consequences to holders of the Swap Policies Claim of receiving one hundred percent (100%) of the Reorganized Equity Units of Reorganized American Roads in full and final satisfaction and discharge of the Swap Policies Claim.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM.  ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN.**

**INTERNAL REVENUE SERVICE CIRCULAR 230 DISCLOSURE**:  TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX RELATED PENALTIES UNDER THE IRC.  TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN IN CONNECTION WITH THE PROMOTION OR MARKETING OF THE PLAN OR MATTERS ADDRESSED BY THE DISCLOSURE STATEMENT.  EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

**10.2    Certain U.S. Federal Income Tax Consequences of the Plan to the Debtors**

In general, a debtor will realize and recognize cancellation of debt income ("COD Income") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness.  The debtor will not, however, be required to include any amount of COD Income in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding.  Instead, as a consequence of such exclusion, the debtor must reduce certain tax attributes by the amount of COD Income that it excluded from gross income pursuant to section 108 of the IRC to the extent that the debtor still has such tax attributes as of the first day of the taxable year immediately following the year in which the COD Income was realized.  Under proposed U.S. Treasury Regulations that purport to clarify current law, Holdco generally will be treated as the debtor with respect to the Allowed Claims for the purpose of applying the COD Income rules described above.  Therefore, COD Income realized upon the Effective Date as a result of the Plan should not increase the gross income of the Reorganized Debtors for U.S. federal income tax purposes and should not have a material effect on the tax attributes of any Reorganized Debtor other than Reorganized Holdco.

**10.3    Certain U.S. Federal Income Tax Consequences of the Plan to Holders of Bondholder Claims**

Pursuant to the Plan, holders of Bondholder Claims shall receive no property or distributions under the Plan on account of such Claims, and on the Effective Date, the obligations of the Debtors or Reorganized Debtors under or in any way related to all notes, instruments, certificates, and other documents evidencing Bondholder Claims, shall be discharged; provided, that, such discharge shall not affect the right of a Bondholder to receive any payments from the Collateral Agent pursuant to the Bond Policies, which shall remain in full force and effect, or to participate in the Bond Release Offer.

**(a)    Discharge of the Debtor's Obligations**

Because the Bond Policies remain in effect to protect the holders of Bondholder Claims from losses in respect of the Bonds, a holder of a Bondholder Claim should not recognize gain or loss as the result of the discharge of the obligations of the Debtors and Reorganized Debtors pursuant to the Plan, but instead should postpone any recognition of gain or loss until its rights under the Bondholder Policies are settled, adjudicated or disposed of in a taxable disposition  (including pursuant to the Bond Release Offer).   In addition, a holder of a Bondholder Claim should continue to include stated interest on the Bondholder Claim as ordinary income in its gross income for U.S. federal income tax purposes, in accordance with the holder's regular method of tax accounting at the time the interest accrues or is paid under the Bond Policies and, as applicable, any inclusions of market discount or deductions of amortized bond premium in respect of the Bondholder Claim.

**(b)    Adjudication or Settlement of a Claim Under the Bond Policies**

As discussed above, in the taxable year in which a holder's claim under the Bond Policies for payments in respect of an underlying Bondholder Claim is adjudicated, settled  or otherwise disposed of in a taxable disposition (including pursuant to the Bond Release Offer), the holder generally should recognize capital gain or loss equal to the difference between the amount it realizes pursuant to the adjudication, settlement or disposition (other than any portion of the amount that is treated as attributable to accrued but unpaid interest, which will be included in gross income as described below) and its adjusted tax basis in the underlying Bondholder Claim at such time.   A holder's adjusted tax basis in a Bondholder Claim generally will equal the acquisition cost of the Claim to the holder, increased by any amounts previously included in income by the holder as market discount and reduced by any previously amortized bond premium.  Such gain or loss generally would be long-term capital gain or loss if the

53

holder's holding period with respect to the underlying Bondholder Claim is more than one year as of the time of the adjudication, settlement or disposition. For non-corporate holders, reduced tax rates may apply to gain recognized as long-term capital gain. The deductibility of capital losses by a holder is subject to limitations.

**(c)**    **Accrued Interest**

To the extent a holder receives, as a result of the adjudication or settlement of a claim under the Bond Policies, an amount that is treated as attributable to accrued but unpaid interest on an underlying Bondholder Claim that has not previously been included in gross income for U.S. federal income tax purposes, the holder would include the amount as ordinary income in its gross income for U.S. federal income tax purposes. Conversely, the holder may be able to recognize a loss to the extent that any accrued interest constituting the underlying Bondholder Claim was previously so included in the holder's gross income but was not paid in full.

**10.4**    **Withholding and Reporting**

In general, information reporting requirements may apply to distributions or payments made to a holder of an Allowed Claim (including a payment under the Bond Policies or in respect of the Bond Release Offer). Additionally, backup withholding, currently at a rate of 28%, will generally apply to such payments if a holder fails to provide an accurate taxpayer identification number or otherwise fails to comply with the applicable requirements of the backup withholding rules. Any amounts withheld under the backup withholding rules will be allowed as a credit against such holder's U.S. federal income tax liability and may entitle such holder to a refund from the IRS, provided that the required information is provided to the IRS.

In addition, from an information reporting perspective, U.S. Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

**THE FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTIONS CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL OR NON-U.S. TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**


**ARTICLE XI**
**CONFIRMATION PROCEDURES**

The following is a brief summary of the Confirmation process. Holders of Claims are encouraged to review the relevant provisions of the Bankruptcy Code and to consult with their own advisors.

**11.1**    **The Confirmation Hearing**

Section 1128(a) of the Bankruptcy Code provides that the Bankruptcy Court, after notice, may conduct the Confirmation Hearing to consider Confirmation. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation.

**11.2**    **Confirmation Standards**

Among the requirements for the Confirmation are that the Plan is accepted by all Impaired Classes of Claims and Interests, or if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class, is feasible, and is in the "best interests" of holders of Claims and Interests that are Impaired under the Plan. The following requirements must be satisfied pursuant to section 1129(a) of the

Bankruptcy Code before the Bankruptcy Court may confirm a plan of reorganization.  The Plan fully complies with the statutory requirements for Confirmation listed below.

- The proponents of the Plan have complied with the applicable provisions of the Bankruptcy Code.

- The Plan has been proposed in good faith and not by any means forbidden by law.

- Any payment made or to be made by the Debtors (or any other proponent of the Plan) or by a Person issuing Securities or acquiring property under the Plan, for services or for costs and expenses in or in connection with the Chapter 11 Cases, in connection with the Plan and incident to the Chapter 11 Cases is subject to the approval of the Bankruptcy Court as reasonable.

- The Debtors (or any other proponent of the Plan) have disclosed the identity and affiliations of any individual proposed to serve, after Confirmation, as a director, officer, or voting trustee of the Reorganized Debtors, any Affiliate of the Debtors reorganized under the Plan, or any successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of Creditors and holders of Interests and with public policies.

- The proponent of the Plan has disclosed the identity of any Insider that will be employed or retained by the Reorganized Debtors and the nature of any compensation for such Insider.

- With respect to each holder within an Impaired Class of Claims or Interests, each such holder (a) has accepted the Plan or (b) will receive or retain under the Plan on account of such Claim or Interest property of a value, as of the Effective Date, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

- With respect to each Class of Claims or Interests, such Class (a) has accepted the Plan or (b) is Unimpaired under the Plan (subject to the "cram-down" provisions discussed below).

- The Plan provides for treatment of Claims, as applicable, in accordance with the provisions of section 507(a) of the Bankruptcy Code.

- If a Class of Claims is Impaired under the Plan, at least one Class of Claims that is Impaired under the Plan has accepted the Plan, determined without including any acceptance of the Plan by any Insider.

- Confirmation is not likely to be followed by the liquidation, or the need for further financial reorganization, the Reorganized Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

- All fees payable under 28 U.S.C. § 1930 have been paid or the Plan provides for the payment of all such fees on the Effective Date.

## 11.3    Best Interests Test/Liquidation Analysis

As described above, section 1129(a)(7) of the Bankruptcy Code requires that each holder of an Impaired Claim or Interest either (a) accept the Plan or (b) receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  Based on the Debtors' liquidation analysis, the Debtors believe that the value of any distributions if the Debtors' Chapter 11 Cases were converted to cases under chapter 7 of the Bankruptcy Code would be no greater than the value of distributions under the Plan.  As a result, the Debtors believe holders of Claims and Interests in all Impaired Classes will recover at least as much as a result of Confirmation as they would recover through a hypothetical chapter 7 liquidation.

## 11.4    Feasibility

The Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan of reorganization is not likely to be followed by liquidation or the need for further financial reorganization.  For purposes of determining

whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan. As part of this analysis, the Debtors have prepared projections, which, together with the assumptions on which they are based, are attached hereto as Exhibit B. Based on such projections, the Debtors believe that they will be able to make all payments required under the Plan. Therefore, Confirmation is not likely to be followed by liquidation or the need for further reorganization.

**11.5    Confirmation Without Acceptance by All Impaired Classes**

The Bankruptcy Court may confirm a plan of reorganization over the rejection or deemed rejection of the plan of reorganization by a class of claims or interests if the plan of reorganization "does not discriminate unfairly" and is "fair and equitable" with respect to such class.

**(a)    No Unfair Discrimination**

This test applies to Classes of Claims or Interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair". The Debtors do not believe the Plan discriminates unfairly against any Impaired Class of Claims or Interests. The Debtors believe the Plan and the treatment of all Classes of Claims and Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation.

**(b)    Fair and Equitable Test**

This test applies to Classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no Class of Claims or Interests receive more than 100% of the amount of the allowed Claims or Interests in such Class. As to the dissenting Class, the test sets different standards depending on the type of Claims or Interests of the Debtor in such Class. In order to demonstrate that a plan is fair and equitable, the plan proponent must demonstrate:

- Secured Creditors: Each holder of a secured claim either (1) retains its liens on the property, to the extent of the allowed amount of its secured claim and receives deferred cash payments having a value, as of the effective date of the chapter 11 plan, of at least the allowed amount of such claim, (2) has the right to credit bid the amount of its claim if its property is sold and retains its liens on the proceeds of the sale (or if sold, on the proceeds thereof), or (3) receives the "indubitable equivalent" of its allowed secured claim.

- Unsecured Creditors: Either (1) each holder of an impaired unsecured claim receives or retains under the chapter 11 plan property of a value equal to the amount of its allowed claim or (2) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the chapter 11 plan.

- Equity Interests: Either (1) each holder of an interest will receive or retain under the chapter 11 plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled, or the value of the interest or (2) the holder of an interest that is junior to the non-accepting class will not receive or retain any property under the chapter 11 plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement notwithstanding that certain Classes of Claims and Interests are deemed to reject the Plan, because, as to such Class, there is no Class of equal priority receiving more favorable treatment and no Class that is junior to such a dissenting Class will receive or retain any property on account of the Claims in such Class.

**ARTICLE XII
ALTERNATIVES TO
CONFIRMATION AND CONSUMMATION OF THE PLAN**

If the Plan cannot be confirmed, the Debtors may seek to (1) prepare and present to the Bankruptcy Court an alternative chapter 11 plan for confirmation, (2) effect a merger or sale transaction, including, potentially, a sale of all or substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (3) liquidate the

Debtors under chapter 7 of the Bankruptcy Code.  If the Debtors were to pursue a liquidation, the Chapter 11 Cases would be converted to cases under chapter 7 of the Bankruptcy Code and a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution in accordance with the priorities established by the Bankruptcy Code.  A discussion of the effects that a chapter 7 liquidation would have on Creditors' recoveries and the Debtors is described in the unaudited liquidation analysis attached hereto as Exhibit E.

## ARTICLE XIII
## CONCLUSION AND RECOMMENDATION

The Debtors urge all holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their ballots and master ballots so they will be received by the Claims and Solicitation Agent no later than 4:00 p.m. prevailing Eastern Time on July 24, 2013.

Dated:  July 23, 2013

Respectfully submitted,

AMERICAN ROADS LLC

*/s/ Neal Belitsky*
Name: Neal Belitsky
Title: Chief Executive Officer

AMERICAN ROADS HOLDING LLC

*/s/ Neal Belitsky*
Name: Neal Belitsky
Title: Chief Executive Officer

ALABAMA TOLL OPERATIONS, LLC

*/s/ Neal Belitsky*
Name: Neal Belitsky
Title: President

THE BALDWIN COUNTY BRIDGE COMPANY, L.L.C.

*/s/ Neal Belitsky*
Name: Neal Belitsky
Title: Chief Executive Officer

ALABAMA EMERALD MOUNTAIN EXPRESSWAY BRIDGE, LLC

*/s/ Neal Belitsky*
Name: Neal Belitsky
Title: President

CENTRAL ALABAMA RIVER PARKWAY, LLC

/s/ Neal Belitsky
Name: Neal Belitsky
Title: President

ALABAMA BLACK WARRIOR PARKWAY, LLC

/s/ Neal Belitsky
Name: Neal Belitsky
Title: President

DETROIT WINDSOR TUNNEL LLC

/s/ Neal Belitsky
Name: Neal Belitsky
Title: President

DWT, Inc.

/s/ Neal Belitsky
Name: Neal Belitsky
Title: President

American Roads Technologies, Inc.

/s/ Neal Belitsky
Name: Neal Belitsky
Title: President

Prepared by:

**CLEARY GOTTLIEB STEEN &
HAMILTON LLP**
Sean A. O'Neal
Louis A. Lipner
One Liberty Plaza
New York, New York  10006
Telephone:  (212) 225-2000
Facsimile:  (212) 225-3999

*Proposed Counsel to the Debtors and Debtors in Possession*

**APPENDIX:**
**RULES OF INTERPRETATION, COMPUTATION OF TIME,**
**GOVERNING LAW, AND OTHER REFERENCES**

**1.      Rules of Interpretation**

For purposes of the Disclosure Statement: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference herein to an existing document, schedule, or exhibit, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) unless otherwise specified, all references herein to "Articles" are references to Articles hereof or hereto; (e) the words "herein," "hereof," and "hereto" refer to the Disclosure Statement in its entirety rather than to any particular portion of the Disclosure Statement; (f) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of the Disclosure Statement; (g) unless otherwise specified herein, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

**2.      Computation of Time**

Bankruptcy Rule 9006(a) applies in computing any period of time prescribed or allowed herein.

**3.      Governing Law**

Except to the extent the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, lease, instrument, release, indenture, or other agreement or document entered into expressly in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to conflict of laws principles.

**4.      Reference to Monetary Figures**

All references in the Disclosure Statement to monetary figures refer to currency of the United States of America, unless otherwise expressly provided.

**5.      Reference to the Debtors or the Reorganized Debtors**

Except as otherwise specifically provided in the Disclosure Statement to the contrary, references in the Disclosure Statement to the Debtors or to the Reorganized Debtors mean the Debtors and the Reorganized Debtors, as applicable, to the extent the context requires.