SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
Larry J. Nyhan
Bojan Guzina
Andrew F. O'Neill
Allison Ross Stromberg

 - and -

SIDLEY AUSTIN LLP
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile:  (212) 839-5599
Nicholas K. Lagemann
Brian J. Lohan

*Counsel for the Ad Hoc Committee of Bondholders*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- x
                                                         :
In re:                                                   :    Chapter 11
                                                         :
American Roads LLC, <u>et al.</u>,[1]                    :    Case No. 13-12412 (BRL)
                                                         :
                                                         :    Jointly Administered
                        Debtors.                         :
                                                         :
-------------------------------------------------------- x

### PRELIMINARY OBJECTION OF THE AD HOC COMMITTEE OF BONDHOLDERS TO APPROVAL OF THE DEBTORS' DISCLOSURE STATEMENT AND CONFIRMATION OF THE DEBTORS' JOINT PREPACKAGED CHAPTER 11 PLAN

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number, are: Alabama Black Warrior Parkway, LLC [2479], Alabama Emerald Mountain Expressway Bridge, LLC [2480], Alabama Toll Operations, LLC [2483], American Roads Holding LLC [3194], American Roads LLC [3196], American Roads Technologies, Inc. [2016], Central Alabama River Parkway, LLC [2478], Detroit Windsor Tunnel LLC [1794], DWT, Inc. [7182] and The Baldwin County Bridge Company L.L.C. [8933]. For the purpose of these cases, the service address for the Debtors is: 100 East Jefferson Avenue, Detroit, Michigan 48226.

TO THE HONORABLE BURTON R. LIFLAND,
UNITED STATES BANKRUPTCY JUDGE:

The Ad Hoc Committee of Bondholders (the "Ad Hoc Committee"), consisting of

certain holders of Series G-1 Senior Secured Bonds and Series G-2 Senior Secured Bonds issued

by American Roads LLC ("American Roads", and together with its affiliated debtors, the

"Debtors"), by and through its undersigned counsel, hereby submits this preliminary objection

(the "Objection") to approval of the Disclosure Statement for the Debtors' Joint Prepackaged

Chapter 11 Plan (the "Disclosure Statement") [Docket No. 22] and confirmation of the Debtors'

Joint Prepackaged Chapter 11 Plan (the "Plan")[2] [Docket No. 21].  In support of this Objection,

the Ad Hoc Committee respectfully states as follows:

## INTRODUCTION

One day prior to filing this Objection, the Ad Hoc Committee filed an emergency

motion (the "Motion to Adjourn") for an order adjourning the hearing on approval of the

Disclosure Statement and confirmation of the Plan, which is currently scheduled to commence at

10:00 a.m. Eastern Time on August 28, 2013.  Following the filing of this Objection, the Ad Hoc

Committee will be propounding targeted and reasonable discovery requests relating to the Plan

on the Debtors, certain of the Debtors' insiders, and Syncora Guarantee Inc. ("Syncora").  The

Ad Hoc Committee intends to supplement this Objection following the close of discovery.

The Ad Hoc Committee believes that there are no exigent circumstances that

necessitate, or justify, a fast-track confirmation process in these cases.  Far from being the

normal prepackaged plan of reorganization that leaves all non-consenting classes of creditors

unimpaired, the Plan before the Court is a classic "cram-down" plan that purports to effectuate a

---

[2] Capitalized terms used but not defined herein have the meanings assigned to such terms in the Plan.

conversion of 100% of the Debtors' funded debt into equity in the reorganized Debtors.  Under

the Plan, the new equity will be distributed to a single creditor – Syncora, in its capacity as the

holder of the Swap Policies Claim – while all other classes of creditors, including the

Bondholders, are impaired, conclusively deemed to reject the Plan, and entitled to receive no

recoveries of any kind from the Debtors' estates.   The Debtors, with Syncora's support, are

seeking to confirm the Plan under the guise of a "consensual prepackaged restructuring" in order

to avoid the scrutiny that is associated with a traditional plan confirmation process, where parties

in interest are afforded ample time to oppose the confirmation of the plan or to propose different

restructuring alternatives for the debtor.  But there is nothing consensual about the Plan and

nothing traditional about the prepetition transactions between the Debtors, certain of their

insiders and Syncora that led to the filing of these chapter 11 cases.  To the contrary, the Plan can

only be described as an improper attempt by Syncora to leverage its prepetition litigation claims

against certain of the Debtors's insiders into a forced restructuring that results in Syncora owning

100% of the reorganized Debtors' equity, the Bondholders losing all of their rights with respect

to the existing collateral, and the Debtors' insiders receiving the benefit of third-party releases.

          The Disclosure Statement is most notable for what it omits, which is any

discussion of (i) the prepetition lawsuit that Syncora had initiated in New York state court,

alleging, among other things, that the Debtors and certain of their insiders had defrauded

numerous creditors of the Debtors' estates or (ii) the circumstances that led to Syncora's

voluntary dismissal of its claims against the Debtors and their insiders at seemingly the same

time that the Debtors commenced their restructuring negotiations with Syncora.  This set of facts,

as discussed in greater detail below, certainly (at a minimum) leaves the impression that the Plan

is the result of a quid-pro-quo arrangement between Syncora and the Debtors' insiders that

would result in Syncora owning the reorganized company while the Debtors' insiders receive third-party releases that insulate them from the consequences of their own wrongdoing. In light of the seriousness of the claims against the Debtors and their insiders, it defies logic and common sense to assume that the underlying claims have no value to the Debtors' estates.

    The deficiencies in the Disclosure Statement pale in comparison to those in the Plan. As discussed below, the Plan is not confirmable for a variety of reasons, but its most glaring defect is that it improperly treats the Swap Policies Claim as senior in priority to the Bondholder Claims based on a plainly erroneous interpretation of the relevant Financing Documents. This is a fatal and irreparable defect. The Ad Hoc Committee submits that under no circumstances should more than a fraction of the Swap Policies Claim be entitled to priority over the Bondholder Claims, and the Ad Hoc Committee's investigation may very well determine that the entirety of the Swap Policies Claim should be treated as *pari passu* with the Bondholder Claims or even equitably subordinated to the Bondholder Claims pursuant to section 510(c) of the Bankruptcy Code. The factual record may also support designating Syncora's vote in favor of the Plan pursuant to section 1126(e) of the Bankruptcy Code, in which case there would be no accepting impaired class for purposes of confirmation under section 1129(b) of the Bankruptcy, or a conclusion that the Plan was not proposed in good faith. The Plan also should not be confirmed because it contains impermissibly broad third-party releases. For all of these reasons, as discussed in greater detail below, the Ad Hoc Committee respectfully requests that the Court deny the Debtors' request for approval of the Disclosure Statement and confirmation of the Plan.

## STATEMENT OF FACTS

### I.    General Background

1.    On July 25, 2013 (the "Petition Date"), American Roads and the other

Debtors filed voluntary petitions for relief under chapter 11 of the United States Code (the

"Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New

York (the "Court").  In addition to certain customary "first day" motions, Debtors filed the Plan

and Disclosure Statement on the Petition Date, along with their Motion for an Order (A)

Scheduling a Combined Hearing to Consider the Adequacy of the Disclosure Statement and

Confirmation of the Plan, (B) Establishing Deadlines and Procedures to File Objections to the

Disclosure Statement and Plan, (C) Approving the Form and Manner of Notice of the

Confirmation Hearing, (D) Establishing Procedures for Any Proposed Assumption and Cure of

Executory Contracts and Unexpired Leases Pursuant to the Plan, and (E) Granting Related Relief

(the "Scheduling Motion") [Docket No. 14].

2.    On the Petition Date, the Debtors also filed the Declaration of Neal

Belitsky in Support of First Day Motions and Applications in Compliance with Local Rule 1007-

2 (the "Belitsky Declaration") [Docket No. 3].

3.    On July 26, 2013, the Court granted the relief requested in the Scheduling

Motion (the "Scheduling Order") [Docket No. 40] and scheduled the Confirmation Hearing for

10 a.m. Eastern Time on August 28, 2013.

4.    The Debtors have approximately $830 million of funded debt, consisting

of Bonds with an aggregate principal amount of $496 million and Swaps with a termination

liability which the Debtors and Syncora have estimated at $334 million.  The Debtors' payment

obligations under the Bonds and the Swaps are guaranteed by Syncora, a monoline insurance

provider (See Belitsky Declaration, ¶¶ 41-42).

## II.    Syncora's Lawsuit Against American Roads and Certain of Its Insiders

5.    On April 18, 2012, Syncora commenced a lawsuit in New York State

Supreme Court against American Roads, Alinda Capital Partners LLC ("ACP"), the Debtors'

private equity sponsor, John S. Laxmi ("Laxmi") (a principal of ACP and a director of American

Roads), and Macquarie Securities (USA) Inc. ("Macquarie").  See Syncora Guarantee Inc. v.

Alinda Capital Partners LLC, et al., Index. No. 651258/2012 (Sup. Ct. N.Y. Co.).  Syncora's

complaint (the "Syncora Complaint"), filed on September 24, 2012, alleges that the defendants

had engaged in a massive fraud that hid the inability of the Debtors to generate sufficient funds

to service their debt.  According to the Syncora Complaint, if the Debtors' toll road assets could

not generate enough cash flow to service that debt, "the ones who would suffer were Syncora

and American Roads' bondholders" (Syncora Complaint, ¶ 77).  Pursuant to the Syncora

Complaint, Syncora brought claims for (i) fraud against ACP, American Roads and Macquarie;

(ii) negligent misrepresentation against ACP, American Roads and Macquarie; (iii) aiding and

abetting fraud against ACP, Macquarie and Laxmi; and (iv) breach of contract against American

Roads.  Syncora also sought a declaratory judgment in respect of its contractual relationship with

American Roads.  Upon information and belief, at the time the Syncora Complaint was filed, the

Debtors were in compliance with all applicable terms of the Financing Documents.

6.    On September 12, 2012, American Roads, Citibank, N.A. ("Citibank")

(the original counterparty under the Swaps), and Barclays Bank PLC ("Barclays") consummated

a novation transaction pursuant to which Barclays replaced Citibank as the counterparty under

the Swaps.  See Belitsky Declaration, ¶ 43.  In connection with the novation transaction,

"Syncora acquired the beneficial interest in the Swaps from Barclays and became entitled to the economic benefits of the Swaps and related Swap Policies."  Id.

7.     Upon information and belief, at the time Syncora "acquired the beneficial interest in the Swaps," the Debtors did not expect any Event of Default under the Financing Documents to occur at any point in the foreseeable future and were in compliance with all applicable terms of the Financing Documents.

8.     On May 3, 2013, Syncora voluntarily dismissed (without prejudice) its claims against American Roads, ACP and Laxmi, leaving Macquarie as the sole remaining defendant.  On July 11, 2013, the New York State Supreme Court denied Macquarie's motion to dismiss the Syncora Complaint, finding that the allegations contained in the Syncora Complaint, which were substantially the same allegations that Syncora had asserted against American Roads, ACP and Laxmi, were clearly sufficient to state a claim for fraud, aiding and abetting fraud, and negligent misrepresentation.  Syncora's action against Macquarie remains pending.

### III.    Prepetition Transactions Between the Debtors, Certain Insiders and Syncora

9.     According to the Debtors, "[n]egotiations between the Debtors, ACP and Syncora commenced in May 2013, resulting in the execution of the RPSA on July 17, 2013." Disclosure Statement, § 1.4 (emphasis added).  As mentioned above, the start of the negotiations between the Debtors, ACP and Syncora appears to have coincided with Syncora's dismissal (without prejudice) of its claims against American Roads, ACP and Laxmi.

10.     The Disclosure Statement further provides that the RPSA "contemplates a series of transactions occurring before and after the commencement of the Chapter 11 Cases." Id.  ACP and certain of its affiliates are parties to the RPSA.

11.     Upon information and belief, at the time the Debtors, certain of their insiders and Syncora entered into the RPSA, the Debtors had more than $50 million of cash with which to perform their payment obligations with respect to the Swaps and the Bonds.

12.     The RPSA required the Debtors and Syncora to take certain steps that are outlined in Exhibit B to the RPSA (titled "Steps Outline").  The first step the Debtors were required to take was to deliver to the Collateral Agent "an accounts transfer certificate that did not provide for the allocation of funds necessary to allow the Collateral Agent to make the Periodic Premium due on June 28, 2013 pursuant to Section 2.4(d) of the Insurance and Reimbursement Premium and the Premium Letter."  In other words, the Debtors were required by Syncora itself to refrain from paying the quarterly premium on Syncora's insurance policies. Upon information and belief, the amount of the quarterly premium was less than $750,000, and the Debtors had more than sufficient cash to timely make that payment.

13.     At approximately the same time as they were failing to pay the quarterly interest premium to Syncora, the Debtors timely made the multi-million dollar semi-annual payment that was due under the Swaps on June 28, 2013.  See Belitsky Declaration, ¶ 44.  As set forth in the Belitsky Declaration, the semi-annual payment was essentially made to Syncora given that Syncora had previously "acquired the beneficial interest" in the Swaps.  Id., ¶ 43.

14.     The RPSA further provides that, following the Debtors' failure to pay the quarterly insurance premium to Syncora, (i) an Event of Default would occur under Section 8.1(b) the Common Agreement and (ii) Syncora would thereafter terminate the Swaps, thereby triggering the "Permitted Swap Termination Payment" which the parties to the RPSA (including Syncora) determined should equal an amount of approximately $334 million.

15.     Immediately thereafter, the Debtors were required to deliver the agreed-
upon versions of the Disclosure Statement and the Plan to Syncora, along with a ballot entitling
Syncora to vote the Swap Policies Claim to accept the Plan.  See RPSA, Exhibit B at 2.

### IV.     Summary of the Plan

16.     According to the Debtors, the proposed distributions to creditors under the
Plan are based on the waterfall provisions set forth in Section 7.06(a) of the Collateral Agency
Agreement.  See Belitsky Declaration, ¶ 53.  Under the waterfall, according to the Debtors,
"distributions of proceeds of the Collateral in respect of any principal amount of the Bonds that
is then due and payable is subordinate in priority to any distributions to (i) the counterparty to the
Swaps in respect of any Permitted Swap Termination Payments and (ii) Syncora in respect of
any Enhancement Liabilities (as defined in the Collateral Agency Agreement) owed to Syncora
that arise under the Insurance and Reimbursement Agreement as a result of a payment by
Syncora of any such Permitted Swap Termination Payments pursuant to the Swap Policies."  Id.

17.     Under the Financing Documents, the Debtors' obligations with respect to
the Swaps are generally *pari passu* to their obligations with respect to the Bonds, except to the
extent the Financing Documents expressly provide otherwise.  See Section 2.02(a) of the
Collateral Agency Agreement.  However, once the Collateral Agent starts exercising rights and
remedies against the Collateral at the direction of the Instructing Senior Creditor, Section 7.06(a)
of the Collateral Agency Agreement provides that the Permitted Swap Termination Payments
and any Enhancement Liabilities with respect thereto (both terms as defined in the Collateral
Agency Agreement) will have a higher priority than the principal amount owed on the Bonds.

18.     The Plan is premised on three central arguments.  The first premise is that
the Debtors' non-payment of a quarterly insurance premium to Syncora on or about June 28,

9

2013 (in accordance with the terms of the RPSA, to which Syncora assented) resulted in an

Event of Default that authorized the Collateral Agent to exercise its rights and remedies, thereby

triggering the waterfall provisions under Section 7.06(a) of the Collateral Agency Agreement.

The second premise is that the occurrence of such Event of Default allowed Syncora to terminate

the Swaps and accelerate all amounts payable by the Debtors thereunder, resulting in a

termination liability of approximately $334 million.  Finally, the Plan is also premised on the

assumption that the entirety of the accelerated amounts payable under the Swaps constitutes  a

Permitted Swap Termination Payment that is senior in priority to the Bondholder Claims,

notwithstanding language in the G-2 Swap and other Financing Documents to the contrary.

19.    Accordingly, the Plan provides that Syncora will receive 100% of the

Reorganized Equity Units (i.e., the new equity interests in American Roads) in full and final

satisfaction and discharge of the Swap Policies Claim.  Bondholders and holders of General

Unsecured Claims will receive no distributions under the Plan and are conclusively deemed to

have rejected the Plan.  Such proposed allocation of the distributable value under the Plan is

premised upon a valuation analysis performed by the Debtors' financial advisor, Greenhill &

Co., Inc. ("Greenhill"), which estimates the going concern value of the Debtors as of the Petition

Date to be within a range from approximately $195 million to $215 million, with a mid-point

estimate of $205 million.  See Disclosure Statement, § 1.11.

20.    The Plan further provides that, on the Effective Date, each of the Debtors,

Syncora and the Collateral Agent shall conclusively and unconditionally release the Released

Parties (including ACP and certain of its affiliated funds and Laxmi, along with all other current

and former officers, directors and principals of either ACP or the Debtors) from any and all

claims and causes of action.  See Plan, §§ 8.2, 8.3.  Section 8.3 of the Plan specifically provides

that Syncora's release of the claims that it has asserted (or that it could have asserted) against American Roads, ACP and Laxmi will become binding on the Effective Date of the Plan.

21.     Under Section 8.5 of the Plan, all holders of Claims that are being discharged under the Plan (including Bondholder Claims and General Unsecured Claims, which are not entitled to receive any distributions under the Plan), shall be permanently enjoined from pursuing any claims or causes of action with respect to such Claims against any of the Released Parties (including, without limitation, ACP and certain of its affiliated funds and Laxmi, along with all other current and former officers, directors and principals of either ACP or the Debtors).

## ARGUMENT

22.     As set forth in its Motion to Adjourn, the Ad Hoc Committee believes that there are no exigent circumstances in these cases that necessitate a fast-track process to confirm the Plan in less than 30 days after the Petition Date.  In light of the potentially devastating impact that the Plan, if confirmed, would have on the rights of the Bondholders, the Ad Hoc Committee must be afforded a meaningful opportunity to develop the factual record supporting its objections to confirmation of the Plan and to properly investigate and evaluate (i) the prepetition transactions among the Debtors, certain of their insiders and Syncora that resulted in the filing of these cases, including the terms of the settlements that apparently underlie the Plan, and (ii) the propriety of the Debtors' request to release Syncora, ACP, Laxmi and other affiliated persons and entities from any third-party claims that may be asserted by the Debtors' creditors, including the Bondholders.  The Ad Hoc Committee must be given sufficient time to investigate and determine whether such proposed releases are fair and reasonable under the circumstances, and whether there are any viable causes of action that the Debtors' estates should pursue against such third parties in an effort to maximize recoveries for the Debtors' creditors.

11

23.     The limited factual record in these cases raises the following questions which must be answered before the Court considers whether the Plan should be confirmed:

- Why did Syncora "acquire the beneficial interest" in the Swaps in November 2012, and what consideration did it provide for such beneficial interest?

- Why did Syncora suddenly decide to dismiss its claims against American Roads, ACP and Laxmi in May 2013 while continuing its litigation against Macquarie?

- Why did the Debtors default on the payment of a quarterly insurance premium to Syncora at approximately the same time that they made a multi-million dollar semi-annual payment to Syncora with respect to the Swaps?

- Why did the Debtors decide to seek bankruptcy protection in July 2013, even though they had more than $50 million of cash on hand and were in compliance with all applicable provisions of the Financing Documents?

- What role did Syncora play in the Debtors' decision to fail to make the quarterly premium payment to Syncora in June 2013 and to thereafter seek bankruptcy protection and the confirmation of the Plan?

- What consideration, if any, has Syncora provided or promised to the Debtors and their insiders in exchange for the Debtors' efforts to confirm the Plan?

- If the Debtors had not defaulted under the Financing Documents as and when required under the RPSA, at what point would the Debtors have expected to no longer be in compliance with the terms of the Financing Documents?

- What amount did Syncora, in its capacity as the insurance provider, actually pay "out of pocket" to Barclays in respect of the Permitted Swap Termination Payments, given that, according to the Disclosure Statement, Syncora held the beneficial interest in the Swaps at all times that Barclays was the counterparty thereunder?

- What analyses, if any, did the Debtors perform to confirm the amount of the Swap Policies Claim as set forth in the Plan or the alleged priority of the entirety of the Swap Policies Claim over the Bondholder Claims?

- Do any actions that Syncora may have taken prior to the Petition Date amount to wrongdoing and/or bad faith that could justify an equitable subordination challenge with respect to Syncora's claims against the Debtors, or that could justify a designation of any vote that Syncora has cast in favor of the Plan?

- Do any actions by the Debtors' insiders prior to the Petition Date give rise to meritorious causes of action that the Debtors' estates should pursue?

- What analyses, if any, did the Debtors perform regarding the potential value of the causes of action the Debtors are seeking to release under the Plan?

- What, if any, "enforcement actions" has the Collateral Agent taken to date that could even arguably have triggered the waterfall provisions under Section 7.06(a) of the Collateral Agency Agreement?

- What are the factual predicates for Greenhill's conclusion that the reorganized Debtors, which will be free of any funded debt after the Effective Date, would have a going concern value with a mid-point of $205 million, and what assumptions did Greenhill rely on in reaching this conclusion?

- Was the Plan proposed in good faith as required by section 1129(a)(3) of the Bankruptcy Code?

24.     These and other related questions must be answered before the Plan can be considered on the merits, and there is simply no valid reason to rush through the confirmation process before the Ad Hoc Committee has had an opportunity to conduct its investigation.  For the time being, the Ad Hoc Committee will use this opportunity to present its preliminary objections to approval of the Disclosure Statement and confirmation of the Plan.

**I.     The Plan Improperly Treats the Swap Policies Claim as Senior in Priority to the Bondholder Claims, and Therefore Cannot Be Confirmed**

25.     As mentioned above, the Plan is premised upon an interpretation of the waterfall provisions set forth in Section 7.06(a) of the Collateral Agency Agreement that treats the entire Swap Policies Claim as a "Permitted Swap Termination Payment" which should be senior in priority to the Bondholder Claims.  In reality, the Financing Documents limit the term "Permitted Swap Termination Payments" to mean swap termination payments as and when due under the applicable swap documents, and the G-2 Swap expressly provides that the swap termination claim calculated thereunder is not payable in a lump sum but only in fractional installments.  In other words, contrary to the Debtors' assertion that Syncora has terminated the Swaps and accelerated all amounts due thereunder, the G-2 Swap by its express terms is not

13

subject to acceleration.  As a result, only the accelerated portion of the G-1 Swap – which the Ad

Hoc Committee believes should constitute only a fraction of the asserted swap termination

liability of $334 million – may constitute a Permitted Swap Termination Payment that would be

entitled to priority over the Bondholder Claims, with any amounts that become due and payable

under the G-2 Swap being *pari passu* with the Bondholder Claims.

26.    The prohibition on acceleration of the G-2 Swap is unambiguously set

forth in Section 5(ee) of the Schedule to the G-2 Swap:

> ***Notwithstanding anything to the contrary in this Agreement, if an Early Termination Date is designated hereunder*** (other than (x) following an Event of Default with respect to which Party A is the sole Defaulting Party or a Termination Event with respect to which Party A is the sole Affected Party or (y) following a Partial Early Termination pursuant to Part 5(p) herein) and there is a Party B Termination Amount, ***then such Party B Termination Amount***: (i) shall, beginning on the Early Termination Date, accrue interest thereafter at the relevant Termination Rate (as defined herein) from time to time; and (ii) ***shall be due and payable by Party B on the following basis: On each Party B Termination Payment Date, Party B shall pay to Party A the Party B Ordinary Termination Payment for such Party B Termination Payment Date and the Remaining Party B Ordinary Termination Amount shall be adjusted accordingly.***

(emphasis added)[3]

27.    The chief definitions for understanding this provision are "Party B",

"Party B Termination Payment Date," and "Party B Ordinary Termination Payment."  "Party B"

means American Roads.  A "Party B Termination Payment Date" means (i) one of the fixed

payment dates set forth on Annex A-3 to the G-2 Swap Confirmation on which American Roads

---

[3] The Steps Outline attached to the RPSA provides that Syncora, "in its capacity as back-to-back swap counterparty " will cause Barclays to "confirm the amount of the Permitted Swap Termination Payments pursuant to the calculation methodology set forth in Section 6(e)(ii) and Part 5(u) of the Schedule of the Interest Rate Hedging Agreements."  No mention is made of Section 5(ee) of the G-2 Swap notwithstanding that Section 5(ee) by its terms expressly overrides the other sections.  The Bondholders are entitled to discovery as to whether this omission was inadvertent – in which case the Plan is premised on a flawed interpretation of the G-2 Swap – or intentional, in which event the good faith of the parties to the RPSA may reasonably be called into question.

would have owed fixed payments to the counterparty had there been no early termination,[4] and (ii) any other date on which the Bondholders *receive a payment* in respect of the G-2 Bonds prior to the scheduled maturity date for such payment.[5]   Absent a Party B Termination Payment Date, <u>no</u> termination amounts are due and owing on, or payable under, the G-2 Swap by Party B, and on a Party B Termination Payment Date, only a portion of the termination amount – referred to in the document as a "Party B Ordinary Termination Payment" – is due and owing.

28.     A "Party B Ordinary Termination Payment" as of any Party B Termination Payment Date is  defined in one of two ways.  If the Party B Termination Payment Date is a fixed payment date as contemplated under clause (i) of the definition thereof, then the Party B Ordinary Termination Payment is calculated to equal the product of (a) the total termination amount under the G-2 Swap, multiplied by (b) a fraction, the numerator of which is the fixed amount that would have been paid on such date had no early termination occurred and the denominator of which is the sum of all the fixed amounts that would have been paid for the period from the Early Termination Date through the scheduled termination date had no early termination occurred.  However, if the Party B Termination Payment Date is triggered by a payment to Bondholders as contemplated under clause (ii) of the definition, then the Party B Ordinary Termination Payment is calculated to equal the product of (x) the total termination

---

[4] Annex A-3 provides for semi-annual payments on the G-2 Swap on June 30 and December 30 of each year, through December 31, 2029.  The dates, subject to differing final maturities, correspond to the interest and principal payment dates on the Bonds.

[5] The precise language of the definition set forth in the Schedule to the G-2 Swap defines Party B Termination Payment Date to mean "(A) each date that would have been a Fixed Rate Payer Payment Date for the Transaction hereunder but for the occurrence of an Early Termination Date, and (B) each date on which there is a payment due in respect of an acceleration, redemption or prepayment with respect to all or any portion of the Related Senior Indebtedness."  The term "<u>Related Senior Indebtedness</u>" is defined to mean the $298,000,000 in principal amount of the Series G-2 Senior Secured Bonds.

amount under the G-2 Swap, multiplied by (y) a fraction, the numerator of which is the principal *being paid to the Bondholders on such date* and the denominator of which is the total amount of the Bondholder debt outstanding immediately before such payment.  The fraction used to compute the total termination amount payable as of any Party B Termination Date under either of the two calculation methods is referred to in the document as the "Fixed Payment Ratio."[6]

29.    The obvious import of these provisions is that the Swap Counterparty may not, by virtue of terminating the G-2 Swap, accelerate its claim to a lump-sum termination amount so as to be paid out ahead of the Bondholders.  Instead, it must continue to be paid any termination amount over time, except on dates when the Bondholders are otherwise receiving an early repayment or prepayment on the Bonds.  This interpretation is wholly consistent with the priority provisions of the Collateral Agency Agreement.  As noted by the Debtors in the Disclosure Statement, Section 7.06(a) of the Collateral Agency Agreement subordinates payment of principal on the Bonds to "Permitted Swap Termination Amounts."  The latter term, however, is not defined as the full termination amount calculated under the Swaps but rather "the aggregate amounts payable, *as and when due,* by the Company … upon the designation of an 'Early Termination Date' thereunder"  (emphasis added) .  The G-2 Swap unambiguously provides that swap termination payments may only be paid on Party B Termination Payment Dates and that any such termination payment may not exceed the product of the "Fixed Payment Ratio" for such date times the total unpaid termination amount.  As a result, the Debtors' claim

---

[6]  The $334 million liability claimed by Syncora as a priority payment in respect of the Swaps represents the total termination liability under the G-1 and the G-2 Swaps as calculated under Section 6(e) of the Swaps without giving effect to the Fixed Payment Ratio.  Under the Plan as proposed, Bondholders are to receive nothing on account of their claims, which results in a Fixed Payment Ratio of zero.  Accordingly, under the provisions of the G-2 Swap, the termination amount payable to Syncora on that date should similarly be zero since zero times the total termination amount also equals zero.

that the full, lump-sum termination amount that may be owing to Syncora is due and payable,

and therefore senior in priority to the principal payments owed to Bondholders, mischaracterizes

the Financing Documents and renders the Plan patently unconfirmable.

**II.    The Collateral Agent Has Taken No Enforcement Actions
That Could Have Triggered the Proceeds Waterfall Under
Section 7.06(a) of the Collateral Agency Agreement**

30.    Even disregarding the express terms of the G-2 Swap, the Plan is not

confirmable because the proceeds waterfall under Section 7.06(a) of the Collateral Agency

Agreement, which affords priority to the Permitted Swap Termination Payments over the

principal amount that is owed on the Bonds, has not been triggered.

31.    Section 7.06(a) of the Collateral Agency Agreement provides that "all

proceeds received by the Collateral Agent pursuant to the exercise of any rights or remedies

accorded to the Collateral Agent <u>pursuant to, or by the operations of any of the terms of, any of

the Security Documents</u>, including insurance proceeds, condemnation proceeds <u>or proceeds from

the sale or disposition of Collateral or other Enforcement Action</u>" (emphasis added) shall be

applied, *inter alia*, to any Permitted Swap Termination Payments then due and payable before

any principal amounts owed on the Bonds can be paid.  The term "Enforcement Action" is

defined under Section 8.3(a) of the Common Agreement to include the following actions by the

Collateral Agent: (i) acceleration of the principal amount of the Senior Indebtedness, (ii)

termination of the Swaps and confirmation of any resulting Permitted Swap Termination

Payments, and (iii) foreclosure on any or all of the Collateral to enforce all remedies available to

the Collateral Agent pursuant to the Financing Documents or otherwise as a matter of law.

32.    Based on the Ad Hoc Committee's preliminarily assessment of the

available facts, it appears that the Collateral Agent has taken no "Enforcement Actions" of any

17

kind, nor has it exercised any of the rights or remedies accorded to it under the Security

Documents.  Indeed, as set forth in Exhibit D to the RPSA, it appears that Syncora has not

directed the Collateral Agent to take any actions that could possibly have triggered the proceeds

waterfall under Section 7.06(a) of the Collateral Agency Agreement.  Instead, the "Enforcement

Direction" that Syncora apparently provided to the Collateral Agent prior to the Petition Date

instructed the Collateral Agent to take (or refrain from taking) only the following actions:

(1)      to consent to the use of cash collateral by the Debtors and to observe,

honor and perform all obligations of the Collateral Agent under the cash collateral orders;

(2)      to not take any steps to oppose the confirmation of the Plan;

(3)      to take any actions in this Court as may be necessary or appropriate to

submit, or to facilitate the entry of, an order confirming the Plan; and

(4)      to observe, honor and perform the obligations of the Collateral Agent

under the Plan once confirmed by the Court and take all steps necessary to consummate

the Plan, including without limitation the distribution of 100% of the reorganized

Debtors' equity to Syncora or its designated affiliates.

33.      The Ad Hoc Committee respectfully submits that none of foregoing

actions (or non-actions) by the Collateral Agent constitute Enforcement Actions (or the exercise

of any rights or remedies accorded to the Collateral Agent under the Security Documents).

Indeed, the only actions that could even arguably constitute Enforcement Actions, such as the

purported termination of the Swaps prior to the Petition Date, were taken by Syncora and not the

Collateral Agent.  As a result, the waterfall provisions under Section 7.06(a) of the Collateral

Agency Agreement have not been triggered and, instead, the waterfall provisions under Section

2.2(a) of the Common Agreement should continue to govern the relative priority of the Swap

Policies Claim vis-à-vis the Bondholder Claims.  The Plan, accordingly, cannot be confirmed.

### III.   <u>It Appears That the Plan Has Not Been Proposed in Good Faith</u>

34.    Based on the Ad Hoc Committee's preliminary assessment of the

prepetition transactions and undisclosed settlements that underlie the Plan, it appears that the

Plan has not been proposed in good faith as required by section 1129(a)(3) of the Bankruptcy

Code.  The "central inquiry" for purposes of section 1129(a)(3) is whether, viewed in light of the

totality of the circumstances, the plan will "fairly achieve a result consistent with the objectives

and purposes of the Code."  <u>In re Rusty Jones, Inc.</u>, 110 B.R. 362, 375 (Bankr. N.D. Ill. 1990).

Courts have expanded on the good faith standard under section 1129(a)(3).   For example, in

<u>Stonington Partners, Inc. v. Official Comm. Of Unsecured Creditors (In re Lernout & Hauspie</u>

<u>Speech Prods., N.V.)</u>, the Delaware District Court summarized the good faith standard applicable

to the confirmation of a plan of reorganization as follows:

> The Bankruptcy Code does not define the term "good faith," but case law has
> defined the term as requiring, alternatively that (1) the plan be consistent with the
> objectives of the Bankruptcy Code; (2) the plan be proposed with honesty and
> good intentions and with a basis for expecting that reorganization can be
> achieved; or (3) there was fundamental fairness in dealing with creditors.

308 B.R. 672, 675 (D. Del. 2004).  Other courts have used similar tests with respect to the "good

faith" requirement.  <u>See</u> <u>In re Coram Healthcare Corp.</u>, 271 B.R. 228, 234 (Bankr. D. Del. 2001);

<u>In re Greate Bay Hotel & Casino, Inc.</u>, 251 B.R. 213, 237-38 (Bankr. D.N.J. 2000).

35.    Here, the proposed Plan appears to be the culmination of an undisclosed

settlement between Syncora, the Debtors and certain insiders of the Debtors of a prepetition

lawsuit alleging, among other things, that the Debtors and certain of their insiders had defrauded

numerous creditors of the Debtors' estates, including the Bondholders.  The Plan seeks to release

potentially valuable estate causes of action and enjoin creditors from pursuing such causes of

action in the future, while distributing 100% of the reorganized equity to Syncora based on (i) an

erroneous interpretation of the Financing Documents and (ii) a manufactured Event of Default

that seems to have occurred at Syncora's direction.  Although the complete factual record

remains to be developed through discovery, the Ad Hoc Committee's preliminary assessment of

the transactions that led to the filing of the Plan certainly indicates that the Plan was not

proposed in good faith and therefore violates section 1129(a) of the Bankruptcy Code.

IV.     **The Facts May Warrant Designating Syncora's Vote to Accept the Plan**

36.     The factual record in these cases may also warrant designating Syncora's

vote in favor of the Plan pursuant to section 1126(e) of the Bankruptcy Code, which allows the

Court to designate (in effect, to disregard) the votes of "any entity whose acceptance or rejection

of such plan was not in good faith."  11 U.S.C. § 1126(e).

37.     As the Second Circuit has recognized, the Bankruptcy Code "provides no

guidance about what constitutes a bad faith vote to accept or reject a plan."  DISH Network

Corp. v. DBSD North Am., Inc. (In re DBSD North Am., Inc.), 634 F.3d 79, 101 (2d Cir. 2011)

(affirming the bankruptcy court's decision to designate a creditor's vote after determining the

creditor acted in bad faith).  Instead, the "good faith" test under section 1126(e) effectively

delegates to the courts the task of deciding when a party has stepped over the boundary.  Id.

Here, the factual record may show that Syncora acquired the Swap Policies Claim and entered

into its prepetition transactions with the Debtors not for the purpose of maximizing the

recoveries on its own claims against the Debtors, but in order to create leverage over the

Bondholders in order to achieve its ultimate goal – the commutation of the Bond Policies.

20

Accordingly, the Ad Hoc Committee reserves the right to seek a ruling designating Syncora's

votes in favor of the Plan upon the conclusion of the discovery process.

## V.    The Proposed Third-Party Releases Under the Plan Are Not Permissible

38.    The need for a meaningful investigation of the transactions that led to the

filing of the Plan is especially important here given the sweeping third-party releases that would

become effective upon confirmation of the Plan.  It is beyond dispute that third-party releases are

subject to scrutiny and should be approved only in rare circumstances.  See, e.g., Deutsche Bank

AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136,

141-42 (2d Cir. 2005) (non-debtor releases are "proper only in rare cases" and "[n]o case has

tolerated non-debtor releases absent the finding of circumstances that may be characterized as

unique"); In re Adelphia Commc'ns Corp., 364 B.R. 518, 529 (Bankr. S.D.N.Y. 2007) (noting

that Metromedia "require[s] the bankruptcy community in [the Second Circuit] to reconsider the

heretofore fairly common issuance of third-party releases – making it clear that such releases are

now proper only in rare cases, under circumstances that can be described as unique") (internal

quotations omitted).

39.    Here, the Debtors have not provided any information regarding why the

proposed third-party releases are necessary, how the proposed third-party releases play an

important role under the Plan, and why each released party's contribution to the case was so

unique as to warrant the release.  Indeed, the Disclosure Statement contains no discussion

whatsoever about the merits of the prepetition causes of action that the Debtors are proposing to

release or why the Debtors, as fiduciaries for their bankruptcy estates, have deemed it

appropriate to release such actions and enjoin other creditors from pursuing them.

## **RESERVATION OF RIGHTS**

40.    The Ad Hoc Committee reserves the right to amend, modify and/or supplement this Objection at a later date.  In addition, the Ad Hoc Committee reserves all of its rights and remedies with respect to the Bondholder Claims.  Nothing in this Objection shall be deemed to be a waiver of any procedural, substantive or other rights, privileges, or remedies available with respect to the Bondholder Claims, all of which are reserved.

## CONCLUSION

41.     For all of the reasons set forth herein, the Ad Hoc Committee requests that

the Court deny approval of the Disclosure Statement and deny confirmation to the Plan.

Dated:  August 21, 2013
        New York, NY

                                        SIDLEY AUSTIN LLP
                                        One South Dearborn Street
                                        Chicago, Illinois 60603
                                        Telephone: (312) 853-7000
                                        Facsimile: (312) 853-7036
                                        Larry J. Nyhan
                                        Bojan Guzina
                                        Andrew F. O'Neill
                                        Allison Ross Stromberg

                                         - and -

                                        SIDLEY AUSTIN LLP


                                          /s/ Brian J. Lohan          .
                                        Nicholas K. Lagemann
                                        Brian J. Lohan
                                        787 Seventh Avenue
                                        New York, New York 10019
                                        Telephone: (212) 839-5300
                                        Facsimile:  (212) 839-5599

                                        *Counsel for the Ad Hoc
                                        Committee of Bondholders*