**Hearing Date:  August 28, 2013 at 10:00 a.m.**

SIDLEY AUSTIN LLP

One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
Larry J. Nyhan
Bojan Guzina
Andrew F. O'Neill
Allison Ross Stromberg

  – and –

SIDLEY AUSTIN LLP

787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile:  (212) 839-5599
Nicholas K. Lagemann

*Counsel for the Ad Hoc Committee of Bondholders*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                          :
In re:                                                    :   Chapter 11
                                                          :
American Roads LLC, et al.,[1]                            :   Case No. 13-12412 (BRL)
                                                          :
              Debtors.                                    :   Jointly Administered
                                                          :
                                                          :
------------------------------------------------------------X

**MEMORANDUM OF LAW OF THE AD HOC COMMITTEE OF BONDHOLDERS IN
SUPPORT OF ITS STANDING TO PARTICIPATE IN THESE CHAPTER 11 CASES**

---

[1]  The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification
number, are: Alabama Black Warrior Parkway, LLC [2479], Alabama Emerald Mountain Expressway
Bridge, LLC [2480], Alabama Toll Operations, LLC [2483], American Roads Holding LLC [3194],
American Roads LLC [3196], American Roads Technologies, Inc. [2016], Central Alabama River
Parkway, LLC [2478], Detroit Windsor Tunnel LLC [1794], DWT, Inc. [7182] and The Baldwin County
Bridge Company L.L.C. [8933]. For the purpose of these cases, the service address for the Debtors is: 100
East Jefferson Avenue, Detroit, Michigan 48226.

## Table of Contents

|  | Page |
|---|---|

PRELIMINARY STATEMENT ........................................................................................ 1

ARGUMENT ..................................................................................................................... 9

    I.    THE MEMBERS OF THE AD HOC COMMITTEE ARE PARTIES IN INTEREST AND SHOULD BE HEARD ON ALL ISSUES IN THESE CASES .....................................................................................................................9

    II.    NOTHING IN THE FINANCING DOCUMENTS CONSTITUTES A WAIVER OF THE RIGHT TO APPEAR AND BE HEARD IN THESE CASES ...................................................................................................................11

        (a)    Waivers of Rights Under the Bankruptcy Code Must Be Clear and Unambiguous in Order to Deny Standing to a Party in Interest ...............12

        (b)    The Ad Hoc Committee is Not Engaging in "Obstructionist Behavior" ..............................................................................................13

        (c)    Under New York Law, "No Action" Clauses Must Be Narrowly Construed ............................................................................................15

        (d)    No Provisions in the Financing Documents Bar the Ad Hoc Committee From Objecting to Confirmation of the Plan .........................17

        (e)    The Ad Hoc Committee's Participation in These Cases is Required to Avoid an Inequitable Outcome .............................................................30

        (f)    The Underlying Purpose of "No Action" Clauses Would Not Be Disturbed by the Ad Hoc Committee's Participation in These Cases .................................................................................................33

    III.    IN THE ALTERNATIVE, THE AD HOC COMMITTEE SHOULD BE PERMITTED TO INTERVENE IN THE PLAN CONFIRMATION PROCEEDINGS PURSUANT TO BANKRUPTCY RULE 2018 ......................34

CONCLUSION ................................................................................................................ 36

i

## TABLE OF AUTHORITIES

**Page(s)**

CASES

Bank of Am., N.A. v. N. LaSalle St. Ltd. P'Ship (In re 203 N. LaSalle St. P'ship),
    246 B.R. 325 (Bankr. N.D. Ill. 2000) ......................................................................32

Beatrice Foods Co., v. Hart Ski Mfg. Co. (In re Hart Ski Mfg. Co.),
    5 B.R. 734 (Bankr. D. Minn. 1980) .........................................................................32

Cruden v. Bank of New York,
    957 F.2d 961 (2d Cir. 1992)....................................................................................16

Cyrus Select Opportunities Master Fund, Ltd. v. Ion Media Networks, Inc. (In re Ion
    Media Networks, Inc.),
    419 B.R. 585 (Bankr. S.D.N.Y. 2009) .......................................................13, 14, 15

Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.,
    837 F.Supp.2d 162 (S.D.N.Y. 2011)........................................................................30

Feldbaum v. McCrory Corp.,
    1992 Del. Ch. LEXIS 113 (Del. Ch. Ct. June 1, 1992)............................................30

GMAM Inv. Funds Trust I v. Globo Comunicacoes E Participacoes S.A. (In re Globo
    Comunicacoes E Participacoes, S.A.),
    317 B.R. 235 (S.D.N.Y. 2004)................................................................................16

Howe v. Bank of New York Mellon,
    783 F.Supp.2d 466 (S.D.N.Y. 2011)........................................................................16

In re Boston Generating, LLC,
    440 B.R. 302 (Bankr. S.D.N.Y. 2010) .......................................................7, 12, 15, 16

In re Erickson Ret. Cmtys., LLC,
    425 B.R. 309 (Bankr. N.D. Tex. 2010).....................................................................15

In re First Interregional Equity Corp.,
    218 B.R. 731 (Bankr. D.N.J. 1997) .........................................................................34

In re Innkeepers USA Trust,
    448 B.R. 131 (Bankr. S.D.N.Y. 2011) ...............................................................11, 30

In re Ionosphere Clubs, Inc.,
    101 B.R. 844 (Bankr. S.D.N.Y. 1989)..............................................................9, 10, 34, 35

In re Public Serv. Co. of New Hampshire,
    88 B.R. 546 (Bankr. D.N.H. 1988) .........................................................................33

In re Stone Barn Manhattan LLC,
    405 B.R. 68 (Bankr. S.D.N.Y. 2009) ...................................................................9

In re SW Boston Hotel Venture, LLC,
    460 B.R. 38 (Bankr. D. Mass. 2011), *rev'd on other grounds*, 2012 WL 4152869 (1st
    Cir. B.A.P. Oct. 1, 2012)......................................................................................32

Krys v. Official Comm. Of Unsecured Creditors of Refco, Inc. (In re Refco, Inc.),
    505 F.3d 109 (2d Cir. 2007)..................................................................................11

Kurak v. Dura Auto. Sys. Inc. (In re Dura Auto. Sys. Inc.),
    379 B.R. 257 (Bankr. D. Del. 2007) ...............................................................29, 30

Metro. W. Asset Mgmt., LLC v. Magnus Funding, Ltd.,
    2004 U.S. Dist. LEXIS 11761 (S.D.N.Y. June 25, 2004)......................................16

So. Boulevard, Inc. v. Martin Paint Stores (In re Martin Paint Stores),
    207 B.R. 57 (S.D.N.Y. 1997)................................................................................34

**STATUTES**

11 U.S.C. § 1109(b) ............................................................................. passim

Fed. R. Bankr. P. 2018 ...........................................................................33

**OTHER AUTHORITIES**

Collier on Bankruptcy (16th ed. 2013), at ¶ 1109.04 ..................................10

S. Rep. No. 989, 95th Cong., 2d Sess. 116 (1978) ......................................10

TO THE HONORABLE BURTON R. LIFLAND,
UNITED STATES BANKRUPTCY JUDGE:

The Ad Hoc Committee of Bondholders (the "Ad Hoc Committee"), consisting of the holders of $162.5 million in principal amount of Series G-1 Senior Secured Bonds and Series G-2 Senior Secured Bonds issued by American Roads LLC ("American Roads", and together with its affiliated debtors, the "Debtors"), by and through its undersigned counsel, hereby submits this memorandum of law in support of its standing to participate in these cases.

## PRELIMINARY STATEMENT

At the last hearing in these cases, and in Syncora's[2] reply to the Ad Hoc Committee's preliminary objection to confirmation of the Plan, counsel for Syncora has attempted to portray the members of the Ad Hoc Committee as opportunistic hold-outs who are opposing the Plan in a last-ditch effort to extract additional value from the Debtors. This contention is patently false. The members of the Ad Hoc Committee purchased their Bonds at par and are not using the bankruptcy process in an effort to earn outsize returns on deeply discounted claims. Far from being the minority of hold-outs in the face of overwhelming consensus, the members of the Ad Hoc Committee hold approximately 56% in amount of the Bondholder Claims that are not held by Syncora and are the only meaningful constituency in these cases besides Syncora. In an effort to protect their significant economic interests in these cases, the members of the Ad Hoc Committee have objected to the terms of the Plan, which (i) directs 100% of all distributions to Syncora in direct contravention of the Financing Documents, (ii) requests that this Court sanction a legally incorrect interpretation of the Financing

---

[2] Capitalized terms used but not defined in this memorandum of law have the meanings assigned to such terms in the Debtors' Joint Prepackaged Chapter 11 Plan (the "Plan") [Docket No. 22].

Documents, and (iii) most outrageously, purports to enjoin the Bondholders from challenging Syncora's misappropriation of Plan distributions that rightfully belong to the Bondholders on any ground, including Syncora's breach of the Financing Documents.

There is nothing "opportunistic" about a significant creditor constituency taking steps to ensure that its rights are protected in a bankruptcy case, particularly when it is clear that another constituency – Syncora – has orchestrated the terms of the Debtors' restructuring with the primary goal of using this Court to strip the Bondholders of their rights to collateral, leaving them with nothing but an insurance policy from a monoline that may very well be insolvent,[3] and shielding Syncora's scheme from further scrutiny or redress through the issuance of plan injunctions.  Syncora disingenuously attempts to convince this Court that the Bondholders have nothing to lose here because they will still be protected by the Bond Policies, but this argument ignores the economic and legal fact that the Bondholders bargained for two separate and independent sources of recovery – the Collateral and the Bond Policies – and are now facing the confirmation of a Plan that seeks to eliminate their rights vis-à-vis the Collateral.  It also ignores the fact that Syncora's financially distressed situation is a matter of public record, as reflected in its most recently published annual and quarterly reports, in which management concedes that it has concluded there is substantial doubt about Syncora's ability to continue as a going concern.

---

[3]  As the Debtors acknowledge in their Disclosure Statement (see Section 8.4(b)-(c)), right before warning the Bondholders that Syncora does not publish financial statements prepared in accordance with GAAP, "[i]f Syncora defaults on its payment obligations under the Bond Policies or becomes subject to a receivership or similar proceeding, the Bondholders may not receive amounts due on the Bonds."

Indeed, it takes remarkable gall for Syncora to accuse the members of the Ad Hoc Committee of opportunistic behavior given that Syncora has, upon information and belief:[4]

- Acquired the Swap exposure at a deep discount in late 2012, thus stepping into the shoes of the Swap Counterparty vis-à-vis the Bondholders;

- Used its prepetition state court litigation against certain of the Debtors' insiders as leverage to induce the insiders to embrace and implement the terms of a restructuring that would unfairly elevate Syncora's interests over those of the Bondholders;

- Required the insiders to cause the Debtors to commit a completely avoidable Event of Default that would allow Syncora to terminate the Swaps and then voluntarily prepaid (in its capacity as the Insurance Company) to itself (in its capacity as the Swap Counterparty) the entirety of the swap termination liability, even though the Debtors' payment obligations to the Swap Counterparty were not accelerated upon the termination of the G-2 Swap and, as a result, no portion of the G-2 Swap was actually due and payable by the Debtors at such time;[5]

---

[4] The Ad Hoc Committee respectfully refers the Court to the *Preliminary Objection of the Ad Hoc Committee of Bondholders to Approval of the Debtors' Disclosure Statement and Confirmation of the Debtors' Joint Prepackaged Plan of Reorganization* for a more fulsome recitation of the relevant facts.

[5] This, in essence, is how the Debtors's reply to the Ad Hoc Committee's preliminary objection to the Plan describes what actually transpired following the occurrence of the Event of Default. On the other hand, the Disclosure Statement (at p. 29) states that "Syncora has paid in full the Permitted Swap Termination Payment to the counterparty to the Swaps in accordance with the terms of the Swap Policies" even though the Debtors now concede that no Permitted Swap Termination Payment was actually due and payable. This glaring discrepancy in the Debtors' explanation of what actually occurred is just one reason why an examination is needed into the events that preceded the filing of these chapter 11 cases. In any event, the Ad Hoc Committee does not concede that Syncora's payment to itself, regardless of how it is characterized, caused the Swap Policies Claim to become senior in priority to the Bondholder Claims.

- By voluntarily prepaying the entirety of the swap termination liability to itself, purported to elevate the priority of its position as the Swap Counterparty in the collateral proceeds waterfall at the expense of the Bondholders;[6]

- Engineered the terms of the "prepackaged" Plan for the Debtors that allocates 100% of the enterprise value to the Swap Counterparty while providing no recoveries for the Bondholders and denying them the opportunity to vote to accept or reject the Plan;

- Asserted the full amount of the Swap Policies Claim for distribution purposes under the Plan even though it acquired the swap exposure at a deep discount and manufactured the priority of its full Swap Policies Claim by making payments to itself; and

- Would, if the Plan is confirmed, receive not only 100% of the new equity in the Reorganized Debtors, but also the benefit of third-party release and injunction provisions that potentially bar the Bondholders from pursuing any claims against Syncora in another forum.

In other words, by virtue of their prepetition settlements and transactions, Syncora and the Debtors have thoroughly stacked the deck against the Bondholders.[7] But those advantages apparently are not enough for Syncora.[8] In response to the Ad Hoc Committee's

---

[6] In simplest terms, if Syncora was not on both sides of the Swaps (as both the Insurance Company and the Swap Counterparty), it would have had no economic incentive to voluntarily prepay the entirety of the swap termination liability to the Swap Counterparty instead of making such payments as and when due under the terms of the G-2 Swap, which does not provide for acceleration of the swap termination liability. Absent the voluntary prepayment that Syncora essentially made to itself, only a fraction of the Swap Policies Claim – the portion constituting "Permitted Swap Termination Payments" – would have been entitled to priority over the Bondholder Claims under the collateral proceeds waterfall.

[7] Including by seeking to have the Plan confirmed barely a month after the Petition Date even though there are no exigent circumstances that necessitate such an extremely abbreviated confirmation process.

[8] Syncora's argument that the Bondholders have no "real economic stake" in these cases because Syncora is obligated to pay under the Bond Policies is a red herring. The existence of the Bond Policies is of no relevance in determining the Bondholders' rights with respect to the Collateral, and it is in the context of those rights that the Court should consider the Ad Hoc Committee's standing to be heard in these cases.

concerns over the terms of the Plan, the need for an investigation into Syncora's role in

formulating the Plan, and the need for an examination of the valuation analysis that underlies the

Plan, Syncora has taken the position that the Ad Hoc Committee lacks standing to be heard on

any issue in these chapter 11 cases.  If accepted, Syncora's position would mean that the only

significant creditor constituency in these cases would be completely muzzled and that the Plan

would receive no scrutiny whatsoever from the creditors whose rights it seeks to impair.  For

example, if the Ad Hoc Committee lacks standing to be heard in these cases, there will be (i) no

investigation into the actions Syncora has taken to advantage its interests at the Bondholders'

expense, (ii) no examination by the Court concerning whether the waterfall structure advocated

by the Debtors and Syncora (which would deliver 100% of the distributions under the Plan to

Syncora) is correct under the terms of the Financing Documents, (iii) no challenge to the

valuation analysis and financial projections that underlie the Debtors' position that only the

Swap Policies Claim is entitled to any recovery from the Debtors' estates, and (iv) no meaningful

scrutiny of the third-party release, exculpation and injunction provisions or the Debtors'

proposed release of estate causes of action under the Plan.  Indeed, taken to its logical

conclusion, Syncora's position would also mean that the Ad Hoc Committee lacks standing to

challenge the scope of the third-party release, exculpation and injunction provisions so that if, as

the Ad Hoc Committee believes, the distribution of 100% of plan value to Syncora would violate

the express terms of the Financing Documents, the Bondholders would be prohibited by the

Confirmation Order from seeking redress against Syncora for breach of contract.

   The argument that the Ad Hoc Committee lacks standing to be heard in these

cases ignores the recognized public policy of liberally permitting parties in interest to appear and

be heard in bankruptcy court, particularly when a significant creditor constituency seeks to voice

its concerns, as well as the applicable case law, which strictly construes and narrowly enforces

any waivers of a creditor's bankruptcy rights under a pre-bankruptcy agreement.  It also is

completely contrary to basic principles of fairness and due process.  Having chosen to implement

the terms of their settlement in bankruptcy court, Syncora and the Debtors cannot be allowed to

take advantage of the protections and benefits afforded by the Bankruptcy Code while, at the

same time, seeking to deny those protections and benefits to the Bondholders.

          To be clear, Syncora has not identified any specific provisions in the Financing

Documents that constitute a waiver of fundamental bankruptcy rights, that preclude the

Bondholders from being heard in these cases, or that expressly assign to Syncora the right of the

Bondholders to oppose the confirmation of a plan of reorganization or to vote on such a plan.

That is because no such provisions exist in the Financing Documents.  Instead, Syncora has

pointed to general provisions in the Financing Documents which delegate to Syncora (as the

Instructing Senior Creditor) [9] or the Collateral Agent, at Syncora's direction, the right to control

the enforcement of certain remedies against the Debtors and that prohibit the Bondholders from

exercising or enforcing any of the rights, powers or remedies which Syncora or the Collateral

Agent is expressly authorized to exercise or enforce under the Financing Documents.  This

argument fails because nothing in the Financing Documents expressly authorizes Syncora or the

Collateral Agent to consent to the terms of a chapter 11 plan on behalf of the Bondholders or

expressly assigns to Syncora or the Collateral Agent the right of the Bondholders to be heard in

these cases.  Moreover, as discussed in greater detail below, the few specific provisions in the

Financing Documents which purport to give Syncora the right to "direct" these chapter 11 cases

---

[9] The Ad Hoc Committee does not concede that Syncora remains the Instructing Senior Creditor for
purposes of the Financing Documents and reserves the right to argue following the conclusion of
discovery that an "Insurer Default" has occurred under the terms of the Financing Documents.

must be strictly construed in the context of the documents in which they appear and do not, under

any reasonable interpretation of those documents, constitute a waiver of any of the fundamental

rights that are accorded to the Bondholders under the Bankruptcy Code.

Although courts have under certain circumstances denied standing to parties in

interest on the basis of contractual waivers under pre-bankruptcy documents, the Ad Hoc

Committee is unaware of any precedent for denying a creditor of the debtor standing to be heard

in the absence of an unambiguous contractual prohibition on the actions the creditor has taken in

bankruptcy court.  Given the "unfettered" right of creditors to be heard in a bankruptcy case,

courts, understandably, are reluctant to deny standing to a creditor in the absence of an express or

intentional waiver of the right to be heard on a particular issue.  As Judge Chapman stated in her

ruling from the bench at the bid procedures hearing in the <u>Boston Generating</u> case:[10]

> Notwithstanding the inter-creditor agreement, which I will parse through in a
> moment, I believe as a general matter, and a quite obvious one, that the Debtors
> are not permitted to abdicate their fiduciary duties to their creditors collectively or
> individually.  We are here today at One Bowling Green, not in the state law
> foreclosure proceeding, but in a bid procedure's hearing in the bankruptcy court.
>
> The first lien lenders are consenting to and encouraging this process, but this is
> the Debtor's motion.  At this threshold stage, all parties in interest have a right to
> assert substantial concerns that if meritorious, would suggest fundamental defects
> in the Debtor's process to date.  <u>In the absence of explicit language in the inter-
> creditor agreement and the type of specific prohibition that is now, for example,
> in the ABA model inter-creditor agreement, I decline to find that I must entirely
> silence the second lien agent simply because the Debtor's proposed course of
> action is supported by the first lien lenders.</u>

(emphasis added).

---

[10]  The transcript from the October 4, 2010 hearing on approval of bid procedures in the <u>In re Boston
Generating, LLC</u> case, Case No. 10-14419 (SCC), is attached as <u>Exhibit A</u> to the *Declaration of Bojan
Guzina in Support of the Memorandum of Law of the Ad Hoc Committee of Bondholders in Support of Its
Standing to Participate in These Chapter 11 Cases*, filed concurrently herewith.  The relevant portions of
Judge Chapman's bench ruling on the issue of standing appear on pages 51-55 of the transcript.

Like the second lien lenders in <u>Boston Generating</u>, the Bondholders in these cases

are a significant creditor constituency that is not hopelessly out of the money.  The Ad Hoc

Committee has voiced substantial concerns about an expedited plan process that provides the Ad

Hoc Committee with no opportunity to conduct discovery, and that may conclude with the

Bondholders receiving no recoveries on account of their claims.  In the absence of an express

contractual prohibition on the fundamental bankruptcy right of the Bondholders to oppose the

Plan or to otherwise be heard in these cases, which simply cannot be found in the Financing

Documents, the Court should permit the Ad Hoc Committee to pursue its objections.

Finally, even if Syncora's interpretation of the Financing Documents and

applicable law were correct – and it is not – it would be unfair and prejudicial to deny the Ad

Hoc Committee standing to contest (i) the appropriate construction of the waterfall provisions

under the Financing Documents, (ii) the scope of the third-party release, exculpation and

injunction provisions under the Plan,[11] and (iii) the valuation analysis that underlies the Plan and

purports to show that the Bondholders are out of the money.  Indeed, as noted above, if the

release, exculpation and injunction provisions are allowed to stand in their present form, the

Bondholders could be enjoined from pursuing any rights or remedies against Syncora in any

---

[11]  In their memorandum of law in support of confirmation of the Plan [Docket No. 107], the Debtors
claim that the Ad Hoc Committee "mischaracterizes the injunction provision set forth in Section 8.5 of
the Plan" which, in the Debtors' view, "simply enjoins third parties from asserting Claims or Interests of
Released Parties that have been released under the Plan against other Released Parties."  However, the
plain language of Section 8.05 of the Plan provides that all entities that hold claims to be discharged
under the Plan, including the Bondholders, would be permanently enjoined from taking any actions or
pursuing any remedies against any of the Released Parties (including Syncora) "on account of or in
connection with or with respect to" the Bondholder Claims.  If the Debtors are sincere in their argument
that such language is not intended to shield the Released Parties from any direct rights or remedies that
the Bondholders could pursue in another forum, then appropriate clarifying language should be added to
the Confirmation Order to avoid any potential confusion or dispute over the scope of the injunction.
Needless to say, without the Ad Hoc Committee's participation in these cases, the Debtors would not
have been compelled to make such an admission or any potential clarifications to the Plan.

forum, including an action for breach of contract in state court. Nothing in the Financing

Documents authorizes Syncora to breach the Financing Documents and then insulate itself from

any potential liability to the Bondholders by using this Court's equitable powers to foreclose any

remedies that the Bondholders may be able to pursue, and nothing in the Bankruptcy Code or

any applicable case law authorizes such a result. Yet that could be the outcome if the Plan is

confirmed in its present form. Furthermore, nothing in the Financing Documents bars the

Bondholders from challenging a valuation of the Debtors that would result in the Bondholders

receiving no recoveries from the Collateral, particularly in the absence of a competitive auction

process that has conclusively determined the value of the Debtors' assets.

   For all of the reasons set forth herein, the Court should conclude that the Ad Hoc

Committee has standing to be heard on all issues arising in these bankruptcy cases.

## **ARGUMENT**

## I. **THE MEMBERS OF THE AD HOC COMMITTEE ARE PARTIES IN INTEREST AND SHOULD BE HEARD ON ALL ISSUES IN THESE CASES**

   Any analysis of standing in a bankruptcy case must begin with the unambiguous

language of the Bankruptcy Code. Section 1109(b) of the Bankruptcy Code provides that a

"party in interest. . .may raise and may appear and be heard on any issue in a case under this

chapter." 11 U.S.C. § 1109(b). Section 1109(b) also provides a non-exhaustive list of who

constitutes a party in interest in a bankruptcy case, including any "creditor." Although the term

"party in interest" is not defined by the Bankruptcy Code or the Bankruptcy Rules, courts

construe its meaning broadly "to insure fair representation of all constituencies impacted in any

significant way by a Chapter 11 case." See In re Stone Barn Manhattan LLC, 405 B.R. 68, 74

(Bankr. S.D.N.Y. 2009). Here, there can be no legitimate dispute that the Bondholders, as the

holders of corporate bond debt issued by American Roads, are creditors of the Debtors with a

pecuniary interest in the outcome of these cases.  See In re Ionosphere Clubs, Inc., 101 B.R. 844,

849 (Bankr. S.D.N.Y. 1989) (noting that "the party requesting standing must either be a creditor

of a debtor to invoke the court's jurisdiction or be able to assert an equitable claim against the

estate").  Indeed, the Plan treats the Bondholders as holders of direct claims against the Debtors.

Since there can be no legitimate dispute that the members of the Ad Hoc

Committee are "parties in interest" under section 1109(b) of the Bankruptcy Code, it must follow

that the Ad Hoc Committee has the right to "appear and be heard on any issue" in these cases.  It

is well-established that a party in interest has an "unqualified" right to be heard to protect its

financial stake in a bankruptcy case.  See Collier on Bankruptcy (16th ed. 2013), at ¶ 1109.04

("[T]he text of section 1109(b) and its legislative history only support the conclusion that the

section applies to every issue in every proceeding."); see also S. Rep. No. 989, 95th Cong., 2d

Sess. 116 (1978) (stating that section 1109(b) provides, "in unqualified terms, that any . . .

creditor shall have the right to be heard as a party in interest under this chapter . . . " ).  This

Court has acknowledged as much, finding that "[t]he legislative history indicates that Congress

sought to encourage and promote greater participation in reorganization cases."  Ionosphere, 101

B.R. at 849; see also In re SFD @ Hollywood, LLC, 411 B.R. 453, 454-55 (Bankr. S.D. Fla.

2009) (finding a party in interest to have the "unfettered right to be heard on any issue in a

chapter 11 case" and labeling such right a "fundamental" one); Collier on Bankruptcy at ¶

1109.04 ("A fundamental purpose of section 1109(b) is to grant any party with a financial stake

in the case the right, at the party's election, to participate with respect to the judicial

determination of any issue bearing on the ultimate disposition of his or her interest.").  Indeed,

no issue is more fundamental in this or any other bankruptcy case, and as to which the voice of a

"party in interest" is more critical, than the confirmation of a plan of reorganization.

Accordingly, the members of the Ad Hoc Committee are "parties in interest" in these chapter 11 cases and, under the plain meaning of section 1109(b) of the Bankruptcy Code, have an unfettered right to be heard on any issue before this Court.[12]

## II.    NOTHING IN THE FINANCING DOCUMENTS CONSTITUTES A WAIVER OF THE RIGHT TO APPEAR AND BE HEARD IN THESE CASES

Syncora has argued that a number of provisions in the Financing Documents eliminate any standing the Bondholders may have to be heard in these cases and overcome the "unfettered right" of the Bondholders as a party in interest under section 1109(b).  However, none of those contractual provisions (as discussed in greater detail below) constitute an express or intentional waiver of the fundamental rights to which creditors are entitled under the Bankruptcy Code.  Most significantly, nothing in the Financing Documents constitutes an express waiver of the Bondholders' right to oppose confirmation of the Plan, to vote on the Plan, or to assert their rights as unsecured creditors in these chapter 11 cases.  Accordingly, the

---

[12] Syncora may attempt to rely on the reasoning of some recent cases in this district in which standing has been challenged to argue that the Bondholders lack standing because they are "creditors of a creditor" or "investors in a creditor" by virtue of the Bond Policies, but that argument would be without merit.  For example, in a recent case involving certificateholders in a CMBS trust structure, Judge Chapman held that the certificateholders were not parties in interest because they held beneficial interests in the CMBS trust, which owned certain assets originated by the debtor, but did not have direct claims against the debtor.  As a result, Judge Chapman concluded that the certificateholders did not have standing to be heard in the bankruptcy case. See In re Innkeepers USA Trust, 448 B.R. 131, 141-43 (Bankr. S.D.N.Y. 2011) (noting that "[c]ourts in this District, while generally interpreting section 1109(b) broadly, have limited 'party in interest' standing where a party's interest in the proceeding is not a direct one").  Similarly, in Krys v. Official Comm. Of Unsecured Creditors of Refco, Inc. (In re Refco, Inc.), 505 F.3d 109, 110 (2d Cir. 2007), the Second Circuit affirmed Judge Drain's ruling that investors in a non-debtor segregated portfolio company (SPC) lacked standing to be heard because only the SPC, and not the investors, could assert a claim against the Refco estate.  Here, although the Bondholders do hold guaranty claims against Syncora under the Bond Policies, neither Innkeepers nor Refco is analogous because, unlike the certificateholders and investors in those cases, the Bondholders also hold claims directly against the Debtors and are not mere "creditors of a creditor" or "investors in a creditor" without a direct right of payment from the Debtors.

Bondholders have not waived their right to be heard in these chapter 11 cases generally or to take

any of the actions the Ad Hoc Committee has taken to date or may undertake in these cases.

   **(a)**     **Waivers of Rights Under the Bankruptcy Code Must Be Clear
              and Unambiguous in Order to Deny Standing to a Party in Interest**

          The case law is clear that waivers of the protections and rights provided to

creditors under the Bankruptcy Code must be clearly and intentionally stated by the express

terms of the underlying agreement in order for such waivers to form the basis for denying

standing to a creditor.  See In re Boston Generating, LLC, 440 B.R. 302, 319 (Bankr. S.D.N.Y.

2010) ("If a secured lender seeks to waive its rights to object to a 363 sale, it must be clear

beyond peradventure that it has done so.").  In Boston Generating, the court determined that it

was "constrained by the language of the Intercompany Agreement" and could not deny the

second lien agent's right to object to approval of bid procedures or the 363 sale itself because

there was no express provision in the intercreditor agreement which constituted a waiver of the

right to object to bid procedures or sale approval.  The Court reached this conclusion despite

believing that the second lien agent's standing to object may "go against the spirit of the

subordination scheme."  Id.  As Judge Chapman stated in her opinion, "Under New York law,

the First Lien Lenders must point me to some provision that reflects an express or intentional

waiver of rights."  Id.  Because nothing in the intercreditor agreement expressly prohibited the

second lien lenders from objecting to bid procedures or the approval of the 363 sale, Judge

Chapman refused to deny the second lien lenders standing to be heard.

          Similarly, in the Ion Media case, Judge Peck relied on an express contractual

prohibition on a second lien lender's ability to object to the plan of reorganization in denying the

second lien lender standing to oppose confirmation.  In that case, the court found that the second

lien debt holder, an "activist distressed investor that purchased certain deeply discounted second

lien debt," lacked standing to challenge the first lien lenders' liens and priority or to file

objections to the plan of reorganization under the express terms of an intercreditor agreement.

See Cyrus Select Opportunities Master Fund, Ltd. v. Ion Media Networks, Inc. (In re Ion Media

Networks, Inc.), 419 B.R. 585 (Bankr. S.D.N.Y. 2009). The terms of the intercreditor agreement

in that case specifically addressed the parties' rights following the commencement of a

bankruptcy case and expressly and unambiguously prohibited the second lien lenders from

"oppos[ing], object[ing] to or vot[ing] against any plan of reorganization or disclosure statement

the terms of which are consistent with the rights of the First Priority Security Parties under the

Security Agreement." Id. at 597 (quoting the relevant language of the intercreditor agreement).

Furthermore, the right of the second lien lenders to participate in the bankruptcy case as

unsecured creditors was also specifically limited "in plain words" to prevent the second lien

lenders from opposing, objecting to, or voting against a plan that was consistent with the priority

scheme under the intercreditor agreement. Id. at 598. Accordingly, Judge Peck concluded that

the second lien lender had expressly waived its right to object to confirmation of the plan.

As discussed below, nothing in the Financing Documents constitutes an express

waiver of the Bondholders' right to appear and be heard in these bankruptcy cases, to oppose the

confirmation of a plan of reorganization, or to vote to accept or reject a plan of reorganization.

In the absence of a clear and unambiguous waiver of the rights conferred on creditors under the

Bankruptcy Code, there is no basis to deny the members of the Ad Hoc Committee their

"unfettered right" to be heard and participate in these chapter 11 cases.

**(b)      The Ad Hoc Committee is Not Engaging in "Obstructionist Behavior"**

It is important to distinguish the facts of this case from the situation Judge Peck

encountered in Ion Media. In that case, an activist distressed investor that purchased certain

deeply discounted second lien debt engaged in an ongoing pattern of obstructionist behavior and

objected to confirmation of the debtor's plan despite a clear contractual prohibition on its ability

to contest confirmation.  It did so based on the argument that certain FCC licenses were

unencumbered property even though (i) it was expressly prohibited from making that argument

(or otherwise challenging the priority of the first lien lenders' claims) under the intercreditor

agreement and (ii) the terms of the agreement were clear that the first lien lenders and the second

lien lenders had allocated among themselves the economic value of the licenses as "collateral"

regardless of the actual validity of the liens encumbering the licenses.  In light of these facts, the

frustration that is evident in Judge Peck's opinion is certainly understandable.

       The Ad Hoc Committee must emphasize that the situation before this Court is

markedly different from the facts Judge Peck faced in <u>Ion Media</u>.  Here, unlike in <u>Ion Media</u>:

- The members of the Ad Hoc Committee are not "activist distressed investors" that
purchased their claims at a deep discount; in fact, both members purchased their Bonds at par.

- The Ad Hoc Committee has not engaged in any "obstructionist behavior"; it has
merely voiced its concerns over certain specific terms of the Cash Collateral Order and the terms
of, and the proposed confirmation timeline for, the Plan.

- The Financing Documents do not provide that the Swap Policies Claim will be
senior in priority to the Bondholder Claims under any and all circumstances; instead, the priority
of the Swap Policies Claim vis-à-vis the Bondholder Claims depends on the circumstances under
which the collateral proceeds waterfall is triggered and is, in any event, limited to specified
"Permitted Swap Termination Payments" that are due and payable or payments on account of the
"Enhancement Liabilities" relating to such Permitted Swap Termination Payments.

- The Plan provides no recoveries whatsoever for Bondholders and the holders of
General Unsecured Claims, instead allocating all value to Syncora; in <u>Ion Media</u>, the plan of

reorganization offered consideration to unsecured creditors and was supported by the official

committee of unsecured creditors, which included representatives of the second lien lenders;

- The Plan provides no recoveries on the unpaid interest owed to the Bondholders

notwithstanding that the same collateral waterfall relied on to establish Syncora's priority of

payment expressly gives priority to such interest over any swap termination payments; and

- Perhaps most importantly, the Financing Documents do not expressly prohibit the

members of the Ad Hoc Committee from opposing the confirmation of the Plan.

Simply put, there are no similarities between this case and <u>Ion Media</u>.[13]  Instead,

the Ad Hoc Committee respectfully submits that the <u>Boston Generating</u> decision is more

instructive and more closely analogous to the facts of this case.  The equities of this case, where

Syncora has dictated the terms of the Plan, is the sole party that has voted to accept the Plan, and

now seeks to prevent the Bondholders that bought their Bonds at par from participating in the

Plan confirmation process, are firmly on the side of permitting the Ad Hoc Committee to assert

its objections to confirmation of the Plan.  Accordingly, this Court should conclude that nothing

in the Financing Documents prevents the members of the Ad Hoc Committee from raising

objections to the Plan or from otherwise being heard in these cases.

(c)    **Under New York Law, "No Action" Clauses Must Be Narrowly Construed**

Under New York law, which governs the Financing Documents, so-called "no

action" clauses that prevent subordinated creditors from taking certain enforcement actions or

---

[13]  Nor are there any similarities between this case and <u>In re Erickson Retirement Communities, LLC</u>, 425 B.R. 309, 312 (Bankr. N.D. Tex. 2010), in which all of the key constituencies in the case had expressed general support for the debtor's plan and the value of the debtor's assets had been determined pursuant to an auction.  As Judge Chapman correctly pointed out in her bench decision on approval of bid procedures in <u>Boston Generating</u>, the motion to appoint an examiner in <u>Erickson Retirement</u> constituted obstructionist behavior by a junior creditor and the commencement of an "action" ultimately aimed at collecting on claims that was prohibited by the terms of the intercreditor agreement at issue in that case.

pursuing certain remedies must be strictly construed and narrowly interpreted.  See Cruden v.
Bank of New York, 957 F.2d 961, 968 (2d Cir. 1992) (no action clauses are "strictly construed");
Howe v. Bank of New York Mellon, 783 F.Supp.2d 466, 473 (S.D.N.Y. 2011) ("Courts strictly
construe a 'no action' clause in accordance with its terms"); Metro. W. Asset Mgmt., LLC v.
Magnus Funding, Ltd., 2004 U.S. Dist. LEXIS 11761, at *13-14 (S.D.N.Y. June 25, 2004)
("[N]o action provisions apply according to their terms and are not broadly construed").  Thus, if
a creditor's right or remedy is not expressly and unequivocally waived under the terms of an
intercreditor agreement, the court should not interpret the agreement as waiving such a right.

   Furthermore, any ambiguity in the meaning of purported "no action" provisions
under the Financing Documents should be construed against Syncora.  See GMAM Inv. Funds
Trust I v. Globo Comunicacoes E Participacoes S.A. (In re Globo Comunicacoes E
Participacoes, S.A.), 317 B.R. 235, 248-49 (S.D.N.Y. 2004) (finding that the bankruptcy court
erred in dismissing an involuntary bankruptcy petition where the "no action" clause did not on its
face prohibit creditors from filing an involuntary petition, and stating that broad interpretation of
a "no action" clause was improper as a matter of law where the clause was at least ambiguous).
The district court in Globo found that the "no action" clause did not expressly prohibit the
creditors from filing an involuntary proceeding against the debtor and, instead, was narrowly
tailored to limit the creditors' ability to sue directly on the debt.  Because the clause did not
expressly prohibit the filing of an involuntary case, the district court could "find no reason why
this ambiguity should be construed automatically" against the creditors.  Id. at 249.  Accordingly,
the district court reversed and remanded the bankruptcy court's determination that the "no
action" clause prohibited the creditors from filing an involuntary case against the debtor.

(d)    **No Provisions in the Financing Documents Bar the Ad Hoc
Committee From Objecting to Confirmation of the Plan**

As a general matter, the Financing Documents do not proscribe the Bondholders'

participation in a case under the Bankruptcy Code.  Indeed, although the Financing Documents

make several explicit references to bankruptcy cases or insolvency laws, as discussed in greater

detail below, none of the relevant provisions bar the Bondholders from voting on a plan of

reorganization, challenging the confirmation of a plan of reorganization, or otherwise being

heard in these chapter 11 cases in order to protect their economic interests – short of taking any

actions that are specifically reserved for Syncora as the Instructing Senior Creditor (or the

Collateral Agent at Syncora's direction).  As further discussed below, the few provisions in the

Financing Documents which could be interpreted as broadly delegating to Syncora the right to

"direct" all matters relating to these chapter 11 cases, or that purport to make Syncora the "sole

holder" of the Bonds or the "sole representative" of the Bondholders, should not be interpreted as

waivers of any fundamental bankruptcy rights – because no such waivers can be found in the

Financing Documents – particularly in light of the very limited nature of the power of attorney

provision in favor of Syncora under Section 6.5 of the Supplemental Indentures.  Instead, such

provisions should be interpreted in the context of the documents in which they appear, merely as

limitations on the Bondholders' ability to direct the actions of the Collateral Agent with respect

to the common Collateral and limited delegations of authority to Syncora with respect to

specific, narrowly-defined circumstances that simply are not applicable here.

Syncora has taken the position that, under the terms of the Financing Documents,

the Bondholders have (i) irrevocably delegated all of their rights to Syncora and to the Collateral

Agent, as directed by Syncora, and (ii) agreed to assert no independent right or remedy they

otherwise would have.  This is both an overly broad and a simplistic characterization of the

Financing Documents and deliberately ignores the fact that nothing in the Financing Documents

constitutes a waiver of the Bondholders' rights to object to a plan of reorganization or to

otherwise be heard in these cases.  Furthermore, as the following discussion demonstrates, the

parties to the Financing Documents knew how to expressly prohibit the Bondholders from taking

certain bankruptcy-related actions (such as filing an involuntary case against the Debtors) when

they actually intended to do so, and only such express prohibitions are indicative of the parties'

intent.  The parties also knew how to expressly grant to Syncora the power of attorney to act on

the Bondholders' behalf in a bankruptcy case, yet did so only with respect to payments that

Syncora has actually made to the Bondholders under the Bond Policies.  Because Syncora has

made no such payments to date, it has no authority to act on the Bondholders' behalf.

      The most relevant provisions of the Financing Documents for purposes of this

discussion are Sections 7.04 and 7.10 of the Collateral Agency Agreement, Section 8.3 of the

Common Agreement and related definitions, and Sections 4.2, 5.3, 5.4, 6.1, 6.4 and 6.5 of the

Supplemental Indentures.  As the following discussion of these provisions demonstrates, nothing

in the relevant language constitutes a waiver of the Bondholders' rights to object to confirmation

of the Plan or to be heard in these chapter 11 cases.  Moreover, the following discussion also

shows that the parties to the Financing Documents specifically intended to limit the

Bondholders' rights with respect to certain bankruptcy-related matters but not others.  As a

result, no additional waivers of bankruptcy-related rights – except for those that are expressly set

forth in the Financing Documents – should be inferred from the provisions discussed below.

### Section 7.04 of the Collateral Agency Agreement

      Section 7.04.   Remedies of the Secured Parties

      (a)   Unless otherwise consented to in writing by the Instructing Senior
Creditor [Syncora], no Secured Party, individually or together with any other Secured Parties,
shall have the right, nor shall it, exercise or enforce any of the rights, powers or remedies which

the Collateral Agent is authorized to exercise or enforce under this Agreement or any of the other Security Documents; and

(b)    Each Secured Party agrees that it will have recourse to the Collateral only through the Collateral Agent, that it shall have no independent recourse thereto and that without the prior written consent of the instructions given by the Instructing Senior Creditor, it shall refrain from exercising any rights or remedies under the Financing Documents with respect to the Collateral accorded to such Secured Party upon the occurrence of an Event of Default or an acceleration of the maturities of the Secured Obligations.

Analysis:    This provision of the Collateral Agency Agreement cannot, under any reasonable reading of the language, be interpreted as prohibiting the Bondholders from objecting to the Plan or from otherwise being heard in these cases.  Consistent with the maxim that "no action" clauses must be narrowly construed, this provision merely (i) prohibits the Bondholders from exercising or enforcing any of the rights, powers or remedies which the Collateral Agent is authorized to exercise or enforce under the Collateral Agency Agreement or the other Security Documents and (ii) prohibits the Bondholders from exercising any rights or remedies under the Financing Documents with respect to the Collateral upon the occurrence of an Event of Default.  Notably, this language does not prohibit the Bondholders from exercising rights or remedies that have not been specifically delegated to the Collateral Agent, or from exercising any rights or remedies other than with respect to the Collateral.  Finally, and perhaps most importantly, nothing in this language bars the Bondholders from objecting to the Plan or exercising any of the other fundamental creditor rights under the Bankruptcy Code.

### Section 7.10 of the Collateral Agency Agreement

Section 7.10.    Consent of Instructing Senior Creditor.  Notwithstanding anything to the contrary in any Financing Document, no Senior Creditor or Senior Creditor Representative may, except with the prior consent of the Instructing Senior Creditor (i) enforce any security interest created or evidenced by any Security Document or require the Collateral Agent to enforce any such security interest; (ii) accelerate the maturity of any Senior Indebtedness or exercise any other remedies available upon the occurrence of any Event of Default (including causing the early termination of any Permitted Swap Transaction, other than as provided in clauses (i) or (ii) of Part 1(p) of the Schedule to (a) the Series G-1 Hedging Agreement, and (b) the Series G-2 Hedging Agreement); (iii) sue for or institute any creditor's process (including an

injunction, garnishment, execution or levy, whether before or after judgment) in respect of any Senior Indebtedness (whether or not for the payment of money) owing to it under or in respect of any Financing Document (*it being understood* that the Interest Rate Hedge Counterparty shall have the rights provided to such party under Part 5(cc) of the Schedule to (a) the Series G-1 Hedging Agreement, and (b) the Series G-2 Hedging Agreement); (iv) take any step for the winding-up, administration of or dissolution of, or any insolvency proceeding in relation to, the Company or any Project Subsidiary, or for a voluntary arrangement, scheme of arrangement or other analogous step in relation to the Company or any Project Subsidiary; or (v) apply for any order for an injunction or specific performance in respect of the Company or any Project Subsidiary in relation to any of the Financing Documents.

Analysis:        This provision of the Collateral Agency Agreement is crucial to Syncora's argument because it specifically proscribes the types of actions that the Bondholders cannot take without Syncora's consent.  However, nothing in this language even remotely prevents the Bondholders from objecting to the Plan or otherwise being heard in these cases.

Clauses (i), (iii) and (v) of Section 7.10 of the Collateral Agency Agreement are plainly not relevant to this discussion because the Bondholders are not seeking to (a) enforce any security interest, (b) sue for or institute any creditor's process in respect of the Bonds, or (c) apply for any order for an injunction or specific performance in respect of the Debtors.  Clause (ii) prohibits the exercise of "any remedies available upon the occurrence of any Event of Default," but it, too, is irrelevant because the Ad Hoc Committee is not seeking to exercise any remedies that are available to the Instructing Senior Creditor or the Collateral Agent but merely to ensure that the distributions from such exercise are remitted in accordance with the terms of the Financing Documents.  Clause (iv), on the other hand, is relevant to bankruptcy but not because it prevents the Bondholders from objecting to the Plan or being heard in these cases, but because it does not do that.  What clause (iv) demonstrates is that the parties to the Financing Documents knew how to prohibit the Bondholders from taking certain bankruptcy-related actions when they actually intended to do so.  In fact, clause (iv) specifically prohibits the Bondholders from commencing a wind-down or insolvency proceeding for the Debtors ("take

any step _for_ the winding up, administration of or dissolution of, or any insolvency proceeding in

relation to" the Debtors (emphasis added), but neither this clause nor the rest of Section 7.10

contains any prohibition on the types of actions that the Bondholders can take _in_ bankruptcy.[14]

Accordingly, nothing in Section 7.10 can be interpreted as denying standing to the Ad Hoc

Committee or any individual Bondholder in these cases.  If the parties intended that only the

Instructing Senior Creditor or the Collateral Agent would have standing to be heard in a

bankruptcy case involving the Debtors, why did they not simply say so?  We submit that the

answer is because the parties did not intend to build such a restriction into the document.

     Consistent with the requirement that "no action" clauses be strictly construed, the

foregoing provisions of the Collateral Agency Agreement cannot, under any reasonable reading

of the relevant language, be interpreted as prohibiting the Bondholders from objecting to the Plan

or generally participating in these chapter 11 cases.

### Section 8.3 of the Common Agreement

   8.3 Remedies.  (a)  During the period commencing on the date of delivery to
the Collateral Agent of the notice described in Section 8.2(a) above and ending on the date of
delivery of a Cessation Notice (such period, a "Default Period"), the Instructing Senior Creditor
shall have the right to give the Collateral Agent one or more enforcement directions (each an
"Enforcement Direction") directing the Collateral Agent to take any or all of the following
actions ("Enforcement Actions") on behalf of the Senior Creditors:

    (i) declare the entire unpaid principal amount of the Senior Indebtedness
(together with all accrued and unpaid interest thereon and any other amount then due under the
Financing Documents) to be forthwith due and payable, whereupon such amounts shall become
and be forthwith due and payable, without presentment, demand, protest, or notice of any kind,
all of which are hereby expressly waived by the Company, provided that the Instructing Senior
Creditor may not give an Enforcement Direction directing that the Senior Indebtedness be
declared forthwith due and payable solely on the basis of an Event of Default under Section

---

[14]  In similar fashion, Section 7.12 of the Collateral Agency Agreement specifically addresses the
Collateral Agent's permissive authority to file a proof of claim in any bankruptcy proceeding involving
the Debtors, but nothing in this provision restricts the Bondholders' ability to appear and be heard in such
a proceeding or to file proofs of claim on their own even if the Collateral Agent has filed its own claim.

8.1(c) (or any comparable provision of the Insurance and Reimbursement Agreement or any reimbursement agreement with another Approved Monoline) until the date on which the relevant Approved Monoline has paid the relevant demand under the applicable Approved Monoline Insurance Policy;

(ii)    terminate any Permitted Swap Transactions and confirm the amount of any resulting Permitted Swap Termination Payments and, if any such Permitted Swap Termination Payment is due and payable to the Company, enforce the collection thereof from the relevant Permitted Swap Counterparties; and

(iii)    foreclose on any or all of the Collateral or proceed to enforce all remedies available to the Collateral Agent pursuant to the Financing Documents or otherwise as a matter of Law.

Analysis:    Although Syncora has argued otherwise, this provision of the Common Agreement is not relevant to the present discussion because the Ad Hoc Committee is not seeking to provide any "Enforcement Direction" to the Collateral Agent.  Furthermore, the scope of the "Enforcement Actions that" are reserved for the Instructing Senior Creditor and the Collateral Agent to pursue is specifically defined and does not include any bankruptcy-specific actions that the Bondholders could take in a chapter 11 case.  Although the language does give the Instructing Senior Creditor the right to direct the Collateral Agent "to enforce all remedies available to the Collateral Agent pursuant to the Financing Documents or otherwise as a matter of Law" (emphasis added), this provision cannot, under any reasonable interpretation of the language, be interpreted as assigning to the Collateral Agent the right of the Bondholders to appear and be heard in a bankruptcy case or to oppose the confirmation of a chapter 11 plan, since neither action constitutes a remedy that is available to the Collateral Agent.[15]

---

[15] Furthermore, Section 8.3 of the Common Agreement pertains to the types of enforcement actions that would, under ordinary circumstances, be precluded by the automatic stay rather than to post-petition actions that are not stayed, such as the filing of an objection to confirmation of a plan of reorganization.

**Section 4.2 of the Supplemental Indentures**[16]

       4.2    <u>Rights of Series G-1 Bondholders</u>.  It is acknowledged and agreed that (and each Series G-1 Bondholder, by its acceptance of a Series G-1 Bond, acknowledges and agrees that) no Series G-1 Bondholder shall have any right in any manner whatever hereunder, under the Indenture or under the Series G-1 Bonds to (i) surrender, impair, waive, affect, disturb or prejudice the Lien of the Security Documents on any property subject thereto or the rights of any other Series G-1 Bondholder, (ii) obtain or seek to obtain priority or preference over any other such Series G-1 Bondholder, or (iii) enforce any right under the Indenture, except in the manner provided herein and/or in the Indenture, the Common Agreement and the Collateral Agency Agreement and for the common benefit of all the Series G-1 Bondholders and the Senior Creditors identified in the Common Agreement and the Collateral Agency Agreement, subject in all cases to the provisions of the Indenture,  this First Supplemental Indenture, the Common Agreement and the Collateral Agency Agreement.

       <u>Analysis:</u>     Clauses (i) and (ii) are not relevant to this discussion.  The prohibitions in clause (iii) make no reference to any bankruptcy-specific actions and are expressly limited to the enforcement of "any rights under the Indenture."  The Indenture, however, makes no reference to any bankruptcy-specific rights and cannot, under any reasonable reading of the document, be interpreted as preventing the Bondholders from objecting to the Plan or from otherwise being heard in these chapter 11 cases.

**Section 5.3 of the Supplemental Indentures**

       5.3    <u>Preference Claims, Etc.</u>

       (a)    On any day that the Trustee has actual knowledge or receives notice that any amount previously paid to the Trustee or to a Series G-1 Bondholder has been subsequently recovered from the Trustee or such Series G-1 Bondholder pursuant to a final order of a court of competent jurisdiction that such payment constitutes an avoidable preference within the meaning of any applicable insolvency law to such Series G-1 Bondholder (a "Preference Claim")  the Trustee shall make a claim within one Business Day upon the Series G-1 Bond Insurance Policy for the full amount of such Preference Claim in accordance with the terms of the Series G-1 Bond Insurance Policy.  All proceeds of any such claim received by the Trustee shall be deposited in the Series G-1 Policy Payments Account and shall be applied by the Trustee to the payment of the Series G-1 Bondholders.

---

[16]  The terms of the First Supplemental Indenture and the Second Supplemental Indenture are substantially the same.  Accordingly, to avoid unnecessary duplication, the Ad Hoc Committee will only quote the relevant provisions of the First Supplemental Indenture for purposes of this discussion.

(b)      The Trustee shall promptly notify XL of either of the following as to which an Authorized Officer of the Trustee has received written notice: (i) the commencement of any Bankruptcy Event; and (ii) the making of any Preference Claim with respect to any payment of principal of or interest on the Series G-1 Bonds.  Each Series G-1 Bondholder, by its purchase of a Series G-1 Bond, and the Trustee hereby agree that, so long as an Insurer Default relating to the Series G-1 Bonds shall not have occurred and be continuing, XL may at any time during the continuation of a Bankruptcy Event direct all matters relating to such Bankruptcy Event with respect to the Series G-1 Bondholders and the Trustee, including (A) all matters relating to any Preference Claim, (B) the direction of any appeal of any order relating to any Preference Claim at the expense of XL and (C) the posting of any surety or performance bond pending any such appeal.

<u>Analysis</u>:      Syncora will undoubtedly attempt to point to this language to claim that the Bondholders agreed to delegate away all of their bankruptcy-related rights, but that is not what the language actually provides.  Clause (b) merely provides that Syncora "may" during the continuation of a bankruptcy case "direct all matters" relating to such case, but it does not prohibit the Bondholders from asserting any of the rights to which they are entitled under the Bankruptcy Code.  In other words, if the parties intended this provision to constitute a waiver of any rights available to individual Bondholders under the Bankruptcy Code, they should have expressly included such a waiver in the contract – but they did not do so.  Furthermore, this provision must be interpreted in the context of the document in which it appears as, at best, reserving for Syncora the ability to direct any collective actions that the Bondholders may be seeking to take in a bankruptcy case, but not precluding or waiving any of the fundamental rights that individual creditors are entitled to assert under the Bankruptcy Code.

It is also clear that Section 5.3(b) of the Supplemental Indentures (titled "<u>Preference Claims, Etc.</u>") is intended to apply to instances in which Syncora has reimbursed the Bondholders for amounts that were paid to them by the Debtors and ultimately avoided as preferential transfers.  It is in the limited context of such potential exposure to Syncora that its ability to "direct all matters" relating to a bankruptcy case must be construed, particularly given that the entirety of Section 5.3(b) is drafted with potential preference exposure in mind.

**Section 5.4 of the Supplemental Indentures**

5.4    Trustee Assignment of Rights

(a)    The Trustee, on behalf of the Series G-1 Bondholders, shall assign to XL, and acknowledges that XL shall be subrogated, in each case, to the fullest extent permitted by applicable Law, to all of the Trustee's and the Series G-1 Bondholders' respective right, title and interest in the Series G-2 Bonds to the extent of payments made by XL under the Series G-1 Bond Insurance Policy, including, for the avoidance of doubt, the rights of such Trustee and each Series G-1 Bondholder in the conduct of any Bankruptcy Event, including all rights of any party to an adversarial proceeding with respect to any court order issued in connection with any such Bankruptcy Event.  Such assignment shall not in any way limit any other rights of subrogation otherwise available to XL.  The Trustee shall take such action as reasonably requested by XL in connection with such assignment.

Analysis:    This provision again is significant as much for what it does not do

as for what it does do.  Although the provision refers to the rights of any party to any adversarial

proceeding in connection with a Bankruptcy Event, the right discussed is qualified by the

language which precedes it, in which Syncora's subrogation rights are limited to "the extent of

any payments made by [it] under the [relevant] Bond Insurance Policy."  Syncora has not made

any payments under the Bond Policies and this provision is therefore inapplicable.

**Section 6.1 of the Supplemental Indentures**

6.1    Control.

(a)    "Series G-1 Bond Controlling Party" means, with respect to the Series G-1 Bonds, as of any date of determination, (i) XL, unless (A) an Insurer Default (other than pursuant to clause (d) of the definition thereof) shall have occurred and be continuing, (B) the Insurer Termination Date shall have occurred or (C) XL shall have delivered to the Trustee a notice of resignation as the Series G-1 Bond Controlling Party, and (ii) otherwise, the holders of a majority in aggregate principal amount (or other applicable percentage required for any action of the Series G-1 Bondholders) of the Outstanding Series G-1 Bonds on such date.

(b)    At any time when XL is the Series G-1 Bond Controlling Party, XL shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the Series G-1 Bonds, or the exercise of any trust or power conferred on the Trustee with respect to the Series G-1 Bonds, (ii) to grant any consent or waiver under or with respect to the Indenture and/or the Series G-1 Bonds or any other Financing Document or Security Document, (iii) agree to or consent to any amendment or modification to the Indenture, this First Supplemental Indenture and/or any other Financing Document or Security Document and (iv) to direct the Trustee in writing in respect of any other action with

respect to the Series G-1 Bonds requiring the consent of the holders of the requisite percentage in aggregate principal amount of the Series G-1 Bonds; provided that (x) XL may not take any Bondholder Reserved Action with respect to the Series G-1 Bonds, (y) such action by XL shall not be in conflict with any applicable Law or the terms of the Indenture, this First Supplemental Indenture, the Common Agreement or the Collateral Agency Agreement, and (z) the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such action by XL or the Indenture.

(c)    At any time when XL is not the Series G-1 Bond Controlling Party, the holders of a majority in aggregate principal amount of the Series G-1 Bonds shall have the right to direct the time, method and place of conducting any proceeding for any remedy available to the Trustee with respect to the Series G-1 Bonds, or exercising any trust or power conferred on the Trustee with respect to the Series G-1 Bonds; provided that (i) such direction shall not be in conflict with any applicable Law or with the terms and conditions of the Indenture, this First Supplemental Indenture, Common Agreement or the Collateral Agency Agreement; and (ii) the Trustee may take any other action deemed proper by the Trustee which is not inconsistent with such direction or the Indenture.

Analysis:    This provision is similar in concept to Sections 7.03 of the

Collateral Agency Agreement and Section 8.3 of the Common Agreement in that it specifies the

types of actions that Syncora may take or direct the Collateral Agent to take with respect to the

enforcement of remedies, the giving of certain consents or waivers, or the giving of directions to

the Collateral Agent.  It does not, however, purport to restrict any rights that the individual

Bondholders are entitled to under the Bankruptcy Code.

Consistent with the requirement that "no action" clauses be strictly construed,

nothing in this provision can be construed as prohibiting the Bondholders from objecting to the

confirmation of the Plan, denying to the Bondholders the right to vote to accept or reject the

Plan, or denying them the ability to appear and be heard in these chapter 11 cases.

### Section 6.4 of the Supplemental Indentures

6.4    Sole Holder.  At any time when XL is the Series G-1 Bond Controlling Party, XL is hereby irrevocably appointed, and the Trustee and the Issuer hereby acknowledge and consent to the designation of XL, as the "sole holder" (as such term is used in the Common Agreement) of the Series G-1 Bonds and as the sole representative of the Series G-1 Bondholders (acting as "Series G-1 Bondholders" or "Senior Creditors") for all purposes hereunder and under each other Transaction Document.  By its acceptance of a Series G-1 Bond, each Series G-1 Bondholder hereby irrevocably consents and agrees to (and the successive Series

26

G-1 Bondholders, by taking and holding one or more of the Series G-1 Bonds, shall be conclusively deemed to irrevocably consent and agree to) such appointment of XL as the "sole holder" and representative of the Series G-1 Bondholders at any time when XL is the Series G-1 Bond Controlling Party.

Analysis:    This is another provision on which Syncora will undoubtedly attempt to rely, but like Section 5.3 of the Supplemental Indentures it cannot, under any reasonable reading of the language, be interpreted as prohibiting the Bondholders from objecting to a plan of reorganization or asserting any other fundamental rights under the Bankruptcy Code.

As a preliminary matter, the designation of Syncora as the "'sole holder' (as such term is used in the Common Agreement)" pursuant to this provision is meaningless because the term "sole holder" is not used anywhere in the Common Agreement.

Second, the appointment of Syncora as the "sole representative" of Bondholders for all purposes of the Financing Documents is insufficient, by itself, to deprive the Bondholders of their right to object to confirmation of the Plan or any other fundamental bankruptcy rights. For the reasons discussed above, "no action" clauses cannot be interpreted as waiving fundamental bankruptcy rights in the absence of express contractual language to that effect, and nothing in this provision indicates that Syncora's undefined role as the "sole representative" is intended to deprive the Bondholders of their right to appear and be heard in a bankruptcy case.

Furthermore, the designation of Syncora as the "sole holder" and "sole representative" is expressly limited by the language that reads "for all purposes hereunder and under each other Transaction Document" but does not say "under the Bankruptcy Code" or "in connection with any bankruptcy case of the Company."  In other words, the "for all purposes" language is expressly limiting language that precludes an expansive reading of the terms "sole holder" and "sole representative" beyond the powers that are explicitly assigned to Syncora under the terms of the Supplemental Indentures and the other Financing Documents.

**Section 6.5 of the Supplemental Indentures**

6.5    Power of Attorney.  The Trustee shall appoint XL as agent and attorney-in-fact for the Trustee and the Series G-1 Bondholders in any legal proceeding with respect to the Series G-1 Bonds in connection with and to the extent of any payments made by XL under the Series G-1 Bond Insurance Policy.  The Trustee acknowledges that, at any time when XL is the Series G-1 Bond Controlling Party, XL shall direct all matters relating to the enforcement of the Trustee's and the Series G-1 Bondholders' rights and remedies with respect to the Series G-1 Bonds pursuant to the terms hereof, Article VIII of the Indenture, the Common Agreement or otherwise, and the rights and remedies of the Trustee or any Series G-1 Bondholder against any debtor with respect to a Preference Claim or other claim in connection with and to the extent of any payments made by XL under the Series G-1 Bond Insurance Policy which is being asserted under any applicable insolvency law, provided that in no event may XL expose the Trustee to any personal liability with respect to which the Trustee has not been indemnified pursuant to the indemnity referred to in Article IX of the Indenture.

Analysis:    Like the earlier provisions in Section 5.4 of the Supplemental

Indentures, this provision clearly demonstrates the basic flaws in Syncora's argument.  First, it

shows that the appointment of Syncora as "agent and attorney-in-fact" for the Bondholders is

expressly limited to "any legal proceeding with respect to" the Bonds "in connection with and to

the extent of any payments made by [Syncora] under the [Bond Policies]" (emphasis added).

Because Syncora has not made any payments under the Bond Policies and is not seeking to

enforce its rights and remedies in connection with and to the extent of such payments, Syncora is

not authorized to act as the agent and attorney-in-fact for the Bondholders in these cases.

Similarly, the authority conferred on Syncora in the second sentence (which

provides that Syncora "shall direct {…} the rights and remedies of the Trustee or any

[Bondholder] against any debtor with respect to a Preference Claim or other claim {…}") is

expressly limited to any rights or remedies "in connection with and to the extent of any payments

made by [Syncora] under the [Bond Policies] which is being asserted under any applicable

insolvency law { …}."  In other words, the only time the parties to the Financing Documents

agreed to allow Syncora to direct the rights and remedies of the Bondholders against a debtor,

they expressly limited such delegation to situations where Syncora has actually made a payment

under the Bond Policies and is pursuing the debtor in connection with such payments. Because Syncora has not made any payment under the Bond Policies, this provision cannot be interpreted as delegating to Syncora any rights at all under the facts of this matter, let alone any of the Bondholders' fundamental rights under the Bankruptcy Code.

More importantly, this provision conclusively shows that the Financing Documents do not grant to Syncora even a modicum of authority, much less sole authority, to assert any of the Bondholders' fundamental rights under the Bankruptcy Code. If the parties actually intended to make Syncora the agent and attorney-in-fact for the Bondholders for any and all purposes in a bankruptcy proceeding, they could easily have done so. Had they done so, this limited provision, which merely grants to Syncora limited control with respect to payments it has actually made on behalf of the Bondholders, would be superfluous – but they clearly did not do so. As a result, Syncora's arguments must fail. Furthermore, even if Syncora had made a payment under the Bond Policies, the language of this provision is neither broad enough nor express enough to be read as depriving the Bondholders of their fundamental bankruptcy rights.

The Ad Hoc Committee also notes that Section 9.13 of the Common Agreement expressly prevents Syncora from taking any Senior Creditor Reserved Action without the consent of each Senior Creditor affected thereby.[17] The defined term "Senior Creditor Reserved Action" includes the defined term "Bondholder Reserved Action" which, under Section 1002 of the Indenture, is defined to include "any reduction in the principal amount of, or a change in the

---

[17] Section 9.4 of the Common Agreement provides that "[i]n case of any conflict or inconsistency between this Agreement and any other Financing Document or (with respect to the rights and obligations of the parties prior to enforcement and the conditions and terms on which security interests may be enforced) any Security Document, this Agreement shall control." Accordingly, the limitation on the rights of the Instructing Senior Creditor under Section 9.13 of the Common Agreement "shall control" in the case of any inconsistency with any of the other terms of the Financing Documents.

fixed maturity of, any Bonds {…}" Because the Plan, if confirmed, would result in the

discharge of 100% of the principal amount of the Bonds without the Bondholders' consent,

Syncora is not authorized to consent to the Plan on behalf of the Bondholders.

Syncora may argue that the limitation on Syncora's ability to unilaterally consent

to any "Bondholder Reserved Action" should only apply in the context of a supplemental

indenture and therefore does not prevent Syncora from implementing "Bondholder Reserved

Actions" pursuant to a plan of reorganization, but this argument would be pure sophistry. If

Syncora is not authorized to consent to any reduction in the principal of the Bonds pursuant to a

supplemental indenture, then it similarly is not authorized to consent to any reduction in the

principal of the Bonds pursuant to a "consensual" plan of reorganization which it negotiated and

essentially entered into with the Debtors by executing the RPSA. To the extent there is any

potential ambiguity on this point, it must be construed against allowing Syncora to unilaterally

enter into transactions that would result in wholesale elimination of the Bond principal.

For this additional reason, it is evident that nothing in the Financing Documents

prevents the Bondholders from opposing the confirmation of the Plan or asserting any of their

other fundamental bankruptcy rights in these chapter 11 cases. The contractual provisions

discussed above are, at best, ambiguous and do not expressly prohibit any of the actions the Ad

Hoc Committee has taken to date (or may take) in these cases. Accordingly, such contractual

provisions cannot form the basis for denying the Ad Hoc Committee standing to be heard on all

issues in these cases. See Globo Comunicacoes E Participacoes, S.A., 317 B.R. at 249.

(e)    **The Ad Hoc Committee's Participation in These
Cases is Required to Avoid an Inequitable Outcome**

The members of the Ad Hoc Committee are a significant creditor constituency in

these cases, with $162.5 million of direct claims against the Debtors. Syncora, however,

believes that the Ad Hoc Committee should be denied standing to be heard on any issues in these

cases regardless of how egregiously the Plan may deviate from the terms of the Financing

Documents or applicable law.  Taken to its logical conclusion, Syncora's argument would mean

that the Ad Hoc Committee should not be allowed to challenge: (i) the treatment of the Swap

Policies Claim as senior in priority to the Bondholder Claims under the Plan, even though (a)

such treatment appears to conflict with several key provisions in the Financing Documents,[18] and

(b) to the extent that the proposed treatment is consistent with the provisions of the Financing

Documents, the necessary predicates for such treatment were orchestrated by Syncora with the

intent of disadvantaging the Bondholders; (ii) the going concern valuation of the Debtors that

shows the Bondholder Claims as being out of the money (assuming that the entirety of the Swap

Policies Claim is, indeed, senior to the Bondholder Claims); and (iii) the scope of the third-party

release, exculpation and injunction provisions under the Plan.  In other words, Syncora's position

is that the Bondholders should be forced to remain quiet while this Court considers the terms of a

Plan that directly impairs their rights, irrespective of the propriety of such Plan.

As discussed above, Syncora's position is incorrect under the plain language of

the Financing Documents.  However, even if the Court determines that certain provisions in the

Financing Documents indirectly delegate to Syncora certain of the rights to which the

Bondholders are entitled under the Bankruptcy Code, it should allow the Bondholders to assert

their objections to confirmation of the Plan in order to avoid an inequitable outcome.

Courts have refused to enforce the terms of subordination agreements, other than

terms affecting the priority of distributions, that are inconsistent with the provisions of the

---

[18] Indeed, by this flawed logic, if the Debtors were worth $1 billion Syncora could still seek to keep 100% of the distributable value on account of the Swap Policies Claim and leave nothing to the Bondholders.

Bankruptcy Code.  See In re SW Boston Hotel Venture, LLC, 460 B.R. 38, 51-52 (Bankr. D.

Mass. 2011), rev'd on other grounds, 2012 WL 4152869 (1st Cir. B.A.P. Oct. 1, 2012) (finding

the assignment of voting rights in a subordination agreement to be unenforceable and stating that

"[t]o the extent a provision in a subordination agreement purports to alter substantive rights

under the Bankruptcy Code, it is invalid."); Beatrice Foods Co., v. Hart Ski Mfg. Co. (In re Hart

Ski Mfg. Co.), 5 B.R. 734, 734 (Bankr. D. Minn. 1980) ("The Bankruptcy Code guarantees each

secured creditor certain rights, regardless of subordination.  These rights include the right to

assert and provide its claim…the right to participate in the voting for confirmation or rejection of

any plan or reorganization, [and] the right to object to confirmation…The above rights and

others not related to contract priority of distributions pursuant to Section 510(a) cannot be

affected by the actions of the parties prior to the commencement of a bankruptcy case when such

rights did not even exist.  To hold that, as a result of a subordination agreement, the "subordinor"

gives up all its rights to the "subordinee" would be totally inequitable."); Bank of Am., N.A. v.

N. LaSalle St. Ltd. P'Ship (In re 203 N. LaSalle St. P'ship), 246 B.R. 325, 331 (Bankr. N.D. Ill.

2000) (refusing to enforce a subordinated creditor's transfer of its right to vote on a plan of

reorganization despite provisions to that effect in a subordination agreement, stating that "[i]t is

generally understood that pre-bankruptcy agreements do not override contrary provisions of the

Bankruptcy Code" and noting that subordination should only affect the order of priority of

payment of claims in bankruptcy).  Similarly, if this Court finds that certain provisions in the

Financing Documents constitute an indirect waiver of bankruptcy rights, it should refuse to

enforce such waivers as a matter of equity (and public policy) and allow the Bondholders to

conduct discovery and oppose the confirmation of the Plan.  Absent active participation in these

cases by the Ad Hoc Committee, even if the Debtors put on a fulsome affirmative case at the

Confirmation Hearing, there will be no party to discover facts in advance of the hearing, point

out any legal deficiencies or inconsistencies between the Plan and the terms of the Financing

Documents, and cross examine the Debtors' witnesses.  In other words, no party would be

present to protect the Bondholders' rights.  To avoid this perverse result, the Ad Hoc Committee

should be allowed to pursue its objections to confirmation of the Plan.

> **(f)      The Underlying Purpose of "No Action" Clauses Would Not Be
> Disturbed by the Ad Hoc Committee's Participation in These Cases**

Furthermore, the underlying purpose of "no action clauses" is not implicated in

this case, where the Ad Hoc Committee is seeking to raise its concerns over a plan of

reorganization that has already been proposed.  The main purpose of a "no action" clause is to

prevent individual creditors from bringing independent actions that are not in the collective's

economic interest.  See  Kurak v. Dura Auto. Sys. Inc. (In re Dura Auto. Sys. Inc.), 379 B.R.

257, 263 (Bankr. D. Del. 2007) (the purpose of a "no action" clause is "to deter individual

debentures from bringing independent law suits for unworthy or unjustifiable reasons, causing

expense to the Company and diminishing its assets").[19]  In Dura, the bankruptcy court declined

to dismiss an adversary proceeding which the indenture trustee argued was commenced in

violation of a no action clause after determining that the main purpose of the no action clause did

not apply once a bankruptcy case was already pending and would not be furthered by dismissing

the adversary proceeding without considering the parties' arguments on the merits.  See 379 B.R.

---

[19]  See also Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc., 837 F.Supp.2d 162, 184
(S.D.N.Y. 2011) (the purpose of the no-action clause in the agreement was protecting the securitization
structure "from the expense of litigating an action brought by a small group of certificate holders that
most investors would consider not to be in their collective economic interest."); Feldbaum v. McCrory
Corp., 1992 Del. Ch. LEXIS 113 (Del. Ch. Ct. June 1, 1992) ("The primary purpose of a no-action clause
is thus to protect issuers from the expense involved in defending lawsuits that are either frivolous or
otherwise not in the economic interest of the corporation or its creditors.").

at 264 ("The no-action clause's main purpose – to prevent the expense of unwarranted litigation – is not applicable to this adversary proceeding.").  As in <u>Dura</u>, the Ad Hoc Committee's actions to date in these cases – its limited objection to the Cash Collateral Order and preliminary objection to confirmation of the Plan – do not implicate the underlying purpose of a "no action" clause and merely assert fundamental bankruptcy rights in cases that are already pending.

Moreover, this is not a case where permitting the Ad Hoc Committee to be heard would open the floodgates for multiple individual lawsuits seeking to advance conflicting interests.  <u>See</u>, <u>e.g.</u>, <u>Innkeepers USA Trust</u>, 448 B.R. at 144 (stating that granting certificateholders standing to object to approval of a stalking horse bidder would "encourage and embolden" other certificateholders to hire their own counsel to advance their individual and conflicting pecuniary interests in the case).  To the contrary, the members of the Ad Hoc Committee hold the majority in principal amount of the Bonds that are not held by Syncora, and the deadline for filing objections to confirmation of the Plan has already passed.  Accordingly, there can be no legitimate concern that allowing the Ad Hoc Committee to be heard would expose the Debtors to multiple actions by parties seeking to advance their conflicting interests.

III.   **IN THE ALTERNATIVE, THE AD HOC COMMITTEE SHOULD BE PERMITTED TO INTERVENE IN THE PLAN CONFIRMATION PROCEEDINGS PURSUANT TO BANKRUPTCY RULE 2018**

In the event that the Court finds that the Ad Hoc Committee does not have standing to be heard in these chapter 11 cases as a "party in interest" under section 1109(b) of the Bankruptcy Code, the Ad Hoc Committee requests permission to intervene in these cases pursuant to Rule 2018 of the Federal Rules of Bankruptcy Procedures (the "<u>Bankruptcy Rules</u>").  Bankruptcy Rule 2018 provides that, in a bankruptcy case, "after hearing on such notice as the court directs and for cause shown, the court may permit any interested entity to intervene generally or with respect to any specified matter."  Fed. R. Bankr. P. 2018.  Bankruptcy Rule

34

2018 "authorizes a very broad and elastic interpretation" as to the parties entitled to intervenor

status, and the Ad Hoc Committee should, at a minimum, be afforded the right to participate in

these cases in such capacity.   In re Public Serv. Co. of New Hampshire, 88 B.R. 546, 554 (Bankr.

D.N.H. 1988) (granting consumer advocate group and industry association right to intervene

under Bankruptcy Rule 2018 with respect to certain matters in the bankruptcy case).

   This Court has acknowledged that "for cause shown" includes situations where a

party has an economic or similar interest in the case.   Ionosphere, 101 B.R. at 853.   In

determining whether to grant a party intervenor status, courts will consider (i) whether the

intervenor has an economic or similar interest in the matter, (ii) whether the intervenor's interests

are already adequately represented, (iii) whether intervention would result in undue delay or

prejudice to the original parties, and (iv) whether the denial of the intervenor's request would

adversely affect its interests.   See In re First Interregional Equity Corp., 218 B.R. 731, 736

(Bankr. D.N.J. 1997) (holding that chapter 11 trustee and unsecured creditors' committee of

former subsidiary of registered broker-deal could intervene in the liquidation of the broker-dealer

under the Security Investors Protection Act pursuant to Bankruptcy Rule 2018); see also So.

Boulevard, Inc. v. Martin Paint Stores (In re Martin Paint Stores), 207 B.R. 57, 62 (S.D.N.Y.

1997) (setting forth considerations for granting intervention but ultimately denying intervention

after determining that interests of the debtor's co-tenant were adequately represented by the

landlord).   In this case, for the reasons discussed below, the Ad Hoc Committee clearly satisfies

the standards for permissive intervention under Bankruptcy Rule 2018.

   First, the members of the Ad Hoc Committee have a material economic interest in

these cases by virtue of their direct claims against the Debtors, but would receive no recovery

under the Plan.   In addition, in light of the arguments that Syncora has made it is obvious that the

interests of the Bondholders are not being adequately represented in these cases.  Indeed, all of Syncora's actions thus far have been taken for the sole benefit of Syncora as the Swap Counterparty and to the detriment of the Bondholders.  To make matters worse, Syncora is attempting to use its position as the purported representative of the Bondholders to secure a release under the Plan from any claims that the Bondholders may bring against it.  Thus, without the opportunity to participate in these cases, the Bondholders would be irreparably harmed.

Furthermore, permitting the Ad Hoc Committee to intervene in these chapter 11 cases would not result in undue delay or prejudice to the Debtors or other parties in interest.  The Ad Hoc Committee is not seeking to unduly delay the Debtors' bankruptcy cases.  To the contrary, the Ad Hoc Committee is merely seeking to adjourn the Confirmation Hearing for a limited period of time in order to conduct discovery necessary for a full and fair assessment of whether the Plan can be confirmed.  Accordingly, the Court should allow the Ad Hoc Committee to intervene to if it does not have standing under section 1109(b).  Ionosphere, 101 B.R. at 854.[20]

## CONCLUSION

For all of the reasons set forth herein, the Court should conclude that the Ad Hoc Committee has standing to appear and be heard on all issues in these chapter 11 cases.

---

[20]  Although the Court did not permit a consumers organization to intervene in Ionosphere, the facts of that case are easily distinguishable.  In Ionosphere, the estate was "hemorrhaging at a rapid rate" and the Court found that "time is of the essence" to successfully rehabilitate the company.  101 B.R. at 854.  In contrast, the Debtors in this case are accruing cash throughout the bankruptcy case (even after paying for restructuring costs) and the near-term value of their operations is stable.  Accordingly, there are no exigent circumstances requiring a fast-track confirmation process in this case.  Further, the Court determined that the interests the consumer organization sought to represent in Ionosphere were adequately represented through an examiner, an unsecured creditors committee, and the individual ticket holders that the consumer organization wanted to represent.  Id. at 853, 855.  That is not the case in this proceeding.

Dated: August 26, 2013
New York, NY

SIDLEY AUSTIN LLP

    /s/ Bojan Guzina            .
One South Dearborn Street
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile:  (312) 853-7036
Larry J. Nyhan
Bojan Guzina
Andrew F. O'Neill
Allison Ross Stromberg

- and -

SIDLEY AUSTIN LLP
Nicholas K. Lagemann
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 839-5300
Facsimile:  (212) 839-5599

*Counsel for the Ad Hoc Committee of Bondholders*

CH1 7984505v.4